# Exhibit C

**EXECUTION COPY**

FINISAR CORPORATION

2½% Convertible Senior Subordinated Notes

due 2010

---

INDENTURE

Dated as of October 12, 2006

U.S. BANK TRUST NATIONAL ASSOCIATION,

TRUSTEE

---

## Table of Contents

Page

ARTICLE 1
DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.01    Definitions..................................................................................... 1
SECTION 1.02    Other Definitions ......................................................................... 12
SECTION 1.03    Incorporation by Reference of Trust Indenture Act.................. 13
SECTION 1.04    Rules of Construction .................................................................. 13
SECTION 1.05    Acts of Holders ............................................................................ 13

ARTICLE 2
THE NOTES

SECTION 2.01    Form and Dating .......................................................................... 14
SECTION 2.02    Execution and Authentication..................................................... 16
SECTION 2.03    Registrar, Paying Agent and Conversion Agent........................ 17
SECTION 2.04    Paying Agent to Hold Money and Notes in Trust...................... 17
SECTION 2.05    Noteholder Lists........................................................................... 17
SECTION 2.06    Transfer and Exchange ............................................................... 18
SECTION 2.07    Replacement Notes ...................................................................... 19
SECTION 2.08    Outstanding Notes; Determinations of Holders' Action............ 20
SECTION 2.09    Temporary Notes ......................................................................... 20
SECTION 2.10    Cancellation ................................................................................. 21
SECTION 2.11    Persons Deemed Owners ............................................................. 21
SECTION 2.12    Global Notes ................................................................................ 21
SECTION 2.13    CUSIP Numbers........................................................................... 26
SECTION 2.14    Defaulted Interest........................................................................ 26
SECTION 2.15    Registration Default..................................................................... 26

ARTICLE 3
REDEMPTION AND REPURCHASES

SECTION 3.01    Provisional Redemption............................................................... 27
SECTION 3.02    Notice of Trustee.......................................................................... 27
SECTION 3.03    Selection of Notes to be Redeemed ............................................ 27
SECTION 3.04    Notice of Redemption.................................................................. 28
SECTION 3.05    Effect of Notice of Redemption................................................... 28
SECTION 3.06    Deposit of Provisional Redemption Price.................................. 29
SECTION 3.07    Notes Redeemed in Part.............................................................. 29
SECTION 3.08    Conversion Arrangement on Call for Redemption .................... 29
SECTION 3.09    Reserved....................................................................................... 30
SECTION 3.10    Repurchase of Notes at Option of the Holder upon Change in
                Control. ........................................................................................ 30
SECTION 3.11    Effect of Change in Control Repurchase Notice........................ 37

Table of Contents
(continued)

Page

SECTION 3.12    Deposit of Change in Control Repurchase Price ...................................... 38
SECTION 3.13    Notes Repurchased in Part ...................................................................... 38
SECTION 3.14    Covenant to Comply with Securities Laws upon Purchase or
                Repurchase of Notes ............................................................................... 38
SECTION 3.15    Repayment to the Company ...................................................................... 39

ARTICLE 4
COVENANTS

SECTION 4.01    Payment of Principal and Interest on the Notes ...................................... 39
SECTION 4.02    Commission and Other Reports ................................................................ 39
SECTION 4.03    Compliance Certificate ............................................................................ 40
SECTION 4.04    Further Instruments and Acts ................................................................... 40
SECTION 4.05    Maintenance of Office or Agency ............................................................ 40
SECTION 4.06    Delivery of Certain Information .............................................................. 40

ARTICLE 5
SUCCESSOR CORPORATION

SECTION 5.01    When Company May Merge or Transfer Assets ...................................... 41

ARTICLE 6
DEFAULTS AND REMEDIES

SECTION 6.01    Events of Default .................................................................................... 42
SECTION 6.02    Acceleration ............................................................................................ 43
SECTION 6.03    Other Remedies ...................................................................................... 44
SECTION 6.04    Waiver of Past Defaults .......................................................................... 44
SECTION 6.05    Control by Majority ................................................................................ 44
SECTION 6.06    Limitation on Suits ................................................................................. 45
SECTION 6.07    Rights of Holders to Receive Payment .................................................... 45
SECTION 6.08    Collection Suit by Trustee ...................................................................... 45
SECTION 6.09    Trustee May File Proofs of Claim ........................................................... 45
SECTION 6.10    Priorities ................................................................................................. 46
SECTION 6.11    Undertaking for Costs ............................................................................. 46
SECTION 6.12    Waiver of Stay, Extension or Usury Laws ............................................... 47

ARTICLE 7
TRUSTEE

SECTION 7.01    Duties and Responsibilities of the Trustee; During Default; Prior to
                Default ..................................................................................................... 47
SECTION 7.02    Certain Rights of the Trustee .................................................................. 48

Table of Contents
(continued)

Page

SECTION 7.03    Trustee Not Responsible for Recitals, Disposition of Notes or
                Application of Proceeds Thereof ............................................... 49
SECTION 7.04    Trustee and Agents May Hold Notes; Collections, etc. .......................... 49
SECTION 7.05    Moneys Held by Trustee ....................................................... 49
SECTION 7.06    Compensation and Indemnification of Trustee and Its Prior Claim ................ 50
SECTION 7.07    Right of Trustee to Rely on Officers' Certificate, etc. ....................... 50
SECTION 7.08    Conflicting Interests ......................................................... 50
SECTION 7.09    Persons Eligible for Appointment as Trustee ................................... 50
SECTION 7.10    Resignation and Removal; Appointment of Successor Trustee ..................... 51
SECTION 7.11    Acceptance of Appointment by Successor Trustee ................................ 52
SECTION 7.12    Merger, Conversion, Consolidation or Succession to Business of
                Trustee ....................................................................... 52
SECTION 7.13    Preferential Collection of Claims Against the Company ......................... 53
SECTION 7.14    Reports by the Trustee ........................................................ 53
SECTION 7.15    Trustee to Give Notice of Default, But May Withhold in Certain
                Circumstances ................................................................. 53

ARTICLE 8
DISCHARGE OF INDENTURE

SECTION 8.01    Discharge of Liability on Notes ............................................... 53
SECTION 8.02    Repayment of the Company ...................................................... 54

ARTICLE 9
AMENDMENTS

SECTION 9.01    Without Consent of Holders .................................................... 54
SECTION 9.02    With Consent of Holders ....................................................... 55
SECTION 9.03    Compliance with Trust Indenture Act ........................................... 56
SECTION 9.04    Revocation and Effect of Consents, Waivers and Actions ........................ 56
SECTION 9.05    Notation on or Exchange of Notes .............................................. 56
SECTION 9.06    Trustee to Sign Supplemental Indentures ....................................... 56
SECTION 9.07    Effect of Supplemental Indentures ............................................. 56

ARTICLE 10
CONVERSION

SECTION 10.01   Conversion Right and Conversion Price ......................................... 56
SECTION 10.02   Exercise of Conversion Right .................................................. 60
SECTION 10.03   Fractions of Shares ........................................................... 61
SECTION 10.04   Adjustment of Conversion Price ................................................ 61
SECTION 10.05   Notice of Adjustments of Conversion Price ..................................... 69
SECTION 10.06   Notice Prior to Certain Actions ............................................... 70
SECTION 10.07   Company to Reserve Common Stock ............................................... 71

iii

Table of Contents
(continued)

Page

SECTION 10.08    Taxes on Conversions ............................................................ 71
SECTION 10.09    Covenant as to Common Stock ................................................ 71
SECTION 10.10    Cancellation of Converted Notes ........................................... 71
SECTION 10.11    Effect of Reclassification, Consolidation, Merger or Sale ..................... 71
SECTION 10.12    Adjustment for Other Distributions ........................................ 72
SECTION 10.13    Responsibility of Trustee for Conversion Provisions .......................... 73
SECTION 10.14    Payment of Cash in Lieu of Common Stock ........................... 74

ARTICLE 11
SUBORDINATION

SECTION 11.01    Agreement to Subordinate .................................................... 74
SECTION 11.02    Liquidation; Dissolution; Bankruptcy ...................................... 74
SECTION 11.03    Default on Designated Senior Indebtedness ............................. 75
SECTION 11.04    Acceleration of Notes ........................................................ 76
SECTION 11.05    When Distribution Must Be Paid Over ................................... 76
SECTION 11.06    Notice by the Company ...................................................... 77
SECTION 11.07    Subrogation .................................................................... 77
SECTION 11.08    Relative Rights ............................................................... 77
SECTION 11.09    Subordination May Not Be Impaired by the Company ................ 77
SECTION 11.10    Distribution or Notice to Representative ................................. 78
SECTION 11.11    Rights of Trustee and Paying Agent ..................................... 78

ARTICLE 12
RESERVED

ARTICLE 13
MISCELLANEOUS

SECTION 13.01    Trust Indenture Act Controls .............................................. 78
SECTION 13.02    Notices ......................................................................... 78
SECTION 13.03    Communication by Holders with Other Holders ....................... 79
SECTION 13.04    Certificate and Opinion as to Conditions Precedent ................. 79
SECTION 13.05    Statements Required in Certificate or Opinion ....................... 80
SECTION 13.06    Separability Clause .......................................................... 80
SECTION 13.07    Rules by Trustee, Paying Agent, Conversion Agent and Registrar ......... 80
SECTION 13.08    Legal Holidays ............................................................... 80
SECTION 13.09    GOVERNING LAW ........................................................ 80
SECTION 13.10    No Recourse Against Others .............................................. 80
SECTION 13.11    Successors ..................................................................... 81
SECTION 13.12    Multiple Originals ........................................................... 81

iv

## Table of Contents
(continued)

Page

EXHIBITS
Exhibit A-1    Form of Face of Global Note
Exhibit A-2    Form of Certificated Note
Exhibit B-1    Transfer Certificate
Exhibit C      Form of Notice of Holder to Elect Repurchase upon a Change in Control
Exhibit D      Form of Accredited Investor Representation Letter

# CROSS-REFERENCE TABLE[*]

| TIA Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.09 |
| (a)(2) | 7.09 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.09 |
| (b) | 7.08; 7.09; 7.10;7.11 |
| (c) | N.A. |
| 311(a) | 7.13 |
| (b) | 7.13 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 13.03 |
| (c) | 13.03 |
| 313(a) | 7.14 |
| (b)(1) | 7.14 |
| (b)(2) | 7.14 |
| (c) | 13.02 |
| (d) | 7.14 |
| 314(a) | 4.02; 4.03; 13.02 |
| (b) | 12.01(e) |
| (c)(1) | 13.04 |
| (c)(2) | 13.04 |
| (c)(3) | N.A. |
| (d) | 12.01(d) |
| (e) | 13.05 |
| (f) | N.A. |
| 315(a) | 7.01 |
| (b) | 7.15; 13.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a) (last sentence) | 2.08 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | 13.01 |

N. A. means Not Applicable

Note: This Cross-Reference Table shall not, for any purpose, be deemed to be part of the Indenture.

INDENTURE, dated as of October 12, 2006, between FINISAR CORPORATION, a Delaware corporation (the "Company"), and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as Trustee hereunder (the "Trustee").

## RECITALS OF THE COMPANY

The Company has duly authorized the creation of an issue of its 2½% Convertible Senior Subordinated Notes due 2010 (herein called the "Notes") of substantially the tenor and amount hereinafter set forth, and to provide therefor the Company has duly authorized the execution and delivery of this Indenture.

All things necessary to make the Notes, when the Notes are executed by the Company and authenticated and delivered hereunder, the valid obligations of the Company, and to make this Indenture a valid agreement of the Company, in accordance with their and its terms, have been done. Further, all things necessary to duly authorize the issuance of the Common Stock of the Company issuable upon the conversion of the Notes, and to duly reserve for issuance the number of shares of Common Stock issuable upon such conversion, have been done.

This Indenture is subject to, and shall be governed by, the provisions of the Trust Indenture Act of 1939, as amended, that are required to be a part of and to govern indentures qualified under the Trust Indenture Act of 1939, as amended.

## NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders of the Notes, as follows:

## ARTICLE 1

## DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.01    Definitions.  For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(1)    the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(2)    all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP; and

(3)    the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision.

1

"<u>Affiliate</u>" of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For purposes of this definition, "control" when used with respect to any specified person means the power to direct or cause the direction of the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"<u>Applicable Procedures</u>" means, with respect to any transfer or transaction involving a Global Note or beneficial interest therein, the rules and procedures of the Depositary for such Note, in each case to the extent applicable to such transaction and as in effect from time to time.

"<u>Board of Directors</u>" means either the board of directors of the Company or any duly authorized committee of such board.

"<u>Board Resolution</u>" means a resolution duly adopted by the Board of Directors, a copy of which, certified by the Secretary or an Assistant Secretary of the Company to be in full force and effect on the date of such certification, shall have been delivered to the Trustee.

"<u>Business Day</u>" means each day of the year other than a Saturday or a Sunday on which banking institutions are not required or authorized to close in the City of New York or the city in which the principal corporate trust office of the Trustee is located.

"<u>Capital Stock</u>" of any corporation means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that corporation.

"<u>Certificated Notes</u>" means Notes that are in the form of the Notes attached hereto as Exhibit A-2.

"<u>Change in Control Effective Date</u>" means the date on which any Change in Control becomes effective.

"<u>Closing Price</u>" of any security on any date of determination means:

(1)    the closing sale price (or, if no closing sale price is reported, the last reported sale price) of such security on the New York Stock Exchange on such date;

(2)    if such security is not listed for trading on the New York Stock Exchange or the NASDAQ Stock Market on any such date, the closing sale price as reported in the composite transactions for the principal U.S. securities exchange on which such security is so listed;

(3)    if such security is not so reported, the last quoted bid price for such security in the over-the-counter market as reported by the National Quotation Bureau or similar organization; or

2

(4)    if such bid price is not available, the average of the mid-point of the last bid and ask prices of such security on such date from at least three nationally recognized independent investment banking firms retained for this purpose by the Company.

"Commission" means the Securities and Exchange Commission.

"Common Stock" means the Common Stock, par value $0.001 per share, of the Company authorized at the date of this instrument as originally executed.  Subject to the provisions of Section 10.11, shares issuable on conversion or repurchase of Notes shall include only shares of Common Stock or shares of any class or classes of common stock resulting from any reclassification or reclassifications thereof; provided, however, that if at any time there shall be more than one such resulting class, the shares so issuable on conversion of Notes shall include shares of all such classes, and the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

"common stock" means any stock of any class of capital stock which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the issuer.

"Company" means the party named as the "Company" in the first paragraph of this Indenture until a successor replaces it pursuant to the applicable provisions of this Indenture, and, thereafter, "Company" shall mean such successor.  The foregoing sentence shall likewise apply to any subsequent such successor or successors.

"Company Request" or "Company Order" means a written request or order signed in the name of the Company by any Officer.

"Conversion Agent" means any person authorized by the Company to convert Notes in accordance with Article 10 hereof.

"Conversion Rate" means the rate at which shares of Common Stock shall be delivered upon conversion, which rate shall be initially 304.9055 shares of Common Stock for each $1,000 principal amount of Notes, as adjusted from time to time pursuant to the provisions of this Indenture.

"Conversion Reference Period" means:

(1)    for Notes that are converted after the Company has delivered a notice of Provisional Redemption to the Trustee, the twenty consecutive Trading Days beginning on the third Trading Day following the Provisional Redemption Date (in the case of Notes being converted that were previously called for redemption, including a partial redemption, this will only apply to those Notes that are subject to such redemption);

(2)    for Notes that are converted during the 60 days prior to the Stated Maturity, the twenty consecutive Trading Days beginning on the third Trading Day following the Stated Maturity; and

(3)    in all other instances, the twenty consecutive Trading Days beginning on the third Trading Day following the conversion date.

"Conversion Value" means, for each $1,000 principal amount of Notes, the average of the Daily Conversion Values for each of the twenty consecutive Trading Days of the Conversion Reference Period.

"Convertible Subordinated Notes" means the Company's 5¼% Convertible Subordinated Notes due 2008 issued pursuant to that certain indenture dated as of October 15, 2001 and the 2½% Convertible Subordinated Notes due 2010 issued pursuant to that certain indenture dated as of October 15, 2003.

"Corporate Trust Office" means the principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 100 Wall Street, 16th Floor, New York, New York, 10005, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as a successor Trustee may designate from time to time by notice to the Holders and the Company).

"Daily Conversion Value" means, with respect to any Trading Day, the product of (1) the applicable Conversion Rate and (2) the Volume Weighted Average Price on such Trading Day.

"Daily Share Amount" means, for each Trading Day of the Conversion Reference Period and for each $1,000 principal amount of Notes surrendered for conversion, a number of shares (but in no event less than zero) equal to (i) the amount of (a) the Volume Weighted Average Price for such Trading Day multiplied by the applicable Conversion Rate, less (b) $1,000; divided by (ii) the Volume Weighted Average Price for such Trading Day multiplied by 20.

"Default" means, when used with respect to the Notes, any event which is, or after notice or passage of time or both would be, an Event of Default.

"Designated Senior Indebtedness" means the Company's obligations under any particular Senior Indebtedness that expressly provides that such Senior Indebtedness shall be "Designated Senior Indebtedness" for purposes of this Indenture.

"Dollar" or "U.S.$" means a dollar or other equivalent unit in such coin or currency of the United States as at the time shall be legal tender for the payment of public and private debts.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Global Notes" means Notes that are in the form of the Notes attached hereto as Exhibit A-1.

4

"Guarantee" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, contingent or otherwise, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness.

"Holder" or "Noteholder" means a person in whose name a Note is registered on the Registrar's books.

"Indebtedness" means, with respect to any person, without duplication:

(1) all indebtedness, obligations and other liabilities, contingent or otherwise, of such person for borrowed money (including overdrafts) or for the deferred purchase price of property or services, excluding any trade payables and other accrued current liabilities incurred in the ordinary course of business, but including, without limitation, all obligations, contingent or otherwise, of such person in connection with any letters of credit and acceptances issued under letter of credit facilities, acceptance facilities or other similar facilities;

(2) all obligations of such person evidenced by bonds, credit or loan agreements, notes, debentures or other similar instruments;

(3) indebtedness of such person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such person (even if the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), but excluding trade payables arising in the ordinary course of business;

(4) all obligations and liabilities, contingent or otherwise, in respect of leases of the person required, in conformity with GAAP, to be accounted for as capitalized lease obligations on the balance sheet of the person and all obligations and other liabilities, contingent or otherwise, under any lease or related document, including a purchase agreement, in connection with the lease of real property or improvements thereon which provides that the person is contractually obligated to purchase or cause a third party to purchase the leased property or pay an agreed upon residual value of the leased property to the lessor and the obligations of the person under the lease or related document to purchase or to cause a third party to purchase the leased property whether or not such lease transaction is characterized as an operating lease or a capitalized lease in accordance with GAAP, including, without limitations, synthetic lease obligations;

(5) all obligations of such person under or in respect of interest rate agreements, currency agreements or other swap, cap floor or collar agreement, hedge agreement, forward contract or similar instrument or agreement or foreign currency, hedge, exchange or purchase or similar instrument or agreement;

(6) all indebtedness referred to in (but not excluded from) the preceding clauses (1) through (5) of other persons and all dividends of other persons, the payment of which is secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien or with respect to property

5

(including, without limitation, accounts and contract rights) owned by such person, even though such person has not assumed or become liable for the payment of such indebtedness (the amount of such obligation being deemed to be the lesser of the value of such property or asset or the amount of the obligation so secured);

(7) all guarantees by such person of indebtedness referred to in (but not excluded from) this definition of any other person;

(8) all Redeemable Capital Stock of such person valued at the greater of its voluntary or involuntary maximum fixed repurchase price plus accrued and unpaid dividends;

(9) the present value of the obligations of such person as lessee for net rental payments (excluding all amounts required to be paid on account of maintenance and repairs, insurance, taxes, assessments, water, utilities and similar charges to the extent included in such rental payments) during the remaining term of the lease included in any sale and leaseback transaction, including any period for which such lease has been extended or may, at the option of the lessor, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP; and

(10)    any and all refinancings, replacements, deferrals, renewals, extensions and refundings of or amendments, modifications or supplements to, any indebtedness, obligation or liability of the kind described in clauses (1) through (9) above.

"Indenture" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof, including the provisions of the TIA that are deemed to be a part hereof.

"Institutional Accredited Investor" shall mean an institution that is an "accredited investor" as that term is defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act.

"Initial Purchasers" means Aristeia International Limited, Aristeia Partners LP, Calamos Market Neutral Fund – Calamos Investment Trust, CNH CA Master Account, L.P., FGO Master Fund Ltd., Fore Multi Strategy Master Fund Ltd., Fore Convertible Master Fund Ltd., Fore ERISA Fund Ltd., Man Mac 1 Limited, Symphony Asset Management and Wolverine Asset Management.

"Interest Payment Date" means the Stated Maturity of an installment of interest on the Notes.

"Interest Rate" means 2½% per annum.

"Issue Date" of any Note means the date on which the Note was originally issued or deemed issued as set forth on the face of the Note.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset given to secure Indebtedness, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction with respect to any such lien, pledge, charge or security interest).

"Liquidated Damages" has the meaning specified in the Registration Rights Agreement.

"Notes" has the meaning ascribed to it in the first paragraph under the caption "Recitals of the Company".

"Officer" means the Chairman of the Board, the Vice Chairman, the Chief Executive Officer, the President, any Executive Vice President, any Senior Vice President, any Vice President, the Treasurer or the Secretary or any Assistant Treasurer or Assistant Secretary of the Company.

"Officers' Certificate" means a written certificate containing the information specified in Sections 13.04 and 13.05, signed in the name of the Company by any two Officers, and delivered to the Trustee. An Officers' Certificate given pursuant to Section 4.03 shall be signed by the principal executive, principal financial or principal accounting officer of the Company but need not contain the information specified in Sections 13.04 and 13.05.

"144A Global Note" means a permanent Global Note in the form of the Note attached hereto as Exhibit A-1, and that is deposited with and registered in the name of the Depositary, representing Notes sold in reliance on Rule 144A.

"Opinion of Counsel" means a written opinion containing the information specified in Sections 13.04 and 13.05, from legal counsel who is reasonably acceptable to the Trustee or the Registrar, as applicable. The counsel may be an employee of, or counsel to, the Company, the Trustee or the Registrar.

"person" or "Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, including any subdivision or ongoing business of any such entity or substantially all of the assets of any such entity, subdivision or business.

"principal" of a Note means the principal amount due on the Stated Maturity as set forth on the face of the Note.

"Redeemable Capital Stock" means any class of the Company's Capital Stock that, either by its terms, by the terms of any securities into which it is convertible or exchangeable or by contract or otherwise, is, or upon the happening of an event or passage of time would be, required to be redeemed (whether by sinking fund or otherwise) prior to the date that is 91 days after the Stated Maturity of the Notes or is redeemable at the option of the holder

thereof at any time prior to such date, or is convertible into or exchangeable for debt securities at any time prior to such date (unless it is convertible or exchangeable solely at the Company's option).

"Registration Rights Agreement" means the Registration Rights Agreement of even date herewith entered into by the Company and the Initial Purchasers.

"Regular Record Date" means, with respect to the interest payable on any Interest Payment Date, the close of business on the April 1 or October 1 (whether or not a Business Day), as the case may be, next preceding such Interest Payment Date.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject.

"Restricted Note" means a Note required to bear the restrictive legend set forth in the form of Note set forth in Exhibits A-1 and A-2 of this Indenture.

"Restriction Termination Date" means, with respect to any Note, the date that is two years after the later of:

(1)    the Issue Date of the Note, or, in the case of Common Stock, the Issue Date of the Note upon the conversion of which such Common Stock was issued; and

(2)    the last date on which any "affiliate," as defined in Rule 144, of the Company was the owner of such Note or Common Stock.

"Rule 144" means Rule 144 promulgated under the Securities Act (or any successor provision), as it may be amended from time to time.

"Rule 144A" means Rule 144A promulgated under the Securities Act (or any successor provision), as it may be amended from time to time.

"Securities Act" means the United States Securities Act of 1933 (or any successor statute), as amended from time to time.

"Senior Indebtedness" means:

(1)    the principal of and premium, if any, and interest on, and fees, costs, enforcement expenses, collateral protection expenses and other reimbursement or indemnity obligations in respect of all of the Indebtedness of the Company or obligations to any person for money borrowed that is evidenced by a note, bond, debenture, loan agreement, or similar instrument or agreement including default interest and interest accruing after a bankruptcy;

8

(2)    commitment or standby fees due and payable to lending institutions with respect to credit facilities available to the Company;

(3)    all of the Company's noncontingent obligations (i) for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (ii) under interest rate swaps, caps, collars, options and similar arrangements and (iii) under any foreign exchange contract, currency swap agreement, futures contract, currency option contract or other foreign currency hedge;

(4)    all of the Company's obligations under leases for real estate, facilities, equipment or related assets, whether or not capitalized, that are entered into or leased for financing purposes;

(5)    any liabilities of others described in clauses (1) through (4) above that the Company has guaranteed or which are otherwise the Company's legal liability; and

(6)    renewals, extensions, refundings, refinancings, restructurings, amendments and modifications of any such indebtedness or guarantee.

Notwithstanding the foregoing, "Senior Indebtedness" shall not include:

(a)    Indebtedness or other obligations of the Company that by its terms ranks equal or junior in right of payment to the Notes;

(b)    Indebtedness evidenced by the Notes;

(c)    Indebtedness evidenced by the Company's Convertible Subordinated Notes, provided that the Holders of the Notes shall not be entitled to any of the U.S. Government Obligations pledged for the exclusive benefit of the holders of the notes described in this subsection (c) (or the proceeds thereof);

(d)    Indebtedness of the Company that by operation of law is subordinate to any general unsecured obligations of the Company;

(e)    accounts payable or other liabilities owed or owing by the Company to trade creditors (including guarantees thereof or instruments evidencing such liabilities);

(f)    amounts owed by the Company for compensation to employees or for services rendered to the Company;

(g)    Indebtedness of the Company to any Subsidiary or any other Affiliate of the Company or any of such Affiliate's Subsidiaries, except if it is pledged as security for any Senior Indebtedness;

(h)    Capital Stock of the Company;

(i)    Indebtedness of the Company evidenced by any Guarantee of any such Indebtedness ranking equal or junior in right of payment to the Notes; and

(j)    Indebtedness of the Company which, when incurred and without respect to any election under Section 1111(b) of Title 11 of the United States Code, is without recourse to the Company.

"Significant Subsidiary" means a Subsidiary of the Company, including the Subsidiaries of such Subsidiary, that meets any of the following conditions:

(1)    the Company's and its other Subsidiaries' investments in and advances to the Subsidiary exceed 10 percent of the total assets of the Company and its Subsidiaries consolidated as of the end of the most recently completed fiscal year; or

(2)    the Company's and its other Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of the Subsidiary exceeds 10 percent of the total assets of the Company and its Subsidiaries consolidated as of the end of the most recently completed fiscal year; or

(3)    the Company's and its other Subsidiaries' equity in the income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principles of the Subsidiary exceeds 10 percent of such income of the Company and its Subsidiaries consolidated for the most recently completed fiscal year.

"Stated Maturity", when used with respect to any Note or any installment of interest thereon, means the date specified in such Note as the fixed date on which the principal of such Note or such installment of interest is due and payable.

"Stock Price" means the price paid, or deemed to be paid, per share of the Common Stock in connection with a Change in Control as determined pursuant to Section 10.01(f).

"Subsidiary" means (i) a corporation, a majority of whose Capital Stock with voting power, under ordinary circumstances, to elect directors is, at the date of determination, directly or indirectly owned by the Company, by one or more Subsidiaries of the Company or by the Company and one or more Subsidiaries of the Company, (ii) a partnership in which the Company or a Subsidiary of the Company holds a majority interest in the equity capital or profits of such partnership, or (iii) any other person (other than a corporation) in which the Company, a Subsidiary of the Company or the Company and one or more Subsidiaries of the Company, directly or indirectly, at the date of determination, has (x) at least a majority ownership interest or (y) the power to elect or direct the election of a majority of the directors or other governing body of such person.

"TIA" means the Trust Indenture Act of 1939 as in effect on the date of this Indenture; provided, however, that in the event the TIA is amended after such date, TIA means, to the extent required by any such amendment, the TIA as so amended.

"Trading Day" means a day during which trading in the Common Stock generally occurs on the New York Stock Exchange or, if the Common Stock is not listed on the New York Stock Exchange, on the principal other national or regional securities exchange on which the Common Stock is then listed or, if the Common Stock is not listed on a national or regional

securities exchange, on the National Association of Securities Dealers Automated Quotation System or, if the Common Stock is not quoted on the National Association of Securities Dealers Automated Quotation System, on the principal other market on which the Common Stock is then traded.

"Trading Price" of the Notes on any date of determination means the average of the secondary market bid quotations per $1,000 principal amount of Notes obtained by the Trustee for $5,000,000 principal amount of Notes at approximately 3:30 p.m., New York City time, on such determination date from three nationally recognized securities dealers the Company selects; provided that if three such bids cannot reasonably be obtained by the Trustee, but two such bids are obtained, then the average of the two bids shall be used, and if only one such bid can reasonably be obtained by the Trustee, that one bid shall be used. The Company will provide prompt written notice to the Trustee identifying the three nationally recognized security dealers selected by the Company. If the Trustee cannot reasonably obtain at least one bid for $5,000,000 principal amount of Notes from a nationally recognized securities dealer, then for purposes of determining whether the condition to conversion of the Notes set forth in Section 10.01(a)(2) has been satisfied, the Trading Price per $1,000 principal amount of Notes will be deemed to be less than 98% of the product of the Volume Weighted Average Price of the Common Stock and the Conversion Rate per $1,000 principal amount of Notes.

"Trustee" means the party named as the "Trustee" in the first paragraph of this Indenture until a successor replaces it pursuant to the applicable provisions of this Indenture and, thereafter, shall mean such successor. The foregoing sentence shall likewise apply to any subsequent such successor or successors.

"United States" means the United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction (its "possessions" including Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands).

"U.S. Government Obligations" means securities that are (i) direct obligations of the United States of America, for the payment of which its full faith and credit is pledged or (ii) obligations of a Person controlled or supervised by or acting as an agency or instrumentality of the United States of America, the payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America, which, in either case, are not callable or redeemable at the option of the issuer thereof at any time prior to the Stated Maturity of the eighth interest installment under the Notes, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Obligation or a specific payment of interest on or principal of any such U.S. Government Obligation held by such custodian for the account of the holder of a depository receipt; provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligation for the specific payment of interest on or principal of the U.S. Government Obligation evidenced by such depository receipt.

"Volume Weighted Average Price" per share of Common Stock on any Trading Day means such price as displayed on Bloomberg (or any successor service) page "FNSR Equity

VAP" in respect of the period from 9:30 a.m. to 4:00 p.m., New York City time, on such Trading Day; or, if such price is not available, the Volume Weighted Average Price means the market value per share of Common Stock on such day as determined by a nationally recognized independent investment banking firm retained for this purpose by the Company.

SECTION 1.02      Other Definitions.

| Term | Defined in Section |
| --- | --- |
| "Act" | 1.05(a) |
| "Agent Members" | 2.12 |
| "Bankruptcy Law" | 6.01 |
| "Change in Control" | 3.10(a) |
| "Change in Control Repurchase Date" | 3.10(a) |
| "Change in Control Repurchase Notice" | 3.10(d) |
| "Change in Control Repurchase Price" | 3.10(a) |
| "Company Change in Control Notice" | 3.10(b) |
| "Conversion Agent" | 2.03 |
| "Conversion Price" | 10.01 |
| "Conversion Trigger Price" | 10.01(a) |
| "Current Market Price" | 10.04(g) |
| "Custodian" | 6.01 |
| "Depositary" | 2.01(a) |
| "Determination Date" | 10.04(e) |
| "Distribution Notice" | 10.01(b) |
| "DTC" | 2.01(a) |
| "Event of Default" | 6.01 |
| "Exchange Act" | 3.10(a) |
| "excluded securities" | 10.04(d) |
| "Expiration Time" | 10.04(f) |
| "fair market value" | 10.04(g) |
| "Legal Holiday" | 13.08 |
| "Legend" | 2.06(f) |
| "Non-Electing Share" | 10.11 |
| "Non-Payment Default" | 11.03(b) |
| "Notice Date" | 3.01 |
| "Notice of Default" | 6.01 |
| "Paying Agent" | 2.03 |
| "Payment Blockage Period" | 11.03(b) |
| "Payment Default" | 11.03(a) |
| "Permitted Junior Securities" | 11.02 |
| "Provisional Redemption" | 3.01 |
| "Provisional Redemption Date" | 3.01 |
| "Provisional Redemption Price" | 3.01 |
| "Purchased Shares" | 10.04(f) |
| "QIB" | 2.01(a) |

"Record Date"...................................................................10.04(g)
"Reference Period" .........................................................10.04(d)
"Registrar" ......................................................................2.03
"Rule 144A Information" ................................................4.06
"Trigger Event"...............................................................10.04(d)
"Valuation Expert"..........................................................10.02(d)

     SECTION 1.03     <u>Incorporation by Reference of Trust Indenture Act</u>. Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture. The following TIA terms used in this Indenture have the following meanings:

     "Commission" means the Commission.

     "indenture notes" means the Notes.

     "indenture note holder" means a Noteholder.

     "indenture to be qualified" means this Indenture.

     "indenture trustee" or "institutional trustee" means the Trustee.

     "obligor" on the indenture Notes means the Company.

     All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rule have the meanings assigned to them by such definitions.

     SECTION 1.04     <u>Rules of Construction</u>.    Unless the context otherwise requires:

     (a)     a term has the meaning assigned to it;

     (b)     an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP as in effect from time to time;

     (c)     "or" is not exclusive;

     (d)     "including" means including, without limitation; and

     (e)     words in the singular include the plural, and words in the plural include the singular.

     SECTION 1.05     <u>Acts of Holders</u>.  (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by their agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such

instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to such officer the execution thereof. Where such execution is by a signer acting in a capacity other than such signer's individual capacity, such certificate or affidavit shall also constitute sufficient proof of such signer's authority. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

The ownership of Notes shall be proved by the register for the Notes or by a certificate of the Registrar.

Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Note shall bind every future Holder of the same Note and the holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Note.

If the Company shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, by or pursuant to a resolution of the Board of Directors, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Company shall have no obligation to do so. If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for purposes of determining whether Holders of the requisite proportion of outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the outstanding Notes shall be computed as of such record date; provided that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than six months after the record date.

## ARTICLE 2

## THE NOTES

SECTION 2.01    <u>Form and Dating</u>. The Global Notes and the Trustee's certificate of authentication to be borne by such Notes and the Certificated Notes and the

14

Trustee's Certificate of Authentication to be borne by such Notes shall be substantially in the form annexed hereto as Exhibits A-1 and A-2, respectively, which are incorporated in and made a part of this Indenture. Each Note shall be dated the date of its authentication. The terms and provisions contained in the form of Note shall constitute, and are hereby expressly made, a part of this Indenture and to the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

Any of the Notes may have such letters, numbers or other marks of identification and such notations, legends and endorsements as the officers executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange or automated quotation system on which the notes may be listed or designated for issuance, or to conform to usage.

(a)    Global Notes.  Notes offered and sold within the United States to qualified institutional buyers as defined in Rule 144A ("QIBs") in reliance on Rule 144A shall be issued, initially in the form of a 144A Global Note, which shall be deposited with the Trustee at its Corporate Trust Office, as custodian for, and registered in the name of, The Depository Trust Company ("DTC") or the nominee thereof (such depositary, or any successor thereto, and any such nominee being hereinafter referred to as the "Depositary"), duly executed by the Company and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary as hereinafter provided.

(b)    Global Notes in General.  Each Global Note shall represent such of the outstanding Notes as shall be specified therein and each shall provide that it shall represent the aggregate amount of outstanding Notes from time to time endorsed thereon and that the aggregate amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges, redemptions and conversions.

Any adjustment of the aggregate principal amount of a Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee in accordance with instructions given by the Holder thereof as required by Section 2.12 hereof and shall be made on the records of the Trustee and the Depositary.

(c)    Book-Entry Provisions.  This Section 2.01(c) shall apply only to Global Notes deposited with or on behalf of the Depositary.

The Company shall execute and the Trustee shall, in accordance with this Section 2.01(c), authenticate and deliver initially one or more Global Notes that (a) shall be registered in the name of the Depositary, (b) shall be delivered by the Trustee to the Depositary or pursuant to the Depositary's instructions and (c) shall bear legends substantially to the following effect:

"UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE

ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY TRUST COMPANY OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN ARTICLE 2 OF THE INDENTURE REFERRED TO ON THE REVERSE HEREOF."

(d)     Restrictive Legends. Until the Restriction Termination Date, all Global Notes and all Certificated Notes shall bear the Legend, unless such Notes have been transferred pursuant to a registration statement that has been declared effective under the Securities Act. Until the Restriction Termination Date, the Company covenants that any stock certificate representing shares of Common Stock delivered by the Company upon conversion of any Notes will bear the Legend, unless such shares have been sold pursuant to a registration statement that has been declared effective under the Securities Act.

(e)     Certificated Notes. Notes not issued as interests in the Global Notes will be issued in certificated form substantially in the form of Exhibit A-2 attached hereto.

SECTION 2.02     Execution and Authentication. The Notes shall be executed on behalf of the Company by any Officer. The signature of the Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signatures of individuals who were at the time of the execution of the Notes the proper Officers shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of authentication of such Notes.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Note a certificate of authentication substantially in the form provided for herein duly executed by the Trustee by manual signature of an authorized signatory, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

The Trustee shall authenticate and deliver Notes for original issue in an aggregate principal amount of up to $100,000,000 upon a Company Order without any further action by the Company. The Trustee shall not authenticate an aggregate principal amount of Notes outstanding at any time in excess of the amount set forth in the foregoing sentence, except as provided in Section 2.07.

The Notes shall be issued only in registered form without coupons and only in denominations of $1,000 in principal amount and any whole multiple thereof.

SECTION 2.03    Registrar, Paying Agent and Conversion Agent.    The Company shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("Registrar"), an office or agency where Notes may be presented for repurchase or payment ("Paying Agent") and an office or agency where Notes may be presented for conversion ("Conversion Agent"). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Company may have one or more co-registrars, one or more additional paying agents and one or more additional conversion agents. The term Paying Agent includes any additional paying agent, including any named pursuant to Section 4.05. The term Conversion Agent includes any additional conversion agent, including any named pursuant to Section 4.05.

The Company shall enter into an appropriate agency agreement with any Registrar, Paying Agent, Conversion Agent or co-registrar (to the extent such agents are other than the Trustee). The agreement shall implement the provisions of this Indenture that relate to such agent. The Company shall notify the Trustee of the name and address of any such agent. If the Company fails to maintain a Registrar, Paying Agent or Conversion Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06. The Company or any Subsidiary or an Affiliate of either of them may act as Paying Agent, Registrar, Conversion Agent or co-registrar.

The Company initially appoints the Trustee as Registrar, Conversion Agent and Paying Agent in connection with the Notes.

SECTION 2.04    Paying Agent to Hold Money and Notes in Trust.    Except as otherwise provided herein, on or prior to each due date of payments in respect of any Note, the Company shall deposit with the Paying Agent a sum of money (in immediately available funds if deposited on the due date) sufficient to make such payments when so becoming due. The Company shall require each Paying Agent (other than the Trustee) to agree in writing that the Paying Agent shall hold in trust for the benefit of Noteholders or the Trustee all money held by the Paying Agent for the making of payments in respect of the Notes and shall notify the Trustee of any default by the Company in making any such payment. At any time during the continuance of any such default, the Paying Agent shall, upon the written request of the Trustee, forthwith pay to the Trustee all money so held in trust. If the Company, a Subsidiary or an Affiliate of either of them acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it. Upon doing so, the Paying Agent shall have no further liability for the money.

17

SECTION 2.05    Noteholder Lists.  The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Noteholders.  If the Trustee is not the Registrar, the Company shall cause to be furnished to the Trustee on or before each semiannual Interest Payment Date a listing of Noteholders dated within 13 days of the date on which the list is furnished and at such other times as the Trustee may request in writing a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Noteholders.

SECTION 2.06    Transfer and Exchange.  Subject to Section 2.12 hereof, (a) upon surrender for registration of transfer of any Note, together with a written instrument of transfer satisfactory to the Registrar duly executed by the Noteholder or such Noteholder's attorney duly authorized in writing, at the office or agency of the Company designated as Registrar or co-registrar pursuant to Section 2.03, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination or denominations, of a like aggregate principal amount.  The Company shall not charge a service charge for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges that may be imposed in connection with the transfer or exchange of the Notes from the Noteholder requesting such transfer or exchange.

At the option of the Holder, Notes may be exchanged for other Notes of any authorized denomination or denominations, of a like aggregate principal amount, upon surrender of the Notes to be exchanged, together with a written instrument of transfer satisfactory to the Registrar duly executed by the Noteholder or such Noteholder's attorney duly authorized in writing, at such office or agency.  Whenever any Notes are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive.

The Company shall not be required to make, and the Registrar need not register, transfers or exchanges of Notes selected for redemption (except, in the case of Notes to be redeemed in part, the portion thereof not to be redeemed) or any Notes in respect of which a Change in Control Repurchase Notice (as defined in Section 3.10(d)) has been given and not withdrawn by the Holder thereof in accordance with the terms of this Indenture (except, in the case of Notes to be repurchased in part, the portion thereof not to be repurchased) or any Notes for a period of 15 days before the mailing of a notice of redemption of Notes to be redeemed.

(b)    Notwithstanding any provision to the contrary herein, so long as a Global Note remains outstanding and is held by or on behalf of the Depositary, transfers of a Global Note, in whole or in part, shall be made only in accordance with Section 2.12 and this Section 2.06(b).  Transfers of a Global Note shall be limited to transfers of such Global Note in whole, or in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

(c)    Successive registrations and registrations of transfers and exchanges as aforesaid may be made from time to time as desired, and each such registration shall be noted on the register for the Notes.

(d)    Any Registrar appointed pursuant to Section 2.03 hereof shall provide to the Trustee such information as the Trustee may reasonably require in connection with the delivery by such Registrar of Notes upon transfer or exchange of Notes.

(e)    No Registrar shall be required to make registrations of transfer or exchange of Notes during any periods designated in the text of the Notes or in this Indenture as periods during which such registration of transfers and exchanges need not be made.

(f)    If Notes are issued upon the transfer, exchange or replacement of Notes subject to restrictions on transfer and bearing the legends set forth on the forms of Note attached hereto as Exhibits A-1 and A-2 setting forth such restrictions (collectively, the "Legend"), or if a request is made to remove the Legend on a Note, the Notes so issued shall bear the Legend, or the Legend shall not be removed, as the case may be, unless there is delivered to the Company and the Registrar such satisfactory evidence, which shall include an Opinion of Counsel, as may be reasonably required by the Company and the Registrar, that neither the Legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or Rule 144 or that such Notes are not "restricted" within the meaning of Rule 144.  Upon (i) provision of such satisfactory evidence, or (ii) notification by the Company to the Trustee and Registrar of the sale of such Note pursuant to a registration statement that is effective at the time of such sale, the Trustee, at the written direction of the Company, shall authenticate and deliver a Note that does not bear the Legend.  If the Legend is removed from the face of a Note and the Note is subsequently held by an affiliate, as defined in Rule 144, of the Company, the Legend shall be reinstated.

SECTION 2.07    Replacement Notes.    If (a) any mutilated Note is surrendered to the Trustee, or (b) the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Note, and there is delivered to the Company and the Trustee such Note (in the case of mutilation) or indemnity (in all other cases) as may be required by them to save each of them harmless, then, in the absence of notice to the Company or the Trustee that such Note has been acquired by a bona fide purchaser, the Company shall execute and upon its written request the Trustee shall authenticate and deliver, in exchange for any such mutilated Note or in lieu of any such destroyed, lost or stolen Note, a new Note of like tenor and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Note has become or is about to become due and payable, or is about to be repurchased by the Company pursuant to Article 3 hereof, the Company in its discretion may, instead of issuing a new Note, pay or repurchase such Note, as the case may be.

Upon the issuance of any new Notes under this Section 2.07, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this Section 2.07 in lieu of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Note shall be at any time enforceable by

substitutions and other variations as the officers executing such Notes may determine, as conclusively evidenced by their execution of such Notes.

If temporary Notes are issued, the Company will cause definitive Notes to be prepared without unreasonable delay. After the preparation of definitive Notes, the temporary Notes shall be exchangeable for definitive Notes upon surrender of the temporary Notes at the office or agency of the Company designated for such purpose pursuant to Section 2.03, without charge to the Holder. Upon surrender for cancellation of any one or more temporary Notes the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor a like principal amount of definitive Notes of authorized denominations. Until so exchanged the temporary Notes shall in all respects be entitled to the same benefits under this Indenture as definitive Notes.

SECTION 2.10    Cancellation.    All Notes surrendered for payment, repurchase by the Company pursuant to Article 3, conversion, redemption or registration of transfer or exchange shall, if surrendered to any person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it. The Company may at any time deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Company may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly cancelled by the Trustee. The Company may not issue new Notes to replace Notes it has paid or delivered to the Trustee for cancellation or that any Holder has converted pursuant to Article 10. No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this Section 2.10, except as expressly permitted by this Indenture. All cancelled Notes held by the Trustee shall be disposed of by the Company in accordance with its customary procedures.

SECTION 2.11    Persons Deemed Owners.    Prior to due presentment of a Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name such Note is registered as the owner of such Note for the purpose of receiving payment of principal of the Note or the payment of any Provisional Redemption Price, or Change in Control Repurchase Price in respect thereof, and interest thereon, for the purpose of conversion and for all other purposes whatsoever, whether or not such Note be overdue, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.

SECTION 2.12    Global Notes.

(a)    Notwithstanding any other provisions of this Indenture or the Notes, (A) transfers of a Global Note, in whole or in part, shall be made only in accordance with Section 2.06 and Section 2.12(a)(i), (B) transfer of a beneficial interest in a Global Note for a Certificated Note shall comply with Section 2.06 and Section 2.12(a)(ii) below, and (C) transfers of a Certificated Note shall comply with Section 2.06 and Sections 2.12(a)(iii) and (iv) below.

(i)    *Transfer of Global Note.*  A Global Note may not be transferred, in whole or in part, to any Person other than the Depositary or a nominee or any successor thereof, and no such transfer to any such other Person may be registered; provided that this clause (i) shall not prohibit any transfer of a Note that is issued in exchange for a Global Note

but is not itself a Global Note. No transfer of a Note to any Person shall be effective under this Indenture or the Notes unless and until such Note has been registered in the name of such Person. Nothing in this Section 2.12(a)(i) shall prohibit or render ineffective any transfer of a beneficial interest in a Global Note effected in accordance with the other provisions of this Section 2.12(a).

(ii)   *Restrictions on Transfer of a Beneficial Interest in a Global Note for a Certificated Note.* A beneficial interest in a Global Note may not be exchanged for a Certificated Note except upon satisfaction of the requirements set forth below. Upon receipt by the Trustee of a transfer of a beneficial interest in a Global Note (which transfer, if made to an Institutional Accredited Investor that is not a QIB, shall be made to a Holder that is acquiring a minimum of $250,000 aggregate principal amount of Notes) in accordance with Applicable Procedures for a Certificated Note in the form satisfactory to the Trustee, together with:

(A)   so long as the Notes are Restricted Notes, certification, in the form set forth in Exhibit B-1 and, in the case of a transfer to an Institutional Accredited Investor that is not a QIB, a representation letter in the form set forth in Exhibit D;

(B)   written instructions to the Trustee to make, or direct the Registrar to make, an adjustment on its books and records with respect to such Global Note to reflect a decrease in the aggregate principal amount of the Notes represented by the Global Note, such instructions to contain information regarding the Depositary account to be credited with such decrease; and

(C)   if the Company or Registrar so requests, an opinion of counsel or other evidence reasonably satisfactory to them as to the compliance with the restrictions set forth in the Legend,

then the Trustee shall cause, or direct the Registrar to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Registrar, the aggregate principal amount of Notes represented by the Global Note to be decreased by the aggregate principal amount of the Certificated Note to be issued, shall issue such Certificated Note and shall debit or cause to be debited to the account of the Person specified in such instructions a beneficial interest in the Global Note equal to the principal amount of the Certificated Note so issued.

(iii)   *Transfer and Exchange of Certificated Notes.* When Certificated Notes are presented to the Registrar with a request:

(x)   to register the transfer of such Certificated Notes; or

(y)   to exchange such Certificated Notes for an equal principal amount of Certificated Notes of other authorized denominations,

the Registrar shall register the transfer or make the exchange as requested if its reasonable requirements for such transaction are met; provided, however, that the Certificated Notes surrendered for transfer or exchange:

(A)    shall be duly endorsed or accompanied by a written instrument of transfer in form reasonably satisfactory to the Company and the Registrar, duly executed by the Holder thereof or his attorney duly authorized in writing; and

(B)    so long as such Notes are Restricted Notes, such Notes are being transferred or exchanged pursuant to an effective registration statement under the Securities Act or pursuant to clause (1), (2) or (3) below, and are accompanied by the following additional information and documents, as applicable:

(1)    if such Certificated Notes are being delivered to the Registrar by a Holder for registration in the name of such Holder, without transfer, a certification from such Holder to that effect; or

(2)    if such Certificated Notes are being transferred to the Company, a certification to that effect; or

(3)    if such Certificated Notes are being transferred pursuant to an exemption from registration (including any transfer to an Institutional Accredited Investor), (i) a certification to that effect (in the form set forth in Exhibit B-1, if applicable) and (ii) if the Company or Registrar so requests, an opinion of counsel or other evidence reasonably satisfactory to them as to the compliance with the restrictions set forth in the Legend.

(iv)  *Restrictions on Transfer of a Certificated Note for a Beneficial Interest in a Global Note.*  A Certificated Note may not be exchanged for a beneficial interest in a Global Note except upon satisfaction of the requirements set forth below, including any transfer from an Institutional Accredited Investor that is not a QIB to a QIB.

Upon receipt by the Trustee of a Certificated Note, duly endorsed or accompanied by appropriate instruments of transfer, in form reasonably satisfactory to the Trustee, together with:

(A)    so long as the Notes are Restricted Notes, certification, in the form set forth in Exhibit B-1, that such Certificated Note is being transferred to a QIB in accordance with Rule 144A; and

(B)    written instructions directing the Trustee to make, or to direct the Registrar to make, an adjustment on its books and records with respect to such Global Note to reflect an increase in the aggregate

23

principal amount of the Notes represented by the Global Note, such instructions to contain information regarding the Depositary account to be credited with such increase, then the Trustee shall cancel such Certificated Note and cause, or direct the Registrar to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Registrar, the aggregate principal amount of Notes represented by the Global Note to be increased by the aggregate principal amount of the Certificated Note to be exchanged, and shall credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Global Note equal to the principal amount of the Certificated Note so cancelled. If no Global Notes are then outstanding, the Company shall issue and the Trustee shall authenticate, upon written order of the Company in the form of an Officers' Certificate, a new Global Note in the appropriate principal amount.

(b)     Subject to the succeeding paragraph, every Note shall be subject to the restrictions on transfer provided in the Legend including the delivery of an opinion of counsel, if so provided. Whenever any Restricted Note is presented or surrendered for registration of transfer or for exchange for a Note registered in a name other than that of the Holder, such Note must be accompanied by a certificate in substantially the form set forth in Exhibit B-1, dated the date of such surrender and signed by the Holder of such Note, as to compliance with such restrictions on transfer. The Registrar shall not be required to accept for such registration of transfer or exchange any Note not so accompanied by a properly completed certificate.

(c)     The restrictions imposed by the Legend upon the transferability of any Note shall cease and terminate when such Note has been sold pursuant to an effective registration statement under the Securities Act or transferred in compliance with Rule 144 or, if earlier, upon the expiration of the holding period applicable to sales thereof under Rule 144(k) promulgated under the Securities Act (or any successor provision). Any Note as to which such restrictions on transfer shall have expired in accordance with their terms or shall have terminated may, upon a surrender of such Note for exchange to the Registrar in accordance with the provisions of this Section 2.12 (accompanied, in the event that such restrictions on transfer have terminated by reason of a transfer in compliance with Rule 144, by an opinion of counsel having substantial experience in practice under the Securities Act and otherwise reasonably acceptable to the Company, addressed to the Company and in form acceptable to the Company, to the effect that the transfer of such Note has been made in compliance with Rule 144), be exchanged for a new Note, of like tenor and aggregate principal amount, which shall not bear the Legend. The Company shall inform the Trustee of the effective date of any registration statement registering the Notes under the Securities Act. The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among DTC participants, members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof. The Trustee shall not be liable for any action taken or omitted

24

to be taken by it in good faith in accordance with the aforementioned opinion of counsel or registration statement.

(d)     In the event that Rule 144(k) as promulgated under the Securities Act is amended to shorten the two-year restriction period, then restrictions on transfer on the Notes and the Common Stock will be deemed to refer to the shortened restriction period. The Company undertakes to inform the Trustee if such change to Rule 144(k) occurs and the effect (if any) to the restrictions on transfer applicable to the Notes and Common Stock and shall provide additional information (including an Opinion of Counsel and/or an Officers' Certificate) if so requested by the Trustee.

(e)     As used in subsections (c) and (d) of this Section 2.12, the term "transfer" encompasses any sale, pledge, transfer, hypothecation or other disposition of any Note.

(f)     The provisions of clauses (i), (ii), (iii), (iv) and (v) below shall apply only to Global Notes:

(i)     Notwithstanding any other provisions of this Indenture or the Notes, except as provided in Section 2.12(a)(i), a Global Note shall not be exchanged in whole or in part for a Note registered in the name of any Person other than the Depositary or one or more nominees thereof, provided that a Global Note may be exchanged for Notes registered in the names of any person designated by the Depositary in the event that (i) the Depositary has notified the Company that it is unwilling or unable to continue as Depositary for such Global Note or such Depositary has ceased to be a "clearing agency" registered under the Exchange Act, and a successor Depositary is not appointed by the Company within 90 days or (ii) an Event of Default has occurred and is continuing with respect to the Notes. Any Global Note exchanged pursuant to clause (i) above shall be so exchanged in whole and not in part, and any Global Note exchanged pursuant to clause (ii) above may be exchanged in whole or from time to time in part as directed by the Depositary. Any Note issued in exchange for a Global Note or any portion thereof shall be a Global Note; provided that any such Note so issued that is registered in the name of a Person other than the Depositary or a nominee thereof shall not be a Global Note.

(ii)     Subject to the last sentence of clause (i) above, notes issued in exchange for a Global Note or any portion thereof shall be issued in definitive, fully registered form, without interest coupons, shall have an aggregate principal amount equal to that of such Global Note or portion thereof to be so exchanged, shall be registered in such names and be in such authorized denominations as the Depositary shall designate and shall bear the applicable legends provided for herein. Any Global Note to be exchanged in whole shall be surrendered by the Depositary to the Trustee, as Registrar. With regard to any Global Note to be exchanged in part, either such Global Note shall be so surrendered for exchange or, if the Trustee is acting as custodian for the Depositary or its nominee with respect to such Global Note, the principal amount thereof shall be reduced, by an amount equal to the portion thereof to be so exchanged, by means of an appropriate adjustment made on the records of the Trustee. Upon any such surrender or adjustment, the Trustee shall authenticate and deliver the Note issuable on such exchange to or upon the order of the Depositary or an authorized representative thereof.

(iii)   Subject to the provisions of clause (v) below, the registered Holder may grant proxies and otherwise authorize any Person, including Agent Members (as defined below) and persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Indenture or the Notes.

(iv)   In the event of the occurrence of any of the events specified in clause (i) above, the Company will promptly make available to the Trustee a reasonable supply of Certificated Notes in definitive, fully registered form, without interest coupons.

(v)   Neither any members of, or participants in, the Depositary (collectively, the "Agent Members") nor any other Persons on whose behalf Agent Members may act shall have any rights under this Indenture with respect to any Global Note registered in the name of the Depositary or any nominee thereof, or under any such Global Note, and the Depositary or such nominee, as the case may be, may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner and holder of such Global Note for all purposes whatsoever.   Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or such nominee, as the case may be, or impair, as between the Depositary, its Agent Members and any other person on whose behalf an Agent Member may act, the operation of customary practices of such Persons governing the exercise of the rights of a holder of any Note.

SECTION 2.13      CUSIP Numbers.  The Company in issuing the Notes may use "CUSIP" numbers and, if so, the Trustee shall use "CUSIP" numbers in notices of redemption as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers.  The Company will promptly notify the Trustee of any change in the CUSIP numbers.

SECTION 2.14      Defaulted Interest.  If the Company defaults in a payment of interest on the Notes, it shall pay, or shall deposit with the Paying Agent money in immediately available funds sufficient to pay, the defaulted interest, plus (to the extent lawful) any interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date.  A special record date, as used in this Section 2.14 with respect to the payment of any defaulted interest, shall mean the 15th day next preceding the date fixed by the Company for the payment of defaulted interest, whether or not such day is a Business Day.  At least 15 days before the subsequent special record date, the Company shall mail to each Holder and to the Trustee a notice that states the subsequent special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.15      Registration Default.  The interest rate borne by the Notes shall be increased upon a Registration Default (as defined in the Registration Rights Agreement) due to the incurrence of Liquidated Damages, as provided in the Registration Rights Agreement and the Notes.  If a Registration Default occurs, the Company shall deliver to the Trustee an

Officers' Certificate stating (1) the amount of increased interest payable in the form of Liquidated Damages, (2) the date from which the increased Interest Rate resulting from the Liquidated Damages is effective and (3) when such Liquidated Damages are payable. Unless and until a Responsible Officer of the Trustee receives such an Officers' Certificate, the Trustee shall assume there has been no increase in the amount of interest.

## ARTICLE 3

## REDEMPTION AND REPURCHASES

SECTION 3.01    <u>Provisional Redemption</u>.    Commencing on or after October 15, 2007, the Company may, at its option, redeem the Notes in whole at any time or in part on any date from time to time, upon notice as set forth in Section 3.04, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus accrued and unpaid interest, if any (such amount, the "Provisional Redemption Price"), to but excluding the date of redemption ("Provisional Redemption Date") (provided however, if such Provisional Redemption Date is an Interest Payment Date, the interest due on such Interest Payment Date shall be payable to the Holder of the Notes called for redemption registered as such on the relevant Record Date and the Provisional Redemption Price shall not include such interest payment), if the Closing Price of the Common Stock has exceeded 150% of the Conversion Price then in effect for at least 20 Trading Days in the consecutive 30-Trading Day period ending on the Trading Day immediately preceding to the date of mailing of the provisional notice of redemption pursuant to Section 3.04 (the "Notice Date").

SECTION 3.02    <u>Notice of Trustee</u>.    If the Company elects to redeem Notes pursuant to the redemption provisions of Section 3.01 hereof, it shall notify the Trustee at least 30 days prior but not more than 60 days prior to the applicable Provisional Redemption Date of such intended Provisional Redemption Date, the principal amount of Notes to be redeemed and the CUSIP numbers of the Notes to be redeemed.

SECTION 3.03    <u>Selection of Notes to be Redeemed</u>.    If fewer than all the Notes are to be redeemed, the Trustee shall select the particular Notes to be redeemed from the outstanding Notes by a method that complies with the requirements of any exchange on which the Notes are listed, or, if the Notes are not listed on an exchange, on a pro rata basis or by lot or in accordance with any other method the Trustee considers fair and appropriate. Notes and portions thereof that the Trustee selects shall be in principal amounts equal to whole multiples of no less than $1,000.

If any Note selected for partial redemption is converted in part before termination of the conversion right with respect to the portion of the Note so selected, the converted portion of such Note shall be deemed to be the portion selected for redemption (provided, however, that the Holder of such Note so converted and deemed redeemed shall not be entitled to any interest payment as a result of such deemed redemption in excess of such interest as such Holder would have otherwise been entitled to receive upon conversion of such Note). Notes that have been converted during a selection of Notes to be redeemed may be treated by the Trustee as outstanding for the purpose of such selection.

The Trustee shall promptly notify the Company and the Registrar in writing of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount thereof to be redeemed.

For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to the redemption of Notes shall relate, in the case of any Notes redeemed or to be redeemed only in part, to the portion of the principal amount of such Notes which has been or is to be redeemed.

SECTION 3.04    Notice of Redemption. Notice of redemption shall be given in the manner provided in Section 13.02 hereof to the Holders of Notes to be redeemed. Such notice shall be given not less than 30 nor more than 60 days prior to a Provisional Redemption Date for redemption pursuant to Section 3.01.

All notices of redemption shall state:

(1)    the Provisional Redemption Date;

(2)    the Provisional Redemption Price;

(3)    if fewer than all the outstanding Notes are to be redeemed, the aggregate principal amount of Notes to be redeemed and the aggregate principal amount of Notes which will be outstanding after such partial redemption;

(4)    that on the applicable Provisional Redemption Date the Provisional Redemption Price will become due and payable upon each such Note to be redeemed, and that interest on the Notes shall cease to accrue on and after such date;

(5)    the Conversion Price, the date on which the right to convert the principal of the Notes to be redeemed will terminate and the places where such Notes may be surrendered for conversion;

(6)    the place or places where such Notes are to be surrendered for payment of the Provisional Redemption Price; and

(7)    the CUSIP number of the Notes.

The notice given shall specify the last date on which exchanges or transfers of Notes may be made pursuant to Section 2.06 hereof, and shall specify the serial numbers of Notes and the portions thereof called for redemption.

Notice of redemption of Notes to be redeemed at the election of the Company shall be given by the Company.

SECTION 3.05    Effect of Notice of Redemption. Notice of redemption having been given as provided in Section 3.04 hereof, the Notes so to be redeemed shall, on the applicable Provisional Redemption Date, become due and payable at the Provisional Redemption Price therein specified and from and after such date (unless the Company shall default in the

payment of the Provisional Redemption Price) such Notes shall cease to bear interest. Upon surrender of any such Note for redemption in accordance with such notice, such Note shall be paid by the Company at the Provisional Redemption Price; Provided, however, that the portion of the Provisional Redemption Price comprising of interest on Notes whose Stated Maturity is prior to or on the applicable Provisional Redemption Date shall be payable to the Holders of such Notes, or one or more predecessor Notes, registered as such on the relevant Record Date according to their terms and the provisions of Section 2.01 hereof.

If any Note called for redemption shall not be so paid upon surrender thereof for redemption, the principal shall, until paid, bear interest from the applicable Provisional Redemption Date at the Interest Rate.

SECTION 3.06     Deposit of Provisional Redemption Price. Prior to or on any Provisional Redemption Date, the Company shall deposit with the Trustee or with a Paying Agent (or, if the Company or a Subsidiary or an Affiliate of either of them is acting as the Paying Agent, such Paying Agent shall segregate and hold in trust as provided in Section 2.04) an amount of money (in immediately available funds if deposited on such Provisional Redemption Date) sufficient to pay the Provisional Redemption Price of all the Notes to be redeemed on that Provisional Redemption Date, other than any Notes called for redemption on that date which have been converted prior to the date of such deposit (except with respect to the Provisional Redemption as provided in Sections 3.01 and 3.05 hereof).

If any Note called for redemption is converted, any money deposited with the Trustee or with a Paying Agent or so segregated and held in trust for the redemption of such Note shall (subject to any right of the Holder of such Note or any predecessor Note to receive interest as provided in Section 4.01 hereof) be paid to the Company on Company Request or, if then held by the Company, shall be discharged from such trust.

SECTION 3.07     Notes Redeemed in Part. Any Note which is to be redeemed only in part shall be surrendered at an office or agency of the Company designated for that purpose pursuant to Section 4.05 hereof (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or the Holder's attorney duly authorized in writing), and the Company shall execute, and the Trustee shall authenticate and deliver to the Holder of such Note without service charge, a new Note or Notes of any authorized denomination as requested by such Holder in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Note so surrendered.

SECTION 3.08     Conversion Arrangement on Call for Redemption. In connection with any redemption of Notes, the Company may arrange for the purchase and conversion of any Notes called for redemption by an agreement with one or more investment banks or other purchasers to purchase such Notes by paying to the Trustee in trust for the Noteholders, on or prior to 11:00 a.m. New York City time on the applicable Provisional Redemption Date, an amount that, together with any amounts deposited with the Trustee by the Company for the redemption of such Notes, is not less than the Provisional Redemption Price of such Notes. Notwithstanding anything to the contrary contained in this Article 3, the obligation of the Company to pay the Provisional Redemption Price of such Notes shall be deemed to be

satisfied and discharged to the extent such amount is so paid by such purchasers. If such an agreement is entered into, any Notes not duly surrendered for conversion by the Holders thereof may, at the option of the Company, be deemed, to the fullest extent permitted by law, acquired by such purchasers from such Holders and (notwithstanding anything to the contrary contained in Article 10) surrendered by such purchasers for conversion, all as of immediately prior to the close of business on the applicable Provisional Redemption Date, subject to payment of the above amount as aforesaid. The Trustee shall hold and pay to the Holders whose Notes are selected for redemption any such amount paid to it for purchase and conversion in the same manner as it would moneys deposited with it by the Company for the redemption of Notes. Without the Trustee's prior written consent, no arrangement between the Company and such purchasers for the purchase and conversion of any Notes shall increase or otherwise affect any of the powers, duties, responsibilities or obligations of the Trustee as set forth in this Indenture, and the Company agrees to indemnify the Trustee from, and hold it harmless against, any loss, liability or expense arising out of or in connection with any such arrangement for the purchase and conversion of any Notes between the Company and such purchasers, including the costs and expenses incurred by the Trustee in the defense of any claim or liability arising out of or in connection with the exercise or performance of any of its powers, duties, responsibilities or obligations under this Indenture, except to the extent such loss, liability, expense or cost results from Trustee's gross negligence or willful misconduct.

SECTION 3.09    <u>Reserved.</u>

SECTION 3.10    <u>Repurchase of Notes at Option of the Holder upon Change in Control.</u>

(a)    If there shall have occurred a Change in Control, all or any portion of the Notes of any Holder equal to a whole multiple of $1,000, not previously called for redemption, shall be repurchased by the Company, at the option of such Holder, at a repurchase price equal to 100% of the principal amount of the Notes to be repurchased, together with interest accrued and unpaid to, but excluding, the repurchase date (the "Change in Control Repurchase Price"), on the date (the "Change in Control Repurchase Date") that is 45 Business Days after the Change in Control Repurchase Notice; provided, however, that installments of interest on Notes whose Stated Maturity is prior to or on the Change in Control Repurchase Date shall be payable to the Holders of such Notes, or one or more predecessor Notes, registered as such on the relevant Regular Record Date according to their terms.

Subject to the fulfillment by the Company of the conditions set forth in Section 3.10(b) hereof, the Company may elect to pay the Change in Control Repurchase Price (to the extent not paid in cash) by delivering the number of shares of Common Stock equal to (i) the Change in Control Repurchase Price divided by (ii) 95% of the average of the Closing Prices per share of Common Stock for the five consecutive Trading Days immediately preceding and including the third Trading Day prior to the Change in Control Repurchase Date.

Whenever in this Indenture (including Sections 2.01, 6.01(a) and 6.07 hereof) or Exhibits A-1 and A-2 annexed hereto there is a reference, in any context, to the principal of any Note as of any time, such reference shall be deemed to include reference to the Change in Control Repurchase Price payable in respect to such Note to the extent that such Change in

Control Repurchase Price is, was or would be so payable at such time, and express mention of the Change in Control Repurchase Price in any provision of this Indenture shall not be construed as excluding the Change in Control Repurchase Price in those provisions of this Indenture when such express mention is not made.

A "Change in Control" of the Company shall be deemed to have occurred at such time after the original issuance of Notes as any of the following events shall occur:

(i)    the acquisition by any person, including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of transactions, of shares of the Capital Stock of the Company entitling that person to exercise 50% or more of the total voting power of all shares of such Capital Stock entitled to vote generally in elections of directors, other than any acquisition by the Company, any of its Subsidiaries or any employee benefit plans of the Company; or

(ii)    any consolidation or merger of the Company with or into any other person, any merger of another person into the Company, or any conveyance, transfer, sale, lease or other disposition of all or substantially all of the Company's properties and assets to another person, other than:

(A)    any transaction (1) that does not result in any reclassification, conversion, exchange or cancellation of outstanding shares of the Capital Stock of the Company and (2) pursuant to which holders of the Capital Stock of the Company immediately prior to the transaction are entitled to exercise, directly or indirectly, 50% or more of the total voting power of all shares of the Capital Stock of the Company entitled to vote generally in the election of directors of the continuing or surviving person immediately after the transaction; or

(B)    any merger solely for the purpose of changing the Company's jurisdiction of incorporation and resulting in a reclassification, conversion or exchange of outstanding shares of Common Stock solely into shares of common stock of the surviving entity,

(iii)    during any consecutive two-year period, individuals who at the beginning of that two-year period constituted the Board of Directors (together with any new directors whose election to the Board of Directors, or whose nomination for election by the stockholders of the Company, was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election were previously so approved) cease for any reason to constitute a majority of the Board of Directors then in office; or

(iv)    the Company is liquidated or dissolved or a resolution is passed by the Company's stockholders approving a plan of liquidation or dissolution of the Company

31

other than in a transaction that complies with the provisions described in Article 5 of the Indenture.

Beneficial ownership shall be determined in accordance with Rule 13d-3 promulgated by the Commission under the Exchange Act. The term "person" shall include any syndicate or group that would be deemed to be a "person" under Section 13(d)(3) of the Exchange Act.

(b)     Unless the Company shall have theretofore called for redemption all of the outstanding Notes, prior to or on the 30th day after the occurrence of a Change in Control, the Company, or, at the written request and expense of the Company prior to or on the 30th day after such occurrence, the Trustee, shall give to all Noteholders, in the manner provided in Section 13.02 hereof, notice of the occurrence of the Change in Control and of the repurchase right set forth herein arising as a result thereof (the "Company Change in Control Notice"). The Company shall also deliver a copy of such Company Change in Control Notice to the Trustee. The notice shall include a form of Change in Control Repurchase Notice (as defined in Section 3.10(c)) to be completed by the Noteholder and shall state:

(1)     briefly, the events causing a Change in Control and the date of such Change in Control;

(2)     the date by which the Change in Control Repurchase Notice pursuant to this Section 3.10 must be given;

(3)     the Change in Control Repurchase Date;

(4)     the Change in Control Repurchase Price;

(5)     the name and address of the Paying Agent and the Conversion Agent;

(6)     the Conversion Price and any adjustments thereto;

(7)     that Notes as to which a Change in Control Repurchase Notice has been given may be converted pursuant to Article 10 hereof and paragraph 9 on the reverse side of the Notes only if the Change in Control Repurchase Notice has been withdrawn in accordance with the terms of this Indenture;

(8)     that Notes must be surrendered to the Paying Agent to collect payment;

(9)     that the Change in Control Repurchase Price for any Note as to which a Change in Control Repurchase Notice has been duly given and not withdrawn will be paid promptly following the later of the Change in Control Repurchase Date and the time of surrender of such Note as described in (8) above;

(10)     briefly, the procedures the Holder must follow to exercise rights under this Section 3.10;

(11)     briefly, the conversion rights of the Notes;

32

(12)    the procedures for withdrawing a Change in Control Repurchase Notice;

(13)    that, unless the Company defaults in making payment on Notes for which a Change in Control Repurchase Notice has been submitted, interest on such Notes will cease to accrue on and after the Change in Control Repurchase Date;

(14)    the CUSIP number of the Notes; and

(15)    whether the Change in Control Repurchase Price shall be paid by the Company in cash or by delivery of shares of Common Stock or a combination thereof, and if a combination thereof, such notice shall provide the proportion of cash and Common Stock.

If any of the Notes to be redeemed are in the form of a Global Note, the Company shall modify such notice to the extent necessary to accord with the procedures of the Depositary applicable to repurchases.

At the Company's request, the Trustee shall give such Company Change in Control Notice on behalf of the Company and at the Company's expense; provided, however, that, in all cases, the text of such Company Change in Control Notice shall be prepared by the Company.

(c)    Purchases of Notes by the Company pursuant to Section 3.10(a) hereof shall be made, at the option of the Holder thereof, upon:

(1)    delivery to the Paying Agent by the Holder of a written notice of repurchase in the form set forth in Exhibit C attached hereto (a "Change in Control Repurchase Notice") on or prior to the 45th day after the date of the Company Change in Control Notice pursuant to 3.10(b) above, stating:

(i)    the certificate number of the Note which the Holder will deliver to be repurchased (or if the Notes are not certificated, the Change in Control Repurchase Notice must comply with the procedures of the Depositary applicable to repurchases);

(ii)    the portion of the principal amount of the Note which the Holder will deliver to be repurchased, which portion must be $1,000 or any whole multiple thereof;

(iii)    that such Note shall be repurchased pursuant to the terms and conditions specified in paragraph 8 on the reverse side of the Notes; and

(iv)    if that the Company elects, pursuant to the Section 3.10(d), to pay the Change in Control Repurchase Price to be paid as of such Change in Control Repurchase Date, in whole or in part, in shares of Common Stock but such portion of the Change in Control Repurchase Price shall ultimately be payable to such Holder entirely in cash because any condition to payment of the Change in Control Repurchase Price (or a portion thereof) in Common Stock is not satisfied prior to the close of business on the Business Day immediately preceding such Repurchase Date, as set forth in Section 3.10(f), whether such Holder elects (i) to withdraw such Change in Control Repurchase

Notice as to some or all of the Notes to which such Change in Control Repurchase Notice relates (stating the principal amount and certificate numbers of the Notes as to which such withdrawal shall relate), or (ii) to receive cash in respect of the entire Change in Control Repurchase Price for all Notes (or portion thereof) to which such Change in Control Repurchase Price relates.

(2)     delivery of such Note to the Paying Agent prior to, on or after the Change in Control Repurchase Date (together with all necessary endorsements) at the offices of the Paying Agent (if the Notes are not certificated, such delivery must comply with the procedures of the Depositary applicable to repurchases) shall be a condition to the receipt by the Holder of the Change in Control Repurchase Price therefor. The Change in Control Repurchase Price shall be so paid pursuant to this Section 3.10 only if the Note so delivered to the Paying Agent shall conform in all respects to the description thereof in the related Change in Control Repurchase Notice, as determined by the Company.

If a Holder, in such Holder's Change in Control Repurchase Notice and in any written notice of withdrawal delivered by such Holder pursuant to the terms of Section 3.10(c)(1), fails to indicate such Holder's choice with respect to the election set forth in clause (iv) of Section 3.10(c)(1), such Holder shall be deemed to have elected to receive cash in respect of the Change in Control Repurchase Price for all Notes subject to Change in Control Notice in the circumstances set forth in such clause (iv).

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Change in Control Repurchase Notice contemplated by this Section 3.10(c) shall have the right to withdraw such Change in Control Repurchase Notice at any time prior to the close of business on the Change in Control Repurchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 3.11.

The Paying Agent shall promptly notify the Company of the receipt by it of any Change in Control Repurchase Notice or written withdrawal thereof.

(d)     The Notes to be purchased pursuant to Section 3.10(a) may be paid for, at the election of the Company, in cash or Common Stock, or in any combination of cash and Common Stock, subject to the conditions set forth in Sections 3.10(e) and (f). The Company shall designate, in the Company Change in Control Notice delivered pursuant to Section 3.10(b), whether the Company will repurchase the Notes for cash or Common Stock, or, if a combination thereof, the percentages of the Change in Control Repurchase Price of Notes in respect of which it will pay in cash or Common Stock; provided that the Company will pay cash for fractional interests in Common Stock. For purposes of determining the existence of potential fractional interests, all Notes subject to repurchase by the Company held by a Holder shall be considered together (no matter how many separate certificates are to be presented). Each Holder whose Notes are purchased pursuant to this Section 3.10 shall receive the same percentage of cash or Common Stock in payment of the Change in Control Price for such Notes, except (i) as provided in Section 3.10(f) with regard to the payment of cash in lieu of fractional shares of Common Stock and (ii) in the event that the Company is unable to repurchase the Notes of a Holder or Holders for Common Stock because any of the conditions specified in Section 3.10(f) have not been satisfied, the Company, subject to such Holder's or Holders' election under Section

3.10(c)(1)(iv) to withdraw its Change in Control Repurchase Notice, may repurchase the Notes of such Holder or Holders for cash. The Company may not change its election with respect to the consideration (or components or percentages of components thereof) to be paid once the Company has given its Company Change in Control Notice to Holders except pursuant to this Section 3.10(b) or pursuant to Section 3.10(f) in the event of a failure to satisfy, prior to the close of business on the Change in Control Repurchase Date, any condition to the payment of the Change in Control Repurchase Price, in whole or in part, in Common Stock.

At least three Business Days before the date on which the Company provides its Company Change in Control Notice, the Company shall deliver an Officers' Certificate to the Trustee specifying:

      (i)    the manner of payment selected by the Company,

      (ii)   the information required by Section 3.10(b),

      (iii)  if the Company elects to pay the Repurchase Price, or a specified percentage thereof, in Common Stock, that the conditions to such manner of payment set forth in Section 3.10(f) have been or will be complied with, and

      (iv)  whether the Company desires the Trustee to give the Company Change in Control Notice required by Section 3.10(b).

      (e)     On the date as provided in Section 3.12, at the option of the Company, as specified in the Change in Control Repurchase Notice or if the conditions in Section 3.10(f) have not been met, the Change in Control Repurchase Price of Notes in respect of which a Change in Control Repurchase Notice pursuant to Section 3.10(c) has been given, or a specified percentage thereof, may be paid by the Company with cash equal to the aggregate Change in Control Repurchase Price of such Notes. If the Company elects to repurchase Notes with cash, the Company Change in Control Notice, as provided in Section 3.10(b), shall be sent to Holders (and to beneficial owners as required by applicable law) not less than 20 Business Days prior to such Change in Control Repurchase Date.

      (f)     On the date as provided in Section 3.12, at the option of the Company, as specified in the Change in Control Repurchase Notice, subject to satisfaction of the conditions set forth in this Section 3.10(f), the Change in Control Repurchase Price of Notes in respect of which a Change in Control Repurchase Notice pursuant to Section 3.10(c) has been given, or a specified percentage thereof, may be paid by the Company by the issuance of a number of shares of Common Stock equal to the quotient obtained by dividing (i) the amount of cash to which the Holders would have been entitled had the Company elected to pay all or such specified percentage, as the case may be, of the Change in Control Repurchase Price of such Notes in cash by (ii) 95% of the average of the Closing Prices per share of Common Stock for the five consecutive Trading Days immediately preceding and including the third Trading Day prior to the Change in Control Repurchase Date, subject to the next succeeding paragraph.

The Company will not issue a fractional share of Common Stock in payment of the Change in Control Repurchase Price. Instead the Company will pay cash for the value of the

fractional share. The value of a fraction of a share shall be determined by multiplying (i) 95% of the average of the Closing Prices per share of Common Stock for the five consecutive Trading Days immediately preceding and including the third Trading Day prior to the Change in Control Repurchase Date by (ii) such fraction and rounding the product to the nearest whole cent. It is understood that if a Holder elects to have more than one Note purchased, the number of shares of Common Stock shall be based on the aggregate amount of Notes to be purchased.

Upon the delivery by the Company to the Holders of the full number of the shares of Common Stock into which the Notes are convertible, together with cash payment, if any, for the cash portion of the Change in Control Repurchase Price or the Holders' fractional shares, the obligation of the Company to pay the principal amount of the Notes and any accrued and unpaid interest thereon shall be deemed satisfied. Accrued and unpaid interest shall be deemed paid in full rather than cancelled, extinguished or forfeited.

The Company's right to exercise its election to repurchase the Notes pursuant to Section 3.10 through the issuance of shares of Common Stock shall be conditioned upon:

(i)    The shares of Common Stock to be issued upon repurchase of Notes hereunder:

(A)    shall not require registration under any federal securities law before such shares may be freely transferable without being subject to any transfer restrictions under the Securities Act upon repurchase or, if such registration is required, such registration shall be completed and shall become effective prior to the Change in Control Repurchase Date; and

(B)    shall not require registration with, or approval of, any governmental authority under any state law or any other federal law before shares may be validly issued or delivered upon repurchase or if such registration is required or such approval must be obtained, such registration shall be completed or such approval shall be obtained prior to the Change in Control Repurchase Date.

(ii)    The shares of Common Stock to be listed upon repurchase of Notes hereunder are, or shall have been, approved for listing on the Nasdaq National Market or the New York Stock Exchange or listed on another national securities exchange, in any case, prior to the Change in Control Repurchase Date.

(iii)    All shares of Common Stock which may be issued upon repurchase of Notes will be issued out of the Company's authorized but unissued Common Stock and will, upon issue, be duly and validly issued and fully paid and nonassessable and free of any preemptive or similar rights.

If any of the conditions set forth in clauses (i) through (iii) of this Section 3.10(f) are not satisfied in accordance with the terms thereof, the Change in Control Repurchase Price shall be paid by the Company only in cash.

(g)    The Company shall repurchase from the Holder thereof, pursuant to this Section 3.10, a portion of a Note if the principal amount of such portion is $1,000 or a whole multiple of $1,000. Provisions of this Indenture that apply to the repurchase of all of a Note also apply to the repurchase of such portion of such Note.

(h)    The Company shall deposit cash (in respect of a cash repurchase under Section 3.10(e) or for fractional interests, as applicable) or shares of Common Stock, or a combination thereof, as applicable, at the time and in the manner as provided in Section 3.12, sufficient to pay the aggregate Change in Control Repurchase Price of all Notes to be purchased pursuant to this Section 3.10. As soon as practicable after the Change in Control Repurchase Date, the Company shall deliver to each Holder entitled to receive Common Stock through the Paying Agent, a certificate for the number of full shares of Common Stock issuable in payment of the Change in Control Repurchase Price and cash in lieu of any fractional interests. The person in whose name the certificate for Common Stock is registered shall be treated as a holder of record of shares of Common Stock on the Business Day following the Repurchase Date. No payment or adjustment will be made for dividends on the Common Stock the record date for which occurred on or prior to the Change in Control Repurchase Date.

(i)    If a Holder of a Note is paid in Common Stock, the Company shall pay any documentary, stamp or similar issue or transfer tax due on such issue of shares of Common Stock. However, the Holder shall pay any such tax which is due because the Holder requests the shares of Common Stock to be issued in a name other than the Holder's name. The Paying Agent may refuse to deliver the certificates representing the Common Stock being issued in a name other than the Holder's name until the Paying Agent receives a sum sufficient to pay any tax which will be due because the shares of Common Stock are to be issued in a name other than the Holder's name. Nothing herein shall preclude any income tax withholding required by law or regulations.

SECTION 3.11    Effect of Change in Control Repurchase Notice. Upon receipt by the Paying Agent of the Change in Control Repurchase Notice specified in Section 3.10(c), the Holder of the Note in respect of which such Change in Control Repurchase Notice was given shall (unless such Change in Control Repurchase Notice is withdrawn as specified in the following two paragraphs) thereafter be entitled to receive solely the Change in Control Repurchase Price with respect to such Note. Such Change in Control Repurchase Price shall be paid to such Holder, subject to receipt of consideration for the Notes and/or Notes from the Holders by the Paying Agent, promptly following the later of (x) the Change in Control Repurchase Date with respect to such Note (provided the conditions in Section 3.10(c) have been satisfied) and (y) the time of delivery of such Note to the Paying Agent by the Holder thereof in the manner required by Section 3.10(c). Notes in respect of which a Change in Control Repurchase Notice has been given by the Holder thereof may not be converted pursuant to Article 10 hereof on or after the date of the delivery of such Change in Control Repurchase Notice unless such Change in Control Repurchase Notice has first been validly withdrawn as specified in the following two paragraphs.

A Change in Control Repurchase Notice may be withdrawn by means of a written notice of withdrawal delivered to the office of the Paying Agent in accordance with the Change

37

in Control Repurchase Notice at any time prior to the close of business on the Change in Control Repurchase Date, specifying:

      (1)    the certificate number of the Note in respect of which such notice of withdrawal is being submitted (or, if the Notes are not certificated, the withdrawal notice must contain information required to comply with appropriate DTC procedures),

      (2)    the principal amount of the Note with respect to which such notice of withdrawal is being submitted, and

      (3)    the principal amount, if any, of such Note which remains subject to the original Change in Control Repurchase Notice and which has been or will be delivered for repurchase by the Company.

      There shall be no repurchase of any Notes pursuant to Section 3.10, if there has occurred (prior to, on or after, as the case may be, the giving, by the Holders of such Notes, of the required Change in Control Repurchase Notice) and is continuing an Event of Default (other than a default in the payment of the Change in Control Repurchase Price with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Notes (x) with respect to which a Change in Control Repurchase Notice has been withdrawn in compliance with this Indenture, or (y) held by it during the continuance of an Event of Default (other than a default in the payment of the Change in Control Repurchase Price with respect to such Notes) in which case, upon such return, the Change in Control Repurchase Notice with respect thereto shall be deemed to have been withdrawn.

      SECTION 3.12    Deposit of Change in Control Repurchase Price.  Prior to 11:00 a.m. (New York City time) on the Business Day following the Change in Control Repurchase Date the Company shall deposit with the Trustee or with the Paying Agent (or, if the Company or a Subsidiary or an Affiliate of either of them is acting as the Paying Agent, shall segregate and hold in trust as provided in Section 2.04) an amount of money (in immediately available funds if deposited on such Business Day) or Common Stock, or a combination thereof, if permitted hereunder, sufficient to pay the aggregate Change in Control Repurchase Price of all the Notes or portions thereof which are to be repurchased as of the Change in Control Repurchase Date. The manner in which the deposit required by this Section 3.12 is made by the Company shall be at the option of the Company.

      SECTION 3.13    Notes Repurchased in Part.  Any Note which is to be repurchased only in part shall be surrendered at the office of the Paying Agent (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or such Holder's attorney duly authorized in writing) and the Company shall execute and the Trustee shall authenticate and deliver to the Holder of such Note, without service charge, a new Note or Notes, of any authorized denomination as requested by such Holder in aggregate principal amount equal to, and in exchange for, the portion of the principal amount of the Note so surrendered which is not repurchased.