Table of Contents

price of $3.705 per share, which is equal to a conversion rate of approximately 269.9055 shares per $1,000 principal amount of notes. The conversion price is subject to adjustment.

At issuance of the notes the Company purchased and pledged to a collateral agent, as security for the exclusive benefit of the holders of the notes, approximately $14.4 million of U.S. government securities, which will be sufficient upon receipt of scheduled principal and interest payments thereon, to provide for the payment in full of the first eight scheduled interest payments due on the notes. At January 28, 2007 and April 30, 2006, approximately $1.3 million and $5.5 million, respectively, of U.S. government securities remained pledged as security for the note holders.

The notes are subordinated to all of the Company's existing and future senior indebtedness and effectively subordinated to all existing and future indebtedness and other liabilities of its subsidiaries. Because the notes are subordinated, in the event of bankruptcy, liquidation, dissolution or acceleration of payment on the senior indebtedness, holders of the notes will not receive any payment until holders of the senior indebtedness have been paid in full. The indenture does not limit the incurrence by the Company or its subsidiaries of senior indebtedness or other indebtedness. The Company may redeem the notes, in whole or in part, at any time up to, but not including, the maturity date at specified redemption prices, plus accrued and unpaid interest, if the closing price of the Company's common stock exceeds $5.56 per share for at least 20 trading days within a period of 30 consecutive trading days.

Upon a change in control of the Company, each holder of the notes may require the Company to repurchase some or all of the notes at a repurchase price equal to 100% of the principal amount of the notes plus accrued and unpaid interest. The Company may, at its option, pay all or a portion of the repurchase price in shares of the Company's common stock valued at 95% of the average of the closing sales prices of its common stock for the five trading days immediately preceding and including the third trading day prior to the date the Company is required to repurchase the notes. The Company cannot pay the repurchase price in common stock unless the Company satisfies the conditions described in the indenture under which the notes have been issued.

The notes were issued in fully registered form and are represented by one or more global notes, deposited with the trustee as custodian for DTC and registered in the name of Cede & Co., DTC's nominee. Beneficial interests in the global notes will be shown on, and transfers will be effected only through, records maintained by DTC and its participants.

In separate, privately-negotiated transactions on October 6, 2006, the Company exchanged $100 million in principal amount of its outstanding 2-1/2% convertible notes due in 2010 for a new series of notes described below. The exchange primarily resulted in the elimination the single-day put option which would have allowed the holders of the original notes to require the Company to repurchase some or all of the notes, for cash or common stock of the Company (at the option of the Company), on October 15, 2007. In accordance with the provisions of Emerging Issues Task Force ("EITF") 96-19, *Debtor's Accounting for a Modification or Exchange of Debt Instruments* , ("EITF 96-19") and EITF 05-07, *Accounting for Modifications to Conversion Options Embedded in Debt Instruments and Related Issues* , ("EITF 05-07") the exchange was treated as the extinguishment of the original debt and issuance of new debt. Accordingly, the Company recorded a non-cash loss on debt extinguishment of $31.6 million during the second quarter of fiscal 2007 which included $1.9 million of unamortized debt issuance costs related to the $100 million of the notes that were exchanged. The remaining $50 million in principal amount of the original notes were not modified, and have been classified as a current liability as a result of the put option. On October 15, 2007, none of the note holders exercised the right to require the Company to repurchase these notes.

Unamortized debt issuance costs associated with these notes were $868,000 and $3.1 million at January 28, 2007 and April 30, 2006, respectively. Amortization of prepaid loan costs are classified as other income (expense), net on the consolidated statements of operations. Amortization of prepaid loan costs for the three and nine months ended January 28, 2007 were $59,000 and $410,000, respectively. Amortization of prepaid loan costs for the three and nine months ended January 29, 2006 were $176,000 and $527,000, respectively.

### Convertible Senior Subordinated Notes due 2010

On October 6, 2006, the Company entered into separate, privately-negotiated, exchange agreements with certain holders of its existing 2 ½% Convertible Subordinated Notes due 2010 (the "Old Notes"), pursuant to which holders of an aggregate of $100 million of the Old Notes agreed to exchange their Old Notes for $100 million in aggregate principal amount of a new series of 2½% Convertible Senior Subordinated Notes due 2010 (the "New Notes"), plus accrued and unpaid interest on the Old Notes at the day prior to the closing of the exchange. Interest on the New Notes is 2 ½% per annum, payable semiannually on April 15 and October 15, and the New Notes are convertible, at the option of the holder under certain circumstances, on or prior to maturity into shares of the Company's common stock at a conversion price of $3.28 per share, which is equal to a rate of approximately 304.9055 shares of Finisar common stock per $1,000 principal amount of the New Notes. The conversion price is subject to adjustment. As noted above, this exchange was treated as the issuance of new debt under EITF 96-19 and 05-07.

21

USB FIN 001943

Table of Contents

The New Notes contain a net share settlement feature which requires that, upon conversion of the New Notes into common stock of the Company, Finisar will pay holders in cash for up to the principal amount of the converted New Notes and that any amounts in excess of the cash amount will be settled in shares of Finisar common stock.

The New Notes are subordinated to all of the Company's existing and future senior indebtedness and effectively subordinated to all existing and future indebtedness and other liabilities of its subsidiaries. Because the New Notes are subordinated, in the event of bankruptcy, liquidation, dissolution or acceleration of payment on the senior indebtedness, holders of the New Notes will not receive any payment until holders of the senior indebtedness have been paid in full. The indenture does not limit the incurrence by the Company or its subsidiaries of senior indebtedness or other indebtedness. The Company may redeem the New Notes, in whole or in part, at any time up to, but not including, the maturity date at specified redemption prices, plus accrued and unpaid interest, if the closing price of the Company's common stock exceeds $4.92 per share for at least 20 trading days within a period of 30 consecutive trading days.

Upon a change in control of the Company, each holder of the New Notes may require the Company to repurchase some or all of the New Notes at a repurchase price equal to 100% of the principal amount of the New Notes plus accrued and unpaid interest. The Company may, at its option, pay all or a portion of the repurchase price in shares of the Company's common stock valued at 95% of the average of the closing sales prices of its common stock for the five trading days immediately preceding and including the third trading day prior to the date the Company is required to repurchase the New Notes. The Company cannot pay the repurchase price in common stock unless the Company satisfies the conditions described in the indenture under which the New Notes have been issued.

The New Notes were issued in fully registered form and are represented by one or more global notes, deposited with the trustee as custodian for DTC and registered in the name of Cede & Co., DTC's nominee. Beneficial interests in the global notes will be shown on, and transfers will be effected only through, records maintained by DTC and its participants.

The Company has agreed to use its best efforts to file a shelf registration statement covering the New Notes and the common stock issuable upon conversion of the stock and keep such registration statement effective until two years after the latest date on which the Company issued New Notes (or such earlier date when the holders of the New Notes and the common stock issuable upon conversion of the New Notes are able to sell their securities immediately pursuant to Rule 144(k) under the Securities Act). If the Company does not comply with these registration obligations, the Company will be required to pay liquidated damages to the holders of the New Notes or the common stock issuable upon conversion. The Company will not receive any of the proceeds from the sale by any selling security holders of the New Notes or the underlying common stock.

The Company considered the embedded derivative in the New Notes, that is, the conversion feature, and concluded that that it is indexed to the Company's common stock and would be classified as equity under EITF 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock* , were it to be accounted for separately and thus is not required to be bifurcated and accounted for separately from the debt.

The Company also considered the Company's call feature and the holders' put feature in the event of a change in control under the provisions of EITF 00-19 and related guidance, and concluded that they need not be accounted for separately from the debt.

During the second quarter of fiscal 2007 the Company incurred fees of approximately $2 million related to the exchange transactions which were capitalized and will be amortized over the life of the New Notes.

Unamortized debt issuance costs associated with the New Notes were $1.8 million and $0 at January 28, 2007 and April 30, 2006, respectively. Amortization of prepaid loan costs are classified as other income (expense), net on the consolidated statements of operations. Amortization of prepaid loan costs for the three and nine months ended January 28, 2007 were $120,000 for each period. The Company did not record any amortization on the New Notes in fiscal 2006.

**4. Inventories**

Inventories consist of the following (in thousands):

|  | January 28, 2007 | April 30, 2006 As Restated(1) |
|---|---|---|
| Raw materials | $ 20,042 | $ 19,133 |
| Work-in-process | 24,496 | 21,479 |
| Finished goods | 18,777 | 12,958 |
| Total inventory | $ 63,315 | $ 53,570 |

(1)   See Note 2, "Restatement of Condensed Consolidated Financial Statements," to Condensed Consolidated Financial Statements.

USB FIN 001944

Table of Contents

During the three and nine months ended January 28, 2007, the Company recorded charges of $3.0 million and $8.9 million, respectively, for excess and obsolete inventory, and sold inventory that was written-off in previous periods with an approximate cost of $1.0 million and $2.8 million, respectively. As a result, cost of revenue associated with the sale of this inventory was zero.

During the three and nine months ended January 29, 2006, the Company recorded charges of $5.4 million and $6.5 million, respectively, for excess and obsolete inventory, and sold inventory that was written-off in previous periods with an approximate cost of $500,000 and $3.2 million, respectively. As a result, cost of revenue associated with the sale of this inventory was zero.

## 5. Property and Equipment

Property and equipment consist of the following (in thousands):

|  | January 28, 2007 | April 30, 2006 |
|---|---|---|
| Land | $ 9,747 | $ 9,747 |
| Buildings | 11,184 | 10,929 |
| Computer equipment | 36,666 | 34,149 |
| Office equipment, furniture and fixtures | 3,182 | 3,182 |
| Machinery and equipment | 130,164 | 118,327 |
| Leasehold improvements | 13,517 | 7,445 |
| Contruction-in-process | 484 | 5,888 |
| Total | 204,944 | 189,667 |
| Accumulated depreciation and amortization | (123,438) | (107,442) |
| Property, equipment and improvements (net) | $ 81,506 | $ 82,225 |

## 6. Income Taxes

The Company recorded a provision for income taxes of $772,000 and $2.0 million for the three and nine months, respectively, ended January 28, 2007 compared to $541,000 and $1.8 million for the three and nine months, respectively, ended January 29, 2006. The provision for income tax expense for the three months ended January 28, 2007 and January 29, 2006, respectively, also includes non-cash charges of $544,000 and $675,000 for deferred tax liabilities that were recorded for tax amortization of goodwill for which no financial statement amortization has occurred under generally accepted accounting principles, as promulgated by SFAS 142.

The Company records a valuation allowance against its deferred tax assets for each period in which management concludes that it is more likely than not that the deferred tax assets will not be realized. Realization of the Company's net deferred tax assets is dependent upon future taxable income the amount and timing of which are uncertain. Accordingly, the Company's net deferred tax assets as of January 28, 2007 have been fully offset by a valuation allowance.

A portion of the valuation allowance for deferred tax assets at January 28, 2007 relates to tax net operating loss carry forwards and other tax attributes of acquired companies the tax benefit of which, when realized, will first reduce goodwill, then other non-current intangible assets arising from the acquired companies, and thereafter, income tax expense.

Utilization of the Company's net operating loss and tax credit carryforwards may be subject to a substantial annual limitation due to the ownership change limitations set forth by Internal Revenue Code Section 382 and similar state provisions. Such an annual limitation could result in the expiration of the net operating loss and tax credit carryforwards before utilization.

23

USB FIN 001945

Table of Contents

## 7. Purchased Intangible Assets

The following table reflects intangible assets subject to amortization as of January 28, 2007 and April 30, 2006 (in thousands):

| | January 28, 2007 | | |
| --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Purchased technology | $ 102,466 | ($92,029) | $ 10,437 |
| Trade name | 3,625 | (3,138) | 487 |
| Customer relationships | 3,758 | (1,599) | 2,159 |
| Total | $ 109,849 | ($96,766) | $ 13,083 |

| | April 30, 2006 | | |
| --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Purchased technology | $ 102,466 | ($87,494) | $ 14,972 |
| Trade name | 3,625 | (3,056) | 569 |
| Customer relationships | 5,243 | (1,628) | 3,615 |
| Total | $ 111,334 | ($92,178) | $ 19,156 |

Estimated remaining amortization expense for each of the next five fiscal years ending April 30, is as follows (dollars in thousands):

| Year | Amount |
| --- | --- |
| 2007 | $ 1,443 |
| 2008 | 5,356 |
| 2009 | 3,264 |
| 2010 | 1,594 |
| 2011 and beyond | 1,426 |
| | $ 13,083 |

During the third quarter of fiscal 2007, the Company determined that the remaining intangible assets related to certain customer relationships acquired from InterSAN, Inc. in May 2005 had been impaired and had a fair value of zero. Accordingly, an impairment charge of $619,000 was recorded against the remaining net book value of these assets in the network test and monitoring systems reporting unit during the third quarter of fiscal 2007. The charge is included in amortization of purchased intangibles.

24

USB FIN 001946

Table of Contents

## 8. Investments

### *Available-for-Sale Securities*

The following is a summary of the Company's available-for-sale investments as of January 28, 2007 and April 30, 2006 (in thousands):

| Investment Type | Amortized Cost | Gross Unrealized Gain | Gross Unrealized Loss | Market Value |
|---|---|---|---|---|
| **As of January 28, 2007** | | | | |
| Debt: | | | | |
| Corporate | $ 56,706 | $ 5 | $ (158) | $56,553 |
| Government agency | 18,748 | 4 | (40) | 18,712 |
| Mortgage-backed | 4,593 | — | (34) | 4,559 |
| Municipal | 300 | — | (5) | 295 |
| Other securities | 386 | — | — | 386 |
| | 80,733 | 9 | (237) | 80,505 |
| Equity: | | | | |
| Corporate | $ 3,607 | $ 4,552 | $ — | $ 8,159 |
| Total investments | $ 84,340 | $ 4,561 | $ (237) | $88,664 |
| Reported as: | | | | |
| Cash equivalents | $ 6,939 | $ — | $ — | $ 6,939 |
| Short-term investments | 56,408 | 4 | (138) | 56,274 |
| Long-term investments | 20,993 | 4,557 | (99) | 25,451 |
| Total | $ 84,340 | $ 4,561 | $ (237) | $88,664 |
| **As of April 30, 2006** | | | | |
| Debt: | | | | |
| Corporate | $ 51,925 | $ 1 | $ (357) | $51,569 |
| Government agency | 16,826 | — | (160) | 16,666 |
| Mortgage-backed | 5,125 | 1 | (54) | 5,072 |
| Municipal | 300 | — | (7) | 293 |
| Total | $ 74,176 | $ 2 | $ (578) | $73,600 |
| Reported as: | | | | |
| Cash equivalents | $ 18,176 | $ — | $ (1) | $18,175 |
| Short-term investments | 33,745 | 1 | (239) | 33,507 |
| Long-term investments | 22,255 | 1 | (338) | 21,918 |
| Total | $ 74,176 | $ 2 | $ (578) | $73,600 |

The gross realized losses for the three and nine months ended January 28, 2007 and January 29, 2006 were immaterial. Realized gains and losses were calculated based on the specific identification method.

### *Restricted Securities*

The Company has purchased and pledged to a collateral agent, as security for the exclusive benefit of the holders of the Company's 2 1/2% convertible subordinated notes, U.S. government securities, which will be sufficient upon receipt of scheduled principal and interest payments thereon, to provide for the payment in full of the first eight scheduled interest payments due on such outstanding convertible subordinated notes. These restricted securities are classified as held to maturity and are recorded on the Company's consolidated balance sheet at amortized cost. The following table summarizes the Company's restricted securities as of January 28, 2007 and April 30, 2006 (in thousands):

USB FIN 001947

| | Amortized Cost | Gross Unrealized Gain/(Loss) | Market Value |
|---|---|---|---|
| **As of January 28, 2007** | | | |
| Government agency | $ 1,250 | $ — | $ 1,250 |
| Classified as: | | | |
| Short term — less than 1 year | 1,250 | — | 1,250 |
| Total | $ 1,250 | $ — | $ 1,250 |
| | | | |
| **As of April 30, 2006** | | | |
| Government agency | $ 5,520 | $ (105) | $ 5,415 |
| Classified as: | | | |
| Short term — less than 1 year | 3,705 | (51) | 3,654 |
| Long term — 1 to 3 years | 1,815 | (54) | 1,761 |
| Total | $ 5,520 | $ (105) | $ 5,415 |

## 9. Minority Investments

Minority investments is comprised of several investments in other companies accounted for under the cost method.

### Cost Method Investments

Included in minority investments at January 28, 2007 and April 30, 2006 are cost method investments of $11.3 million for each period.

### Equity Method Investment

Included in minority investments at January 28, 2007 and April 30, 2006 are $0 and $3.8 million, respectively, representing the carrying value of the Company's minority investment in one private company accounted for under the equity method. During the three and nine months ended January 28, 2007, the Company recorded expenses of $0 and $237,000, respectively, representing the Company's share of the loss of the investee. During the three and nine months ended January 29, 2006, the Company recorded expenses of $476,000 and $1.5 million, respectively, representing its share of the loss of the investee. These losses were classified as other expense.

### Conversion of Equity Method Investment to Available-for-Sale Securities

During the first quarter of fiscal 2007, the Company's ownership percentage in its equity method investee decreased below 20%. Additionally, the investee became a publicly traded company. The Company classified this investment as available-for-sale securities in accordance with SFAS 115 and recorded an unrealized gain of $11.9 million in accumulated other comprehensive income at July 31, 2006. As of January 28, 2007, the fair market value of this investment included in long-term available-for-sale investments was $8.2 million.

## 10. Employee Benefit Plans

### Employee Stock Purchase Plan

The Company has an Employee Stock Purchase Plan, which includes its sub-plan, the International Employee Stock Purchase Plan (together the "Purchase Plan"), under which 15,750,000 shares of the Company's common stock have been reserved for issuance. Eligible employees may purchase a limited number of shares of common stock at a discount of 15% to the market value at certain plan-defined dates. During the three months ended January 28, 2007, the Company did not issue any shares under this plan. During the nine months ended January 28, 2007, the Company issued 860,025 shares under this plan. For the three and nine months ended January 29, 2006, the Company did not issue any shares under this plan. At January 28, 2007, 10,060,097 shares were available for issuance under the Purchase Plan.

The Purchase Plan permits eligible employees to purchase Finisar common stock through payroll deductions, which may not exceed 20% of the employee's total compensation. Stock may be purchased under the plan at a price equal to 85% of the fair market value of Finisar common stock on either the first or the last day of the offering period, whichever is lower.

USB FIN 001948

Table of Contents

### Employee Stock Option Plans

During fiscal 1989, Finisar adopted the 1989 Stock Option Plan (the "1989 Plan"). The 1989 Plan expired in April 1999 and no further option grants have been made under the 1989 Plan since that time. Options granted under the 1989 Plan had an exercise price of not less than 85% of the fair value of a share of common stock on the date of grant (110% of the fair value in certain instances) as determined by the board of directors. Options generally vested over five years and had a maximum term of 10 years.

Finisar's 1999 Stock Option Plan was adopted by the board of directors and approved by the stockholders in September 1999. An amendment and restatement of the 1999 Stock Option Plan, including renaming it the 2005 Stock Incentive Plan (the "2005 Plan"), was approved by the board of directors in September 2005 and by the stockholders in October 2005. A total of 21,000,000 shares of common stock were initially reserved for issuance under the 2005 Plan. The share reserve automatically increases on May 1 of each calendar year by a number of shares equal to 5% of the number of shares of Finisar's common stock issued and outstanding as of the immediately preceding April 30, subject to certain restrictions on the aggregate maximum number of shares that may be issued pursuant to incentive stock options. The types of stock-based awards available under the 2005 Plan includes stock options, stock appreciation rights, restricted stock units and other stock-based awards which vest upon the attainment of designated performance goals or the satisfaction of specified service requirements or, in the case of certain restricted stock units or other stock-based awards, become payable upon the expiration of a designated time period following such vesting events. To date, only stock options have been granted under the 2005 Plan. Options generally vest over five years and have a maximum term of 10 years. As both of January 28, 2007 and January 29, 2006, 3,700 shares were subject to repurchase.

A summary of activity under the Company's employee stock option plans is as follows:

| Options for Common Stock | Options Available for Grant | Options Outstanding | | | |
|---|---|---|---|---|---|
| | Number of Shares | Number of Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (In years) | Aggregate Intrinsic Value (1) ($000's) |
| Balance at April 30, 2006 | 20,067,862 | 41,849,962 | $2.34 | | |
| Increase in authorized shares | 15,275,605 | | — | | |
| Options granted | (7,203,062) | 7,203,062 | $3.49 | | |
| Options exercised | | (2,259,152) | $1.61 | | |
| Options canceled | 1,523,920 | (1,523,920) | $2.85 | | |
| Balance at January 28, 2007 | 29,664,325 | 45,269,952 | $2.54 | 6.66 | $57,285 |

(1)    Represents the difference between the exercise price and the value of Finisar common stock at January 26, 2007.

The aggregate intrinsic value in the preceding table represents the total pretax intrinsic value, based on the Company's closing stock price of $3.28 as of January 26, 2007, which would have been received by the option holders had all option holders exercised their options as of that date.

27

USB FIN 001949

Table of Contents

The following table summarizes significant ranges of outstanding and exercisable options as of January 28, 2007:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| | Number of Shares | Weighted-Average Remaining Contractual Life (In years) | Weighted-Average Exercise Price | Number of Shares Exercisable | Weighted-Average Exercise Price |
| $0.05 - $1.15 | 7,394,037 | 6.65 | $ 1.07 | 2,999,041 | $ 1.04 |
| $1.18 - $1.50 | 6,839,905 | 6.12 | 1.40 | 4,047,087 | 1.46 |
| $1.58 - $1.73 | 1,680,800 | 5.44 | 1.73 | 1,440,000 | 1.73 |
| $1.76 - $1.76 | 4,746,725 | 7.70 | 1.76 | 1,715,525 | 1.76 |
| $1.77 - $1.80 | 8,613,489 | 6.13 | 1.79 | 6,810,651 | 1.80 |
| $1.84 - $3.10 | 8,845,691 | 7.78 | 2.67 | 2,682,451 | 2.50 |
| $3.14 - $4.63 | 4,814,025 | 6.30 | 3.80 | 2,452,125 | 3.74 |
| $4.64 - $21.71 | 2,051,980 | 5.86 | 11.05 | 1,142,060 | 16.00 |
| $22.13 - $22.13 | 280,300 | 3.37 | 22.13 | 280,300 | 22.13 |
| $22.50 - $22.50 | 3,000 | 3.42 | 22.50 | 3,000 | 22.50 |
| | 45,269,952 | 6.66 | $ 2.54 | 23,572,240 | $ 2.85 |

The weighted-average remaining contractual life of options exercisable is 5.8 years. The total number of in-the-money options exercisable as of January 28, 2007 was 19.9 million.

*Valuation and Expense Information under SFAS 123(R)*

On May 1, 2006, the Company adopted SFAS 123(R), which requires the measurement and recognition of compensation expense for all share-based payment awards made to the Company's employees and directors including employee stock options and employee stock purchases under its 1999 Employee Stock Purchase Plan based on estimated fair values. The following table summarizes stock-based compensation expense related to employee stock options and employee stock purchases under SFAS 123(R) for the three and nine months ended January 28, 2007 which was reflected in our operating results as follows (in thousands):

| | Three Months Ended January 28, 2007 | Nine Months Ended January 28, 2007 |
|---|---|---|
| Cost of revenues | $ 843 | $ 2,877 |
| Stock-based compensation expense included in cost of revenues | 843 | 2,877 |
| Research and development | 965 | 3,231 |
| Sales and marketing | 462 | 1,497 |
| General and administrative | 584 | 1,820 |
| Stock-based compensation expense included in operating expenses | 2,011 | 6,548 |
| Stock-based compensation expense related to employee stock options and employee stock purchases | 2,854 | 9,425 |
| Tax benefit | — | — |
| Stock-based compensation expense related to employee stock options and employee stock purchases, net of tax | $ 2,854 | $ 9,425 |

As a result of adopting SFAS 123(R), the Company's net income for the three months ended January 28, 2007 was $2.6 million lower than if the Company had continued to account for stock-based compensation under APB 25. As a result of adopting SFAS 123(R), the Company's net loss for the nine months ended January 28, 2007, was $7.7 million higher than if the Company had continued to account for stock-based compensation under APB 25. Basic and diluted income per share for the three months ended

28

USB FIN 001950

January 28, 2007 would have improved by $0.01 had the Company continued to account for share-based compensation under APB 25. Basic and diluted loss per share for the nine months ended January 28, 2007 would have improved by $0.03 per share had the Company continued to account for share-based compensation under APB 25.

The total stock-based compensation capitalized as part of inventory as of January 28, 2007 was $319,000.

As of January 28, 2007, total compensation cost related to unvested stock options not yet recognized was $16.8 million which is expected to be recognized over the next 26 months on a weighted-average basis.

Upon adoption of SFAS 123(R), the Company began estimating the value of employee stock options on the date of grant using the Black-Scholes option-pricing model with a straight-line attribution method to recognize share-based compensation expense. Compensation expense for all share-based payment awards granted prior to the adoption of SFAS 123(R) was recognized using the Black-Scholes option-pricing model with a multiple-option approach for the purpose of the pro forma financial information in accordance with SFAS 123.

The fair value of each option grant is estimated on the date of grant using the Black-Scholes option-pricing model and the straight-line attribution approach with the following weighted-average assumptions:

|  | Employee Stock Option Plans | | Employee Stock Purchase Plan | |
|---|---|---|---|---|
|  | January 28, 2007 | January 29, 2006 | January 28, 2007 | January 29, 2006 |
| Expected term (in years) | 5.24 | 3.01 | 0.50 | 0.5 |
| Volatility | 100% | 107% | 69% | 68% |
| Risk-free interest rate | 4.78% | 4.38% | 4.45% | 4.14% |
| Dividend yield | 0.00% | 0.00% | 0.00% | 0.00% |

The expected term represents the period that the Company's stock-based awards are expected to be outstanding and was determined based on the Company's historical experience with similar awards, giving consideration to the contractual terms of the stock-based awards, vesting schedules and expectations of future employee behavior as influenced by changes to the terms of its stock-based awards.

The fair value of stock based payments made during the three months ended January 28, 2007 and January 29, 2006, were valued using the Black-Scholes option-pricing model with a volatility factor based on the Company's historical stock prices.

The Company bases the risk-free interest rate used in the Black-Scholes option-pricing model on constant maturity bonds from the Federal Reserve in which the maturity is set equal to the expected term.

The Black-Scholes option-pricing model calls for a single expected dividend yield as an input. The Company has not issued any dividends.

As stock-based compensation expense recognized in the condensed consolidated statement of operations for the first three quarters of fiscal 2007 is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures. SFAS 123(R) requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. Forfeitures were estimated based on historical experience. In the Company's pro forma information required under SFAS 123 for the periods prior to fiscal 2007, the Company accounted for forfeitures as they occurred.

29

USB FIN 001951

Table of Contents

*Pro Forma information Under SFAS 123 for Periods Prior to Fiscal 2007*

The following table summarizes the pro forma information regarding option grants made to the Company's employees and directors and employee stock purchases related to the Purchase Plan had the Company applied the fair value recognition provisions of SFAS 123 (in thousands, except share and per share amounts):

| | Three Months Ended January 29, 2006 (As Restated) | Nine Months Ended January 29, 2006 (As Restated) |
|---|---|---|
| Net loss | $ 5,654 | $ (29,810) |
| Add: | | |
| APB 25 stock-based compensation expense, included in net loss, net of tax | 2,521 | 3,067 |
| Less: | | |
| Stock-based compensation expense determined under fair value based method, net of tax | (2,887) | (6,521) |
| Pro forma net loss | $ 5,288 | $ (33,264) |
| | | |
| Basic net income (loss) per share-as reported | $ 0.02 | $ (0.10) |
| Diluted net income (loss) per share-as reported | $ 0.02 | $ (0.10) |
| | | |
| Basic net income (loss) per share-pro forma | $ 0.02 | $ (0.12) |
| Diluted net income (loss) per share-as pro forma | $ 0.02 | $ (0.12) |
| | | |
| Shares used in computing reported and pro forma net loss: | | |
| Basic | 297,265 | 286,434 |
| Diluted | 307,681 | 286,434 |

The weighted-average estimated value of employee stock options granted during the three and nine months ended January 29, 2006 was $1.43 and $1.21, respectively, using the Black-Scholes model with the following weighted-average assumptions:

| | Three Months Ended January 29, 2006 | Nine Months Ended January 29, 2006 |
|---|---|---|
| Expected term (in years) | 2.72 | 3.01 |
| Volatility | 107% | 107% |
| Risk-free interest rate | 4.46% | 4.38% |
| Dividend yield | 0.00% | 0.00% |

*Accuracy of Fair Value Estimates*

The Black-Scholes option valuation model requires the input of highly subjective assumptions, including the expected life of the stock-based award and the stock price volatility. The assumptions listed above represent management's best estimates, but these estimates involve inherent uncertainties and the application of management judgment. As a result, if other assumptions had been used, our recorded and pro forma stock-based compensation expense could have been materially different from that depicted above. In addition, we are required to estimate the expected forfeiture rate and only recognize expense for those shares expected to vest. If our actual forfeiture rate is materially different from our estimate, the stock-based compensation expense could be materially different.

## 11. Segments and Geographic Information

The Company designs, develops, manufactures and markets optical subsystems, components and test and monitoring systems for high-speed data communications. The Company views its business as having two principal operating segments, consisting of optical subsystems and components and network test and monitoring systems.

Optical subsystems consist primarily of transceivers sold to manufacturers of storage and networking equipment for storage area networks (SANs) and local area networks (LANs) and metropolitan access network (MAN) applications. Optical subsystems also include multiplexers, de-multiplexers and optical add/drop modules for use in MAN applications. Optical components consist

30

USB FIN 001952

Table of Contents

primarily of packaged lasers and photo-detectors which are incorporated in transceivers, primarily for LAN and SAN applications. Network test and monitoring systems include products designed to test the reliability and performance of equipment for a variety of protocols including Fibre Channel, Gigabit Ethernet, 10 Gigabit Ethernet, iSCSI, SAS and SATA. These test and monitoring systems are sold to both manufacturers and end-users of the equipment.

Both of the Company's operating segments and its corporate sales function report to the President and Chief Executive Officer. Where appropriate, the Company charges specific costs to these segments where they can be identified and allocates certain manufacturing costs, research and development, sales and marketing and general and administrative costs to these operating segments, primarily on the basis of manpower levels or a percentage of sales. The Company does not allocate income taxes, non-operating income, acquisition related costs, stock compensation, interest income and interest expense to its operating segments. The accounting policies of the segments are the same as those described in the summary of significant accounting policies. There are no intersegment sales.

31

USB FIN 001953

**Table of Contents**

Information about reportable segment revenues and income/(losses) are as follows (in thousands):

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | January 28, 2007 | January 29, 2006 As Restated(1) | January 28, 2007 | January 29, 2006 As Restated(1) |
| Revenues: | | | | |
| Optical subsystems and components | $ 98,007 | $ 84,199 | $ 293,059 | $ 234,018 |
| Network test and monitoring systems | 9,512 | 9,336 | 28,892 | 27,871 |
|     Total revenues | $ 107,519 | $ 93,535 | $ 321,951 | $ 261,889 |
| Depreciation and amortization expense: | | | | |
| Optical subsystems and components | $ 6,576 | $ 6,721 | $ 19,423 | $ 24,784 |
| Network test and monitoring systems | 280 | 341 | 852 | 1,236 |
|     Total depreciation and amortization expense | $ 6,856 | $ 7,062 | $ 20,275 | $ 26,020 |
| Operating income (loss): | | | | |
| Optical subsystems and components | 7,886 | $ 1,192 | $ 20,701 | $ (5,582) |
| Network test and monitoring systems | (1,533) | 1,941 | (2,906) | (1,787) |
|     Total operating income (loss) | 6,353 | 3,133 | 17,795 | (7,369) |
| Unallocated amounts: | | | | |
| Amortization of acquired developed technology | (1,512) | (4,003) | (4,536) | (15,078) |
| Amortization of purchased intangibles | (925) | (453) | (1,537) | (1,382) |
| Impairment of acquired developed technology | — | — | — | (853) |
| Restructuring costs | — | — | — | (3,064) |
| Loss on debt extinguishment | — | — | (31,606) | — |
| Interest income (expense), net | (2,403) | (2,980) | (7,570) | (9,349) |
| Other non-operating income (expense), net | (345) | 10,498 | (1,155) | 9,077 |
|     Total unallocated amounts | (5,185) | 3,062 | (46,404) | (20,649) |
| Income (loss) before income taxes | $ 1,168 | $ 6,195 | $ (28,609) | $ (28,018) |

(1)   See Note 2, "Restatement of Condensed Consolidated Financial Statements," to Condensed Consolidated Financial Statements.

The following is a summary of total assets by segment (in thousands):

| | January 28, 2007 | April 30, 2006 (As Restated) |
| --- | --- | --- |
| Optical subsystems and components | $ 366,263 | $ 350,129 |
| Network test and monitoring systems | 74,751 | 72,422 |
| Other assets | 92,854 | 83,919 |
| | $ 533,868 | $ 506,470 |

Short-term, restricted and minority investments are the primary components of other assets in the above table.

32

USB FIN 001954

Table of Contents

The following is a summary of operations within geographic areas based on the location of the entity purchasing the Company's products (in thousands):

| | Three Months Ended | | Nine Months Ended | |
| | January 28, 2007 | January 29, 2006 | January 28, 2007 | January 29, 2006 |
|---|---|---|---|---|
| Revenues from sales to unaffiliated customers: | | | | |
| United States | $ 37,084 | $ 54,712 | $ 114,423 | $ 153,269 |
| Rest of the world | 70,435 | 38,823 | 207,528 | 108,620 |
| | $ 107,519 | $ 93,535 | $ 321,951 | $ 261,889 |

Revenues generated in the United States are all from sales to customers located in the United States.

The following is a summary of long-lived assets within geographic areas based on the location of the assets (in thousands):

| | January 28, 2007 | April 30, 2006 |
|---|---|---|
| Long-lived assets | | |
| United States | $ 220,635 | $233,498 |
| Malaysia | 25,319 | 21,649 |
| Rest of the world | 2,952 | 2,984 |
| | $ 248,906 | $258,131 |

The following is a summary of capital expenditures by reportable segment (in thousands):

| | Nine Months Ended | |
| | January 28, 2007 | January 29, 2006 |
|---|---|---|
| Optical subsystems and components | $ 16,565 | $ 14,564 |
| Network test and monitoring systems | 243 | 130 |
| Total capital expenditures | $ 16,808 | $ 14,694 |

## 12. Warranty

The Company generally offers a one-year limited warranty for all of its products. The specific terms and conditions of these warranties vary depending upon the product sold and the end customer. The Company estimates the costs that may be incurred under its basic limited warranty and records a liability in the amount of such costs based on revenue recognized. Factors that affect the Company's warranty liability include the number of units sold, historical and anticipated rates of warranty claims and cost per claim. The Company periodically assesses the adequacy of its recorded warranty liabilities and adjusts the amounts as necessary.

Changes in the Company's warranty liability during the following period were as follows (in thousands):

| | Nine Months Ended January 28, 2007 |
|---|---|
| Beginning balance at April 30, 2006 | $ 1,767 |
| Additions during the period based upon product sold | 1,802 |
| Settlements | (388) |
| Changes in liability for pre-existing warranties, including expirations | (1,157) |
| Ending balance at January 28, 2007 | $ 2,024 |

USB FIN 001955

Table of Contents

### 13. Sales of Accounts Receivable

The Company has an agreement with Silicon Valley Bank to sell certain trade receivables. In these non-recourse sales, the Company removes the sold receivables from its books and records no liability related to the sale, as the Company has assessed that the sales should be accounted for as "true sales" in accordance with SFAS No. 140 *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*. During the three and nine months ended January 28, 2007 the Company sold $5.3 million and $9.5 million of its trade receivables to Silicon Valley Bank under the terms of this agreement. During the three and nine months ended January 29, 2006, the Company sold approximately $4.4 million and $15.5 million, respectively, of its trade receivables.

### 14. Restructuring

As of January 28, 2007, $948,000 of committed facility payments remain accrued and are expected to be fully utilized by the end of fiscal 2011. This amount relates to restructuring activities associated with the Company's Scotts Valley facility that took place in fiscal 2006.

### 15. Pending Litigation

#### *Matters Related to Historical Stock Option Grant Practices*

On November 30, 2006, the Company announced that it had undertaken a voluntary review of its historical stock option grant practices subsequent to its initial public offering in November 1999. The review was initiated by senior management, and preliminary results of the review were discussed with the Audit Committee of the Company's Board of Directors. Based on the preliminary results of the review, senior management concluded, and the Audit Committee agreed, that it was likely that the measurement dates for certain stock option grants differed from the recorded grant dates for such awards and that the Company would likely need to restate its historical financial statements to record non-cash charges for compensation expense relating to some past stock option grants. The Audit Committee thereafter conducted a further investigation and engaged independent legal counsel and financial advisors to assist in that investigation. The Audit Committee concluded that measurement dates for certain option grants differ from the recorded grant dates for such awards. The Company's management, in conjunction with the Audit Committee, conducted a further review to finalize revised measurement dates and determine the appropriate accounting adjustments to its historical financial statements, which are reflected in this report. The announcement of the investigation, and related delays in filing this quarterly report on Form 10-Q for the quarter ended October 29, 2006 (the "October 10-Q"), the Company's quarterly reports on Form 10-Q for the quarters ended January 28, 2007 (the "January 10-Q") and July 29, 2007 (the "July 10-Q") and its annual report on Form 10-K for the fiscal year ended April 30, 2007 (the "2007 10-K"), have resulted in the initiation of regulatory proceedings as well as civil litigation and claims.

#### *Nasdaq Determination of Non-compliance*

On December 13, 2006, the Company received a Staff Determination notice from the Nasdaq Stock Market stating that the Company was not in compliance with Marketplace Rule 4310(c)(14) because it did not timely file the October 10-Q and, therefore, that its common stock was subject to delisting from the Nasdaq Global Select Market. The Company received similar Staff Determination Notices with respect to its failure to timely file the January 10-Q, the July 10-Q and the 2007 10-K. In response to the original Staff Determination Notice, the Company requested a hearing before a Nasdaq Listing Qualifications Panel (the "Panel") to review the Staff Determination and to request additional time to comply with the filing requirements pending completion of the Audit Committee's investigation. The hearing was held on February 15, 2007. The Company thereafter supplemented its previous submission to Nasdaq to include the subsequent periodic reports in its request for additional time to make required filings. On April 4, 2007, the Panel granted the Company additional time to comply with the filing requirements until June 11, 2007 for the October 10-Q and until July 3, 2007 for the January 10-Q. The Company appealed the Panel's decision to the Nasdaq Listing and Hearing Review Counsel (the "Listing Council"), seeking additional time to make the filings. On May 18, 2007, the Listing Council agreed to review the Panel's April 4, 2007 decision and stayed that decision pending review of the Company's appeal. On October 5, 2007, the Listing Council granted the Company an exception until December 4, 2007 to file its delinquent periodic reports and restatement. On November 26, 2007, the Company filed an appeal with the Nasdaq Board of Directors seeking a review of the Listing Council's decision and a stay of the decision, including the Listing Council's December 4, 2007 deadline. On November 30, 2007, the Nasdaq Board of Directors agreed to review the Listing Council's decision and stayed the decision pending further consideration by the Board. The Company believes that the filing of this report, and the simultaneous filing of its other delinquent reports on Form 10-Q and Form 10-K, will satisfy the conditions of the Listing Council's decision and that its common stock will continue to be listed on the Nasdaq Global Select Market.

#### *Securities and Exchange Commission Inquiry*

In November 2006, the Company informed the staff of the Securities and Exchange Commission (the "SEC") of the voluntary investigation that had been undertaken by the Audit Committee of the Board of Directors. The Company was subsequently notified by the SEC that the SEC was conducting an informal inquiry regarding the Company's historical stock option grant practices. The Company is cooperating with the SEC's review.

USB FIN 001956

Table of Contents

*Stock Option Derivative Litigation*

Following the announcement by the Company on November 30, 2006 that the Audit Committee of the Board of Directors had voluntarily commenced an investigation of the Company's historical stock option grant practices, the Company was named as a nominal defendant in several shareholder derivative cases. These cases have been consolidated into two proceedings pending in federal and state courts in California. The federal court cases have been consolidated in the United States District Court for the Northern District of California. The state court cases have been consolidated in the Superior Court for the State of California for the County of Santa Clara. Plaintiffs in all cases have alleged that certain current or former officers and directors of the Company caused it to grant stock options at less than fair market value, contrary to the Company's public statements (including its financial statements), and that, as a result, those officers and directors are liable to the Company. No specific amount of damages has been alleged, and by the nature of the lawsuits no damages will be alleged, against the Company. On May 22, 2007, the state court granted the Company's motion to stay the state court action pending resolution of the consolidated federal court action. On June 12, 2007, the plaintiffs in the federal court case filed an amended complaint to reflect the results of the stock option investigation announced by the Audit Committee in June 2007. On August 28, 2007, the Company and the individual defendants filed motions to dismiss the complaint. A hearing on the motions has been set for January 11, 2008.

*Trust Indenture Litigation*

On January 4, 2007, the Company received three substantially identical purported notices of default from U.S. Bank Trust National Association, as trustee (the "Trustee") for the Company's 2 1/2% Convertible Senior Subordinated Notes due 2010, its 2 1/2% Convertible Subordinated Notes due 2010 and its 5 1/4% Convertible Subordinated Notes due 2008 (collectively, the "Notes"). The notices asserted that the Company's failure to timely file the October 10-Q with the SEC and to provide a copy to the Trustee constituted a default under each of the three indentures between the Company and the Trustee governing the respective series of Notes (the "Indentures"). The notices each indicated that, if the Company did not cure the purported default within 60 days, an "Event of Default" would occur under the respective Indenture. As previously reported, the Company had delayed filing the October 10-Q pending the completion of the review of its historical stock option grant practices conducted by the Audit Committee of its Board of Directors.

The Company believes that it is not in default under the terms of the Indentures. The Company contends that the plain language of each Indenture requires only that the Company file with the Trustee reports that have actually been filed with the SEC, and that, since the October 10-Q had not yet been filed with the SEC, the Company was under no obligation to file it with the Trustee.

In anticipation of the expiration of the 60-day cure period under the notices on March 5, 2007, and the potential assertion by the Trustee or the noteholders that an "Event of Default" had occurred and a potential attempt to accelerate payment on one or more series of the Notes, on March 2, 2007, the Company filed a lawsuit in the Superior Court for the State of California for the County of Santa Clara against U.S. Bank Trust National Association, solely in its capacity as Trustee under the Indentures, seeking a judicial declaration that the Company is not in default under the three Indentures, based on the Company's position as described above. The Trustee filed an answer to the complaint generally denying all allegations and also filed a notice of removal of the state case to the United States District Court for the Northern District of California. On October 12, 2007, the action was remanded back to the state court in which it was commenced because the Trustee's notice of removal was not timely.

As expected, on March 16, 2007, the Company received three additional notices from the Trustee asserting that "Events of Default" under the Indentures had occurred and were continuing based on the Company's failure to cure the alleged default within the 60-day cure period.

On April 24, 2007, the Company received three substantially identical purported notices of default from the Trustee for each of the Indentures, asserting that the Company's failure to timely file the January 10-Q with the SEC and to provide a copy to the Trustee constituted a default under each of the Indentures. The notices each indicated that, if the Company did not cure the purported default within 60 days, an "Event of Default" would occur under the respective Indenture. The Company believes that it is not in default under the terms of the Indentures for the reasons described above.

On June 21, 2007, the Company filed a second declaratory relief action against the Trustee in the Superior Court of California for the County of Santa Clara. The second action is essentially identical to the first action filed on March 2, 2007 except that it covers the notices asserting "Events of Default" received in April 2007 and any other notices of default that the Trustee may deliver in the future with respect to the Company's delay in filing, and providing copies to the Trustee, of periodic reports with the SEC. The Trustee filed an answer to the complaint generally denying all allegations and filed a notice of removal to the United States District Court for the Northern District of California. The Company has filed a motion to remand to state court, which was heard and taken under submission on November 2, 2007.

35

USB FIN 001957

Table of Contents

On July 9, 2007, the Company received three substantially identical purported notices of default from the Trustee for each of the Indentures, asserting that the Company's failure to timely file this Form 10-K report with the SEC and to provide a copy to the Trustee constituted a default under each of the Indentures. As before, the notices each indicated that, if the Company did not cure the purported default within 60 days, an "Event of Default" would occur under the respective Indenture. The Company believes that it is not in default under the terms of the Indentures for the reasons described above.

To date, neither the Trustee nor the holders of at least 25% in aggregate principal amount of one or more series of the Notes have declared all unpaid principal, and any accrued interest, on the Notes to be due and payable, although the Trustee stated in the notices that it reserved the right to exercise all available remedies. As of October 31, 2007, there was $250.3 million in aggregate principal amount of Notes outstanding and an aggregate of approximately $558,000 in accrued interest.

### Patent Litigation

#### DirecTV Litigation

On April 4, 2005, the Company filed an action for patent infringement in the United States District Court for the Eastern District of Texas against the DirecTV Group, Inc., DirecTV Holdings, LLC, DirecTV Enterprises, LLC, DirecTV Operations, LLC, DirecTV, Inc., and Hughes Network Systems, Inc. (collectively, "DirecTV"). The lawsuit involves the Company's U.S. Patent No. 5,404,505 (the "505 patent"), which relates to technology used in information transmission systems to provide access to a large database of information. On June 23, 2006, following a jury trial, the jury returned a verdict that the Company's patent had been willfully infringed and awarded the Company damages of $78,920,250. In a post-trial hearing held on July 6, 2006, the Court determined that, due to DirecTV's willful infringement, those damages would be enhanced by an additional $25 million. Further, the Court awarded the Company pre-judgment interest on the jury's verdict in the amount of 6% compounded annually from April 4, 1999, amounting to approximately $13.4 million. Finally, the Court awarded the Company costs of $147,282 associated with the litigation. The Court declined to award the Company its attorney's fees. The Court denied the Company's motion for injunctive relief, but ordered DirecTV to pay a compulsory ongoing license fee to the Company at the rate of $1.60 per set-top box activated by or on behalf of DirecTV for the period beginning June 16, 2006 through the duration of the patent, which expires in April 2012. The Court entered final judgment in favor of the Company and against DirecTV on July 7, 2006. On September 1, 2006, the Court denied DirecTV's post-trial motions seeking to have the jury verdict set aside or reversed and requesting a new trial on a number of grounds. In another written post-trial motion, DirecTV asked the Court to allow DirecTV to place any amounts owed the Company under the compulsory license into an escrow account pending the outcome of any appeal and for those amounts to be refundable in the event that DirecTV prevails on appeal. The Court granted DirecTV's motion and payments under the compulsory license are being made into an escrow account pending the outcome of the appeal. As of October 12, 2007, DirecTV has deposited approximately $28 million into escrow. These escrowed funds represent DirecTV's compulsory royalty payments for the period from June 17, 2006 through September 30, 2007.

DirecTV has appealed to the United States Court of Appeals for the Federal Circuit. In its appeal, DirecTV raised issues related to claim construction, infringement, invalidity, willful infringement and enhanced damages. The Company cross-appealed raising issues related to the denial of the Company's motion for permanent injunction, the trial court's refusal to enhance future damages for willfulness and the trial court's determination that some of the asserted patent claims are invalid. The appeals have been consolidated. The parties were ordered to participate in the appellate court's mandatory mediation program, which occurred on February 13, 2007 without resolution. The parties have filed their respective briefs with the appellate court. A neutral third party, New York Intellectual Property Law Association ("NYIPLA") filed an *amicus* brief urging the appellate court to vacate the portion of trial court's judgment denying the Company's motion for a permanent injunction and ordering DirecTV to pay royalties pursuant to a compulsory license. Over DirecTV's objection, the appellate court accepted NYIPLA's *amicus* brief. On November 19, 2007, the Court of Appeals denied NYIPLA's motion to file a reply brief. Oral arguments have been set for January 7, 2008. Subsequent to the oral arguments, it is anticipated that a decision from the appellate court will be issued between March 2008 and November 2008.

#### Comcast Litigation

On July 7, 2006, Comcast Cable Communications Corporation, LLC ("Comcast") filed a complaint against the Company in the United States District Court, Northern District of California, San Francisco Division. Comcast seeks a declaratory judgment that the Company's '505 patent is not infringed and is invalid. The '505 patent is the same patent alleged by the Company in its lawsuit against DirecTV. The Company's motion to dismiss the declaratory judgment action was denied on November 9, 2006. As a result, on November 22, 2006, the Company filed an answer and counterclaim alleging that Comcast infringes the '505 patent and seeking damages to be proven at trial. The court held a claim construction hearing and, on April 6, 2007, issued its claim construction ruling.

36

USB FIN 001958

Table of Contents

Discovery is now underway. The parties have been ordered to a mediation and settlement conference on December 13, 2007. A jury trial has been scheduled for March 3, 2008.

### EchoStar Litigation

On July 10, 2006, EchoStar Satellite LLC, EchoStar Technologies Corporation and NagraStar LLC (collectively "EchoStar") filed an action against the Company in the United States District Court for the District of Delaware seeking a declaration that EchoStar does not infringe, and has not infringed, any valid claim of the Company's '505 patent. The '505 patent is the same patent that is in dispute in the DirecTV and Comcast lawsuits. On October 24, 2006, the Company filed a motion to dismiss the action for lack of a justiciable controversy. The Court denied the Company's motion on September 25, 2007. The Company filed its answer and counterclaim on October 10, 2007. No scheduling order has been entered in the case, and discovery has not yet begun.

### XM/Sirius Litigation

On April 27, 2007, the Company filed an action for patent infringement in the United States District Court for the Eastern District of Texas, Lufkin Division, against XM Satellite Radio Holdings, Inc., XM Satellite Radio, Inc., and XM Radio, Inc. (collectively, "XM") and Sirius Satellite Radio, Inc. and Satellite CD Radio, Inc. (collectively, "Sirius"). Judge Clark, the same judge who presided over the DirecTV trial, has been assigned to the case. The lawsuit alleges that XM and Sirius have infringed and continue to infringe the Company's '505 patent and seeks an injunction to prevent further infringement, actual damages to be proven at trial, enhanced damages for willful infringement and attorneys' fees. The defendants filed an answer denying infringement of the '505 patent and asserting invalidity and other defenses. The defendants also moved to stay the case pending the outcome of the DirectTV appeal and the re-examination of the '505 patent described below. The defendants' motion for a stay was denied. Discovery is now underway. The claim construction hearing has been set for February 6, 2008, and the trial has been set for September 15, 2008.

### Requests for Re-Examination of the '505 Patent

Three requests for re-examination of the Company's '505 patent have been filed with the United States Patent and Trademark Office ("PTO"). The '505 patent is the patent that is in dispute in the DirecTV, EchoStar, Comcast and XM/Sirius lawsuits. On December 11, 2006, the PTO entered an order granting the first request and, on March 21, 2007, the PTO entered an order granting the second request. The third request, filed on August 1, 2007, was partially granted on September 28, 2007. The Company expects that the PTO will take steps to consolidate these requests into one request for re-examination. Alternately, the PTO may consolidate the first two requests and keep the third separate because it is directed to different claims than the first two requests. During the re-examination, some or all of the claims in the '505 patent could be invalidated or revised to narrow their scope, either of which could have a material adverse impact on the Company's position in the DirecTV, EchoStar, Comcast and XM/Sirius lawsuits. Resolution of one or more re-examination requests of the '505 Patent is likely to take more than 15 months.

### Securities Class Action

A securities class action lawsuit was filed on November 30, 2001 in the United States District Court for the Southern District of New York, purportedly on behalf of all persons who purchased the Company's common stock from November 17, 1999 through December 6, 2000. The complaint named as defendants Finisar, Jerry S. Rawls, the Company's President and Chief Executive Officer, Frank H. Levinson, the Company's former Chairman of the Board and Chief Technical Officer, Stephen K. Workman, the Company's Senior Vice President and Chief Financial Officer, and an investment banking firm that served as an underwriter for the Company's initial public offering in November 1999 and a secondary offering in April 2000. The complaint, as subsequently amended, alleges violations of Sections 11 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(b) of the Securities Exchange Act of 1934, on the grounds that the prospectuses incorporated in the registration statements for the offerings failed to disclose, among other things, that (i) the underwriter had solicited and received excessive and undisclosed commissions from certain investors in exchange for which the underwriter allocated to those investors material portions of the shares of the Company's stock sold in the offerings and (ii) the underwriter had entered into agreements with customers whereby the underwriter agreed to allocate shares of the Company's stock sold in the offerings to those customers in exchange for which the customers agreed to purchase additional shares of the Company's stock in the aftermarket at pre-determined prices. No specific damages are claimed. Similar allegations have been made in lawsuits relating to more than 300 other initial public offerings conducted in 1999 and 2000, which were consolidated for pretrial purposes. In October 2002, all claims against the individual defendants were dismissed without prejudice. On February 19, 2003, the Court denied defendants' motion to dismiss the complaint. In July 2004, the Company and the individual defendants accepted a settlement proposal made to all of the issuer defendants. Under the terms of the settlement, the plaintiffs would dismiss and release all claims against participating defendants in exchange for a contingent payment guaranty by the insurance companies collectively responsible for insuring the issuers in all related cases, and the assignment or surrender to the plaintiffs of certain claims the issuer defendants may have against the underwriters. Under the guaranty, the insurers would be required to pay the amount, if any, by which $1 billion exceeds the aggregate amount ultimately collected by the plaintiffs from the

USB FIN 001959

Table of Contents

underwriter defendants in all the cases. If the plaintiffs fail to recover $1 billion and payment is required under the guaranty, the Company would be responsible to pay its pro rata portion of the shortfall, up to the amount of the self-insured retention under the Company's insurance policy, which may be up to $2 million. The timing and amount of payments that the Company could be required to make under the proposed settlement would depend on several factors, principally the timing and amount of any payment that the insurers may be required to make pursuant to the $1 billion guaranty. The Court gave preliminary approval to the settlement in February 2005 and held a hearing in April 2006 to consider final approval of the settlement. Before the Court issued a final decision on the settlement, on December 5, 2006, the United States Court of Appeals for the Second Circuit vacated the class certification of plaintiffs' claims against the underwriters in six cases designated as focus or test cases. Thereafter, on December 14, 2006, the Court ordered a stay of all proceedings in all of the lawsuits pending the outcome of the plaintiffs' petition to the Second Circuit Court of Appeals for a rehearing en banc and resolution of the class certification issue. On April 6, 2007, the Second Circuit Court of Appeals denied the plaintiffs' petition for a rehearing, but clarified that the plaintiffs may seek to certify a more limited class. Subsequently, and consistent with these developments, the Court entered an order, at the request of the plaintiffs and issuers, to deny approval of the settlement, and the plaintiffs filed an amended complaint in an attempt to comply with the decision of the Second Circuit Court of Appeals. If an amended or modified settlement is not reached, and thereafter approved by the Court, the Company intends to defend the lawsuit vigorously. Because of the inherent uncertainty of litigation, however, the Company cannot predict its outcome. If, as a result of this dispute, the Company is required to pay significant monetary damages, its business would be substantially harmed.

The Company cannot predict the outcome of the legal proceedings discussed above. No amount of loss, if any, is considered probable or measurable and no loss contingency has been recorded at the balance sheet date.

## 16. Guarantees and Indemnifications

In November 2002, the FASB issued Interpretation No. 45 *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* ("FIN 45"). FIN 45 requires that upon issuance of a guarantee, the guarantor must recognize a liability for the fair value of the obligations it assumes under that guarantee. As permitted under Delaware law and in accordance with the Company's Bylaws, the Company indemnifies its officers and directors for certain events or occurrences, subject to certain limits, while the officer or director is or was serving at the Company's request in such capacity. The term of the indemnification period is for the officer's or director's lifetime. The Company may terminate the indemnification agreements with its officers and directors upon 90 days written notice, but termination will not affect claims for indemnification relating to events occurring prior to the effective date of termination. The maximum amount of potential future indemnification is unlimited; however, the Company has a director and officer insurance policy that may enable it to recover a portion of any future amounts paid.

The Company enters into indemnification obligations under its agreements with other companies in its ordinary course of business, including agreements with customers, business partners, and insurers. Under these provisions the Company generally indemnifies and holds harmless the indemnified party for losses suffered or incurred by the indemnified party as a result of the Company's activities or the use of the Company's products. These indemnification provisions generally survive termination of the underlying agreement. In some cases, the maximum potential amount of future payments the Company could be required to make under these indemnification provisions is unlimited.

The Company believes the fair value of these indemnification agreements is minimal. Accordingly, the Company has not recorded any liabilities for these agreements as of January 28, 2007. To date, the Company has not incurred material costs to defend lawsuits or settle claims related to these indemnification agreements.

## 17. Subsequent Events

### Acquisition of AZNA LLC

On March 26, 2007, the Company completed the acquisition of AZNA LLC ("AZNA"), a privately-held company located in Wilmington, Massachusetts for a purchase price of $19.7 million, consisting of convertible promissory notes in the aggregate principal amount of $17.0 million and cash of $2.7 million. The results of operations of AZNA (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in the Company's consolidated financial statements beginning in the fourth quarter of fiscal 2007.

### Acquisition of Kodeos Communications, Inc.

On April 11, 2007, the Company completed the acquisition of Kodeos Communications, Inc., a privately-held company located in South Plainfield, New Jersey for $7.4 million with additional consideration of up to $3.5 million in cash payable to holders of certain equity interests contingent on technical and financial performance. The results of operations of Kodeos (beginning with the

38

closing date of the acquisition) and the estimated fair value of assets acquired were included in the Company's consolidated financial statements beginning in the fourth quarter of fiscal 2007.

### Future Impact of Certain Stock Option Restatement Items

Because virtually all holders of options issued by the Company were neither involved in nor aware of its accounting treatment of stock options, the Company has taken and intends to take actions to deal with certain adverse tax consequences that may be incurred by the holders of certain incorrectly priced options. The primary adverse tax consequence is that incorrectly priced stock options vesting after December 31, 2004 may subject the option holder to a penalty tax under Internal Revenue Code Section 409A (and, as applicable, similar penalty taxes under California and other state tax laws). The Company presently estimates that it will incur a liability to option holders of approximately $7.0 million, of which approximately $5.7 million will be recognized as additional stock compensation expense in future periods.

### Letter of Credit Reimbursement Agreement

On November 1, 2007, the Company entered into an amended letter of credit reimbursement agreement with Silicon Valley Bank that will be available to the Company through October 25, 2008. The terms of the new amended agreement are substantially unchanged from the previous agreement, although, the bank has waived the SEC filing requirement covenant until the Company is current with its filing requirements.

### Non-recourse Accounts Receivable Purchase Agreement

On November 1, 2007, the Company entered into an amended non-recourse accounts receivable purchase agreement effective October 26, 2007 with Silicon Valley Bank that will be available to the Company through October 25, 2008. The terms of the new amended agreement are substantially unchanged from the previous agreement.

USB FIN 001961

Table of Contents

**Item 2.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

**Forward-Looking Statements**

The following discussion contains forward-looking statements that involve risks and uncertainties. Our actual results could differ substantially from those anticipated in these forward-looking statements as a result of many factors, including those set forth in "Part II, Item 1A. Risk Factors" below. The following discussion should be read together with our consolidated financial statements and related notes thereto included elsewhere in this report.

**Business Overview**

Finisar Corporation is a leading provider of optical subsystems and components that connect local area networks, or LANs, storage area networks, or SANs, and metropolitan area networks, or MANs. Our optical subsystems consist primarily of transceivers which provide the fundamental optical-electrical interface for connecting the equipment used in building these networks. These products rely on the use of digital semiconductor lasers in conjunction with integrated circuit design and novel packaging technology to provide a cost-effective means for transmitting and receiving digital signals over fiber optic cable using a wide range of network protocols, transmission speeds and physical configurations over distances of 70 meters to 200 kilometers. Our line of optical components consists primarily of packaged lasers and photodetectors used in transceivers, primarily for LAN and SAN applications. Our manufacturing operations are vertically integrated and include internal manufacturing, assembly and test capability. We sell our optical subsystem and component products to manufacturers of storage and networking equipment such as Brocade, Cisco Systems, EMC, Emulex, Hewlett-Packard Company, Huawei and Qlogic.

We also provide network performance test and monitoring systems to original equipment manufacturers for testing and validating equipment designs and, to a lesser degree, to operators of networking and storage data centers for testing, monitoring and troubleshooting the performance of their installed systems. We sell these products primarily to leading storage equipment manufacturers such as Brocade, EMC, Emulex, Hewlett-Packard Company, IBM and Qlogic.

**Restatement of Previously Issued Financial Statements**

In this quarterly report on Form 10-Q for the three and nine months ended January 28, 2007, we are restating our condensed consolidated balance sheet as of April 30, 2006, the related condensed consolidated statements of operations for the three and nine months ended January 29, 2006 and the related condensed consolidated statement of cash flows for the nine months ended January 29, 2006, as a result of an independent investigation of our historical stock option grants conducted by our Audit Committee. This restatement is more fully described in Note 2, "Restatement of Consolidated Financial Statements," of the Notes to the Condensed Consolidated Financial Statements. In our annual report on Form 10-K for the fiscal year ended April 30, 2007, we are restating our consolidated balance sheet as of April 30, 2006 and the related statements of operations, stockholder's equity and cash flows for the fiscal years ended April 30, 2006 and April 30, 2005, as well as the "Selected Consolidated Financial Data" for the fiscal years ended April 30, 2006, April 30, 2005, April 30, 2004 and April 30, 2003 as set forth in Item 6 of the Form 10-K report, and the unaudited quarterly financial information and financial statements for the interim periods of fiscal 2006 and the three months ended July 29, 2006.

*Origin of the Investigation*

In late August 2006, our management commenced a preliminary internal review of certain of our historical stock options granted since our initial public offering in November 1999. The review was voluntarily initiated by us due to the widespread media attention concerning the stock option grant practices of many companies and was not in response to a news report or an investigation concerning Finisar by the SEC or any other governmental agency.

After management's report on the results of this initial review, the Audit Committee directed management to conduct a further analysis of certain stock option grants. Thereafter, management reviewed documentation and materials regarding additional option grants and, in early November, identified potential issues with respect to certain annual grants to employees. As a result, the Audit Committee determined that it should conduct a review of our historical practices for granting and accounting for stock option grants made from the date of our initial public offering through September 8, 2006 (the "Review Period"). On November 30, 2006, we issued a press release and filed a current report on Form 8-K announcing the commencement of this review of our historical stock option granting practices and related accounting, and disclosing that our previously-filed financial statements could no longer be relied upon. We also informed the staff of the SEC of the commencement of the investigation into our historical stock option granting practices and related accounting.

USB FIN 001962

Table of Contents

### Scope of the Investigation

The investigation was commenced under the authority of the Audit Committee, composed of three independent directors, two of whom also served as members of the Compensation Committee during a portion of the Review Period, although they were generally not involved with the approval of grants of stock options to non-officer employees. The investigation was conducted with the assistance of independent counsel and forensic accountants (collectively, the "Investigation Team"). Under the direction of the Audit Committee, the Investigation Team reviewed our practices and processes for granting options to officers and directors, and for new hire and annual grants to non-officer employees. The only grants made during the Review Period that were not initially reviewed by the Investigation Team were grants made in blocks of less than 50 to non-officer, non-director grantees. In the course of reviewing grants made in blocks to 50 or more grantees, the Investigation Team expanded the scope of the investigation to review four additional grants to less than 50 non-officer, non-director grantees. The Investigation Team reviewed approximately 95% of all options granted by Finisar during the Review Period.

At the conclusion of the investigation by the Investigation Team, a Working Group was formed to address the accounting implications of the results of the investigation by the Investigation Team. The Working Group was composed of managers from our accounting and legal departments with assistance from independent consultants engaged to assist in the assessment of the historical accounting treatment of stock option grants, as tax advisors and in the calculation of the revised stock-based compensation expense based on the revised measurement dates.

The Investigation Team identified 94 "Grant Dates" — dates on which our records show a stock option grant had occurred during the Review Period. Of the 94 Grant Dates, the Investigation Team reviewed 44 "Grant Dates of Interest" based on the size of the grant or some other factor. These 44 Grant Dates reviewed represented 95% of all options granted during the Review Period. The Working Group performed a subsequent review of 100% of the option grants during the Review Period and identified 151 separate stock option granting actions ("Granting Actions") made on the 95 original Grant Dates ("Grant Dates") during the Review Period. The Investigation Team noted that none of the past or present members of our Board of Directors, nor our Chief Executive, received any grants during the Review Period on a date for which the measurement date was ultimately revised, except in the case of one grant to two of our Board members where the date of approval of the grant by the Board of Directors differed from the date on which the grant was recorded. In that instance, the exercise price was higher on the date on which the grant was erroneously recorded than on the date the options were approved by the Board of Directors, and, as a result, we did not recognize any additional stock-based compensation expense on this grant.

### Findings and Remedial Measures

Based on the results of the investigation by the Audit Committee, and additional work performed by the Working Group, we found evidence that we previously used incorrect measurement dates when accounting for stock option grants pursuant to APB 25 and related interpretations. We have concluded that revised measurement dates are required for 105, or 70%, of the 151 Granting Actions during the Review Period, and that it is necessary to modify the accounting measurement dates for approximately 71% of the stock option grants awarded during the Review Period to employees and consultants. This consists of options to purchase approximately 75.9 million shares of common stock. Certain historic grants were also determined to be subject to variable accounting. Revising option grant measurement dates results in total additional stock-based compensation expense of $107.6 million to be recognized in the fiscal years 2000 through 2006. Approximately 85% of this total additional stock-based compensation expense, or $91.1 million, is attributable to six key Granting Actions that occurred between June 2000 and August 2003, representing approximately 21 million shares, or 20% of all options granted during the Review Period. Three of these six key Granting Actions were performance grants, and three were New Hire grants, as such grant types are defined below. The Audit Committee determined that the incorrect measurement dates were the result of process-related deficiencies and that the individuals involved in the option granting process lacked a thorough understanding of the relevant accounting rules. The Audit Committee found no evidence of intentional misconduct or malfeasance on the part of the Company personnel involved in selecting and approving the grant dates or administering the stock option granting process.

In addition, we identified modifications to certain stock options related to extended leaves of absence that should have been accounted for by applying modification accounting as required by the provisions of FASB Interpretation No. 44, " *Accounting for Certain Transactions Involving Stock Compensation,* " or FIN 44. This resulted in approximately $5 million of additional stock-based compensation expense, of which $4.9 million is attributable to one leave of absence.

Therefore, as a result of the investigation, we have identified a total of $112.1 million in additional pre-tax, non-cash, stock-based compensation expense for the fiscal years 2000 through 2006 ($112.7 million prior to the consideration of payroll tax charges and inventory capitalization), and approximately $3.6 million of deferred stock-based compensation expense to be amortized as of April 30, 2006. On May 1, 2006, we adopted Statement of Financial Accounting Standards ("SFAS") No. 123 (revised 2004), " *Share-Based Payment"* ("SFAS 123R"). As required by SFAS 123R, the unamortized deferred compensation expense of $3.6 million at May 1, 2006 has been reclassified to additional paid-in capital.

USB FIN 001963

Table of Contents

These adjustments for stock-based compensation, shown before any related payroll tax charges, inventory capitalization or income tax effects, are as follows (in thousands):

| | Fiscal Years Ended April 30, | | | | | | | |
| | 2000 | 2001 | 2002 | 2003 (1) | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|---|---|---|---|
| Stock-based compensation expense resulting from revised measurement dates | $5,416 | $27,160 | $31,741 | $24,441 | $ 8,296 | $3,257 | $7,303 | $107,614 |
| Other — leaves of absence | — | — | 39 | 41 | 4,791 | 183 | — | 5,054 |
| Total | $5,416 | $27,160 | $31,780 | $24,482 | $13,087 | $3,440 | $7,303 | $112,668 |

(1)    Includes the acceleration of $13.1 million in deferred stock-based compensation expense related to our previous option exchange program. See the Section entitled "Option Exchange Program" below for a further discussion of this program.

Consistent with our historical accounting policy, we use the graded, or accelerated, amortization method to determine the amount of stock-based compensation expense for each reporting period.

In accordance with the applicable accounting guidance, we immediately expensed the unamortized deferred stock-based compensation expense associated with options with revised measurement dates that were cancelled as part of our stock option exchange program in fiscal 2003. As a result, on the date of the cancellation, we recognized $13.1 million of deferred stock-based compensation. See the discussion of the option exchange program below under "Option Exchange Program."

Of the $112.7 million total restated stock-based compensation expense arising from the investigation, $101.9 million, or 90.5%, has been expensed by the end of our fiscal year ended on April 30, 2004. This is primarily attributable to (i) the fact that the intrinsic value of the revised option awards was greater in the early years of the Review Period, (ii) we used graded, or accelerated, amortization method to recognize stock-based compensation and (iii) as a result of the deferred compensation expense recognized upon the cancellation of options as part of our stock option exchange program in fiscal 2003. Only 3% and 6%, respectively, of the total restated stock-based compensation expense impacted our 2005 and 2006 fiscal years, respectively.

### Details of the Restatement

We have concluded that of the 151 Granting Actions made on 95 Grant Dates, 105 Granting Actions on 63 Grant Dates require revised measurement dates. The remaining 46 Granting Actions on 32 Grant Dates require no change to the original grant date. The following is a summary of the revised Granting Actions by type of grant:

| Grant Type | Number of Revised Granting Actions | Percent of Total Granting Actions | Number of Option Shares With Revised Measurement Dates | Percent of Total Grants |
|---|---|---|---|---|
| Acquisition-Related | | | | |
| Assumed Options | — | — | — | — |
| Target Employees | 4 | 2.6% | 3,872,806 | 3.6% |
| Total acquisition-related | 4 | 2.6% | 3,872,806 | 3.6% |
| Director (1) | 1 | 0.7% | 60,000 | 0.1% |
| Officer | 2 | 1.3% | 735,000 | 0.7% |
| Performance | 12 | 7.9% | 47,215,703 | 44.1% |
| New Hire/Promotion | 86 | 57.0% | 24,028,510 | 22.5% |
| Option Exchange Program | — | 0.0% | — | 0.0% |
| Total | 105 | 69.5% | 75,912,019 | 71.0% |

(1)    While one properly approved grant to two of our Board members was not recorded properly, it did not result in any incremental stock-based compensation expense.

USB FIN 001964

Table of Contents

The grants giving rise to the total $107.6 million in additional non-cash stock-based compensation expense based on revised measurement dates are categorized and summarized as follows:

*New Hire and Promotion Grants*

During the Review Period, we granted options to purchase a total of 26.4 million shares to newly-hired employees. To facilitate the granting of options to our rapidly growing workforce, in February 2000, the Board of Directors established a Stock Plan Committee composed solely of our Chief Executive Officer, and delegated authority to the Stock Plan Committee to grant options to newly hired and existing non-officer employees subject to certain limitations and established parameters. During the Review Period, grants made to newly-hired employees ("New Hire grants") generally were approved by the Stock Plan Committee on a periodic basis. While details of stock option grants were generally set forth in the offer letter to the prospective employee, the grant date was determined when the grant was approved by the Stock Plan Committee after the date on which the employee commenced employment with us. New Hire grants were generally made to all new employees who had joined Finisar since the last date on which the Stock Plan Committee approved and awarded grants to newly hired employees. Additionally, grants were made to a smaller number of existing employees who received promotions or some other employment adjustment since the last date on which the Stock Plan Committee awarded and approved New Hire grants. The evidence available to support the original grant date for options granted to newly promoted or other existing employees generally differed from the evidence supporting the measurement date for New Hire grants. Thus, we differentiated between awards made as a result of a promotion or adjustment and New Hire grants. This differentiation based on award type resulted in application of different measurement dates for grants originally made on the same original grant date. We also found that offer letters to our Malaysia and Shanghai employees did not always include all of the details of the option grant to be made to newly-hired employees in such locations required to determine the proper measurement date, i.e., the number of shares underlying each option to be granted to the newly-hired employee once the option has been approved by the Stock Plan Committee. Accordingly, for those grants we required additional supporting evidence to determine the appropriate measurement date.

None of the Grant Dates recorded for New Hire grants preceded the commencement of employment of any newly-hired employee. However, in multiple instances, evidence suggested that New Hire grants were approved by the Stock Plan Committee at a later date than the stated grant date. In some cases, the identity of all grantees as set forth in such Granting Action was not known or specified until after the stated grant date. Moreover, our Stock Plan Committee's process for finalizing and documenting these grants was often completed after the originally assigned grant date. In some cases, no contemporaneous, direct evidence of the date of approval by the Stock Plan Committee was located. Additionally, in several instances, the evidence showed that the Stock Plan Committee retrospectively selected a grant date with a more favorable price. Based on all available facts and circumstances, we determined that the originally recorded measurement dates for the New Hire grants made by the Stock Plan Committee during the Review Period cannot be relied upon in isolation as the correct measurement dates.

New Hire grants to non-officer, non-director employees that required Board of Directors or Compensation Committee approval because the size of the individual grant exceeded the authority delegated to the Stock Plan Committee were typically approved by unanimous written consent, or UWC, of the Board or Compensation Committee. We were unable to locate documents demonstrating contemporaneous Board of Directors or Compensation Committee approval on the date designated in the UWC as the effective date of the grant. In some cases, the UWC was prepared after the selected grant date. Additionally, in several instances, no direct evidence confirmed the date on which the UWC was executed by each Board or Compensation Committee member.

APB 25 defines the measurement date for determining stock-based compensation expense as the first date on which both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, are known with finality. In 77 of the 97 New Hire Granting Actions, reliable objective evidence suggested a single specific date on which approval was reached on the final number of shares comprising each stock option, the identity of those individuals entitled to receive each stock option and the exercise price of the stock option. Such evidence primarily consisted of electronic data such as emails and files attached to emails or written agreements, including offer letters. We utilized this evidence to revise measurement dates for 66 New Hire Granting Actions covering options to purchase 14.7 million shares of common stock. This resulted in incremental stock-based compensation expense of $13.6 million on a pre-tax basis, amortized over the respective awards' vesting terms.

In 14 New Hire Granting Actions, where no other reliable objective evidence pointed to a single specific date on which the number of shares, the identity of all individuals entitled to receive those shares and the price had become final, we have determined the date on which information concerning the grant was first entered into our options software accounting database to be the most reliable measurement date. We use a commonly available third party accounting software program to monitor and administer our equity award programs and to track and account for our stock option grants. For grants where reliable objective evidence was not recovered in the investigation to support a specific measurement date, the revised measurement date was based on the date these grants were recorded into our stock options software accounting database. The date on which information concerning the option was entered into this option software database was utilized to revise measurement dates for New Hire grants covering 4.0 million shares of

USB FIN 001965

common stock. This resulted in incremental stock-based compensation expense of $27.3 million on a pre-tax basis, amortized over the respective awards' vesting terms.

In six New Hire Granting Actions, the evidence suggests that the Stock Plan Committee selected an initial grant date, then subsequently chose a later grant date when the underlying stock price was lower than on the earlier grant date. In those cases, the fair market value of our common stock on the initial measurement date was higher than the later-selected date on which the option grant was recorded. Based on the evidence, we concluded that such grants should be deemed to have been repriced and subject to variable accounting from the date of repricing as required by the provisions of FASB Interpretation No. 44, " *Accounting for Certain Transactions Involving Stock Compensation,* " ("FIN 44") and the provisions of Emerging Issues Task Force No. 00-23, " *Issues Related to the Accounting for Stock Compensation under APB Opinion No. 25 and FASB Interpretation No. 44* ," ("EITF 00-23"). After considering forfeitures, we have adjusted the measurement of compensation cost for these options that are subject to variable accounting, covering 5.4 million shares of common stock. This has resulted in incremental stock-based compensation of $6.3 million on a pre-tax basis, amortized over the respective awards' vesting terms through April 30, 2006. Under FAS 123, and upon the adoption of FAS 123R on May 1, 2006, these options are not treated as variable awards.

Upon review of all such New Hire grants, we have determined that the correct measurement date for financial accounting purposes was different than the stated grant date for 86 New Hire Granting Actions covering 24 million shares, or 91% of all New Hire grants made during the Review Period. For grants representing 22.1 million shares, the market price of our common stock on the revised measurement date was higher than the option exercise price. This resulted in our recording of approximately $47.2 million in non-cash stock-based compensation expense relating to New Hire grants (representing 42% of the total additional non-cash-based compensation expense recorded).

*Performance Grants*

Performance grants were broad-based stock option grants that were usually linked to the annual employee performance appraisal process. Approval of these grants to non-officer employees was generally delegated to our Chief Executive Officer, as the sole member of the Stock Plan Committee. This delegated authority included determining the number of options to be granted to each individual employee. During the annual review process, each employee was awarded a performance ranking. This performance ranking then corresponded to a range of option awards, or at times during the Review Period a set schedule, that was pre-determined by the Chief Executive Officer. The Stock Plan Committee determined the number of shares underlying the stock options awarded to the employee based upon this range or schedule corresponding to the performance ranking achieved by the employee. The Stock Plan Committee selected the grant date, which in all cases appears to have been a date after the start of the performance appraisal process, but prior to the date when the identity of the grantees and number of options allocated to each grantee were known with finality.

We determined that for all performance grants, changes to the list of approved individual employee grants continued to be made after the Stock Plan Committee approved the grant date. In some cases, the list of employees included in a particular Granting Action was not prepared until after the stated grant date, and, in some cases, changes were made to the number of shares comprising individual awards and/or the identity of the employee receiving an award, indicating the grant was not finalized at the stated grant date.

In eleven of the 14 total performance grant Granting Actions, reliable objective evidence suggested a single specific date on which the Stock Plan Committee had approved the final number of shares comprising each stock option, the identity of those individuals entitled to receive each stock option and the exercise price had become final. In nine of these performance grant Granting Actions, for options covering 36.7 million shares, we found that not all actions had been taken, (i.e., the final number of shares comprising each stock option and/or the identity of those individuals entitled to receive each stock option), were completed as of the stated grant date, and the details of the grants changed after the stated grant date. We revised the measurement date to correspond with the date on which evidence was located to indicate that approval of the details of each grant was final. Since the market price of our common stock on the revised measurement date was higher than the option exercise price for eight of the performance grant Granting Actions, covering 23.6 million shares, we recorded additional stock-based compensation expense of $29.5 million.

In two performance grant Granting Actions, no reliable objective evidence pointed to a single specific date on which the number of shares comprising each stock option, the identity of all individuals entitled to receive each stock option and the exercise price had become final. Therefore, we have determined the date on which information concerning the grant was entered into our stock option database is the most reliable measurement date for calculating additional stock-based compensation expense under APB 25. The date on which information concerning the grant was entered into our stock option database was utilized as the measurement date for these performance grants covering 7.6 million shares of common stock. The market price of our common stock on the revised measurement date was higher than the option exercise price for one of these Granting Actions, and accordingly, we recorded incremental stock-based compensation expense of $27.5 million.

USB FIN 001966

Table of Contents

In one performance grant Granting Action, the evidence suggests that the Stock Plan Committee selected a grant date, then subsequently chose a later grant date when the closing sales price of our common stock was lower than on the earlier date. Accordingly, the fair market value of our common stock on the initial measurement date was higher than the recorded option exercise price. Based on the evidence, we concluded that the grant, covering approximately 2.8 million shares, should be deemed to have been repriced and subject to variable accounting, from the date of repricing as required by the provisions of FIN 44 and EITF 00-23. After considering the movement in our stock prices and forfeitures, there was no incremental stock-based compensation expense recognized on this award through April 30, 2006. Under FAS 123, and upon the adoption of FAS 123R on May 1, 2006, these options are not treated as variable awards.

We also found one performance grant to an employee as part of an annual Granting Action that was added after the original grant date. We deemed it necessary to determine whether such action suggested that the entire Granting Action was still subject to change (and hence the requisite Granting Action had not been completed pursuant to the requirements of APB 25), or whether the change related solely to the one so-called "straggler," which would not affect the measurement date of all other awards made in that Granting Action. We found reliable objective evidence that the "straggler" grant represented a separate Granting Action, predominantly based on the fact that this "straggler" was added to our stock option database nearly six weeks after all other grantees in the performance grant, and, as such, did not affect the finality of the previously completed Granting Action.

Upon review of all such performance grants, we determined that the correct measurement date for financial accounting purposes was different than the stated grant date for 12 performance grant Granting Actions, representing 47.2 million shares, or 92% of all Performance grants made during the Review Period. For grants representing 34.0 million shares, the market price of our common stock on the revised measurement date was higher than the option exercise price. As a result, we are recording a total of approximately $57 million in additional non-cash stock-based compensation expense relating to this category (representing 51% of the total additional non-cash-based compensation expense recorded).

*Acquisition-Related Awards*

We made multiple acquisitions of other companies during the Review Period. These acquisitions sometimes resulted in option grants being awarded to employees of the acquired companies, in one of three forms:

- existing options held by the acquired company employees to purchase stock of the acquired company, that were assumed by us and became options to acquire our common stock ("Assumed Options");

- option grants made to induce employees of the target company to join us, the details of which were set forth in the acquisition agreements between us and the acquired company; and

- option grants made to employees of the acquired company that followed the form of our New Hire grants, and were made to provide an incentive to such employee sometime after the acquired company employee became our employee (but which options were not required to be granted by the terms of the related acquisition agreements).

Assumed Options were assumed by us at a set, formula driven ratio, as set forth in the acquisition documents, and as approved by our Board of Directors and were recorded in our stock option database at this preset valuation. We determined that for all Assumed Options, the fair value of these options was appropriately measured as required by EITF Issue No. 99-12, "Determination of the Measurement Date for the Market Price of Acquirer Securities Issued in a Purchase Business Combination" and included in the purchase price, and the intrinsic value of the unvested portion of those options, as measured on the date the close of the business combination, was deducted from the purchase price and recognized as compensation expense.

Options provided as inducements to employees of the acquired company to accept our offer of employment post-acquisition ("Target Employees") were set forth and approved by our Board of Directors as part of the acquisition documents, or sometimes in related employment agreements and in one case were approved by the Compensation Committee prior to the acquisition but with an effective date specified as the date the key individual became an employee of Finisar. If the details concerning these grants were described in the acquisition agreements or in the related employment agreements approved prior to the closing date of the acquisition, we determined that the appropriate measurement date was the closing date of the respective acquisition. The evidence indicates that some of these option grants were originally recorded with a grant date that was different than the date specified in the respective acquisition agreements. We found that three grants required revised measurement dates because they were recorded on a date other than the date specified by the acquisition agreements or related employment agreements. The exercise price of the stock on t hese grants was lower on the recorded date than the fair market value of our common stock on the date specified in the particular acquisition agreement. This resulted in additional stock-based compensation expense of approximately $1.4 million (representing 1.2% of the total additional stock-based compensation expense recorded).

45

USB FIN 001967