fiscal year ended April 30, 2006 and for the quarter ended July 30, 2006. We also are including our unaudited restated consolidated statements of operations and consolidated balance sheet data for the fiscal years ended April 30, 2004, 2003, 2002, 2001 and 2000 in Item 6 of this report. This restatement has no impact on our previously reported revenue or cash positions for any period.

### Origin of the Investigation

In late August 2006, our management commenced a preliminary internal review of certain of our historical stock options granted since our initial public offering in November 1999. The review was voluntarily initiated by us due to widespread media attention concerning the stock option grant practices of many companies and was not in response to a news report or an investigation concerning Finisar by the SEC or any other governmental agency.

After management's report on the results of this initial review, the Audit Committee directed management to conduct a further analysis of certain stock option grants. Thereafter, management reviewed documentation and materials regarding additional option grants and, in early November, identified potential issues with respect to certain annual grants to employees. As a result, the Audit Committee determined that it should undertake a more comprehensive investigation of our historical practices for granting and accounting for stock options from the date of our initial public offering through September 8, 2006 (the "Review Period"). On November 30, 2006, we issued a press release and filed a Current Report on Form 8-K announcing the commencement of this review of our historical stock option granting practices and related accounting, and disclosing that our previously-filed financial statements could no longer be relied upon. We also informed the staff of the SEC of the commencement of the investigation into our historical stock option granting practices and related accounting.

### Scope of the Investigation

The investigation was commenced under the authority of the Audit Committee, composed of three independent directors, two of whom also served as members of the Compensation Committee during a portion of the Review Period, although they were generally not involved with the approval of grants of stock options to non-officer employees. Accordingly, the Board of Directors determined that the members of the Audit Committee were independent for purposes of the investigation and that, based on the facts known at that time, none of the Audit Committee members had conflicts of interest precluding them from acting as independent members of the Audit Committee.

The investigation was conducted with the assistance of independent counsel and forensic accountants (collectively, the "Investigation Team"). Under the direction of the Audit Committee, the Investigation Team reviewed our practices and processes for granting options to officers and directors, and for new hire and annual grants to non-officer employees. Specifically, the Investigation Team initially examined:

- All grants made to members of the Board of Directors, employees at the level of Vice President or higher, and grants made outside of the delegated authority of the Stock Plan Committee described below, including grants to individuals who subsequently left the Company;

- Large annual or performance grants, and grants made at one time to more than 50 existing or newly hired employees between 2000 and 2006;

- Grants made to individuals who became Finisar employees as a result of acquisitions by Finisar between 2000 and 2006;

- Grants that were entered in our stock option accounting database with a grant date that did not match the date of the original authorizing document (i.e. minutes of meetings of the Board of Directors or the Compensation Committee, or unanimous written consents or actions of the Stock Plan Committee); and

- Grants as to which potentially inconsistent evidence of the measurement date was discovered during the course of the investigation.

The only grants made during the Review Period that were not initially reviewed by the Investigation Team were grants made in blocks of less than 50 to non-officer, non-director grantees. In the course of reviewing grants made in blocks to 50 or more grantees, the Investigation Team expanded the scope of the investigation to review

45

Table of Contents

four additional grants to less than 50 non-officer, non-director grantees. The Investigation Team reviewed approximately 95% of all options granted by Finisar during the Review Period.

Approximately 3.1 million files of data were collected from electronic sources and screened using pre-determined key word searches developed by the Investigation Team and reviewed by our independent auditors, and approximately 755,000 documents were then reviewed. The Investigation Team gathered and reviewed metadata from certain documents, reviewed electronic and hard copy documents from our human resources files, computer hard drives from 16 custodians, payroll and other human resources files and data storage systems, stock administration files, documents, including minutes of meetings of the Board of Directors and committees of the Board, and other relevant documentation maintained by our finance or legal departments.

A total of 40 interviews of 33 persons were conducted by the Investigation Team. These interviews included all present and former Board members since the date of our initial public offering, all currently employed officers (and one former officer) who either received options or who were involved with the authorization of stock option grants or the administration of the stock option granting process during the Review Period, and all employees who were involved with the authorization of stock option grants or the administration of the stock option granting process during the Review Period. Representatives of our independent auditors and outside legal counsel were also interviewed.

At the conclusion of the investigation by the Investigation Team, a Working Group was formed to address the accounting implications of the results of the investigation by the Investigation Team. The Working Group was composed of managers from our accounting and legal departments with assistance from independent third parties engaged to assist in the assessment of the historical accounting treatment of stock option grants, as tax advisors and in the calculation of the revised stock-based compensation expense based on the revised measurement dates. At no point during the Review Period were any of the members of the Working Group involved in the administration of our stock option granting process. Other than the Chief Financial Officer, no members were involved in determining to whom options were granted, the number of shares comprising each grant, or the date of grant. While our Chief Financial Officer was involved in communications concerning several of the grants at issue which occurred during the Review Period, he did not approve any of those grants.

In addition to reviewing data provided by the Investigation Team, the Working Group performed additional procedures to facilitate its understanding of the documents, the underlying stock option grants, our historical stock option granting practices, and the accounting implications thereof, Additional testing and analyses of our hiring, termination, leave of absence, and grant notification practices regarding stock options was performed.

The Audit Committee considered the scope of the Investigation Team's review to have been substantively and procedurally thorough. The Investigation Team identified 94 "Grant Dates" — dates on which our records show a stock option grant had occurred during the Review Period. Of the 94 Grant Dates, the Investigation Team reviewed 44 "Grant Dates of Interest" based on the size of the grant or some other factor. These 44 Grant Dates reviewed represented 95% of all options granted during the Review Period. The Working Group performed a subsequent review of 100% of the option grants during the Review Period and identified 151 separate stock option granting actions ("Granting Actions") made on the 95 original Grant Dates ("Grant Dates") during the Review Period. The Investigation Team noted that none of the past or present members of our Board of Directors, nor our Chief Executive, received any grants during the Review Period on a date for which the measurement date was ultimately revised, except in the case of one grant to two of our Board members where the date of approval of the grant by the Board of Directors differed from the date on which the grant was recorded. In that instance, the exercise price was higher on the date on which the grant was erroneously recorded than on the date the options were approved by the Board of Directors, and, as a result, we did not recognize any additional stock-based compensation expense on this grant.

Neither the Board of Directors nor Company management placed any restrictions on the scope of the Audit Committee's review nor did the Audit Committee place any restrictions on the review conducted by the Investigation Team or the Working Group. Both the Board of Directors and Company management cooperated fully with the Audit Committee and its advisors.

46

USB FIN 002055

Table of Contents

*Findings and Remedial Measures*

Based on the results of the investigation by the Audit Committee, and additional work performed by the Working Group, we found evidence that we previously used incorrect measurement dates when accounting for stock option grants pursuant to APB 25 and related interpretations. We have concluded that revised measurement dates are required for 105, or 70%, of the 151 Granting Actions during the Review Period, and that it is necessary to modify the accounting measurement dates for approximately 71% of the stock option grants awarded during the Review Period to employees and consultants. This consists of options to purchase approximately 75.9 million shares of common stock. Certain historic grants were also determined to be subject to variable accounting. Revising option grant measurement dates results in total additional stock-based compensation expense of $107.6 million to be recognized in the fiscal years 2000 through 2006. Approximately 85% of this total additional stock-based compensation expense, or $91.1 million, is attributable to six key Granting Actions that occurred between June 2000 and August 2003, representing approximately 21 million shares, or 20% of all options granted during the Review Period. Three of these six key Granting Actions were performance grants, and three were New Hire grants, as such grant types are discussed below.

In addition, we identified modifications to certain stock options related to extended leaves of absence that should have been accounted for by applying modification accounting as required by the provisions of FASB Interpretation No. 44, *"Accounting for Certain Transactions Involving Stock Compensation,"* or FIN 44. This resulted in approximately $5.1 million of additional stock-based compensation expense, of which $4.9 million is attributable to one leave of absence. Therefore, as a result of the investigation, we have identified a total of $112.1 million in additional pre-tax, non-cash, stock-based compensation expense for the fiscal years 2000 through 2006 ($112.7 million prior to the consideration of payroll tax charges and inventory capitalization), and had approximately $3.6 million of deferred stock-based compensation expense to be amortized as of April 30, 2006. As described in Note 2, "Summary of Significant Accounting Policies," to Consolidated Financial Statements, on May 1, 2006, we adopted Statement of Financial Accounting Standards ("SFAS") No. 123 (revised 2004), *"Share-Based Payment"* ("SFAS 123R"). As required by SFAS 123R, the unamortized deferred compensation expense of $3.6 million at May 1, 2006 has been reclassified to additional paid-in capital.

These adjustments for stock-based compensation, shown before any related payroll tax charges, inventory capitalization or income tax effects, are as follows (in thousands):

| | Fiscal Year Ended April 30, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003(1) | 2004 | 2005 | 2006 | Total |
| Stock-based compensation expense resulting from revised measurement dates | $5,416 | $27,160 | $31,741 | $24,441 | $ 8,296 | $3,257 | $7,303 | $107,614 |
| Other — leaves of absence | — | — | 39 | 41 | 4,791 | 183 | — | 5,054 |
| Total | $5,416 | $27,160 | $31,780 | $24,482 | $13,087 | $3,440 | $7,303 | $112,668 |

(1) Includes the acceleration of $13.1 million in deferred stock-based compensation expense related to our previous option exchange program. See the Section entitled "Option Exchange Program" below for a further discussion of this program.

Consistent with our historical accounting policy, we use the graded, or accelerated, amortization method to determine the amount of stock-based compensation expense for each reporting period.

In accordance with the applicable accounting guidance, we immediately expensed the unamortized deferred stock-based compensation expense associated with options with revised measurement dates that were cancelled as part of our stock option exchange program in fiscal 2003. As a result, on the date of the cancellation, we recognized $13.1 million of deferred stock-based compensation. See the discussion of the option exchange program below under "Option Exchange Program."

Of the $112.7 million total restated stock-based compensation expense arising from the investigation, $101.9 million, or 90.5%, has been expensed by the end of our fiscal year ended on April 30, 2004. This is primarily attributable to (i) the fact that the intrinsic value of the revised option awards was greater in the early years

USB FIN 002056

Table of Contents

of the Review Period, (ii) we used graded, or accelerated, amortization method to recognize stock-based compensation and (iii) as a result of the deferred compensation expense recognized upon the cancellation of options as part of our stock option exchange program in fiscal 2003. Only 3% and 6%, respectively, of the total restated stock-based compensation expense impacted our 2005 and 2006 fiscal years, respectively.

During the course of the investigation, we reviewed the effectiveness of our internal control over financial reporting, using the criteria set forth in *Internal Control — Integrated Framework* issued by COSO. Based on this assessment, as a result of the conclusions reached in the investigation, we identified certain material weaknesses in our internal control over financial reporting related to our stock option granting practices and the related accounting, which we believe have been remediated by April 30, 2007. See our discussion in "Item 9A Controls and Procedures," below.

Specifically, in the case of grants which were approved pursuant to the authority delegated to our Chief Executive Officer as the Stock Plan Committee, the Audit Committee found process-related deficiencies. These deficiencies resulted in the Company erroneously treating the stated grant date as the measurement date for financial accounting purposes. The grants in this category included performance grants, grants to newly hired employees and grants to employees hired in connection with acquisitions of other companies by Finisar. The Audit Committee concluded that twelve performance grants either lacked contemporaneous evidence to verify the date selected or, in the case of two grants, were selected retrospectively to capture a more favorable price. The Audit Committee found that 86 grants to newly hired employees lacked contemporaneous evidence of grant date selection. Additionally, the Audit Committee found that four grants to employees of acquired companies were recorded on a date other than that specified in the acquisition agreements. In eight Granting Actions, a grant date was properly approved on a grant date that was prior to the recorded grant date, effectively repricing the grant, resulting in variable accounting. Finally, a grant to three of our officers, including a grant to our Chief Financial Officer, was erroneously included in a large, broad-based performance grant Granting Action by the Stock Plan Committee. The Audit Committee was unable to locate conclusive evidence that a grant to these officers was approved by the Board of Directors or Compensation Committee prior to the Granting Action by the Stock Plan Committee. Nonetheless, the Audit Committee considers these grants to be valid obligations of the Company. The Audit Committee found no evidence of intentional misconduct or malfeasance on the part of Company personnel involved in selecting and approving the grant dates or administering the stock option granting process. Additionally, the Chief Executive Officer did not benefit from any of these grants.

In fiscal 2007, prior to the commencement of and not in response to the internal review that led to the investigation by the Audit Committee, the Audit Committee recommended, and the Board of Directors adopted, new policies and procedures with regard to grants of equity compensation awards to Board members, officers, and non-officer employees alike. Under these policies and procedures:

- All stock option grants and other equity awards to executive officers are to be granted by the Compensation Committee.

- All other awards are generally to be granted by the Compensation Committee, although grants to non-executive officers may be granted by the Board.

- Except in special circumstances, all awards are to be granted at regular quarterly meetings of the Compensation Committee.

- Awards are to be approved at meetings of the Compensation Committee or the Board of Directors, and not by unanimous written consent.

- The effective date of each award approved at a regular quarterly meeting will be the later of the third trading day following the public announcement of our financial results for the preceding quarter or the date of the meeting.

- The key terms of each award are to be communicated to the recipient promptly following the award.

The remedial measures described above provide for training and education in those rules and the designation of a finance department employee to be responsible for the accounting for stock options and other forms of equity compensation.

48

USB FIN 002057

Table of Contents

Management determined that the revised option granting procedures and controls that were implemented in August 2006 were effective in enabling us to appropriately determine measurement dates and properly account for stock option grants made subsequent to August 2006.

In connection with the completion of its investigation, and in light of the findings from the investigation, the Audit Committee recommended that the Board consider, and the Board of Directors unanimously adopted, certain remedial measures, including the following:

- The implementation of a cross-functional training program for certain key employees concerning (i) the Company's equity compensation programs and related improvements in equity compensation controls, processes and procedures, (ii) the accounting implications of the Company's equity compensation programs and (iii) the legal implications of the equity compensation programs.

- The appointment of a designated finance department employee to be responsible for the accounting for stock options and other forms of equity compensation.

- The adoption of additional policies to assure that grants will be recorded promptly in the Company's option accounting database, and that grantees will receive prompt written notification of their grants.

- The adoption of policies to assure that there will be a specific date to complete the generation of a list of recommended equity grant recipients and number of option shares prior to the submission of the recommendations to the Compensation Committee for approval.

- Implementation of a requirement that our Internal Audit Department review our compliance with the controls and procedures regarding equity compensation at least annually and report the results of its review to the Audit Committee.

We believe that these changes, together with the new policies and procedures adopted before the commencement of the investigation, remediated the past material weaknesses in our internal control over financial reporting related to our stock option granting practices and the related accounting and reduced to remote the likelihood that any incorrect measurement dates or any material error in accounting for stock option grants could have occurred during the fiscal year ended April 30, 2007 and not have been detected as part of our financial reporting close process. As a result, we concluded that we maintained effective internal control over financial reporting as of April 30, 2007.

*Overview of Our Historical Stock Option Granting Practices*

During the period prior to and immediately after our initial public offering, the Board of Directors approved all stock option grants, either at duly convened meetings of the Board of Directors or pursuant to approval by written consent. Our practice has been to grant stock options, except where prohibited, to nearly all full-time employees in connection with their joining us, as well as annual grants to most employees in connection with annual performance reviews ("performance grants"). To facilitate the granting of options to our rapidly growing workforce, in February 2000, the Board of Directors established a Stock Plan Committee composed solely of our Chief Executive Officer, and delegated authority to the Stock Plan Committee to grant options to newly hired and existing non-officer employees subject to certain limitations and established parameters. For example, the Board of Directors delegated authority to the Stock Plan Committee to approve grants in amounts equal to or less than 100,000 shares per employee to persons who were not officers or directors. The Compensation Committee was delegated the authority to approve grants to officers, and to employees in amounts that exceeded the authority of the Stock Plan Committee, while the full Board retained authority to approve grants to members of the Board of Directors and grants made in connection with the acquisition of or merger with other companies. During the Review Period, our Chief Executive Officer made recommendations to the Board and the Compensation Committee regarding stock option grants to officers, and, in his role as sole member of the Stock Plan Committee, approved all stock option grants to non-officer employees, except for grants in excess of his granting authority.

Grants made to our existing executive officers (as defined by Section 16(b) of the Securities Exchange Act of 1934, or "Section 16(b) officers"), were generally approved by the Compensation Committee, and were either approved at and recorded in the minutes of a meeting of the Compensation Committee, or by written resolution

49

USB FIN 002058

approved by all of the members of the Compensation Committee and set forth in a unanimous written consent, or UWC, of the Compensation Committee signed by all members of the Compensation Committee. During the Review Period, the Board of Directors had sole authority to grant stock options to employees as part of an acquisition or merger, and to approve options granted to members of the Board of Directors. Stock option grants approved by the Board of Directors were either approved at and recorded in minutes of meetings of the Board of Directors, or approved by written resolution set forth in a UWC signed by all members of the Board of Directors. The Board also sometimes approved grants to newly-hired employees, officers, and other individuals.

Since our initial public offering, we have, from time to time, consulted with outside legal counsel about the design and implementation of our stock option plans, the establishment of the Stock Plan Committee to whom authority to make certain grants was delegated and about some individual grants. Outside counsel also typically drafted minutes of Board of Directors and Compensation Committee meetings where stock options were granted, as well as UWCs of the Board and Compensation Committee to approve stock option grants. Outside counsel did not prepare or review documentation of actions by the Stock Plan Committee.

The Stock Plan Committee approved 105 of the 151 Granting Actions. Fifteen Granting Actions were approved by the Compensation Committee, of which 11 were recorded in minutes of meetings of the Compensation Committee and four were approved by UWC. The Board directly approved stock options in 14 Granting Actions, of which seven were approved by UWC and seven were recorded in minutes of meetings of the Board of Directors. There were 12 Granting Actions by the Board relating to options assumed in connection with acquisitions of other companies by us, and five Granting Actions by the Board related to options granted to employees of acquired companies.

*Details of Restatement*

Consistent with the applicable accounting literature and recent guidance provided in a letter provided by the SEC's Chief Accountant to Lawrence Salva, Chairman, Committee on Corporate Reporting, Financial Executives International and Sam Ranzilla, Chairman, Center for Public Company Audit Firms, American Institute of Certified Public Accountants dated September 19, 2006, the Working Group organized the 151 separate Granting Actions made on the 95 original Grant Dates into categories based on the grant type and the process by which the grant was approved and finalized as follows:

| Grant Type | Number of Granting Actions | Percent of Total | Number of Option Shares | Percent of Total |
|---|---|---|---|---|
| Acquisition-Related | | | | |
| Assumed Options | 12 | 8.0% | 1,591,133 | 1.5% |
| Target Employees | 6 | 4.0% | 4,513,308 | 4.2% |
| Total acquisition-related | 18 | 12.0% | 6,104,441 | 5.7% |
| Director | 5 | 3.3% | 785,000 | 0.8% |
| Officer | 15 | 9.9% | 11,045,000 | 10.3% |
| Performance | 14 | 9.3% | 51,476,145 | 48.1% |
| New Hire/Promotion | 97 | 64.2% | 26,388,923 | 24.7% |
| Option Exchange Program | 2 | 1.3% | 11,144,690 | 10.4% |
| Total | 151 | 100% | 106,944,199 | 100% |

The Working Group reviewed evidence developed through the Audit Committee's investigation related to each grant, and, based upon the relevant facts and circumstances, applied the applicable accounting standards to determine, for every grant within each category, whether the measurement date required adjustment. If the measurement date was not the originally assigned grant date, accounting adjustments were made as required, resulting in additional non-cash stock-based compensation expense related to the intrinsic value, that is, the difference between the exercise price and the closing sales price of our common stock on the revised measurement date.

50

USB FIN 002059

We have concluded that of the 151 Granting Actions made on 95 Grant Dates, 105 Granting Actions on 63 Grant Dates require revised measurement dates. The remaining 46 Granting Actions on 32 Grant Dates require no change to the original grant date. The following is a summary of the revised Granting Actions by type of grant:

| Grant Type | Number of Revised Granting Actions | Percent of Total Granting Actions | Number of Option Shares With Revised Measurement Dates | Percent of Total Grants | Stock-based Compensation Expense (In thousands) |
|---|---|---|---|---|---|
| Acquisition-Related Assumed Options | — | — | — | — | $ — |
| Target Employees | 4 | 2.6% | 3,872,806 | 3.6% | 1,459 |
| Total acquisition-related | 4 | 2.6% | 3,872,806 | 3.6% | 1,459 |
| Director(1) | 1 | 0.7% | 60,000 | 0.1% | — |
| Officer | 2 | 1.3% | 735,000 | 0.7% | 1,992 |
| Performance | 12 | 7.9% | 47,215,703 | 44.1% | 56,988 |
| New Hire/Promotion | 86 | 57.0% | 24,028,510 | 22.5% | 47,175 |
| Option Exchange Program | — | 0.0% | — | 0.0% | — |
| Total | 105 | 69.5% | 75,912,019 | 71.0% | $ 107,614 |

(1) While one properly approved grant to two of our Board members was not measured on the appropriate date, it did not result in any incremental stock-based compensation expense.

The grants giving rise to the total $107.6 million in additional non-cash stock-based compensation expense based on revised measurement dates are categorized and summarized as follows:

*New Hire and Promotional Grants*

During the Review Period, we granted options to purchase a total of 26.4 million shares to newly-hired employees. During the Review Period, grants made to newly-hired employees ("New Hire grants") generally were approved by the Stock Plan Committee on a periodic basis. While details of stock option grants were generally set forth in the offer letter to the prospective employee, the grant date was determined when the grant was approved by the Stock Plan Committee after the date on which the employee commenced employment with us. New Hire grants were generally made to all new employees who had joined Finisar since the last date on which the Stock Plan Committee approved and awarded grants to newly hired employees. Additionally, New Hire grants include grants made to a smaller number of existing employees who received promotions or some other employment adjustment since the last date on which the Stock Plan Committee awarded and approved New Hire grants. The evidence available to support the original grant date for options granted to newly promoted or other existing employees generally differed from the evidence supporting the measurement date for New Hire grants. Thus, we differentiated between awards made as a result of a promotion or adjustment and New Hire grants. This differentiation based on award type resulted in application of different measurement dates for grants originally made on an original grant date. We also found that offer letters to our Malaysia and Shanghai employees did not always include all of the details of the option grant to be made to newly-hired employees in such locations required to determine the proper measurement date, i.e., the number of shares underlying each option to be granted to the newly-hired employee once the option has been approved by the Stock Plan Committee. Accordingly, for those grants we required additional supporting evidence to determine the appropriate measurement date.

None of the Grant Dates recorded for New Hire grants preceded the commencement of employment of any newly-hired employee. However, in multiple instances, evidence suggested that New Hire grants were approved by the Stock Plan Committee at a later date than the stated grant date. In some cases, the identity of all grantees as set forth in such Granting Action was not known or specified with finality until after the stated grant date. Moreover, our Stock Plan Committee's process for finalizing and documenting these grants was often completed after the originally assigned grant date. In some cases, no contemporaneous, direct evidence of the date of approval by the

51

Stock Plan Committee was located. Additionally, in several instances, the evidence showed that the Stock Plan Committee retrospectively selected a grant date with a more favorable price. Based on all available facts and circumstances, we determined that the originally recorded measurement dates for the New Hire grants made by our Stock Plan Committee during the Review Period cannot be relied upon in isolation as the correct measurement dates.

New Hire grants to non-officer, non-director employees that required Board of Directors or Compensation Committee approval because the size of the individual grant exceeded the authority delegated to the Stock Plan Committee were typically approved by UWC of the Board or Compensation Committee. We were unable to locate documents demonstrating contemporaneous Board of Directors or Compensation Committee approval on the date designated in the UWC as the effective date of the grant. In some cases, the UWC was prepared after the selected grant date. Additionally, in several instances, no direct evidence confirmed the date on which the UWC was executed by each Board or Compensation Committee member.

APB 25 defines the measurement date for determining stock-based compensation expense as the first date on which both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, are known with finality. In 77 of the 97 New Hire Granting Actions, reliable objective evidence suggested a single specific date on which approval was reached on the final number of shares comprising each stock option, the identity of those individuals entitled to receive each stock option and the exercise price of the stock option. Such evidence primarily consisted of electronic data such as emails and files attached to emails or written agreements, including offer letters. We utilized this evidence to revise measurement dates for 66 New Hire Granting Actions covering options to purchase 14.7 million shares of common stock. This resulted in incremental stock-based compensation expense of $13.6 million on a pre-tax basis, amortized over the respective awards' vesting terms.

In 14 New Hire Granting Actions, where no other reliable objective evidence points to a single specific date on which the number of shares, the identity of all individuals entitled to receive those shares and the price had become final, we have determined the date on which information concerning the grant was first entered into our options software accounting database to be the most reliable measurement date. We use a commonly available third party accounting software program to monitor and administer our equity award programs and to track and account for our stock option grants. For grants where reliable objective evidence was not recovered in the investigation to support a specific measurement date, the revised measurement date was based on the date these grants were recorded into our stock options software accounting database. The date on which information concerning the option was entered into this option software database was utilized to revise measurement dates for New Hire grants covering 4.0 million shares of common stock. This resulted in incremental stock-based compensation expense of $27.3 million on a pre-tax basis, amortized over the respective awards' vesting terms.

In six New Hire Granting Actions, the evidence suggests that the Stock Plan Committee selected an initial grant date, then subsequently chose a later grant date when the underlying stock price was lower than on the earlier grant date. In those cases, the fair market value of our common stock on the initial measurement date was higher than the later-selected date on which the option grant was recorded. Based on the evidence, we concluded that such grants should be deemed to have been repriced and subject to variable accounting from the date of repricing as required by the provisions of FASB Interpretation No. 44, *"Accounting for Certain Transactions Involving Stock Compensation,"* ("FIN 44") and the provisions of Emerging Issues Task Force No. 00-23, *"Issues Related to the Accounting for Stock Compensation under APB Opinion No. 25 and FASB Interpretation No. 44,"* ("EITF 00-23"). After considering forfeitures, we have adjusted the measurement of compensation cost for these options that are subject to variable accounting, covering 5.4 million shares of common stock. This has resulted in incremental stock-based compensation of $6.3 million on a pre-tax basis, amortized over the respective awards' vesting terms through April 30, 2006. Under FAS 123, and upon the adoption of FAS 123R on May 1, 2006, these options are not treated as variable awards.

Upon review of all such New Hire grants, we have determined that the correct measurement date for financial accounting purposes was different than the stated grant date for 86 New Hire Granting Actions covering 24 million shares, or 91% of all New Hire grants made during the Review Period. For grants representing 22.1 million shares, the market price of our common stock on the revised measurement date was higher than the option exercise price. This resulted in our recording of approximately $47.2 million in non-cash stock-based compensation expense

USB FIN 002061

relating to New Hire grants (representing 42% of the total additional non-cash-based compensation expense recorded).

*Performance Grants*

Performance grants were broad-based stock option grants that were usually linked to the annual employee performance appraisal process. Approval of these grants to non-officer employees was generally delegated to our Chief Executive Officer, as the sole member of the Stock Plan Committee. This delegated authority included determining the number of options to be granted to each individual employee. During the annual review process, each employee was awarded a performance ranking. This performance ranking then corresponded to a range of option awards, or at times during the Review Period a set schedule, that was pre-determined by the Chief Executive Officer. The Stock Plan Committee determined the number of shares underlying the stock options awarded to the employee based upon this range or schedule corresponding to the performance ranking achieved by the employee. The Stock Plan Committee selected the grant date, which in all cases appears to have been a date after the start of the performance appraisal process, but prior to the date when the identity of the grantees and number of options allocated to each grantee were known with finality.

We determined that for all performance grants, changes to the list of approved individual employee grants continued to be made after the Stock Plan Committee approved the grant date. In some cases, the list of employees included in a particular Granting Action was not prepared until after the stated grant date, and, in some cases, changes were made to the number of shares comprising individual awards and/or the identity of the employee receiving an award, indicating the grant was not finalized at the stated grant date.

In eleven of the 14 total performance grant Granting Actions, reliable objective evidence suggested a single specific date on which the Stock Plan Committee had approved the final number of shares comprising each stock option, the identity of those individuals entitled to receive each stock option and the exercise price of the stock option. In nine of these performance grant Granting Actions, for options covering 36.7 million shares, we found that not all actions had been taken, (i.e., the final number of shares comprising each stock option and/or the identity of those individuals entitled to receive each stock option), were completed as of the stated grant date, and the details of the grants changed after the stated grant date. We revised the measurement date to correspond with the date on which evidence was located to indicate that approval of the details of each grant was final. Since the market price of our common stock on the revised measurement date was higher than the option exercise price for eight of the performance grant Granting Actions, covering 23.6 million shares, we recorded additional stock-based compensation expense of $29.5 million.

In two performance grant Granting Actions, no reliable objective evidence points to a single specific date on which the number of shares comprising each stock option, the identity of all individuals entitled to receive each stock option and the exercise price had become final. Therefore, we have determined the date on which information concerning the grant was entered into our stock option database is the most reliable measurement date for calculating additional stock-based compensation expense under APB 25. The date on which information concerning the grant was entered into our stock option database was utilized as the measurement date for these performance grants covering 7.6 million shares of common stock. The market price of our common stock on the revised measurement date was higher than the option exercise price for one of these Granting Actions, and accordingly, we recorded incremental stock-based compensation expense of $27.5 million.

In one performance grant Granting Action, the evidence suggests that the Stock Plan Committee selected a grant date, then subsequently chose a later grant date when the closing sales price of our common stock was lower than on the earlier date. Accordingly, the fair market value of our common stock on the initial measurement date was higher than the recorded option exercise price. Based on the evidence, we concluded that the grant, covering approximately 2.8 million shares, should be deemed to have been repriced and subject to variable accounting, from the date of repricing as required by the provisions of FIN 44 and EITF 00-23. After considering the movement in our stock prices and forfeitures, there was no incremental stock-based compensation expense recognized on this award through April 30, 2006. Under FAS 123, and upon the adoption of FAS 123R on May 1, 2006, these options are not treated as variable awards.

USB FIN 002062

Table of Contents

We also found one performance grant to an employee as part of an annual Granting Action that was added after the original grant date. We deemed it necessary to determine whether such action suggested that the entire Granting Action was still subject to change (and hence the requisite Granting Action had not been completed pursuant to the requirements of APB 25), or whether the change related solely to the one so-called "straggler," which would not affect the measurement date of all other awards made in that Granting Action. We found reliable objective evidence that the "straggler" grant represented a separate Granting Action, predominantly based on the fact that this "straggler" was added to our stock option database nearly six weeks after all other grantees in the performance grant, and, as such, did not affect the finality of the previously completed Granting Action.

Upon review of all such performance grants, we determined that the correct measurement date for financial accounting purposes was different than the stated grant date for 12 performance grant Granting Actions, representing 47.2 million shares, or 92% of all Performance grants made during the Review Period. For grants representing 34.0 million shares, the market price of our common stock on the revised measurement date was higher than the option exercise price. As a result, we are recording a total of approximately $57 million in additional non-cash stock-based compensation expense relating to this category (representing 51% of the total additional non-cash-based compensation expense recorded).

*Acquisition-Related Awards*

We made multiple acquisitions of other companies during the Review Period. These acquisitions sometimes resulted in option grants being awarded to employees of the acquired companies, in one of three forms:

- existing options held by the acquired company employees to purchase stock of the acquired company, that were assumed by us and became options to acquire our common stock ("Assumed Options");

- option grants made to induce employees of the target company to join us, the details of which were set forth in the acquisition agreements between us and the acquired company; and

- option grants made to employees of the acquired company that followed the form of our New Hire grants, and were made to provide an incentive to such employee sometime after the acquired company employee became our employee (but which options were not required to be granted by the terms of the related acquisition agreements).

Assumed Options were assumed by us at a set, formula driven ratio, as set forth in the acquisition documents, and as approved by our Board of Directors and were recorded in our stock option database at this preset valuation. We determined that for all Assumed Options, the fair value of these options was appropriately measured as required by EITF Issue No. 99-12, "Determination of the Measurement Date for the Market Price of Acquirer Securities Issued in a Purchase Business Combination" and included in the purchase price, and the intrinsic value of the unvested portion of those options, as measured on the date the close of the business combination, was deducted from the purchase price and recognized as compensation expense.

Options provided as inducements to employees of the acquired company to accept our offer of employment post-acquisition ("Target Employees") were set forth and approved by our Board of Directors as part of the acquisition documents, or sometimes in related employment agreements and in one case were approved by the Compensation Committee prior to the acquisition but with an effective date specified as the date the key individual became an employee of Finisar. If the details concerning these grants were described in the acquisition agreements or in the related employment agreements approved prior to the closing date of the acquisition, we determined that the appropriate measurement date was the closing date of the respective acquisition. The evidence indicates that some of these option grants were originally recorded with a grant date that was different than the date specified in the respective acquisition agreements. We found that three grants required revised measurement dates because they were recorded on a date other than the date specified by the acquisition agreements or related employment agreements. The exercise price of the stock on two of these grants was lower on the recorded date than the fair market value of our common stock on the date specified in the particular acquisition agreement. This resulted in additional stock-based compensation expense of approximately $1.4 million (representing 1.2% of the total additional stock-based compensation expense recorded).

54

USB FIN 002063

Table of Contents

We determined that one grant, representing an option to purchase 750,000 shares of our common stock, made to a Target Employee of an acquired company was effectively repriced. This grant was originally approved by the Compensation Committee with a grant date corresponding to the date of commencement of employment, and then approved again with a lower exercise price at a later date, causing the recorded grant date as entered into our stock option database to differ from the date evidence shows approval was first given for the grant. This repricing on a later grant date resulted in the application of variable accounting. Although there was no initial intrinsic value for this grant, the application of variable accounting resulted in a total of approximately $93,000 in additional non-cash stock-based compensation expense being recorded by us (representing 0.08% of the total additional non-cash-based compensation expense recorded). All unexercised options in this award were cancelled in fiscal 2005.

*Director Grants*

During the Review Period, grants made to our directors were approved by the Board of Directors at and recorded in the minutes of the Board of Directors, except for one Grant Date, when the grant was approved by resolution set forth in a UWC signed by all of the members of the Board of Directors. There were five grants to members of the Board of Directors, representing options to purchase 785,000 shares of our common stock, that were properly approved by the Board of Directors at meetings of the Board. None of these five grants required changes to the measurement date that resulted in the recordation of any additional stock-based compensation expense. Of these five grants, one Granting Action, representing grants made to two of our Board members, had a different grant date recorded in our stock option accounting database than the date on which the Board approved the grant; however, because the exercise price of the options recorded in the stock option accounting database was higher than the price on the correct grant date, no additional compensation expense resulted from this error. Unlike those revised grants we concluded should be subject to variable accounting, there was no repricing action taken by the approver, in this instance the Board of Directors, and the mistake appears to have been a clerical error made when the grant documentation was finalized. Accordingly, we have corrected the clerical error and recorded the grant date as the date the Board actually approved the grant, at the exercise price on the date of approval, and accordingly, no incremental stock-based compensation expense is incurred.

For the one grant to directors that was approved by UWC of the Board, although the UWC was deemed effective as of a date earlier than the date signed by the directors, the UWC was sent electronically to the directors on the effective date of the consent. In addition, the evidence indicates that details of the grant, including identification of the grantee and the number of shares subject to each option grant, were orally approved by the members of the Board on, or in advance of, the effective date of the UWC. Accordingly, we determined that the details of such grant had been agreed to by the members of the Board of Directors on or before the effective date of the grant, and the Audit Committee considered that the date of execution of the UWC did not change the grant date.

*Officer Grants*

Grants made to our Section 16(b) officers during the Review Period were, except for one instance described below, either approved by the Board of Directors or the Compensation Committee, at a meeting of the Board of Directors or Compensation Committee held in person or by telephone, or approved by resolution set forth in a UWC signed by all of the members of the Board of Directors or Compensation Committee. For all grants approved by UWC, the Investigation Team determined that evidence supported the effective date of the UWC as the appropriate grant date. The evidence obtained in the course of the investigation indicates that details of the grant, including the identification of the grantee and number of shares subject to each individual grant, were orally approved by the members of the Board of Directors or Compensation Committee, as applicable, on, or in advance of, the effective date of the UWC. Some UWCs were deemed effective as of a date earlier than the date the UWC was sent to or signed by the directors, although generally such UWCs were sent electronically to the directors to sign either on the effective date of the consent or within one day after the consent; however, the directors did not always sign the consents on the effective date of the consent. However, because the evidence shows that all such grants had been agreed to by all members of the Board or Compensation Committee, as applicable, on or before the effective date of the grant, the Audit Committee considered that the date of execution of the UWC did not change the grant date.

Fourteen grants to officers, representing options to purchase 10.8 million shares of our common stock, were properly approved during the Review Period, and required no change to the grant date. In one case, a grant to an

55

USB FIN 002064

officer was documented by UWC, but recorded in our stock option accounting database on a date other than the date the evidence indicates that final approval of the grant was made, resulting in the option having a lower exercise price than the fair market value of our common stock on the effective date. Unlike those revised grants we concluded should be subject to variable accounting, there was no repricing action taken by the approver, in this instance the Compensation Committee, and the mistake appears to have been a clerical error made when the grant documentation was finalized. Accordingly, we have corrected the clerical error made to the grant date as recorded in the stock option accounting database and the related grant documentation.

In one instance, a broad-based annual performance grant of options to purchase a total of 2,540,000 shares made in June 2000 by the Stock Plan Committee erroneously included grants of options to purchase an aggregate of 235,000 shares to three Section 16(b) officers (including our Chief Financial Officer). The Audit Committee has not located conclusive evidence that the three officer grants were separately approved by the Board of Directors or the Compensation Committee. Nonetheless, the Audit Committee considers these grants to be valid obligations of the Company. This grant was made shortly after the Board of Directors established the Stock Plan Committee. Based on the evidence, initially there was some confusion about the limits of the Chief Executive Officer's authority, acting as the Stock Plan Committee, to make option grants, and the grantees had no reason to doubt his authority to make these grants. The measurement date for these options was revised along with the grants to non-officers in this performance Granting Action.

*Awards Subject to Variable Accounting*

As noted above under the discussions of new hire, performance, and acquisition-related awards, we concluded that certain revised option awards were repriced and thus subject to variable accounting. To the extent these awards have intrinsic value on the original grant date, as determined in the investigation, the amount of this intrinsic value, net of any forfeitures, is the minimum "fixed-portion" of stock-based compensation expense to be recorded for these grants, regardless of the fact that the award becomes subject to variable accounting when repriced. In addition to the fixed-portion of the stock-based compensation expense for awards and from the date of the repricing, the variable stock-based compensation attributable to these awards is recomputed at each reporting date based on the difference between the option exercise price and the then market value of our common stock. Such variable accounting continues until the option is exercised, forfeited or otherwise cancelled. These grants are not treated as variable under the disclosure-only provisions of FAS 123, or under FAS 123R, which we adopted on May 1, 2006. Under FAS 123 and FAS 123R, the total stock-based compensation expense for such "repricings," which are considered modifications, is the sum of the original grant date fair value plus any incremental fair value of the option award as of the modification date.

The following table reflects the amount of additional stock-based compensation expense included in the total additional stock-based compensation expense of $112.1 million recorded as a result of the investigation that relates to the options discussed above that we determined were subject to variable accounting (in thousands):

| | Fiscal Year Ended April 30, | | | | | | | |
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|---|---|---|---|
| Fixed portion of variable stock-based compensation related to initial intrinsic value | $ — | $ — | $ 31 | $323 | $ 126 | $ 53 | $ (11) | $ 522 |
| Variable stock-based compensation | — | 272 | (265) | 3 | 1,392 | (757) | 5,206 | 5,851 |
| Total | $ — | $272 | $(234) | $326 | $1,518 | $(704) | $5,195 | $6,373 |

*Improperly Recorded Leaves of Absences*

Our stock option plans provide that vesting of options held by employees ceases during leaves of absence taken by the employee, and that the options held by such employees do not continue to vest during such leaves of absence. During the review and testing of personnel files related to leave of absences, we found that leaves of absence taken by employees were not always recorded in our stock option accounting database. Thus, in some instances, vesting of the option continued to be recorded during the leave of absence, which resulted in accelerated vesting for certain stock option awards. Pursuant to FASB Interpretation 44, such continuation and/or subsequent acceleration of

USB FIN 002065

vesting constitutes a modification of the option grant that results in a new measurement date for such grant. This modification results in additional stock-based compensation expense, measured on the modification date, which is generally the date that the leave commenced, but only expensed to the extent that the employee actually received a benefit that such employee would not otherwise have received absent the modification.

We identified 113 unrecorded leaves of absence. In 79 cases, the employee remained employed by us for a period of time beyond the vesting period of the option and for a period of time at least equal to the amount of the acceleration provided as a result of the leave of absence. Therefore, the employee received no additional benefit from accelerated vesting. In 34 instances, the employee terminated his or her employment with us. In eleven of these instances we determined that the employee benefited from accelerated vesting or extended exercise periods and the related options had intrinsic value on the date of modification. This resulted in $5.1 million of additional stock-based compensation expense. One leave of absence, to a section 16(b) officer, accounted for $4.9 million of that $5.1 million additional expense.

*Other Modifications*

We also reviewed other instances where modifications were made to employee stock options such as accelerations or extensions of vesting periods related to termination of employees. We found 33 instances of accelerated vesting or extended exercise periods which required the calculation of stock-based compensation expense because the price per share of our common stock on the date of the modification was higher than the exercise price of the related options. The amount of stock-based compensation expense calculated for these modifications is $452,000 and had been previously recognized in the Company's financial statements.

*Option Exchange Program*

On November 8, 2002, we announced a voluntary stock option exchange program for eligible option holders. Under the program, eligible holders of our options who elected to participate had the opportunity to tender for cancellation outstanding options in exchange for new options to be granted on a future date at least six months and one day after the date of cancellation. In order to participate in the exchange program, however, the employee had to tender all options granted within six months of the commencement of the offer (i.e., all options granted after May 7, 2002) for cancellation and replacement with new stock options. Members of our Board of Directors were not eligible to participate in the program. The option exchange program terminated on December 17, 2002 and the shares were cancelled the next day. As of that date, holders of options to purchase an aggregate of 11,816,890 shares of common stock tendered their shares for cancellation. On June 19, 2003, new options to purchase an aggregate of 11,144,690 shares of common stock were granted. Under the applicable accounting guidance, all unamortized deferred stock-based compensation expense related to cancelled options should be immediately expensed when the options are cancelled.

The Working Group verified that all options tendered in the exchange program were appropriately cancelled and replaced with new options that were granted six months and one day later. The Working Group also determined that none of the revisions to measurement dates of stock options as a result of the investigation caused any other grant dates to fall within the period that was six months prior to or following the cancellation date of the option exchange program. Accordingly, none of the option grants made as part of the option exchange program are subject to variable accounting as a result of revisions to measurement dates.

Of the options to purchase approximately 75.9 million shares of common stock for which we have revised the measurement date, 11.8 million options were cancelled as part of the option exchange program. Accordingly, of the $112.1 million additional stock-based compensation expense recorded as part of the restatement, $13.1 million was expensed in connection with the option exchange program concurrent with the cancellation of such options.

57

USB FIN 002066

Table of Contents

*Summary of Stock-Based Compensation Adjustments*

The impact on the consolidated statement of operations from recognizing stock-based compensation expense through April 30, 2006 resulting from the investigation is summarized as follows (in millions):

| | Restatement Adjustments | | | | | | |
| | Gross Stock-Based Compensation Charge | Stock-Based Compensation Capitalized to Inventory | Net Stock-Based Compensation Charge | Payroll Tax Charge | Total Pre-Tax Charges | Income Tax (Benefit) Provision | After-Tax Non-Cash Charge |
| Fiscal Year Ended | | | | | | | |
| | (In thousands) | | | | | | |
| April 30, 2000 | $    5,416 | $    (124) | $    5,292 | $    0 | $    5,292 | $    (2,112) | $    3,180 |
| April 30, 2001 | 27,160 | (563) | 26,597 | 175 | 26,772 | (10,906) | 15,866 |
| April 30, 2002 | 31,780 | (568) | 31,212 | 22 | 31,234 | 13,018 | 44,252 |
| April 30, 2003 | 24,482 | 835 | 25,317 | 3 | 25,320 | — | 25,320 |
| April 30, 2004 | 13,087 | 72 | 13,159 | (14) | 13,145 | — | 13,145 |
| Cumulative Effect at April 30, 2004 | 101,925 | (348) | 101,577 | 186 | 101,763 | — | 101,763 |
| April 30, 2005 | 3,440 | 236 | 3,676 | (55) | 3,621 | — | 3,621 |
| April 30, 2006 | 7,303 | (484) | 6,819 | 1,425 | 8,244 | (134) | 8,110 |
| Total | $  112,668 | $    (596) | $  112,072 | $1,556 | $113,628 | $    (134) | $113,494 |

In addition to the $112.1 million recognized through fiscal 2006, $3.6 million of unamortized deferred compensation remained as of April 30, 2006. As required by SFAS 123R, which was adopted on May 1, 2006, the unamortized deferred compensation of $3.6 million has been reclassified to additional paid-in capital, along with the unamortized deferred compensation for stock options assumed from past acquisitions, in our consolidated balance sheet. Upon the adoption of Statement of Financial Accounting Standards, or SFAS, 123R on May 1, 2006, we recorded an additional $1.2 million cumulative benefit from a change in accounting principle, net of tax, reflecting the net cumulative impact of estimated forfeitures related to unvested stock options as of May 1, 2006 that were previously not included in the determination of historic stock-based compensation expense under APB 25 in periods prior to May 1, 2006.

### Impact of Judgments and Interpretations on Restatement Values

We reviewed evidence gathered through the investigation by the Investigation Team, together with additional work performed by the Working Group. Based on the relevant facts and circumstances, we applied the applicable accounting standards to determine whether the measurement date required adjustment. For all grants, we considered the best available evidence to determine the most appropriate measurement date. We reviewed the evidence available concerning each stock option grant and developed and documented a methodology, under the direction of the Audit Committee, to determine the most appropriate measurement date for financial accounting purposes for each previously granted stock option. We then used the software tool in the program used for our stock option accounting database to compute the revised stock-based compensation expense. The strongest evidence of the appropriate measurement date available for each Granting Action (i.e. when the essential actions necessary to grant the stock option were completed, including the final determination of the number of shares to be granted to each employee, the identity of the employee, and exercise price) was used as the correct measurement date to determine the market price of the option shares pursuant to APB 25 and its related interpretations. The specific circumstances surrounding each such grant were considered in determining the evidentiary level of support for a given grant measurement date.

We ranked the level of persuasiveness of each type of evidence. Written records, such as email messages, notes, spreadsheets and other information pertaining to specific grant dates, acquisition agreements and minutes of Board and Compensation Committee meetings were deemed to be the most persuasive. Based on this evidence, we selected dates that represent the earliest information available whereby both (1) the number of shares to which an individual employee is entitled as the option grant and (2) the option or purchase price, if any, are known with

58

Table of Contents

finality. Evidence was also considered reliable when it provided compelling support for the specific measurement date. Evidence was considered inconclusive when it suggested the possibility of an alternative measurement date, or dates, or range of dates, but insufficient documentary evidence was available to identify a specific date on which the Granting Actions were complete. We found objective reliable evidence on which to establish a measurement date for 89% of the total option shares awarded during the Review Period. These grants represent 49%, or $52.8 million, of the total non-cash stock-based compensation expense being recognized through April 30, 2006 as a result of the selection of revised measurement dates. For the remaining grants, representing $54.8 million of the total non-cash stock-based compensation expense being recognized through April 30, 2006, no contemporaneous documentary evidence was found to establish a new measurement date other than the date that the grant was entered into our stock option accounting database. Two Granting Actions, comprising $53.9 million, represent 98% of the total incremental stock-based compensation expense attributable to grants for which we used the date that data was entered into our stock option accounting database to establish the revised measurement date.

Where the evidence did not clearly support a specific measurement date, we selected the measurement date indicated by the best available evidence. However, when one or more potential alternative measurement dates or a range of dates were identified, significant judgment was applied in selecting a specific measurement date. In those cases, we also performed a sensitivity analysis to quantify the potential divergence in stock-based compensation expense associated with the alternative dates or ranges for such awards. In the sensitivity analysis, a date range was established indicating the earliest date on which the available evidence indicated that all essential actions necessary to grant the option could have been completed, including the final determination of the number of shares to be granted to each employee, the identity of the employee, and the exercise price. The endpoint in the range was the last date on which all essential actions necessary to grant the option could have been completed, which was often the date the grant was first entered into our stock option accounting database. An upper and lower stock-based compensation expense was then computed based upon the highest and lowest closing price of our common stock during this date range, and the results were compared to the stock-based compensation expense calculated using the date of grant selected by the Working Group for each Granting Action, based upon the best available evidence.

Based on our sensitivity analysis for all Granting Actions in the Review Period, a review or assessment of the judgments and interpretations applied to the various grants resulted in a possible range of pre-tax stock-based compensation expense of $97.5 million to $132.5 million had we selected an alternative measurement date. Our final conclusion resulted in $107.6 million in additional pre-tax stock-based compensation expense related to revised measurement dates. The following table reflects the range of stock-based compensation expense that would have been incurred at the high and low end of the sensitivity range, by grant type:

| Grant Type | # of Granting Actions | Shares | Low End of Range | As Restated (In thousands) | High End of Range |
|---|---|---|---|---|---|
| Acquisition-Related | | | | | |
| Assumed Options | 12 | 1,591,133 | $ — | $ — | $ — |
| Target Employees | 6 | 4,513,308 | 1,459 | 1,459 | 1,459 |
| Total acquisition-related | 18 | 6,104,441 | 1,459 | 1,459 | 1,459 |
| Director | 5 | 785,000 | — | — | — |
| Officer | 15 | 11,045,000 | 1,992 | 1,992 | 1,992 |
| Performance | 14 | 51,476,145 | 56,541 | 56,988 | 78,188 |
| New Hire/Promotion | 97 | 26,388,923 | 37,478 | 47,175 | 50,886 |
| Option Exchange Program | 2 | 11,144,690 | — | — | — |
| Total | 151 | 106,944,199 | $97,470 | $ 107,614 | $132,525 |

Similar to the actual revised stock-based compensation expense, had we applied an alternative judgment to select the appropriate measurement dates, approximately 91% of the potentially higher or lower stock-based compensation expense determined by this sensitivity analysis would have been fully expensed by the end of our fiscal 2004. This is primarily attributable to (i) the fact that the intrinsic value of the revised option awards was

USB FIN 002068

greater in the early years of the Review Period, (ii) we used graded, or accelerated, amortization method to recognize stock-based compensation expense and (iii) as a result of the deferred compensation expense recognized upon the cancellation of options as part of our stock option exchange program in fiscal 2003.

### Tax Impact of Restatement Items

In connection with the restatement of our consolidated financial statements due to stock option adjustments, we recorded deferred tax benefits on the non-cash stock-based compensation expense over the option vesting periods for grants to individuals who were employed in tax jurisdictions where a tax deduction was available. The tax impact of the restatement for stock-based compensation expense reduced (increased) the tax provision for the fiscal years ended April 30, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 by $2.1 million, $10.9 million, $(13.0) million, $0, $0, $0, and $134,000, respectively. As a result of the restated stock-based compensation expense our deferred tax assets attributable to stock-based compensation as of April 30, 2006 increased by $9.7 million with a corresponding increase in our tax valuation allowance.

We have determined that in connection with the additional stock-based compensation expense recorded as a result of the investigation, a related expense for payroll taxes should have been recorded. We have recorded this payroll tax expense in the period of exercise of the related option as a result of our obligation to withhold taxes upon the exercise of nonqualified stock options. Our employer's liability for taxes is joint and several along with the employee. As applicable, a portion of the liability has been subsequently released in the periods the respective statute of limitation lapsed. We have recorded a charge to opening retained earnings for the 2005 fiscal year of $186,000 related to payroll taxes, an incremental payroll tax benefit of $55,000 in fiscal 2005 and a payroll tax expense of $1.4 million in fiscal 2006, resulting in a $1.6 million payroll tax liability at April 30, 2006. An additional $387,000 was recognized in fiscal 2007, resulting in a $2.0 million payroll tax liability at April 30, 2007.

Internal Revenue Code Section 162(m) limits the deductibility of compensation in excess of $1.0 million that is not performance-based and that is paid to the Chief Executive Officer and the four other named executive officers in our annual proxy statement. Stock-based compensation expense for non-qualified stock options (including incentive stock options deemed to be non-qualified as a result of any re-measurement) was assumed to be deductible at the time of exercise, subject to limitations under Section 162(m) and local country law. Based on our review of the option grants remeasured in connection with the investigation, no revised compensation expense, when considered in connection with any other non-performance based compensation, exceeded the limits imposed by 162(m).

Because virtually all holders of options issued by us were neither involved in nor aware of our accounting treatment of stock options, we have taken and intend to take actions to address certain adverse tax consequences that may be incurred by the holders of certain incorrectly priced options. The primary adverse tax consequence is that incorrectly priced stock options vesting after December 31, 2004 may subject the option holder to a penalty tax under Internal Revenue Code Section 409A (and, as applicable, similar penalty taxes under California and other state tax laws).We presently estimate that we will incur a liability to option holders of approximately $7.0 million, of which approximately $5.7 million will be recognized as additional stock compensation expense in future periods, with the remainder being recorded in additional paid-in capital as a cash settlement of a portion of the related option grants.

### Impact on SFAS 123 Disclosure

As a consequence of the stock option adjustments discussed above, the compensation expense that we disclosed in our footnotes under the fair value method has been restated. We previously applied APB 25 and its related interpretations and provided the required pro forma disclosures under SFAS 123 and its related interpretations through our fiscal year ended April 30, 2006. For SFAS 123 pro forma disclosure purposes, stock-based compensation expense determined under the fair value method was adjusted to include the incremental expense resulting from the modifications to the measurement dates of affected options. During the investigation we also identified and corrected errors in certain valuation assumptions used in the Black-Scholes model to estimate the fair value of our grants under SFAS 123 in fiscal years prior to 2004. As a result of the incremental stock compensation expense arising from the modifications to the measurement dates and the corrections in the pre-2004 Black-Scholes valuation assumptions, our pro-forma stock-based compensation expense under the fair value method decreased

60

$185,000 and $2.7 million during the years ended April 30, 2006 and 2005, respectively. Beginning in our fiscal year ended April 30, 2007, we adopted SFAS 123R.

*Restatements and Impact on the Consolidated Financial Statements*

The following table summarizes the additional stock-based compensation expense recorded on an annual basis for the fiscal years ended April 30, 2000 through April 30, 2006 as a result of the investigation into our historical stock option grant practices and related issues. The table categorizes by type of grant and other adjustments detailed above that led to the determination that additional stock-based compensation should have been recorded (in thousands):

| | Fiscal Year Ended April 30, | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | |
| Acquisition Related Grants | $ — | $ 1,263 | $ 2,013 | $(1,914) | $ 364 | $ (254) | $ (13) | $ 1,459 |
| New Hire Grants | 5,416 | 13,441 | 10,436 | 9,658 | 2,214 | 644 | 5,366 | 47,175 |
| Director Grants | — | — | — | — | — | — | — | — |
| Officer Grants | — | 1,157 | 889 | 281 | (335) | — | — | 1,992 |
| Performance Grants | — | 11,299 | 18,403 | 16,416 | 6,053 | 2,867 | 1,950 | 56,988 |
| Total SBC Expense from Revised Measurement Dates | 5,416 | 27,160 | 31,741 | 24,441 | 8,296 | 3,257 | 7,303 | 107,614 |
| Leaves of Absence & Other Adjustments | — | — | 39 | 41 | 4,791 | 183 | — | 5,054 |
| Total Revised SBC Charges | 5,416 | 27,160 | 31,780 | 24,482 | 13,087 | 3,440 | 7,303 | 112,668 |
| Inventory Capitalization | (124) | (563) | (568) | 835 | 72 | 236 | (484) | (596) |
| Pre-Tax Non-Cash Charge | 5,292 | 26,597 | 31,212 | 25,317 | 13,159 | 3,676 | 6,819 | 112,072 |
| Payroll Tax Charge | — | 175 | 22 | 3 | (14) | (55) | 1,425 | 1,556 |
| Total Pre-Tax Charge | 5,292 | 26,772 | 31,234 | 25,320 | 13,145 | 3,621 | 8,244 | 113,628 |
| Income Tax (benefit) | (2,112) | (10,906) | 13,018 | — | — | — | (134) | (134) |
| Net SBC Expense Adjustment | $ 3,180 | $ 15,866 | $44,252 | $25,320 | $13,145 | $3,621 | $8,110 | $113,494 |

## Business Overview

We are a leading provider of optical subsystems and components that connect local area networks, or LANs, storage area networks, or SANs, and metropolitan area networks, or MANs. Our optical subsystems consist primarily of transceivers which provide the fundamental optical-electrical interface for connecting the equipment used in building these networks. These products rely on the use of digital semiconductor lasers in conjunction with integrated circuit design and novel packaging technology to provide a cost-effective means for transmitting and receiving digital signals over fiber optic cable using a wide range of network protocols, transmission speeds and physical configurations over distances of 70 meters to 200 kilometers. Our line of optical components consists primarily of packaged lasers and photodetectors used in transceivers, primarily for LAN and SAN applications. Our manufacturing operations are vertically integrated and include internal manufacturing, assembly and test capability. We sell our optical subsystem and component products to manufacturers of storage and networking equipment such as Brocade, Cisco Systems, EMC, Emulex, Hewlett-Packard Company, Huawei and Qlogic.

We also provide network performance test and monitoring systems to original equipment manufacturers for testing and validating equipment designs and, to a lesser degree, to operators of networking and storage data centers for testing, monitoring and troubleshooting the performance of their installed systems. We sell these products primarily to leading storage equipment manufacturers such as Brocade, EMC, Emulex, Hewlett-Packard Company, IBM and Qlogic.

Since October 2000, we have completed the acquisition of ten privately-held companies and certain businesses and assets from six other companies in order to broaden our product offerings and provide new sources of revenue,

61

USB FIN 002070

Table of Contents

production capabilities and access to advanced technologies that we believe will enable us to reduce our product costs and develop innovative and more highly integrated product platforms while accelerating the timeframe required to develop such products.

We recognize revenue when persuasive evidence of an arrangement exists, title and risk of loss pass to the customer, which is generally upon shipment, the price is fixed or determinable and collectability is reasonably assured. For those arrangements with multiple elements, or in related arrangements with the same customer, we allocate revenue to the separate elements based upon each element's fair value as determined by the list price for such element.

We sell our products through our direct sales force, with the support of our manufacturers' representatives, directly to domestic customers and indirectly through distribution channels to international customers. The evaluation and qualification cycle prior to the initial sale for our optical subsystems may span a year or more, while the sales cycle for our test and monitoring systems is usually considerably shorter.

The market for optical subsystems and components is characterized by declining average selling prices resulting from factors such as industry over-capacity, increased competition, the introduction of new products and the growth in unit volumes as manufacturers continue to deploy network and storage systems. We anticipate that our average selling prices will continue to decrease in future periods, although the timing and amount of these decreases cannot be predicted with any certainty.

Our cost of revenues consists of materials, salaries and related expenses for manufacturing personnel, manufacturing overhead, warranty expense, inventory adjustments for obsolete and excess inventory and the amortization of acquired developed technology associated with acquisitions that we have made. We have been manufacturing our optical subsystem products at our subsidiary in Ipoh, Malaysia, since fiscal 2002. We manufacture VCSELs used in our LAN/SAN products at our facility in Allen, Texas. We manufacture long wavelength FP and certain DFB lasers used in our MAN and telecom products at our facility in Fremont, CA. We manufacture certain passive components used in our MAN and telecom products at our facility in Shanghai, China. We conduct manufacturing engineering, supply chain management, quality assurance and documentation control at our facility in Sunnyvale, California. As a result of building a vertically integrated business model, our manufacturing cost structure has become more fixed. While this can be beneficial during periods when demand is strong, it can be more difficult to reduce costs during periods when demand for our products is weak, product mix is unfavorable or selling prices are generally lower. While we undertook measures to reduce our operating costs in order to become profitable toward the end of fiscal 2006, there can be no assurance that we will be able to reduce our cost of revenues enough to sustain profitability during periods of weak demand or when our product mix is unfavorable or when average selling prices are low.

Our gross profit margins vary among our product families, and are generally higher on our network test and monitoring systems than on our optical subsystems and components. Our optical products sold for longer distance MAN and telecom applications typically have higher gross margins than our products for shorter distance LAN and SAN applications. Our overall gross margins have fluctuated from period to period as a result of overall revenue levels, shifts in product mix, the introduction of new products, decreases in average selling prices and our ability to reduce product costs.

Research and development expenses consist primarily of salaries and related expenses for design engineers and other technical personnel, the cost of developing prototypes and fees paid to consultants. We charge all research and development expenses to operations as incurred. We believe that continued investment in research and development is critical to our long-term success.

Sales and marketing expenses consist primarily of commissions paid to manufacturers' representatives, salaries and related expenses for personnel engaged in sales, marketing and field support activities and other costs associated with the promotion of our products.

General and administrative expenses consist primarily of salaries and related expenses for administrative, finance and human resources personnel, professional fees, and other corporate expenses.

USB FIN 002071

Table of Contents

In connection with the grant of stock options to employees between August 1, 1998 and October 15, 1999, we recorded deferred stock compensation representing the difference between the deemed value of our common stock for accounting purposes and the exercise price of these options at the date of grant. In connection with the assumption of stock options previously granted to employees of companies we acquired, we recorded deferred compensation representing the difference between the fair market value of our common stock on the date of closing of each acquisition and the exercise price of the unvested portion of options granted by those companies which we assumed. Deferred stock compensation is presented as a reduction of stockholder's equity, with accelerated amortization recorded over the vesting period, which is typically three to five years. The amount of deferred stock compensation expense related to these grants steadily decreased over time and was fully amortized at the end of fiscal 2005. In fiscal 2007, we commenced a voluntary review of our historical stock option granting practices and related accounting, and recorded additional stock option related compensation expense for fiscal years ended April 30, 2000 through 2006.

Acquired in-process research and development represents the amount of the purchase price in a business combination allocated to research and development projects underway at the acquired company that had not reached the technologically feasible stage as of the closing of the acquisition and for which we had no alternative future use.

A portion of the purchase price in a business combination is allocated to goodwill and intangibles. Prior to May 1, 2002, goodwill and purchased intangibles were amortized over their estimated useful lives. Subsequent to May 1, 2002, goodwill and intangible assets with indefinite lives are no longer amortized but subject to annual impairment testing.

Impairment charges consist of write downs to the carrying value of intangible assets and goodwill arising from various business combinations to their implied fair value.

Restructuring costs generally include termination costs for employees associated with a formal restructuring plan and the cost of facilities or other unusable assets abandoned or sold.

Other acquisition costs primarily consist of incentive payments for employee retention included in certain of the purchase agreements of companies we acquired and costs incurred in connection with transactions that were not completed.

Other income and expenses generally consist of bank fees, gains or losses as a result of the periodic sale of assets and other-than-temporary decline in the value of investments.

## Recent Acquisitions

### Acquisition of Assets of Data Transit Corp.

On August 6, 2004, we completed the purchase of substantially all of the assets of Data Transit Corp. in exchange for a cash payment of $500,000 and the issuance of a convertible promissory note in the original principal amount of $16.3 million. Transaction costs totaled $682,000. The note was subsequently converted into an aggregate of 15,082,865 shares of our common stock. The acquisition was accounted for as a purchase and, accordingly, the results of operations of the acquired assets (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in our consolidated financial statements beginning in the second quarter of fiscal 2005.

### Acquisition of Transceiver and Transponder Product Line From Infineon Technologies AG

On January 31, 2005, we acquired certain assets of Infineon's fiber optics business unit associated with the design, development and manufacture of optical transceiver and transponder products in exchange for 34 million shares of our common stock. We did not acquire any employees or assume any liabilities as part of the acquisition, except for obligations under customer contracts. The 34 million shares of our common stock issued to Infineon were valued at approximately $59.5 million based on the closing price of our common stock on January 31, 2005. The acquisition was accounted for as a purchase and, accordingly, the results of operations of the acquired assets

63

USB FIN 002072

(beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in our consolidated financial statements beginning in the fourth quarter of fiscal 2005.

### Acquisition of I-TECH Corp.

On April 8, 2005, we completed the acquisition of I-TECH Corp., a privately-held network test and monitoring company. The acquisition agreement provided for the merger of I-TECH with a wholly-owned subsidiary of Finisar and the issuance by Finisar to the sole holder of I-TECH's common stock of convertible promissory notes in the aggregate principal amount of approximately $12.1 million. During fiscal 2006, we issued 10,107,550 shares of common stock upon the conversion of all of the principal and interest on these notes. The results of operations of I-TECH (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in our consolidated financial statements beginning in the fourth quarter of fiscal 2005.

### Acquisition of InterSAN, Inc.

On May 12, 2005, we completed the acquisition of InterSAN, Inc., a privately-held company located in Scotts Valley, California. Under the terms of the acquisition agreement, InterSAN merged with a wholly-owned subsidiary of Finisar and the holders of InterSAN's securities received 7,132,229 shares of Finisar common stock having a value of approximately $8.8 million at the time of the acquisition. The results of operations of InterSAN (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in our consolidated financial statements beginning in the first quarter of fiscal 2006.

### Acquisition of Big Bear Networks, Inc.

On November 15, 2005, we completed the purchase of certain assets of Big Bear Networks, Inc. in exchange for a cash payment of $1.9 million. The acquisition was accounted for as a purchase and, accordingly, the results of operations of the acquired assets (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in our consolidated financial statements for the third quarter of fiscal 2006.

### Acquisition of AZNA LLC

On March 26, 2007, we completed the acquisition of AZNA LLC ("AZNA"), a privately-held company located in Wilmington, Massachusetts for a purchase price of $19.7 million, consisting of convertible promissory notes in the aggregate principal amount of $17.0 million and cash of $2.7 million. The results of operations of AZNA (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in our consolidated financial statements beginning in the fourth quarter of fiscal 2007.

### Acquisition of Kodeos Communications, Inc.

On April 11, 2007, we completed the acquisition of Kodeos Communications, Inc., a privately-held company located in South Plainfield, New Jersey for $7.4 million in cash, with additional consideration of up to $3.5 million in cash payable to holders of certain equity interests contingent on technical and financial performance. The results of operations of Kodeos (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in our consolidated financial statements beginning in the fourth quarter of fiscal 2007.

### Critical Accounting Policies

The preparation of our financial statements and related disclosures require that we make estimates, assumptions and judgments that can have a significant impact on our net revenue and operating results, as well as on the value of certain assets, contingent assets and liabilities on our balance sheet. We believe that the estimates, assumptions and judgments involved in the accounting policies described below have the greatest potential impact on our financial statements and, therefore, consider these to be our critical accounting policies. See Note 1 to our consolidated financial statements included elsewhere in this report for more information about these critical accounting policies, as well as a description of other significant accounting policies. We believe there have been no material changes to our critical accounting policies during the fiscal year ended April 30, 2007 compared to prior

USB FIN 002073

years, except for the adoption of Financial Accounting Standards Board Statement No. 123R, *Share-Based Payment* ("SFAS 123R").

### Share-Based Payments

*Restatement of Consolidated Financial Statements*

In calculating the amount of incremental share-based compensation expense to record, we made certain interpretations and assumptions and drew certain conclusions from and regarding the independent investigation findings by the Audit Committee. There is the risk that the interpretations and assumptions we made could be disputed by others after the fact or that we did not draw the correct conclusions from the findings. There is a further risk that the investigation findings themselves were inaccurate or incomplete. All of these risks are particularly acute as to grants for which there was inconclusive evidence to support the grant measurement date. Where we had incomplete documentation, we considered the guidance provided in a letter provided by the SEC's Chief Accountant to Lawrence Salva, Chairman, Committee on Corporate Reporting, Financial Executives International and Sam Ranzilla, Chairman, Center for Public Company Audit Firms, American Institute of Certified Public Accountants dated September 19, 2006. Specifically, we used all reasonably available relevant information to form reasonable conclusions as to the most likely option granting actions that occurred and the dates on which such actions occurred in determining the parameters of the restatement.

For grants with inconclusive evidence of a measurement date, we performed a sensitivity analysis to determine the potential accounting impact of alternative measurement dates. The sensitivity analysis showed that a decision by us to select an alternative measurement date in some cases would have made the restated compensation expense higher and in some cases would have made the restated compensation expense lower. This analysis resulted in a possible range of pre-tax share-based compensation cost of $97.5 million to $132.5 million, as compared with our final conclusion of $107.6 million in additional pre-tax expense for grants with revised measurement dates. The possible range of pre-tax share-based compensation cost by year based on the sensitivity analysis is as follows:

| | Sensitivity Analysis | | |
| --- | --- | --- | --- |
| Fiscal Year Ended | Low Estimate | Actual Adjustment (In thousands) | High Estimate |
| April 30, 2000 | $ 3,769 | $ 5,416 | $ 5,587 |
| April 30, 2001 | 23,958 | 27,160 | 28,353 |
| April 30, 2002 | 29,410 | 31,741 | 43,461 |
| April 30, 2003 | 22,455 | 24,441 | 33,375 |
| April 30, 2004 | 7,790 | 8,296 | 9,866 |
| April 30, 2005 | 2,881 | 3,257 | 4,211 |
| April 30, 2006 | 7,207 | 7,303 | 7,672 |
| Total | $97,470 | $ 107,614 | $132,525 |

*Adoption of FAS 123R*

On May 1, 2006, we adopted the fair value recognition provisions of SFAS 123R. Prior to that date, we accounted for share-based payments under the recognition and measurement provisions of APB Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), and related Interpretations, as permitted by FASB Statement No. 123, *Accounting for Share-based Compensation* ("SFAS 123"). In accordance with APB 25 no compensation cost was required to be recognized for options granted that had an exercise price equal to the market value of the underlying common stock on the date of grant.

We adopted SFAS 123R using the modified-prospective-transition method. Under that transition method, share-based compensation expense recognized in our consolidated statement of operations for the year ended April 30, 2007 includes (i) compensation expense for stock-based awards granted prior to, but not yet vested as of, May 1, 2006 based on the grant date fair value estimated in accordance with the provisions of SFAS 123 and (ii) compensation expense for the stock-based awards granted subsequent to April 30, 2006 based on the grant date

65

Table of Contents

fair value estimated in accordance with the provisions of FAS 123R. Compensation expense for all grants made prior to the adoption of SFAS 123R that are expected-to-vest will continue to be recognized using the graded amortization attribution method; all grants subsequent to the adoption of SFAS 123R will be recognized using the straight-line attribution method, provided that the amount of compensation cost recognized at any date is no less than the portion of the grant-date value of the award that is vested at that date. In our stock-based compensation expense required under APB 25 and the pro forma information required under SFAS 123 for the periods prior to fiscal 2007, we accounted for forfeitures as they occurred. Upon adoption of SFAS 123R on May 1, 2006, we adjusted retained earnings by approximately $1.2 million. This adjustment reflects the cumulative effect of adoption of SFAS 123R on retained earnings and represents our estimate of previously recognized stock-based compensation expense that will be reversed when stock options granted prior to May 1, 2006 are forfeited. The results for the prior periods have not been restated for the adoption of SFAS 123R consistent with the provisions of the accounting standard.

As a result of adopting SFAS 123R in the year ended April 30, 2007, our net loss in fiscal 2007 is $9.2 million higher than if we had continued to account for share-based compensation under APB 25 as we did in the comparable prior year period. Basic and diluted loss per share for the year ended April 30, 2007 was lower by $0.03 than if we had not adopted SFAS 123R. We have not recognized, and do not expect to recognize in the near future, any tax benefit related to employee stock based compensation cost as a result of the full valuation allowance on our net deferred tax assets and our net operating loss carryforwards. Total compensation cost capitalized in inventory was $410,000 as of April 30, 2007. Share-based compensation cost of $6.8 million and $3.7 million was recognized in accordance with APB 25 for the years ended April 30, 2006 and 2005, respectively.

Share-based compensation recognized in the financial statements by line item caption is as follows (dollars in thousands):

| | Years Ended April 30 | | |
| | 2007 | 2006 (As restated) | 2005 (As restated) |
|---|---|---|---|
| Cost of revenues | $ 3,517 | $ 2,597 | $ 1,251 |
| Research and development | 3,969 | 1,936 | 1,448 |
| Sales and marketing | 1,956 | 1,014 | 669 |
| General and administrative | 2,379 | 1,272 | 308 |
| Total share-based compensation expense | $11,821 | $ 6,819 | $ 3,676 |

| | As of April 30, | | |
| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Share-based compensation cost capitalized in inventory | $410 | $596 | $112 |

In accordance with FAS 123R, the fair value of each option award is estimated on the date of grant using the Black-Scholes-Merton option valuation model with the weighted average assumptions noted in the table in Note 16 of the notes to the consolidated financial statements. The expected term of options granted is derived from historical data on employee exercise and post-vesting employment termination behavior. The risk-free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant. Expected volatility is based on the historical volatility of our stock.

For options granted prior to May 1, 2006, and valued (on a pro forma basis) in accordance with FAS 123, the expected volatility used to estimate the fair value of the options was based solely on the historical volatility on our stock.

For options granted after April 30, 2006, and valued in accordance with FAS 123R, the expected volatility used to estimate the fair value of the options was based on the historical volatility of our stock; we used the straight-line method for expense attribution and we estimate forfeitures and only recognize expense for those shares expected to vest. Our estimated forfeiture rate in fiscal 2007, based on our historical forfeiture experience, is approximately 17%.

USB FIN 002075

Table of Contents

The Black-Scholes-Merton option valuation model requires the input of highly subjective assumptions, including the expected life of the share-based award and stock price volatility. The assumptions used in calculating the fair value of share-based compensation represent management's best estimates, but these estimates involve inherent uncertainties and the application of management judgment. As a result, if other assumptions had been used, our share-based compensation expense could have been materially different. In addition, we are required to estimate the expected forfeiture rate and only recognize expense for those shares expected to vest. If our actual forfeiture rate is materially different from our estimate, the share-based compensation expense could be materially different.

### Revenue Recognition, Warranty and Sales Returns

Our revenue recognition policy follows SEC Staff Accounting Bulletin (SAB) No. 104, "Revenue Recognition." Specifically, we recognize revenue when persuasive evidence of an arrangement exists, title and risk of loss have passed to the customer, generally upon shipment, the price is fixed or determinable and collectability is reasonably assured. For those arrangements with multiple elements, or in related arrangements with the same customer, the arrangement is divided into separate units of accounting if certain criteria are met, including whether the delivered item has stand-alone value to the customer and whether there is objective and reliable evidence of the fair value of the undelivered items. The consideration received is allocated among the separate units of accounting based on their respective fair values, and the applicable revenue recognition criteria are applied to each of the separate units. For units of accounting which include more than one deliverable, we generally recognize all revenue and cost of revenue for the unit of accounting over the period in which the last undelivered item is delivered.

At the time revenue is recognized, we establish an accrual for estimated warranty expenses associated with our sales, recorded as a component of cost of revenues. Our standard warranty period usually extends 12 months from the date of sale although it can extend for longer periods of three to five years for certain products sold to certain customers. Our warranty accrual represents our best estimate of the amounts necessary to settle future and existing claims on products sold as of the balance sheet date. While we believe that our warranty accrual is adequate and that the judgment applied is appropriate, such amounts estimated to be due and payable could differ materially from what actually transpire in the future. If our actual warranty costs are greater than the accrual, costs of revenue will increase in the future. We also provide an allowance for estimated customer returns, which is netted against revenue. This provision is based on our historical returns, analysis of credit memo data and our return policies. If the historical data used by us to calculate the estimated sales returns does not properly reflect future returns, revenue could be overstated.

### Allowance for Doubtful Accounts

We evaluate the collectability of our accounts receivable based on a combination of factors. In circumstances where, subsequent to delivery, we become aware of a customer's potential inability to meet its obligations, we record a specific allowance for the doubtful account to reduce the net recognized receivable to the amount we reasonably believe will be collected. For all other customers, we recognize an allowance for doubtful accounts based on the length of time the receivables are past due. A material adverse change in a major customer's ability to meet its financial obligations to us could result in a material reduction in the estimated amount of accounts receivable that can ultimately be collected and an increase in our general and administrative expenses for the shortfall.

### Slow Moving and Obsolete Inventories

We make inventory commitment and purchase decisions based upon sales forecasts. To mitigate the component supply constraints that have existed in the past and to fill orders with non-standard configurations, we build inventory levels for certain items with long lead times and enter into certain longer-term commitments for certain items. We permanently write off 100% of the cost of inventory that we specifically identify and consider obsolete or excessive to fulfill future sales estimates. We define obsolete inventory as inventory that will no longer be used in the manufacturing process. We periodically discard obsolete inventory. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using our best estimate of future demand at the time, based upon information then available to us. In making these assessments, we are required to make judgments as to the

USB FIN 002076

future demand for current or committed inventory levels. We use a 12-month demand forecast, and in addition to the demand forecast, we also consider:

- parts and subassemblies that can be used in alternative finished products;
- parts and subassemblies that are unlikely to be engineered out of our products; and
- known design changes which would reduce our ability to use the inventory as planned.

Significant differences between our estimates and judgments regarding future timing of product transitions, volume and mix of customer demand for our products and actual timing, volume and demand mix may result in additional write-offs in the future, or additional usage of previously written-off inventory in future periods for which we would benefit from a reduced cost of revenues in those future periods.

### Investment in Equity Securities

For strategic reasons, we may make minority investments in private or public companies or extend loans or receive equity or debt from these companies for services rendered or assets sold. Our minority investments in private companies are primarily motivated by our desire to gain early access to new technology. Our investments in these companies are passive in nature in that we generally do not obtain representation on the boards of directors. Our investments have generally been part of a larger financing in which the terms were negotiated by other investors, typically venture capital investors. These investments are generally made in exchange for preferred stock with a liquidation preference that helps protect the underlying value of our investment. At the time we made our investments, in most cases the companies had not completed development of their products and we did not enter into any significant supply agreements with the companies in which we invested. In determining if and when a decline in the market value of these investments below their carrying value is other-than-temporary, we evaluate the market conditions, offering prices, trends of earnings and cash flows, price multiples, prospects for liquidity and other key measures of performance. Our policy is to recognize an impairment in the value of its minority equity investments when clear evidence of an impairment exists, such as (a) the completion of a new equity financing that may indicate a new value for the investment, (b) the failure to complete a new equity financing arrangement after seeking to raise additional funds or (c) the commencement of proceedings under which the assets of the business may be placed in receivership or liquidated to satisfy the claims of debt and equity stakeholders. As of April 30, 2007, the carrying value of these investments totaled $11.3 million. Future adverse changes in market conditions or poor operating results at any of the companies in which we hold a minority position could result in losses or an inability to recover the carrying value of these investments.

### Restructuring Accrual

During the second quarter of fiscal 2006, we consolidated our Sunnyvale facilities into one building and permanently exited a portion of our Scotts Valley facility. As a result of these activities, we recorded restructuring charges of approximately $3.1 million. These restructuring charges included $290,000 of miscellaneous costs required to effect the closures and approximately $2.8 million of non-cancelable facility lease payments. Of the $3.1 million in restructuring charges, $1.9 million related to our optical subsystems and components segment and $1.2 million related to our network test and monitoring systems segment.

The facilities consolidation charges were calculated using estimates that were based upon the remaining future lease commitments for vacated facilities from the date of facility consolidation, net of estimated future sublease income. The estimated costs of vacating these leased facilities were based on market information and trend analyses, including information obtained from third party real estate sources. As of April 30, 2007, $898,000 of committed facilities payments remains accrued and are expected to be fully utilized by fiscal 2011.

### Goodwill, Purchased Intangibles and Other Long-Lived Assets

Our long-lived assets include significant investments in goodwill and other intangible assets. In June 2001, the Financial Accounting Standards Board, or FASB, issued Statement of Financial Accounting Standards, or SFAS 141 "Business Combinations" and SFAS 142 "Goodwill and Other Intangible Assets". SFAS 141 requires business combinations initiated after June 30, 2001 to be accounted for using the purchase method of accounting. SFAS 141

USB FIN 002077

Table of Contents

also included guidance on the initial recognition and measurement of goodwill and other intangible assets arising from business combinations completed after June 30, 2001. SFAS 142 prohibits the amortization of goodwill and intangible assets with indefinite useful lives. SFAS 142 requires that these assets be reviewed for impairment at least annually. Intangible assets with finite lives will continue to be amortized over their estimated useful lives.

SFAS 142 requires that goodwill be tested for impairment at the reporting unit level at adoption and at least annually thereafter, utilizing a two-step methodology. The initial step requires us to determine the fair value of each reporting unit and compare it to the carrying value, including goodwill, of such unit. We operate two reporting units, optical subsystems and components and network test and monitoring systems. If the fair value of the reporting unit exceeds the carrying value, no impairment loss would be recognized. However, if the carrying value of the reporting unit exceeds its fair value, the goodwill of the unit may be impaired. The amount, if any, of the impairment would then be measured in the second step.

During the fourth quarters of fiscal 2005, 2006 and 2007, we performed the required annual impairment testing of goodwill and indefinite-lived intangible assets and determined that no impairment charge was required. At April 30, 2007 our investment in goodwill and intangible assets was $123.8 and $24.0 million, respectively.

We are required to make judgments about the recoverability of our long-lived assets, other than goodwill, whenever events or changes in circumstances indicate that the carrying value of these assets may be impaired or not recoverable. In order to make such judgments, we are required to make assumptions about the value of these assets in the future including future prospects for earnings and cash flows. If impairment is indicated, we write those assets down to their fair value which is generally determined based on discounted cash flows. Judgments and assumptions about the future are complex, subjective and can be affected by a variety of factors including industry and economic trends, our market position and the competitive environment of the businesses in which we operate.

During the second quarter of fiscal 2005, we determined that the remaining intangible assets related to certain purchased passive optical technology, acquired from New Focus, Inc. in May 2002, were obsolete, and had a fair value of zero. Accordingly, an impairment charge of $3.7 million was recorded against the remaining net book value of these assets during that quarter.

During the second quarter of fiscal 2006, we determined that there had been an impairment in the value of intangible assets associated with certain products acquired in the acquisition of Genoa Corporation in April 2003 and in the acquisition of Transwave Fiber Inc. in May 2001, and we recorded an impairment charge of $853,000 related to these assets.

69

USB FIN 002078