**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Advertising Costs*

Advertising costs are expensed as incurred. Advertising is used infrequently in marketing the Company's products. Advertising costs during fiscal 2007, 2006 and 2005 were $75,000, $252,000, and $580,000, respectively.

*Shipping and Handling Costs*

The Company records costs related to shipping and handling in cost of sales for all periods presented.

*Cash and Cash Equivalents*

Finisar's cash equivalents consist of money market funds and highly liquid short-term investments with qualified financial institutions. Finisar considers all highly liquid investments with an original maturity from the date of purchase of three months or less to be cash equivalents.

*Investments*

*Available-for-sale*

The Company determines the appropriate classification of securities at the time of purchase and reevaluates such classification as of each balance sheet date. Realized gains and losses and declines in value judged to be other than temporary are determined based on the specific identification method and are reported in the Consolidated Statements of Operations. Available-for-sale investments are initially recorded at cost and periodically adjusted to fair value through comprehensive income.

*Restricted Investments*

Restricted investments consist of interest bearing securities with maturities of greater than three months from the date of purchase and investments held in escrow under the terms of the Company's convertible subordinated notes. In accordance with SFAS 115, the Company has classified its restricted investments as held-to-maturity. Held-to-maturity securities are stated at amortized cost.

*Other*

The Company uses the cost method of accounting for investments in companies that do not have a readily determinable fair value in which it holds an interest of less than 20% and over which it does not have the ability to exercise significant influence. For entities in which the Company holds an interest of greater than 20% or in which the Company does have the ability to exercise significant influence, the Company uses the equity method. In determining if and when a decline in the market value of these investments below their carrying value is other-than-temporary, the Company evaluates the market conditions, offering prices, trends of earnings and cash flows, price multiples, prospects for liquidity and other key measures of performance. The Company's policy is to recognize an impairment in the value of its minority equity investments when clear evidence of an impairment exists, such as (a) the completion of a new equity financing that may indicate a new value for the investment, (b) the failure to complete a new equity financing arrangement after seeking to raise additional funds or (c) the commencement of proceedings under which the assets of the business may be placed in receivership or liquidated to satisfy the claims of debt and equity stakeholders. The Company's minority investments in private companies are generally made in exchange for preferred stock with a liquidation preference that is intended to help protect the underlying value of its investment.

*Fair Value of Financial Instruments*

The carrying amounts of certain of the Company's financial instruments, including cash and cash equivalents, accounts receivable, accounts payable, accrued compensation and other accrued liabilities, approximate fair value

95

USB FIN 002104

## FINISAR CORPORATION

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

because of their short maturities. As of April 30, 2007 and 2006, the fair value of the Company's convertible subordinated debt based on quoted market prices was approximately $285.2 million and $323.0 million, respectively.

### *Inventories*

Inventories are stated at the lower of cost (determined on a first-in, first-out basis) or market.

The Company permanently writes down the cost of inventory that the Company specifically identifies and considers obsolete or excessive to fulfill future sales estimates. The Company defines obsolete inventory as inventory that will no longer be used in the manufacturing process. Excess inventory is generally defined as inventory in excess of projected usage and is determined using management's best estimate of future demand, based upon information then available to the Company. The Company also considers: (1) parts and subassemblies that can be used in alternative finished products, (2) parts and subassemblies that are unlikely to be engineered out of the Company's products, and (3) known design changes which would reduce the Company's ability to use the inventory as planned.

### *Property, Equipment and Improvements*

Property, equipment and improvements are stated at cost, net of accumulated depreciation and amortization. Property, plant, equipment and improvements are depreciated on a straight-line basis over the estimated useful lives of the assets, generally three years to seven years except for buildings which are depreciated over life of the building lease. Land is carried at acquisition cost and not depreciated. Leased land is depreciated over the life of the lease.

### *Goodwill, Purchased Technology, and Other Intangible Assets*

Goodwill, purchased technology, and other intangible assets result from acquisitions accounted for under the purchase method. Amortization of purchased technology and other intangibles has been provided on a straight-line basis over periods ranging from three to seven years. The amortization of goodwill ceased with the adoption of SFAS 142 beginning in the first quarter of fiscal 2003.

### *Accounting for the Impairment of Long-Lived Assets*

The Company periodically evaluates whether changes have occurred to long-lived assets that would require revision of the remaining estimated useful life of the property, improvements and assigned intangible assets or render them not recoverable. If such circumstances arise, the Company uses an estimate of the undiscounted value of expected future operating cash flows to determine whether the long-lived assets are impaired. If the aggregate undiscounted cash flows are less than the carrying amount of the assets, the resulting impairment charge to be recorded is calculated based on the excess of the carrying value of the assets over the fair value of such assets, with the fair value determined based on an estimate of discounted future cash flows.

### *Stock-Based Compensation Expense*

On May 1, 2006, the Company adopted Statement of Financial Accounting Standards No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123R"), which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors including employee stock options and employee stock purchases related to the Employee Stock Purchase Plan ("employee stock purchases") based on estimated fair values. SFAS 123R supersedes the Company's previous accounting under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), as allowed under Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"), for periods beginning in fiscal 2007. In March 2005, the SEC issued Staff Accounting Bulletin No. 107 ("SAB 107") relating to SFAS 123R. The Company has applied the provisions of SAB 107 in its adoption of SFAS 123R.

USB FIN 002105

## FINISAR CORPORATION

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company adopted SFAS 123R using the modified prospective transition method, which requires the application of the accounting standard as of May 1, 2006, the first day of the Company's fiscal year 2007. In accordance with the modified prospective transition method, the Company's consolidated financial statements for prior periods have not been restated to reflect, and do not include, the impact of SFAS 123R.

SFAS 123R requires companies to estimate the fair value of share-based payment awards on the date of grant using an option-pricing model. The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in the Company's condensed consolidated statement of operations. Prior to the adoption of SFAS 123R, the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with APB 25 as allowed under SFAS 123.

Stock-based compensation expense recognized under SFAS 123R for the year ended April 30, 2007 was $11.2 million which consisted of stock-based compensation expense related to employee stock options and employee stock purchases, net of approximately $410,000 which was capitalized in inventory. See Note 16 for additional information.

The Company adopted SFAS 123R using the modified-prospective-transition method. Under that transition method, share-based compensation expense recognized in the Company's consolidated statement of operations for the year ended April 30, 2007 includes (i) compensation expense for stock-based awards granted prior to, but not yet vested as of, May 1, 2006 based on the grant date fair value estimated in accordance with the provisions of FAS 123 and (ii) compensation expense for the stock-based awards granted subsequent to April 30, 2006 based on the grant date fair value estimated in accordance with the provisions of SFAS 123R. Compensation expense for all grants made prior to the adoption of SFAS 123R that are expected-to-vest will continue to be recognized using the graded amortization attribution method; all grants subsequent to the adoption of FAS 123R will be recognized using the straight-line attribution method, provided that the amount of compensation cost recognized at any date is no less than the portion of the grant-date value of the award that is vested at that date. In the stock-based compensation expense required under APB 25 and the pro forma information required under SFAS 123 for the periods prior to fiscal 2007, the Company accounted for forfeitures as they occurred. Upon adoption of SFAS 123R on May 1, 2006, the Finisar adjusted retained earnings by approximately $1.2 million. This adjustment reflects the cumulative effect of adoption of SFAS 123R on retained earnings and represents the estimate of previously recognized stock-based compensation expense that will be reversed when stock options granted prior to May 1, 2006 are forfeited. The results for the prior periods have not been restated for the adoption of SFAS 123R consistent with the provisions of the accounting standard.

On November 10, 2005, the Financial Accounting Standards Board ("FASB") issued FASB Staff Position No. 123R-3 "Transition Election Related to Accounting for Tax Effects of Share-Based Payment Awards." The Company has elected to adopt the alternative transition method provided in the FASB Staff Position for calculating the tax effects of stock-based compensation pursuant to SFAS 123R. The alternative transition method includes simplified methods to establish the beginning balance of the additional paid-in capital pool ("APIC pool") related to the tax effects of employee stock-based compensation, and to determine the subsequent impact on the APIC pool and condensed consolidated statements of cash flows of the tax effects of employee stock-based compensation awards that are outstanding upon adoption of SFAS 123R.

### Net Loss Per Share

Basic and diluted net loss per share are presented in accordance with SFAS No. 128 *Earnings Per Share* for all periods presented. Basic net loss per share has been computed using the weighted-average number of shares of common stock outstanding during the period. Diluted net loss per share has been computed using the weighted-average number of shares of common stock and dilutive potential common shares from options and warrants (under the treasury stock method), convertible redeemable preferred stock (on an if-converted basis) and convertible notes (on an as-if-converted basis) outstanding during the period.

97

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table presents the calculation of basic and diluted net loss per share (in thousands, except per share amounts):

| | Fiscal Years Ended April 30, | | |
| | 2007 | 2006 (As restated) | 2005 (As restated) |
|---|---|---|---|
| Numerator: | | | |
| Net loss | $(45,399) | $ (33,029) | $ (117,728) |
| Denominator for basic net loss per share: | | | |
| Weighted-average shares outstanding — total | 307,814 | 290,522 | 232,274 |
| Weighted-average shares outstanding — subject to repurchase | — | — | (64) |
| Weighted-average shares outstanding — basic and diluted | 307,814 | 290,522 | 232,210 |
| Basic and diluted net loss per share | $ (0.15) | $ (0.11) | $ (0.51) |
| Common stock equivalents related to potentially dilutive securities excluded from computation above because they are anti-dilutive: | | | |
| Employee stock options | 16,229 | 10,800 | 4,521 |
| Stock subject to repurchase | — | — | 64 |
| Conversion of convertible subordinated notes | 34,520 | 58,647 | 58,647 |
| Conversion of convertible notes | 4,705 | — | 14,981 |
| Warrants assumed in acquisition | 469 | 471 | 942 |
| Potentially dilutive securities | 55,923 | 69,918 | 79,155 |

*Comprehensive Income*

Financial Accounting Standards Board Statement of Financial Accounting Standard No. 130, "Reporting Comprehensive Income" ("SFAS 130") establishes rules for reporting and display of comprehensive income and its components. SFAS 130 requires unrealized gains or losses on the Company's available-for-sale securities and foreign currency translation adjustments to be included in comprehensive income.

The components of comprehensive loss for the fiscal years ended April 30, 2007, 2006 and 2005 were as follows (in thousands):

| | Fiscal Years Ended April 30, | | |
| | 2007 | 2006 (As restated) | 2005 (As restated) |
|---|---|---|---|
| Net loss | $(45,399) | $ (33,029) | $ (117,728) |
| Foreign currency translation adjustment | 3,819 | 1,397 | 136 |
| Change in unrealized gain (loss) on securities, net of reclassification adjustments for realized gain/(loss) | 5,645 | (80) | (465) |
| Comprehensive loss | $(35,935) | $ (31,712) | $ (118,057) |

Included in the determination of net loss was a gain (loss) on foreign exchange transactions of $(265,000), $722,000, and $(63,000) for the fiscal years ended April 30, 2007, 2006 and 2005, respectively. The gain in fiscal

98

USB FIN 002107

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

2006 includes the transfer of $964,000 of cumulative translation adjustment to other income (expense), net on the statement of operations related to the liquidation of the Company's German subsidiary.

The components of accumulated other comprehensive loss, net of taxes, were as follows (in thousands):

|  | April 30, | |
| --- | --- | --- |
|  | 2007 | 2006 |
| Net unrealized gains/(losses) on available-for-sale securities | $ 5,069 | $ (576) |
| Cumulative translation adjustment | 6,093 | 2,274 |
| Accumulated other comprehensive loss | $11,162 | $1,698 |

### Pending Adoption of New Accounting Standards

### Fair Value Measurements

In September 2006, the FASB issued Statement of Financial Accounting Standards (SFAS) No. 157, Fair Value Measurements. SFAS 157 replaces the different definitions of fair value in the accounting literature with a single definition. It defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. SFAS 157 is effective for fair-value measurements already required or permitted by other standards for financial statements issued for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. The Company is currently in the process of determining the impact of adopting the provisions of SFAS 157 on its financial position, results of operations and cash flows.

### Fair Value Option for Financial Assets and Liabilities

In February 2007, the FASB issued Statement No. 159, The Fair Value Option for Financial Assets and Financial Liabilities, including an amendment of FASB Statement No. 115 (FAS 159). FAS 159 permits companies to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value and establishes presentation and disclosure requirements designed to facilitate comparisons between companies that choose different measurement attributes for similar types of assets and liabilities. The provisions of FAS 159 become effective for fiscal years beginning after November 15, 2007. The Company believes that the adoption of SFAS 159 will not have a material effect on its financial statements.

### Accounting for Electronic Equipment Waste Obligations

In June 2005, the FASB issued FSP No. FAS 143-1, Accounting for Electronic Equipment Waste Obligations ("FSP 143-1"). FSP 143-1 provides guidance in accounting for obligations associated with Directive 2002/96/EC (the "Directive") on Waste Electrical and Electronic Equipment adopted by the European Union. FAS 143-1 is required to be applied to the later of the first reporting period ending after June 6, 2005 or the date of the Directive's adoption into law by the applicable EU member countries in which we have significant operations. The Directive distinguishes between "new" and "historical" waste. New waste relates to products put on the market after August 13, 2005. FSP 143-1 directs commercial users to apply the provisions of FASB Statement No. 143, Accounting for Asset Retirement Obligations, and the related FASB Interpretation No. 47, Accounting for Conditional Asset Retirement Obligations, for the measurement and recognition of the liability and asset retirement obligation associated with the historical waste management requirements of the Directive. Additionally, FSP 143-1 provides guidance for the accounting by producers for the financing of the obligations of historical waste held by private households.

We adopted FAS 143-1 in the first quarter of fiscal 2006 and concluded that no significant liability had been incurred as of April 30, 2006. The Company believes that the adoption of FSP 143-1 will not have a material effect on its financial statements.

USB FIN 002108

FINISAR CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Accounting for Income Taxes*

In June 2006, the FASB issued Interpretation, or FIN, No. 48, *Accounting for Uncertainty in Income Taxes — an Interpretation of SFAS No. 109*, or FIN 48. FIN 48 clarifies the accounting for uncertain taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, *Accounting for Income Taxes.* FIN 48 prescribes a recognition threshold and measurement of a tax position taken or expected to be taken in an enterprise's tax return. In addition, FIN 48 provides guidance on derecognition, classification, interest and penalties, accounting in interim periods and disclosure related to uncertain income tax positions. FIN 48 is effective for the fiscal years beginning after December 15, 2006 for all public companies. Accordingly, the Company was required to adopt FIN 48 as of May 1, 2007. The adoption of FIN 48 will not have a material impact on its consolidated financial statements.

**4. Business Combinations and Asset Acquisitions**

*Acquisition of Assets of Data Transit Corp.*

On August 6, 2004, the Company completed the purchase of substantially all of the assets of Data Transit Corp. in exchange for a cash payment of $500,000 and the issuance of a convertible promissory note in the original principal amount of $16.3 million. Transaction costs totaled $682,000. The acquisition of Data Transit expanded the Company's product offering for testing and monitoring systems, particularly those systems based on the SAS and SATA protocols used in the disk drive industry. The goodwill recorded in connection with this acquisition reflected the incremental earnings associated with selling this new test and monitoring capability, the underlying know-how for making these products which the Company plans to incorporate into its XGig product platform and cost synergies associated with integrating the operations of Data Transit with the Company's Network Tools Division. The principal balance of the note issued in this acquisition bore interest at 8% per annum. During fiscal 2006, the Company issued 15,082,865 shares of common stock upon the conversion of all of the principal and interest on this note (see Note 12). The acquisition was accounted for as a purchase and, accordingly, the results of operations of the acquired assets (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in the Company's consolidated financial statements beginning in the second quarter of fiscal 2005.

*Acquisition of Transceiver and Transponder Product Line From Infineon Technologies AG*

On January 31, 2005, the Company acquired certain assets from Infineon Technologies AG related to Infineon's fiber optics business unit associated with the design, development and manufacture of optical transceiver and transponder products in exchange for 34 million shares of the Company's common stock. The acquisition expanded the Company's product offering and customer base for optical transceivers and transponders and expanded its portfolio of intellectual property used in designing and manufacturing these products as well as those to be developed in the future. The goodwill recorded in connection with this acquisition reflected the value to be realized associated with cost savings resulting from integrating these products with the Company's Optics Division as well as the incremental growth in revenue and earnings from the sale of future products. The Company did not acquire any employees or assume any liabilities as part of the acquisition, except for obligations under customer contracts. The acquisition was accounted for as a purchase and, accordingly, the results of operations of the acquired assets (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in the Company's consolidated financial statements beginning in the fourth quarter of fiscal 2005.

*Acquisition of I-TECH Corp.*

On April 8, 2005, the Company completed the acquisition of I-TECH Corp., a privately-held network test and monitoring company based in Eden Prairie, Minnesota. The acquisition expanded the Company's product offering for testing and monitoring systems, particularly for those systems relying on the use of the Fibre Channel protocol, and expanded its portfolio of intellectual property used in designing and manufacturing these products as well as those to be developed in the future. The goodwill recorded in connection with this acquisition reflected the

100

USB FIN 002109

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

underlying patents and know-how used in manufacturing future products and cost synergies associated with integrating the operations of I-TECH with the Company's Network Tools Division. The acquisition agreement provided for the merger of I-TECH with a wholly-owned subsidiary of Finisar and the issuance by Finisar to the sole holder of I-TECH's common stock of promissory notes in the aggregate principal amount of approximately $12.1 million. During fiscal 2006, the Company issued 10,107,550 shares of common stock upon the conversion of all of the principal and interest on these notes (see Note 12). The results of operations of I-TECH (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in the Company's consolidated financial statements beginning in the fourth quarter of fiscal 2005.

*Acquisition of InterSAN, Inc.*

On May 12, 2005, the Company completed the acquisition of InterSAN, Inc., a privately-held company located in Scotts Valley, California. Under the terms of the acquisition agreement, InterSAN merged with a wholly-owned subsidiary of Finisar and the holders of InterSAN's securities received 7,132,229 shares of Finisar common stock having a value of approximately $8.8 million at the time of the acquisition. The results of operations of InterSAN (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in the Company's consolidated financial statements beginning in the first quarter of fiscal 2006.

*Acquisition of Big Bear Networks, Inc.*

On November 15, 2005, the Company completed the purchase of certain assets of Big Bear Networks, Inc. in exchange for a cash payment of $1.9 million. The acquisition expanded the Company's product offering and customer base for optical transponders and its portfolio of intellectual property used in designing and manufacturing these products as well as those to be developed in the future. The acquisition was accounted for as a purchase and, accordingly, the results of operations of the acquired assets (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in the optical subsystems and components segment of the Company's consolidated financial statements beginning in the third quarter of fiscal 2006.

*Acquisition of AZNA LLC*

On March 26, 2007, the Company completed the acquisition of AZNA LLC ("AZNA"), a privately-held company located in Wilmington, Massachusetts for $19.7 million. Under the terms of the agreement, Finisar acquired all outstanding securities of AZNA in exchange for the issuance of convertible promissory notes in the aggregate principal amount of $17.0 million and cash payment of $2.7 million. One of the notes issued, for $1.4 million, and portion of the cash paid, $1.5 million, were placed in escrow for one year following the closing date to satisfy indemnification provisions of the purchase agreement. In addition, the Company may be required to pay additional cash consideration of up to $1.8 million to certain of AZNA's equity interest holders contingent upon their continuing employment with the Company for a 12 month period subsequent to the closing date. When, and if, paid, this consideration will be recorded as compensation expense. The acquisition is expected to broaden the Company's product offering and increase its competitive advantage in cost, reach and capabilities in telecom applications. AZNA designs and develops photonic components and subsystems for the communications and instrumentation industries. Its proprietary technology, chirp managed lasers ("CMLs"), manage the inherent chirp associated with the direct modulation of these lasers by integrating a standard DFB laser chip with a passive optical spectrum reshaper filter to achieve longer reach and more dispersion tolerance. The Company's products enable telecommunications equipment manufacturers to provide longer reach optical transmitter solutions at lower cost, better performance and less complexity compared to those based on external modulators. The results of operations of AZNA (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in the Company's consolidated financial statements beginning in the fourth quarter of fiscal 2007.

101

USB FIN 002110

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Acquisition of Kodeos Communications, Inc.*

On April 11, 2007, the Company completed the acquisition of Kodeos Communications, Inc. ("Kodeos"), a privately-held company located in South Plainfield, New Jersey for a cash payment of $7.4 million, with additional consideration of up to $3.5 million in cash to be paid to certain Kodeos' shareholders and employees, contingent upon reaching certain technical and financial performance milestones during the period from the closing date to December 31, 2007. The Company expects to extend its technology's capabilities in datacom and telecom applications with Kodeos' Maximum Likelihood Sequence Estimator ("MSLE") technology. The MLSE is used on the receiver side of the optical link and increases the distortion tolerance, transmission distance and performance of 300-pin transponder. The results of operations of Kodeos (beginning with the closing date of the acquisition) and the estimated fair value of assets acquired were included in the Company's consolidated financial statements beginning in the fourth quarter of fiscal 2007.

The following is a summary of business combinations ("BC") and asset acquisitions ("AA") made by the Company during the three-year period ended April 30, 2007. All of the business combinations were accounted for under the purchase method of accounting:

*Acquisition Summary*

| Entity Name | Type | Description of Business | Operating Segment | Acquisition Date |
|---|---|---|---|---|
| **Fiscal 2007** | | | | |
| AZNA LLC ("Azna") | BC | Optical components | 1 | March 26, 2007 |
| Kodeos Communications, Inc. ("Kodeos") | BC | Optical components | 1 | April 11, 2007 |
| **Fiscal 2006** | | | | |
| Big Bear Networks, Inc. ("Big Bear") | AA | Optical components | 1 | November 15, 2005 |
| InterSAN, Inc. ("InterSAN") | BC | Network test and monitoring products | 2 | May 12, 2005 |
| **Fiscal 2005** | | | | |
| Data Transit Corp. ("Data Transit") | AA | Network test and monitoring software | 2 | August 6, 2004 |
| Infineon Technologies AG ("Infineon") transceiver and transponder product lines | AA | Optical components | 1 | January 31, 2005 |
| I-TECH Corp. ("I-TECH") | BC | Network test and monitoring products | 2 | April 8, 2005 |

(1) Optical Subsystems and Components

(2) Network Test and Monitoring Systems

102

USB FIN 002111

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following is a summary of the consideration paid by the Company for each of these business combinations and asset acquisitions. For transactions in which shares of Finisar common stock were issued at closing, the value of the shares was determined in accordance with EITF 99-12, *Determination of the Measurement Date for the Market Price of Acquirer Securities Issued in a Purchase Business Combination* , using the average closing price of Finisar common stock for the five day period ending two days after the announcement of the transaction.

| | Stock | | Convertible Note | Cash Including Acquisition Costs | Total Consideration |
|---|---|---|---|---|---|
| Entity Name | Value | Number and Type of Shares(1) | | | |
| | $ (000) | | $ (000) | $ (000) | $ (000) |
| **Fiscal 2007** | | | | | |
| Azna | — | — | 16,950 | 3,006 | 19,956 |
| Kodeos | — | — | — | 7,592 | 7,592 |
| **Fiscal 2006** | | | | | |
| InterSAN | 8,816 | 7,132,229(C) | — | 1,212 | 10,028 |
| Big Bear | — | — | — | 1,918 | 1,918 |
| **Fiscal 2005** | | | | | |
| Data Transit | — | — | 16,270 | 1,510 | 17,780 |
| Infineon | 52,496 | 34,000,000(C) | — | 1,861 | 54,357 |
| I-TECH | — | — | 12,061 | 861 | 12,922 |

(1) Shares of common stock (C) or warrants to purchase common stock (W).

The following is a summary of the initial purchase price allocation for each of the Company's business combinations and asset acquisitions (in thousands):

| | Net Tangible Assets | Intangible Assets Acquired | | | | Goodwill | Total |
|---|---|---|---|---|---|---|---|
| Entity Name | | Developed Technology | In-process Research & Development | Customer Base | Tradename | | |
| **Fiscal 2007** | | | | | | | |
| Azna | $ 4,573 | $ 7,300 | $ 4,200 | $ 2,856 | $ 72 | $ 955 | $19,956 |
| Kodeos | 130 | 2,080 | 1,570 | 350 | — | 3,462 | 7,592 |
| **Fiscal 2006** | | | | | | | |
| InterSAN | (4) | 429 | — | 1,529 | — | 8,074 | 10,028 |
| Big Bear | 1,918 | — | — | — | — | — | 1,918 |
| **Fiscal 2005** | | | | | | | |
| Data Transit | 1,813 | 6,414 | 318 | 2,100 | 758 | 6,377 | 17,780 |
| Infineon | 8,306 | 4,567 | 1,126 | 864 | — | 39,494 | 54,357 |
| I-TECH | 1,319 | 1,084 | 114 | 750 | — | 9,655 | 12,922 |

The amounts allocated to current technology were determined based on discounted cash flows which result from the expected sale of products that were being manufactured and sold at the time of the acquisition over their expected useful life. The amounts allocated to in-process research and development ("IPRD") were determined through established valuation techniques in the high-technology industry and were expensed upon acquisition because technological feasibility had not been established and no future alternative uses existed. Research and development costs to bring the products from the acquired companies to technological feasibility are not expected to have a material impact on the Company's future results of operations or cash flows. Goodwill represents the excess of purchase consideration over the fair value of the assets, including identifiable intangible assets, net of the

103

## FINISAR CORPORATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

fair value of liabilities assumed. Intangible assets related to the acquisitions, excluding goodwill, are amortized to expense on a straight-line basis over their estimated useful lives ranging from three to five years. For income tax purposes, intangible assets including goodwill related to the asset acquisitions are amortized to expense on a straight-line basis, generally over 15 years.

The following is a summary of the weighted average amortization period for intangible assets acquired in fiscal 2007 and 2006 (in years):

|  | Developed Technology | Customer Base | Tradename | Other | Total |
|---|---|---|---|---|---|
| **Acquired in fiscal 2007** |  |  |  |  |  |
| Azna | 5.0 | 8.0 | 1.0 | 0.8 | 5.3 |
| Kodeos | 5.0 | 5.0 | — | 0.7 | 5.0 |
| **Acquired in fiscal 2006** |  |  |  |  |  |
| Intersan | 3.0 | 2.9 | — | — | 3.0 |

The consolidated statements of operations of Finisar presented throughout this report include the operating results of the acquired companies from the date of each respective acquisition.

## 5. Purchased Intangible Assets Including Goodwill

The following table reflects changes in the carrying amount of goodwill by reporting unit (in thousands):

|  | Optical Subsystems and Components | Network Test and Monitoring Systems | Consolidated Total |
|---|---|---|---|
| Balance at April 30, 2004 | $   44,620 | $   16,000 | $   60,620 |
| Addition related to achievement of milestones | 256 | — | 256 |
| Addition related to acquisition of subsidiary | 43,546 | 15,268 | 58,814 |
| Balance at April 30, 2005 | $   88,422 | $   31,268 | $ 119,690 |
| Addition (reduction) related to acquisition of subsidiary | (3,996) | 8,838 | 4,842 |
| Balance at April 30, 2006 | $   84,426 | $   40,106 | $ 124,532 |
| Addition related to acquisition of subsidiary | 4,417 | — | 4,417 |
| Balance at April 30, 2007 | $   88,843 | $   40,106 | $ 128,949 |

During the fourth quarters of fiscal 2005, 2006 and 2007, the Company performed the required annual impairment testing of goodwill and indefinite-lived intangible assets and determined that no impairment charge was required.

During fiscal 2005, the Company recorded additional goodwill in the optical subsystems and components reporting unit in the amount of $256,000 as a result of achievement of certain milestones specified in the Transwave acquisition agreement. In fiscal 2005, the Company recorded the following additional goodwill in conjunction with several companies acquired in fiscal 2005: $43.5 million in conjunction with the Infineon acquisition, $9.0 million in conjunction with the I-TECH acquisition, and $6.3 million in conjunction with the Data Transit acquisition.

During fiscal 2006, the Company recorded a $4.0 million reduction of goodwill in the optical subsystems and components reporting unit. The reduction was primarily due to a reassessment of the allocation of the purchase price of assets related to the acquisition of the transceiver and transponder business of Infineon Technologies AG, which was completed in the fourth quarter of fiscal 2005. The reassessment included the reduction of the purchase

USB FIN 002113

# FINISAR CORPORATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

price by $8.0 million related to inventory Infineon repurchased from the Company, and lower than expected VAT and other transaction costs of $332,000. These reductions were offset by the reduced allocation of the purchase price to a minority investment of $4.2 million and additional payments of $184,000 associated with the Infineon acquisition. The Company recorded additional goodwill of $8.8 million in the network test and monitoring systems reporting unit. The addition was due to $8.1 million recorded in connection with the acquisition of InterSAN, additional payments of $112,000 for the I-TECH acquisition and $59,000 for the Data Transit acquisition, an adjustment related to I-TECH inventory of $225,000, and an adjustment to an I-TECH accrual of $367,000.

During fiscal 2007, the Company recorded goodwill of $4.4 million in the optical subsystems and components reporting unit related to the acquisitions of AZNA and Kodeos.

The following table reflects intangible assets subject to amortization as of April 30, 2007 and April 30, 2006 (in thousands):

|  | April 30, 2007 | | |
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| --- | --- | --- | --- |
| Purchased technology | $111,846 | $ (93,495) | $18,351 |
| Trade name | 3,697 | (3,171) | 526 |
| Customer Relationships | 6,964 | (1,843) | 5,121 |
| Totals | $122,507 | $ (98,509) | $23,998 |

|  | April 30, 2006 | | |
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| --- | --- | --- | --- |
| Purchased technology | $102,466 | $ (87,494) | $14,972 |
| Trade name | 3,625 | (3,056) | 569 |
| Customer Relationships | 5,243 | (1,628) | 3,615 |
| Totals | $111,334 | $ (92,178) | $19,156 |

The amortization expense on these intangible assets for fiscal 2007 was $7.8 million compared to $19.4 million for fiscal 2006 and $23.4 million for fiscal 2005.

During the second fiscal quarter of 2005, the Company determined that the remaining intangible assets related to certain purchased passive optical technology, acquired from New Focus, Inc., in May 2002, were obsolete, and had a fair value of zero. Accordingly, an impairment charge of $3.7 million was recorded against the remaining net book value of these assets during the second quarter of fiscal 2005.

During the second quarter of fiscal 2006, the Company determined that the remaining intangible assets related to certain purchased optical amplifier technology acquired from Genoa Corporation in April 2003 and certain intangible assets related to passive optical technology acquired from Transwave Fiber, Inc., in May 2001, had been impaired and had a fair value of zero. Accordingly, an impairment charge of $853,000 was recorded against the remaining net book value of these assets in the optical subsystems and components reporting unit during the second quarter of fiscal 2006.

During the third quarter of fiscal 2007, the Company determined that the remaining intangible assets related to certain customer relationships acquired from InterSAN, Inc. in May 2005 had been impaired and had a fair value of zero. Accordingly, an impairment charge of $619,000 was recorded against the remaining net book value of these assets in the network test and monitoring systems reporting unit during the third quarter of fiscal 2007.

105

USB FIN 002114

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Estimated amortization expense for each of the next five fiscal years ending April 30, is as follows (dollars in thousands):

| Year | Amount |
|------|-------:|
| 2008 | $ 8,249 |
| 2009 | 5,481 |
| 2010 | 3,811 |
| 2011 | 3,336 |
| 2012 and beyond | 3,121 |
| | $23,998 |

## 6. Investments

### *Unrestricted Securities*

The following is a summary of the Company's available-for-sale investments as of April 30, 2007 and 2006 (in thousands):

| Investment Type | Amortized Cost | Gross Unrealized Gain | Gross Unrealized Loss | Market Value |
|---|---:|---:|---:|---:|
| **As of April 30, 2007** | | | | |
| Debt: | | | | |
| Corporate | $ 62,643 | $ 9 | $ (94) | $62,558 |
| Government agency | 12,200 | 26 | (18) | 12,208 |
| Mortgage-backed | 3,626 | 1 | (21) | 3,606 |
| Municipal | 300 | — | (3) | 297 |
| Total | $ 78,769 | $ 36 | $ (136) | $78,669 |
| Equity: | | | | |
| Corporate | $ 3,607 | $ 5,169 | $ — | $ 8,776 |
| Total investments | $ 82,376 | $ 5,205 | $ (136) | $87,445 |
| Reported as: | | | | |
| Cash equivalents | $ 11,079 | $ — | $ — | $11,079 |
| Short-term investments | 56,603 | 3 | (95) | 56,511 |
| Long-term investments | 14,694 | 5,202 | (41) | 19,855 |
| | $ 82,376 | $ 5,205 | $ (136) | $87,445 |

106

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| Investment Type | Amortized Cost | Gross Unrealized Gain | Gross Unrealized Loss | Market Value |
|---|---|---|---|---|
| **As of April 30, 2006** | | | | |
| Debt: | | | | |
| Corporate | $ 51,925 | $ 1 | $ (357) | $51,569 |
| Government agency | 16,826 | — | (160) | 16,666 |
| Mortgage-backed | 5,125 | 1 | (54) | 5,072 |
| Municipal | 300 | — | (7) | 293 |
| Total | $ 74,176 | $ 2 | $ (578) | $73,600 |
| Reported as: | | | | |
| Cash equivalents | $ 18,176 | $ — | $ (1) | $18,175 |
| Short-term investments | 33,745 | 1 | (239) | 33,507 |
| Long-term investments | 22,255 | 1 | (338) | 21,918 |
| | $ 74,176 | $ 2 | $ (578) | $73,600 |

The Company monitors its investment portfolio for impairment on a periodic basis in accordance with FASB Staff Position (FSP) FAS 115-1 *The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments*. In the event that the carrying value of an investment exceeds its fair value and the decline in value is determined to be other-than-temporary, an impairment charge is recorded and a new cost basis for the investment is established. In order to determine whether a decline in value is other-than-temporary, the Company evaluates, among other factors: the duration and extent to which the fair value has been less than the carrying value; the Company's financial condition and business outlook, including key operational and cash flow metrics, current market conditions and future trends in its industry; the Company's relative competitive position within the industry; and the Company's intent and ability to retain the investment for a period of time sufficient to allow for any anticipated recovery in fair value. The decline in value of these investments, shown in the table above as "Gross Unrealized Losses", is primarily related to changes in interest rates and is considered to be temporary in nature. The number of investments that have been in a continuous unrealized loss position for more than twelve months is not material.

The following is a summary of the Company's available-for-sale investments as of April 30, 2007 and 2006 by contractual maturity (in thousands):

| | 2007 | | 2006 | |
|---|---|---|---|---|
| | Amortized Cost | Market Value | Amortized Cost | Market Value |
| Mature in less than one year | $ 66,151 | $66,069 | $ 50,005 | $49,788 |
| Mature in one to five years | 8,992 | 8,994 | 19,046 | 18,740 |
| Mature in various dates | 3,626 | 3,606 | 5,125 | 5,072 |
| | $ 78,769 | $78,669 | $ 74,176 | $73,600 |

The gross realized gains and losses for fiscal 2007, 2006, and 2005 were immaterial. Realized gains and losses were calculated based on the specific identification method.

107

USB FIN 002116

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Restricted Securities*

The Company has purchased and pledged to a collateral agent, as security for the exclusive benefit of the holders of the 2 1/2% convertible subordinated notes, U.S. government securities, which will be sufficient upon receipt of scheduled principal and interest payments thereon, to provide for the payment in full of the first eight scheduled interest payments due on each series of notes. These restricted securities are classified as held to maturity and are held on the Company's consolidated balance sheet at amortized cost. The following table summarizes the Company's restricted securities as of April 30, 2007 and April 30, 2006 (in thousands):

| | Amortized Cost | Gross Unrealized Gain/(Loss) | Market Value |
|---|---|---|---|
| **As of April 30, 2007** | | | |
| Government agency | $ 625 | $ — | $ 625 |
| Classified as: | | | |
| Short term — less than 1 year | 625 | | 625 |
| Total | $ 625 | $ — | $ 625 |
| **As of April 30, 2006** | | | |
| Government agency | $ 5,520 | $ (105) | $5,415 |
| Classified as: | | | |
| Short term — less than 1 year | 3,705 | (51) | 3,654 |
| Long term — 1 to 3 years | 1,815 | (54) | 1,761 |
| Total | $ 5,520 | $ (105) | $5,415 |

**7. Minority Investments**

Minority investments is comprised of several investments in other companies accounted for under the cost method and one investment in another company accounted for under the equity method.

*Cost Method Investments*

Included in minority investments at April 30, 2007 and April 30, 2006 is $11.3 million representing the carrying value of the Company's minority investment in three privately held companies accounted for under the cost method. During the quarter ended July 31, 2005, the Company evaluated the valuation of a minority investment acquired on January 31, 2005 as part of the Infineon acquisition and determined the value of the investment to be zero. As a result, the Company reclassified the purchase price originally allocated to the investment to goodwill. Included in minority investments at April 30, 2005 is $15.4 million representing the carrying value of the Company's minority investment in four privately held companies accounted for under the cost method. These four minority investments include a $1.0 million cash investment in and a $3.75 million convertible promissory note issued to CyOptics, Inc., which occurred during the second and fourth quarters of fiscal 2005 (see Note 12), and a $4.2 million investment in a private company, which was acquired through the acquisition of Infineon's transceiver and transponder product line in the fourth quarter of fiscal 2005. During fiscal 2006 and 2005, the Company recorded charges of $0.0 million and $10.0 million, respectively, for impairments in the value of these minority investments, which were recorded in other income (expense), net.

The Company's investments in these early stage companies was primarily motivated by its desire to gain early access to new technology. The Company's investments were passive in nature in that the Company generally did not obtain representation on the board of directors of the companies in which it invested. At the time the Company made its investments, in most cases the companies had not completed development of their products and the Company did

108

USB FIN 002117

FINISAR CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

not enter into any significant supply agreements with any of the companies in which it invested. The Company's policy is to recognize an impairment in the value of its minority equity investments when clear evidence of an impairment exists, such as (a) the completion of a new equity financing that may indicate a new value for the investment, (b) the failure to complete a new equity financing arrangement after seeking to raise additional funds or (c) the commencement of proceedings under which the assets of the business may be placed in receivership or liquidated to satisfy the claims of debt and equity stakeholders.

*Equity Method Investments*

Included in minority investments is $0 and $3.8 million at April 30, 2007 and 2006, respectively, representing the carrying value of the Company's minority investment in one private company accounted for under the equity method. The Company had a 22.7% ownership interest in this company at April 30, 2006. For fiscal 2007 and 2006, the Company recorded expenses of $237,000 and $2.1 million, respectively, representing its share in the losses of this company, which were recorded in other income (expense), net.

*Conversion of Equity Method Investment to Available-for-Sale Securities*

During the first quarter of fiscal 2007, the Company's ownership percentage in its equity method investee decreased below 20%. Additionally, the investee became a publicly traded company. The Company classified this investment as available-for-sale securities in accordance with SFAS 115. As of April 30, 2007, an unrealized gain of $5.2 million is included in accumulated other comprehensive income. As of April 30, 2007, the fair market value of this investment included in long-term available-for-sale investments was $8.8 million.

**8.  Inventories**

Inventories consist of the following (in thousands):

|  | April 30, | |
|  | 2007 | 2006 |
|  |  | (As restated) |
| Raw materials | $21,597 | $  19,133 |
| Work-in-process | 27,336 | 21,479 |
| Finished goods | 28,737 | 12,958 |
| Total inventory | $77,670 | $  53,570 |

In fiscal 2007, the Company recorded charges of $12.1 million for excess and obsolete inventory and sold inventory components that were written-off in prior periods of $4.1 million, resulting in a net charge to cost of revenues of $8.0 million. In fiscal 2006, the Company recorded charges of $9.3 million for excess and obsolete inventory and sold inventory components that were written-off in prior periods of $3.6 million, resulting in a net charge to cost of revenues of $5.7 million. In fiscal 2005, the Company recorded charges of $11.3 million for excess and obsolete inventory and sold inventory components that were written-off in prior periods with an approximate original cost of $9.3 million, resulting in a net charge to cost of sales of $2.0 million.

The Company makes inventory commitment and purchase decisions based upon sales forecasts. To mitigate the component supply constraints that have existed in the past and to fill orders with non-standard configurations, the Company builds inventory levels for certain items with long lead times and enters into certain longer-term commitments for certain items. The Company permanently writes off 100% of the cost of inventory that is specifically identified and considered obsolete or excessive to fulfill future sales estimates. The Company defines obsolete inventory as inventory that will no longer be used in the manufacturing process. The Company periodically discards obsolete inventory. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using the Company's best estimate of future demand at the time, based upon information then available.

109

USB FIN 002118

# FINISAR CORPORATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In making these assessments, the Company is required to make judgments as to the future demand for current or committed inventory levels. The Company uses a 12-month demand forecast and in addition also considers:

- parts and subassemblies that can be used in alternative finished products;

- parts and subassemblies that are unlikely to be engineered out of our products; and

- known design changes which would reduce our ability to use the inventory as planned.

Significant differences between the Company's estimates and judgments regarding future timing of product transitions, volume and mix of customer demand for the Company's products and actual timing, volume and demand mix may result in additional write-offs in the future, or additional usage of previously written-off inventory in future periods for which the Company would benefit by a reduced cost of revenues in those future periods.

## 9. Property, Equipment and Improvements

Property, equipment and improvements consist of the following (in thousands):

|  | April 30, | |
|---|---|---|
|  | 2007 | 2006 |
| Land | $ 9,747 | $ 9,747 |
| Buildings | 11,365 | 10,929 |
| Computer equipment | 37,475 | 34,149 |
| Office equipment, furniture and fixtures | 3,196 | 3,182 |
| Machinery and equipment | 135,238 | 118,327 |
| Leasehold improvements | 12,795 | 7,445 |
| Contruction-in-process | 444 | 5,888 |
| Total | 210,260 | 189,667 |
| Accumulated depreciation and amortization | (126,189) | (107,442) |
| Property, equipment and improvements (net) | $ 84,071 | $ 82,225 |

## 10. Sale-leaseback and Impairment of Tangible Assets

During the quarter ended January 31, 2005, the Company recorded an impairment charge of $18.8 million to write down the carrying value of one of its corporate office facilities located in Sunnyvale, California upon entering into a sale-leaseback agreement. The property was written down to its appraised value, which was based on the work of an independent appraiser in conjunction with the sale-leaseback agreement. Due to retention by the Company of an option to acquire the leased properties at fair value at the end of the fifth year of the lease, the sale-leaseback transaction was recorded in the Company's fourth quarter ending April 30, 2005 as a financing transaction under which the sale will not be recorded until the option expires or is otherwise terminated. At April 30, 2007 and April 30, 2006, the carrying value of the financing liability, included in other long-term liabilities, was $11.6 million and $12.0 million, respectively and the current portion of the financing liability, included in the current portion of other long-term liabilities, was $358,000 and $300,000, respectively.

## 11. Letter of Credit Reimbursement Agreement

On December 25, 2006, the Company entered into an amended letter of credit reimbursement agreement with Silicon Valley Bank that will be available to the Company through October 26, 2007. Under the terms of the amended agreement, Silicon Valley Bank is providing a $15 million letter of credit facility covering existing letters of credit issued by Silicon Valley Bank and any other letters of credit that may be required by the Company. The cost related to the credit facility consisted of a loan fee of $31,250, plus the bank's out of pocket expenses associated

USB FIN 002119

# FINISAR CORPORATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

with the credit facility. The credit facility is unsecured with a negative pledge on all assets, including intellectual property. The negative pledge requires that the Company will not create a security in favor of a subsequent creditor without the approval of Silicon Valley Bank. The agreement requires the Company to maintain its primary banking and cash management relationships with Silicon Valley Bank or SVB Securities and to maintain a minimum unrestricted cash and cash equivalents balance, net of any outstanding debt and letters of credit exposure with Silicon Valley Bank, of $40 million at all times. At April 30, 2007 the Company was not in compliance with its SEC filing requirements under the terms of this agreement but had obtained a waiver from the bank through October 26, 2007. Outstanding letters of credit secured by this agreement at April 30, 2007 totaled $11.3 million.

On November 1, 2007, the Company entered into an amended letter of credit reimbursement agreement with Silicon Valley Bank that will be available to the Company through October 25, 2008. The terms of the new amended agreement are substantially unchanged from the previous agreement, although, the bank has waived the SEC filing requirement covenant until the Company is current with its filing requirements.

## 12.  Non-recourse Accounts Receivable Purchase Agreement

On December 25, 2006, the Company entered into an amended non-recourse accounts receivable purchase agreement with Silicon Valley Bank that will be available to the Company through October 26, 2007. Under the terms of the agreement, the Company may sell to Silicon Valley Bank up to $20 million of qualifying receivables whereby all right, title and interest in the Company's invoices are purchased by Silicon Valley Bank. In these non-recourse sales, the Company removes sold receivables from its books and records no liability related to the sale, as the Company has assessed that the sales should be accounted for as "true sales" in accordance with SFAS No. 140 *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities* . The discount interest for the facility is based on the number of days in the discount period multiplied by Silicon Valley Bank's prime rate plus 0.50% and a non-refundable administrative fee of 0.25% of the face amount of each invoice. During fiscal 2007 and 2006, the Company sold receivables totaling $14.7 million and $15.5 million, respectively.

On November 1, 2007, the Company entered into an amended non-recourse accounts receivable purchase agreement effective October 26, 2007 with Silicon Valley Bank that will be available to the Company through October 25, 2008. The terms of the new amended agreement are substantially unchanged from the previous agreement.

## 13.  Commitments

The Company's future commitments at April 30, 2007 include minimum payments under non-cancelable operating lease agreements, a lease commitment under a sale-leaseback agreement, non-cancelable purchase obligations, and non-cancelable purchase commitments as follows (in thousands):

| | Total | Payments Due in Fiscal Year | | | | | |
| | | 2008 | 2009 | 2010 | 2011 | 2012 | Thereafter |
|---|---|---|---|---|---|---|---|
| Operating leases | $ 5,174 | $2,275 | $1,452 | $1,100 | $ 347 | — | — |
| Lease commitment under sale-leaseback agreement | 45,474 | 3,096 | 3,166 | 3,237 | 3,310 | $3,385 | $ 29,280 |
| Purchase obligations | 2,798 | 2,798 | — | — | — | — | — |
| Total contractual obligations | $53,446 | $8,169 | $4,618 | $4,337 | $3,657 | $3,385 | $ 29,280 |

Rent expense under the non-cancelable operating leases was approximately $3.1 million, $5.1 million and $4.6 million for the years ended April 30, 2007, 2006, and 2005, respectively. The Company subleases a portion of its facilities that it considers to be in excess of its requirements. Sublease income was $279,000, $221,000, and $20,000 for the years ended April 30, 2007, 2006, and 2005, respectively. Certain leases have scheduled rent increases which have been included in the above table. Other leases contain provisions to adjust rental rates for

111

USB FIN 002120

## FINISAR CORPORATION

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

inflation during their terms, most of which are based on to-be-published indices. Rents subject to these adjustments are included in the above table based on current rates.

Purchase obligations consist of standby repurchase obligations and are related to excess materials purchased and held by the Company's manufacturing subcontractors at their facilities on behalf of the Company to fulfill the subcontractors' obligations under the Company's purchase orders. The Company's purchase obligations of $2.8 million has been expensed and recorded on the balance sheet as non-cancelable purchase obligations as of April 30, 2007.

### 14.  Convertible Debt

The Company's convertible subordinated and senior subordinated notes as of April 30, 2007 and 2006 are summarized as follows (in thousands):

| Description | Amount | Interest Rate | Due in Fiscal Year |
|---|---|---|---|
| **As of April 30, 2007** | | | |
| Convertible subordinated notes due 2008 | $100,250 | 5.25% | 2009 |
| Convertible subordinated notes due 2010 | 50,000 | 2.50% | 2011 |
| Convertible senior subordinated notes due 2010 | 100,000 | 2.50% | 2011 |
| | $250,250 | | |
| **As of April 30, 2006** | | | |
| Convertible subordinated notes due 2008 | $100,250 | 5.25% | 2009 |
| Convertible subordinated notes due 2010 | 150,000 | 2.50% | 2011 |
| | $250,250 | | |

The Company's convertible subordinated and senior subordinated notes are due by fiscal year as follows (in thousands):

| | Total | Fiscal Years Ended April 30, | | | |
|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | 2011 |
| Convertible notes | $250,250 | $ — | $100,250 | $ — | $150,000 |

As of April 30, 2007 and 2006, the fair value of the Company's convertible subordinated and convertible senior subordinated notes based on quoted market prices was approximately $285.2 million and $323.0 million, respectively.

*Convertible Subordinated Notes due 2008*

On October 15, 2001, the Company sold $125 million aggregate principal amount of 5 1/4% convertible subordinated notes due October 15, 2008. Interest on the notes is 5 1/4% per annum on the principal amount, payable semiannually on April 15 and October 15. The notes are convertible, at the option of the holder, at any time on or prior to maturity into shares of the Company's common stock at a conversion price of $5.52 per share, which is equal to a conversion rate of approximately 181.159 shares per $1,000 principal amount of notes. The conversion price is subject to adjustment. The notes may be redeemed by the Company for a cash payment of 100.75% of the principal amount on or after October 15, 2007, together with accrued and unpaid interest.

Because the market value of the stock rose above the conversion price between the day the notes were priced and the day the proceeds were collected, the Company recorded a discount of $38.3 million related to the intrinsic value of the beneficial conversion feature. This amount is being amortized to interest expense over the life of the

USB FIN 002121

Table of Contents

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

convertible notes, or sooner upon conversion. During fiscal 2007, 2006 and 2005, the Company recorded interest expense amortization of $4.8 million, $4.5 million and $4.3 million, respectively.

The notes are subordinated to all of the Company's existing and future senior indebtedness and effectively subordinated to all existing and future indebtedness and other liabilities of its subsidiaries. Because the notes are subordinated, in the event of bankruptcy, liquidation, dissolution or acceleration of payment on the senior indebtedness, holders of the notes will not receive any payment until holders of the senior indebtedness have been paid in full. The indenture does not limit the incurrence by the Company or its subsidiaries of senior indebtedness or other indebtedness. The Company may redeem the notes, in whole or in part, at any time up to, but not including, the maturity date at specified redemption prices, plus accrued and unpaid interest, if the closing price of the Company's common stock exceeds $5.56 per share for at least 20 trading days within a period of 30 consecutive trading days.

Upon a change in control of the Company, each holder of the notes may require the Company to repurchase some or all of the notes at a repurchase price equal to 100% of the principal amount of the notes plus accrued and unpaid interest. The Company may, at its option, pay all or a portion of the repurchase price in shares of the Company's common stock valued at 95% of the average of the closing sales prices of its common stock for the five trading days immediately preceding and including the third trading day prior to the date the Company is required to repurchase the notes. The Company cannot pay the repurchase price in common stock unless the Company satisfies the conditions described in the indenture under which the notes have been issued.

The notes were issued in fully registered form and are represented by one or more global notes, deposited with the trustee as custodian for DTC and registered in the name of Cede & Co., DTC's nominee. Beneficial interests in the global notes will be shown on, and transfers will be effected only through, records maintained by DTC and its participants.

Unamortized debt issuance costs associated with these notes were $791,000 and $1.3 million at April 30, 2007 and 2006, respectively. Amortization of prepaid loan costs are classified as other income (expense), net on the consolidated statements of operations. Amortization of prepaid loan costs were $542,000 in each of the years ended April 30, 2007, 2006, and 2005.

*Convertible Subordinated Notes due 2010*

On October 15, 2003, the Company sold $150 million aggregate principal amount of $2 \, 1/2 \%$ convertible subordinated notes due October 15, 2010. Interest on the notes is $2 \, 1/2 \%$ per annum, payable semiannually on April 15 and October 15. The notes are convertible, at the option of the holder, at any time on or prior to maturity into shares of the Company's common stock at a conversion price of $3.705 per share, which is equal to a conversion rate of approximately 269.9055 shares per $1,000 principal amount of notes. The conversion price is subject to adjustment.

At issuance of the notes the Company purchased and pledged to a collateral agent, as security for the exclusive benefit of the holders of the notes, approximately $14.4 million of U.S. government securities, which will be sufficient upon receipt of scheduled principal and interest payments thereon, to provide for the payment in full of the first eight scheduled interest payments due on the notes. At April 30, 2007 and 2006, approximately $625,000 and $5.5 million, respectively, of cash and U.S. government securities remained pledged as security for the note holders.

The notes are subordinated to all of the Company's existing and future senior indebtedness and effectively subordinated to all existing and future indebtedness and other liabilities of its subsidiaries. Because the notes are subordinated, in the event of bankruptcy, liquidation, dissolution or acceleration of payment on the senior indebtedness, holders of the notes will not receive any payment until holders of the senior indebtedness have been paid in full. The indenture does not limit the incurrence by the Company or its subsidiaries of senior indebtedness or other indebtedness. The Company may redeem the notes, in whole or in part, at any time up to, but not including, the maturity date at specified redemption prices, plus accrued and unpaid interest, if the closing price

113

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

of the Company's common stock exceeds $5.56 per share for at least 20 trading days within a period of 30 consecutive trading days.

Upon a change in control of the Company, each holder of the notes may require the Company to repurchase some or all of the notes at a repurchase price equal to 100% of the principal amount of the notes plus accrued and unpaid interest. The Company may, at its option, pay all or a portion of the repurchase price in shares of the Company's common stock valued at 95% of the average of the closing sales prices of its common stock for the five trading days immediately preceding and including the third trading day prior to the date the Company is required to repurchase the notes. The Company cannot pay the repurchase price in common stock unless the Company satisfies the conditions described in the indenture under which the notes have been issued.

The notes were issued in fully registered form and are represented by one or more global notes, deposited with the trustee as custodian for DTC and registered in the name of Cede & Co., DTC's nominee. Beneficial interests in the global notes will be shown on, and transfers will be effected only through, records maintained by DTC and its participants.

In separate, privately-negotiated transactions on October 6, 2006, the Company exchanged $100 million in principal amount of its outstanding 2 $1/2$% convertible notes due in 2010 for a new series of notes described below. The exchange primarily resulted in the elimination the single-day put option which would have allowed the holders of the original notes to require the Company to repurchase some or all of the notes, for cash or common stock of the Company (at the option of the Company), on October 15, 2007. In accordance with the provisions of Emerging Issues Task Force ("EITF") 96-19, *Debtor's Accounting for a Modification or Exchange of Debt Instruments* , ("EITF 96-19") and EITF 05-07, *Accounting for Modifications to Conversion Options Embedded in Debt Instruments and Related Issues* , ("EITF 05-07") the exchange was treated as the extinguishment of the original debt and issuance of new debt. Accordingly, the Company recorded a non-cash loss on debt extinguishment of $31.6 million during the second quarter of fiscal 2007 which included $1.9 million of unamortized debt issuance costs related to the $100 million of the notes that were exchanged. The remaining $50 million in principal amount of the original notes have not been modified, and have been classified as a current liability as a result of the put option. On October 15, 2007, none of the note holders exercised the right to require the Company to repurchase these notes.

Unamortized debt issuance costs associated with these notes were $809,000 and $3.1 million at April 30, 2007 and 2006, respectively. Amortization of prepaid loan costs are classified as other income (expense), net on the consolidated statements of operations. Amortization of prepaid loan costs were $468,000 in fiscal 2007, $702,000 in fiscal 2006, and $707,000 in fiscal 2005.

*Convertible Senior Subordinated Notes due 2010*

On October 6, 2006, the Company entered into separate, privately-negotiated, exchange agreements with certain holders of its existing 2 $1/2$% Convertible Subordinated Notes due 2010 (the "Old Notes"), pursuant to which holders of an aggregate of $100 million of the Old Notes agreed to exchange their Old Notes for $100 million in aggregate principal amount of a new series of 2 $1/2$% Convertible Senior Subordinated Notes due 2010 (the "New Notes"), plus accrued and unpaid interest on the Old Notes at the day prior to the closing of the exchange. Interest on the New Notes is 2 $1/2$% per annum, payable semiannually on April 15 and October 15. The New Notes become convertible, at the option of the holder, upon the Company's common stock reaching $4.92 for a period of time at a conversion price of $3.28 per share, which is equal to a rate of approximately 304.9055 shares of Finisar common stock per $1,000 principal amount of the New Notes. The conversion price is subject to adjustment. As noted above, this exchange was treated as the issuance of new debt under EITF 96-19 and 05-07.

The New Notes contain a net share settlement feature which requires that, upon conversion of the New Notes into common stock of the Company, Finisar will pay holders in cash for up to the principal amount of the converted New Notes and that any amounts in excess of the cash amount will be settled in shares of Finisar common stock.

114

USB FIN 002123

# FINISAR CORPORATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The New Notes are subordinated to all of the Company's existing and future senior indebtedness and effectively subordinated to all existing and future indebtedness and other liabilities of its subsidiaries. Because the New Notes are subordinated, in the event of bankruptcy, liquidation, dissolution or acceleration of payment on the senior indebtedness, holders of the New Notes will not receive any payment until holders of the senior indebtedness have been paid in full. The indenture does not limit the incurrence by the Company or its subsidiaries of senior indebtedness or other indebtedness. The Company may redeem the New Notes, in whole or in part, at any time up to, but not including, the maturity date at specified redemption prices, plus accrued and unpaid interest, if the closing price of the Company's common stock exceeds $4.92 per share for at least 20 trading days within a period of 30 consecutive trading days.

Upon a change in control of the Company, each holder of the New Notes may require the Company to repurchase some or all of the New Notes at a repurchase price equal to 100% of the principal amount of the New Notes plus accrued and unpaid interest. The Company may, at its option, pay all or a portion of the repurchase price in shares of the Company's common stock valued at 95% of the average of the closing sales prices of its common stock for the five trading days immediately preceding and including the third trading day prior to the date the Company is required to repurchase the New Notes. The Company cannot pay the repurchase price in common stock unless the Company satisfies the conditions described in the indenture under which the New Notes have been issued.

The New Notes were issued in fully registered form and are represented by one or more global notes, deposited with the trustee as custodian for DTC and registered in the name of Cede & Co., DTC's nominee. Beneficial interests in the global notes will be shown on, and transfers will be effected only through, records maintained by DTC and its participants.

The Company has agreed to use its best efforts to file a shelf registration statement covering the New Notes and the common stock issuable upon conversion of the stock and keep such registration statement effective until two years after the latest date on which the Company issued New Notes (or such earlier date when the holders of the New Notes and the common stock issuable upon conversion of the New Notes are able to sell their securities immediately pursuant to Rule 144(k) under the Securities Act). If the Company does not comply with these registration obligations, the Company will be required to pay liquidated damages to the holders of the New Notes or the common stock issuable upon conversion. The Company will not receive any of the proceeds from the sale by any selling security holders of the New Notes or the underlying common stock. As of April 30, 2007 the Company had not complied with the registration requirements under this agreement. Accordingly, it had accrued a liability of $124,000 for liquidated damages payable under this agreement.

The Company considered the embedded derivative in the New Notes, that is, the conversion feature, and concluded that that it is indexed to the Company's common stock and would be classified as equity under EITF 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock* , were it to be accounted for separately and thus is not required to be bifurcated and accounted for separately from the debt.

The Company also considered the Company's call feature and the holders' put feature in the event of a change in control under the provisions of EITF 00-19 and related guidance, and concluded that they need not be accounted for separately from the debt.

During fiscal year 2007 the Company incurred fees of approximately $2 million related to the exchange transactions which were capitalized and will be amortized over the life of the New Notes.

Unamortized debt issuance costs associated with the New Notes were $1.7 million and $0 at April 30, 2007 and 2006, respectively. Amortization of prepaid loan costs are classified as other income (expense), net on the consolidated statement of operations. Amortization of prepaid loan costs were $240,000 in fiscal 2007 and $0 in fiscal 2006 and 2005.

USB FIN 002124

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Convertible Note — Acquisition of Assets of Data Transit Corp.*

On August 6, 2004, the Company completed the purchase of substantially all of the assets of Data Transit Corp. in exchange for a cash payment of $500,000 and the issuance of a convertible promissory note in the original principal amount of $16.3 million. Transaction costs totaled $682,000. The principal balance of the note bore interest at 8% per annum and was due and payable, if not earlier converted, on the second anniversary of its issuance. Generally, the terms of the convertible promissory note provided for automatic conversion of the outstanding principal and interest into shares of Finisar common stock on a biweekly basis, commencing on the later of the effectiveness of a registration statement covering the resale of the shares or one year after the closing date. The conversion price was the average closing bid price of the stock for the three days preceding the date of conversion. The amount of principal and interest converted on each conversion date was based on the average trading volume of our common stock over the preceding 14 days.

During the first quarter of fiscal 2006, the Company issued 5,144,609 shares of common stock upon the conversion of $4.2 million of principal and $1.1 million of interest related to this convertible promissory note. During the second quarter of fiscal 2006, the Company issued 9,938,256 shares of common stock upon the conversion of $12.1 million of principal and $191,000 of interest related to this convertible promissory note. As of April 30, 2007, all of the principal and interest on this note had been converted into shares of common stock.

*Convertible Note — Acquisition of I-TECH Corp.*

On April 8, 2005, the Company completed the acquisition of I-TECH CORP, a privately-held network test and monitoring company, in exchange for the issuance of two promissory notes to the sole holder of I-TECH's common stock. The promissory notes, which had an aggregate principal amount of approximately $12.1 million and an interest rate of 3.35%, were convertible into shares of Finisar common stock upon the occurrence of certain events and at the election of the Company and the holder of the notes.

During the first quarter of fiscal 2006, the Company issued 9,834,541 shares of common stock upon the conversion of $11.1 million of principal and $65,000 of interest related to one of these convertible promissory notes resulting in the complete conversion of the note. During the third quarter of fiscal 2006, the Company issued 99,860 shares of common stock upon the conversion of $157,000 of principal and $22,000 of interest related to the remaining promissory note. During the fourth quarter of fiscal 2006, the Company issued 173,149 shares of common stock upon the conversion of $843,000 of principal and $9,000 of interest related to the remaining promissory note. As of April 30, 2007, all of the principal and interest on these notes had been converted into shares of common stock.

*Convertible Note — Minority Investment in CyOptics, Inc.*

On April 29, 2005, the Company entered into a Series F Preferred Stock Purchase Agreement (the "SPA") with CyOptics, Inc. Pursuant to the SPA, the Company issued a convertible promissory note in the principal amount of approximately $3.8 million and an interest rate of 3.35% as consideration for the purchase of 24,298,580 shares of CyOptics Series F Preferred Stock.

The terms of the note provided for four weekly conversions of equal portions of the outstanding principal of the note into shares of our common stock, commencing on June 14, 2005. The number of shares to be issued upon each conversion was determined by dividing the amount converted by the average closing bid price of the Company's common stock for either (i) the four trading days immediately prior to the conversion, or (ii) the trading day prior to the conversion, as selected by the holder of the note.

During the first quarter of fiscal 2006, the Company issued 3,594,607 shares of common stock upon the conversion of the full $3.8 million of principal and $19,000 of interest related to this convertible promissory note. As of April 30, 2007, all of the principal and interest on this note had been converted into shares of common stock.

USB FIN 002125

## FINISAR CORPORATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Convertible Note — Acquisition of AZNA LLC*

On March 26, 2007, the Company completed the acquisition of AZNA LLC, a privately-held optical subsystems and components company, in exchange for the issuance of two promissory notes to the majority holder of AZNA's equity interest. The promissory notes, which have an aggregate principal amount of approximately $17.0 million and an interest rate of 5.0%. The notes are payable, at the Company's option, in cash or shares of Finisar common stock, with the value of such shares to be based on the trading price of the stock at the time the shares are registered for re-sale pursuant to the Securities Act of 1933, as amended. The exact number of shares of Finisar common stock to be issued pursuant to the convertible promissory notes is dependent on the trading price of Finisar's common stock on the dates of conversion of the notes, but shall not exceed in the aggregate 9.99% of either the total shares outstanding or voting power outstanding of the Company as of the date of the notes. The Company will be obligated to repay the notes in cash if the registration of the underlying shares is delayed more than 12 months after the closing. Because the number of shares to be issued is based upon the market price of the Company's common stock, cannot be determined prior to conversion.

### 15. Installment Loan

In December 2005, the Company entered into a note and security agreement with a financial institution. Under this agreement, the Company borrowed $9.9 million at an interest rate of 5.9% per annum. The note is payable in 60 equal monthly installments beginning in January 2006 and is secured by certain property and equipment of the Company. The Company's bank issued an irrevocable transferable standby letter of credit in the amount of $9.9 million for the benefit of the lender under the letter of credit facility described in Note 11. The agreement allows for periodic reductions of the amount required under the irrevocable transferable standby letter of credit at the discretion of the lender. At April 30, 2007, the remaining principal balance outstanding under this note was $7.5 million and the amount of the letter of credit securing this loan was $7.8 million.

### 16. Stockholders' Equity

*Common Stock and Preferred Stock*

As of April 30, 2007, Finisar is authorized to issue 750,000,000 shares of $0.001 par value common stock and 5,000,000 shares of $0.001 par value preferred stock. The board of directors has the authority to issue the undesignated preferred stock in one or more series and to fix the rights, preferences, privileges and restrictions thereof. The holder of each share of common stock has the right to one vote and is entitled to receive dividends when and as declared by the Company's Board of Directors. The Company has never declared or paid dividends on its common stock.

Common stock subject to future issuance as of April 30, 2007 is as follows:

| | |
|---|---:|
| Conversion of convertible notes | 34,520,004 |
| Exercise of outstanding warrants | 468,694 |
| Exercise of outstanding options | 46,119,115 |
| Available for grant under stock option plans | 28,815,162 |
| Reserved for issuance under the employee stock purchase plan | 10,060,097 |
| | 119,983,072 |

*Warrants*

In connection with the acquisition of Shomiti Systems, Inc. ("Shomiti") in fiscal 2001, the Company assumed warrants to purchase stock of Shomiti. Upon completion of the acquisition, these warrants entitled the holders to

117

USB FIN 002126

Table of Contents

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

purchase 10,153 shares of Finisar common stock at an exercise price of $11.49 per share. The warrants expire at various dates through 2007. None of the warrants have been exercised to date.

In conjunction with the acquisition of Genoa in fiscal 2003, the Company assumed warrants to purchase stock of Genoa and issued warrants to purchase stock of Finisar. The assumed warrants entitle the holders to purchase 29,766 shares of Finisar common stock at an exercise price of $15.25 per share and expire at various dates through 2011. None of the assumed warrants have been exercised to date. The warrants issued by the Company entitle the holders to purchase 999,835 shares of Finisar common stock at an exercise price of $1.00 per share and expire at various dates through 2011. During fiscal 2007, 2006, and 2005, warrants issued by the Company to purchase 2,011, 471,627, and 21,845 shares of Finisar common stock were exercised, respectively. At April 30, 2007, warrants to purchase 428,775 shares of Finisar common stock at an exercise price of $1.00 per share were still outstanding.

*Preferred Stock*

The Company has authority to issue up to 5,000,000 shares of preferred stock, $0.001 par value. The preferred stock may be issued in one or more series having such rights, preferences and privileges as may be designated by the Company's board of directors. In September 2002, the Company's board of directors designated 500,000 shares of its preferred stock as Series RP Preferred Stock, which is reserved for issuance under the Company's stockholder rights plan described below. As of April 30, 2007 and 2006, no shares of the Company's preferred stock were issued and outstanding.

*Stockholder Rights Plan*

In September 2002, Finisar's board of directors adopted a stockholder rights plan. Under the rights plan, stockholders received one share purchase right for each share of Finisar common stock held. The rights, which will initially trade with the common stock, effectively allow Finisar stockholders to acquire Finisar common stock at a discount from the then current market value when a person or group acquires 20% or more of Finisar's common stock without prior board approval. When the rights become exercisable, Finisar stockholders, other than the acquirer, become entitled to exercise the rights, at an exercise price of $14.00 per right, for the purchase of one-thousandth of a share of Finisar Series RP Preferred Stock or, in lieu of the purchase of Series RP Preferred Stock, Finisar common stock having a market value of twice the exercise price of the rights. Alternatively, when the rights become exercisable, the board of directors may authorize the issuance of one share of Finisar common stock in exchange for each right that is then exercisable. In addition, in the event of certain business combinations, the rights permit the purchase of the common stock of an acquirer at a 50% discount. Rights held by the acquirer will become null and void in each case. Prior to a person or group acquiring 20%, the rights can be redeemed for $0.001 each by action of the board of directors.

The rights plan contains an exception to the 20% ownership threshold for Finisar's founder, former Chairman of the Board and former Chief Technical Officer, Frank H. Levinson. Under the terms of the rights plan, Dr. Levinson and certain related persons and trusts are permitted to acquire additional shares of Finisar common stock up to an aggregate amount of 30% of Finisar's outstanding common stock, without prior Board approval.

*Employee Stock Purchase Plan*

The Company has an Employee Stock Purchase Plan, which includes its sub-plan, the International Employee Stock Purchase Plan (together the "Purchase Plan"), under which 15,750,000 shares of the Company's common stock have been reserved for issuance. Eligible employees may purchase a limited number of shares of common stock at a discount of 15% to the market value at certain plan-defined dates. During the fiscal year ended April 30, 2007 and 2006, the Company issued 860,025 and 1,229,249 shares, respectively. At April 30, 2007, 10,060,097 shares were available for issuance under the Purchase Plan.

USB FIN 002127

**FINISAR CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The employee stock purchase plan permits eligible employees to purchase Finisar common stock through payroll deductions, which may not exceed 20% of the employee's total compensation. Stock may be purchased under the plan at a price equal to 85% of the fair market value of Finisar common stock on either the first or the last day of the offering period, whichever is lower.

*Employee Stock Option Plans*

During fiscal 1989, Finisar adopted the 1989 Stock Option Plan (the "1989 Plan"). The 1989 Plan expired in April 1999 and no further option grants have been made under the 1989 Plan since that time. Options granted under the 1989 Plan had an exercise price of not less than 85% of the fair value of a share of common stock on the date of grant (110% of the fair value in certain instances) as determined by the board of directors. Options generally vested over five years and had a maximum term of 10 years.

Finisar's 1999 Stock Option Plan was adopted by the board of directors and approved by the stockholders in September 1999. An amendment and restatement of the 1999 Stock Option Plan, including renaming it the 2005 Stock Incentive Plan (the "2005 Plan"), was approved by the board of directors in September 2005 and by the stockholders in October 2005. A total of 21,000,000 shares of common stock were initially reserved for issuance under the 2005 Plan. The share reserve automatically increases on May 1 of each calendar year by a number of shares equal to 5% of the number of shares of Finisar's common stock issued and outstanding as of the immediately preceding April 30, subject to certain restrictions on the aggregate maximum number of shares that may be issued pursuant to incentive stock options. The types of stock-based awards available under the 2005 Plan includes stock options, stock appreciation rights, restricted stock units and other stock-based awards which vest upon the attainment of designated performance goals or the satisfaction of specified service requirements or, in the case of certain restricted stock units or other stock-based awards, become payable upon the expiration of a designated time period following such vesting events. To date, only stock options have been granted under the 2005 Plan. Options generally vest over five years and have a maximum term of 10 years. All options granted under the 2005 Plan are immediately exercisable. As of April 30, 2007 and 2006, 6,066 and 3,700 shares were subject to repurchase, respectively.

119

USB FIN 002128