Table of Contents

### Patent Litigation

#### DirecTV Litigation

On April 4, 2005, the Company filed an action for patent infringement in the United States District Court for the Eastern District of Texas against the DirecTV Group, Inc., DirecTV Holdings, LLC, DirecTV Enterprises, LLC, DirecTV Operations, LLC, DirecTV, Inc., and Hughes Network Systems, Inc. (collectively, "DirecTV"). The lawsuit involves the Company's U.S. Patent No. 5,404,505 (the "'505 patent"), which relates to technology used in information transmission systems to provide access to a large database of information. On June 23, 2006, following a jury trial, the jury returned a verdict that the Company's patent had been willfully infringed and awarded the Company damages of $78,920,250. In a post-trial hearing held on July 6, 2006, the Court determined that, due to DirecTV's willful infringement, those damages would be enhanced by an additional $25 million. Further, the Court awarded the Company pre-judgment interest on the jury's verdict in the amount of 6% compounded annually from April 4, 1999, amounting to approximately $13.4 million. Finally, the Court awarded the Company costs of $147,282 associated with the litigation. The Court declined to award the Company its attorney's fees. The Court denied the Company's motion for injunctive relief, but ordered DirecTV to pay a compulsory ongoing license fee to the Company at the rate of $1.60 per set-top box activated by or on behalf of DirecTV for the period beginning June 16, 2006 through the duration of the patent, which expires in April 2012. The Court entered final judgment in favor of the Company and against DirecTV on July 7, 2006. On September 1, 2006, the Court denied DirecTV's post-trial motions seeking to have the jury verdict set aside or reversed and requesting a new trial on a number of grounds. In another written post-trial motion, DirecTV asked the Court to allow DirecTV to place any amounts owed the Company under the compulsory license into an escrow account pending the outcome of any appeal and for those amounts to be refundable in the event that DirecTV prevails on appeal. The Court granted DirecTV's motion and payments under the compulsory license are being made into an escrow account pending the outcome of the appeal. As of October 12, 2007, DirecTV has deposited approximately $28 million into escrow. These escrowed funds represent DirecTV's compulsory royalty payments for the period from June 17, 2006 through September 30, 2007.

DirecTV has appealed to the United States Court of Appeals for the Federal Circuit. In its appeal, DirecTV raised issues related to claim construction, infringement, invalidity, willful infringement and enhanced damages. The Company cross-appealed raising issues related to the denial of the Company's motion for permanent injunction, the trial court's refusal to enhance future damages for willfulness and the trial court's determination that some of the asserted patent claims are invalid. The appeals have been consolidated. The parties were ordered to participate in the appellate court's mandatory mediation program, which occurred on February 13, 2007 without resolution. The parties have filed their respective briefs with the appellate court. A neutral third party, New York Intellectual Property Law Association ("NYIPLA") filed an *amicus* brief urging the appellate court to vacate the portion of trial court's judgment denying the Company's motion for a permanent injunction and ordering DirecTV to pay royalties pursuant to a compulsory license. Over DirecTV's objection, the appellate court accepted NYIPLA's *amicus* brief. On November 19, 2007, the Court of Appeals denied NYIPLA's motion to file a reply brief. Oral arguments have been set for January 7, 2008. Subsequent to the oral arguments, it is anticipated that a decision from the appellate court will issue between March 2008 and November 2008.

#### Comcast Litigation

On July 7, 2006, Comcast Cable Communications Corporation, LLC ("Comcast") filed a complaint against the Company in the United States District Court, Northern District of California, San Francisco Division. Comcast seeks a declaratory judgment that the Company's '505 patent is not infringed and is invalid. The '505 patent is the same patent alleged by the Company in its lawsuit against DirecTV. The Company's motion to dismiss the declaratory judgment action was denied on November 9, 2006. As a result, on November 22, 2006, the Company filed an answer and counterclaim alleging that Comcast infringes the '505 patent and seeking damages to be proven at trial. The court held a claim construction hearing and, on April 6, 2007, issued its claim construction ruling. Discovery is now underway. The parties have been ordered to a mediation and settlement conference on December 13, 2007. A jury trial has been scheduled for March 3, 2008.

#### EchoStar Litigation

On July 10, 2006, EchoStar Satellite LLC, EchoStar Technologies Corporation and NagraStar LLC (collectively "EchoStar") filed an action against the Company in the United States District Court for the District of Delaware seeking a declaration that EchoStar does not infringe, and has not infringed, any valid claim of the Company's '505 patent. The '505 patent is the same patent that is in dispute in the DirecTV and Comcast lawsuits. On October 24, 2006, the Company filed a motion to dismiss the action for lack of a justiciable controversy. The Court denied the Company's motion on September 25, 2007. The Company filed its answer and counterclaim on October 10, 2007. No scheduling order has been entered in the case, and discovery has not yet begun.

USB FIN 002232

Table of Contents

*XM/Sirius Litigation*

On April 27, 2007, the Company filed an action for patent infringement in the United States District Court for the Eastern District of Texas, Lufkin Division, against XM Satellite Radio Holdings, Inc., XM Satellite Radio, Inc., and XM Radio, Inc. (collectively, "XM"), and Sirius Satellite Radio, Inc. and Satellite CD Radio, Inc. (collectively, "Sirius"). Judge Clark, the same judge who presided over the DirecTV trial, has been assigned to the case. The lawsuit alleges that XM and Sirius have infringed and continue to infringe the Company's '505 patent and seeks an injunction to prevent further infringement, actual damages to be proven at trial, enhanced damages for willful infringement and attorneys' fees. The defendants filed an answer denying infringement of the '505 patent and asserting invalidity and other defenses. The defendants also moved to stay the case pending the outcome of the DirecTV appeal and the re-examination of the '505 patent described below. Judge Clark The defendants' motion for a stay was denied. Discovery is now underway. The claim construction hearing has been set for February 6, 2008, and the trial has been set for September 15, 2008.

*Requests for Re-Examination of the '505 Patent*

Three requests for re-examination of the Company's '505 patent have been filed with the United States Patent and Trademark Office ("PTO"). The '505 patent is the patent that is in dispute in the DirecTV, EchoStar, Comcast and XM/Sirius lawsuits. On December 11, 2006, the PTO entered an order granting the first request and, on March 21, 2007, the PTO entered an order granting the second request. The third request, filed on August 1, 2007, was partially granted on September 28, 2007. The Company expects that the PTO will take steps to consolidate these requests into one request for re-examination. Alternately, the PTO may consolidate the first two requests and keep the third separate because it is directed to different claims than the first two requests. During the re-examination, some or all of the claims in the '505 patent could be invalidated or revised to narrow their scope, either of which could have a material adverse impact on the Company's position in the DirecTV, EchoStar, Comcast and XM/Sirius lawsuits. Resolution of one or more re-examination requests of the '505 Patent is likely to take more than 15 months.

*Securities Class Action*

A securities class action lawsuit was filed on November 30, 2001 in the United States District Court for the Southern District of New York, purportedly on behalf of all persons who purchased the Company's common stock from November 17, 1999 through December 6, 2000. The complaint named as defendants Finisar, Jerry S. Rawls, the Company's President and Chief Executive Officer, Frank H. Levinson, the Company's former Chairman of the Board and Chief Technical Officer, Stephen K. Workman, the Company's Senior Vice President and Chief Financial Officer, and an investment banking firm that served as an underwriter for the Company's initial public offering in November 1999 and a secondary offering in April 2000. The complaint, as subsequently amended, alleges violations of Sections 11 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(b) of the Securities Exchange Act of 1934, on the grounds that the prospectuses incorporated in the registration statements for the offerings failed to disclose, among other things, that (i) the underwriter had solicited and received excessive and undisclosed commissions from certain investors in exchange for which the underwriter allocated to those investors material portions of the shares of the Company's stock sold in the offerings and (ii) the underwriter had entered into agreements with customers whereby the underwriter agreed to allocate shares of the Company's stock sold in the offerings to those customers in exchange for which the customers agreed to purchase additional shares of the Company's stock in the aftermarket at pre-determined prices. No specific damages are claimed. Similar allegations have been made in lawsuits relating to more than 300 other initial public offerings conducted in 1999 and 2000, which were consolidated for pretrial purposes. In October 2002, all claims against the individual defendants were dismissed without prejudice. On February 19, 2003, the Court denied defendants' motion to dismiss the complaint. In July 2004, the Company and the individual defendants accepted a settlement proposal made to all of the issuer defendants. Under the terms of the settlement, the plaintiffs would dismiss and release all claims against participating defendants in exchange for a contingent payment guaranty by the insurance companies collectively responsible for insuring the issuers in all related cases, and the assignment or surrender to the plaintiffs of certain claims the issuer defendants may have against the underwriters. Under the guaranty, the insurers would be required to pay the amount, if any, by which $1 billion exceeds the aggregate amount ultimately collected by the plaintiffs from the underwriter defendants in all the cases. If the plaintiffs fail to recover $1 billion and payment is required under the guaranty, the Company would be responsible to pay its pro rata portion of the shortfall, up to the amount of the self-insured retention under the Company's insurance policy, which may be up to $2 million. The timing and amount of payments that the Company could be required to make under the proposed settlement would depend on several factors, principally the timing and amount of any payment that the insurers may be required to make pursuant to the $1 billion guaranty. The Court gave preliminary approval to the settlement in February 2005 and held a hearing in April 2006 to consider final approval of the settlement. Before the Court issued a final decision on the settlement, on December 5, 2006, the United States Court of Appeals for the Second Circuit vacated the class certification of plaintiffs' claims against the underwriters in six cases designated as focus or test cases. Thereafter, on December 14, 2006, the Court ordered a stay of all proceedings in all of the lawsuits pending the outcome of the plaintiffs' petition to the Second Circuit Court of Appeals for a rehearing en banc and resolution of the class certification issue. On April 6, 2007, the Second Circuit Court of Appeals denied the plaintiffs' petition for a rehearing, but clarified that the plaintiffs may seek to certify a more limited class. Subsequently, and consistent with these developments, the Court entered an order, at the request of the plaintiffs and issuers, to deny approval of the settlement, and the plaintiffs filed an amended complaint

USB FIN 002233

Table of Contents

in an attempt to comply with the decision of the Second Circuit Court of Appeals. If an amended or modified settlement is not reached, and thereafter approved by the Court, the Company intends to defend the lawsuit vigorously. Because of the inherent uncertainty of litigation, however, the Company cannot predict its outcome. If, as a result of this dispute, the Company is required to pay significant monetary damages, its business would be substantially harmed.

The Company cannot predict the outcome of the legal proceedings discussed above. No amount of loss, if any, is considered probable or measurable and no loss contingency has been recorded at the balance sheet date.

### 15. Guarantees and Indemnifications

In November 2002, the FASB issued Interpretation No. 45 *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* ("FIN 45"). FIN 45 requires that upon issuance of a guarantee, the guarantor must recognize a liability for the fair value of the obligations it assumes under that guarantee. As permitted under Delaware law and in accordance with the Company's Bylaws, the Company indemnifies its officers and directors for certain events or occurrences, subject to certain limits, while the officer or director is or was serving at the Company's request in such capacity. The term of the indemnification period is for the officer's or director's lifetime. The Company may terminate the indemnification agreements with its officers and directors upon 90 days written notice, but termination will not affect claims for indemnification relating to events occurring prior to the effective date of termination. The maximum amount of potential future indemnification is unlimited; however, the Company has a director and officer insurance policy that may enable it to recover a portion of any future amounts paid.

The Company enters into indemnification obligations under its agreements with other companies in its ordinary course of business, including agreements with customers, business partners, and insurers. Under these provisions the Company generally indemnifies and holds harmless the indemnified party for losses suffered or incurred by the indemnified party as a result of the Company's activities or the use of the Company's products. These indemnification provisions generally survive termination of the underlying agreement. In some cases, the maximum potential amount of future payments the Company could be required to make under these indemnification provisions is unlimited.

The Company believes the fair value of these indemnification agreements is minimal. Accordingly, the Company has not recorded any liabilities for these agreements as of July 29, 2007. To date, the Company has not incurred material costs to defend lawsuits or settle claims related to these indemnification agreements.

### 16. Subsequent Events

#### *Future Impact of Certain Stock Option Restatement Items*

Because virtually all holders of options issued by the Company were neither involved in nor aware of its accounting treatment of stock options, the Company has taken and intends to take actions to deal with certain adverse tax consequences that may be incurred by the holders of certain incorrectly priced options. The primary adverse tax consequence is that incorrectly priced stock options vesting after December 31, 2004 may subject the option holder to a penalty tax under Internal Revenue Code Section 409A (and, as applicable, similar penalty taxes under California and other state tax laws). The Company presently estimates that it will incur a liability to option holders of approximately $7.0 million, of which approximately $5.7 million will be recognized as additional stock compensation expense in future periods.

24

USB FIN 002234

Table of Contents

**Item 2. *Management's Discussion and Analysis of Financial Condition and Results of Operations***

**Forward-Looking Statements**

The following discussion contains forward-looking statements that involve risks and uncertainties. Our actual results could differ substantially from those anticipated in these forward-looking statements as a result of many factors, including those set forth in "Part II, Item 1A. Risk Factors" below. The following discussion should be read together with our consolidated financial statements and related notes thereto included elsewhere in this report.

**Business Overview**

Finisar Corporation is a leading provider of optical subsystems and components that connect local area networks, or LANs, storage area networks, or SANs, and metropolitan area networks, or MANs. Our optical subsystems consist primarily of transceivers which provide the fundamental optical-electrical interface for connecting the equipment used in building these networks. These products rely on the use of digital semiconductor lasers in conjunction with integrated circuit design and novel packaging technology to provide a cost-effective means for transmitting and receiving digital signals over fiber optic cable using a wide range of network protocols, transmission speeds and physical configurations over distances of 70 meters to 200 kilometers. Our line of optical components consists primarily of packaged lasers and photodetectors used in transceivers, primarily for LAN and SAN applications. Our manufacturing operations are vertically integrated and include internal manufacturing, assembly and test capability. We sell our optical subsystem and component products to manufacturers of storage and networking equipment such as Brocade, Cisco Systems, EMC, Emulex, Hewlett-Packard Company, Huawei and Qlogic.

We also provide network performance test and monitoring systems to original equipment manufacturers for testing and validating equipment designs and, to a lesser degree, to operators of networking and storage data centers for testing, monitoring and troubleshooting the performance of their installed systems. We sell these products primarily to leading storage equipment manufacturers such as Brocade, EMC, Emulex, Hewlett-Packard Company, IBM and Qlogic.

**Critical Accounting Policies**

The preparation of our financial statements and related disclosures require that we make estimates, assumptions and judgments that can have a significant impact on our net revenue and operating results, as well as on the value of certain assets, contingent assets and liabilities on our balance sheet. We believe that the estimates, assumptions and judgments involved in the accounting policies described below have the greatest potential impact on our financial statements and, therefore, consider these to be our critical accounting policies. See Note 1 to our consolidated financial statements included elsewhere in this report for more information about these critical accounting policies, as well as a description of other significant accounting policies.

*Income Taxes*

We adopted FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes – An interpretation of FASB Statement No. 109,* ("FIN 48") on May 1, 2007. FIN 48 is an interpretation of FASB Statement 109, *Accounting for Income Taxes,* and it seeks to reduce the diversity in practice associated with certain aspects of measurement and recognition in accounting for income taxes. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position that an entity takes or expects to take in a tax return. Additionally, FIN 48 provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosures, and transition. Under FIN 48, an entity may only recognize or continue to recognize tax positions that meet a "more likely than not" threshold. In accordance with our accounting policy, we recognize accrued interest and penalties related to unrecognized tax benefits as a component of tax expense. This policy did not change as a result of our adoption on FIN 48.

25

USB FIN 002235

Table of Contents

## Results of Operations

The following table sets forth certain statement of operations data as a percentage of revenues for the periods indicated:

| | Three Months Ended | |
| --- | --- | --- |
| | July 29, 2007 | July 30, 2006 |
| | (Unaudited) | |
| Revenues: | | |
| Optical subsystems and components | 91.1% | 90.4% |
| Network test and monitoring systems | 8.9 | 9.6 |
| Total revenues | 100.0 | 100.0 |
| Cost of revenues | 67.8 | 66.6 |
| Amortization of acquired developed technology | 1.6 | 1.4 |
| Gross profit | 30.6 | 32.0 |
| | | |
| Operating expenses: | | |
| Research and development | 16.6 | 13.5 |
| Sales and marketing | 9.5 | 8.3 |
| General and administrative | 7.6 | 7.1 |
| Amortization of purchased intangibles | 0.4 | 0.3 |
| Total operating expenses | 34.1 | 29.2 |
| Income (loss) from operations | (3.5) | 2.8 |
| Interest income | 1.3 | 1.2 |
| Interest expense | (4.0) | (3.7) |
| Other income (expense), net | (0.1) | (0.3) |
| Income (loss) before income taxes and cumulative effect of change in accounting principle | (6.3) | 0.0 |
| Provision for income taxes | 0.6 | 0.6 |
| Net income (loss) before cumulative effect of adopting change in accounting principle | (6.9) | (0.6) |
| Cumulative effect of adopting change in accounting principle, net of tax | 0.0 | (1.1) |
| Net income (loss) | (6.9)% | 0.5% |

*Revenues.* Revenues decreased $508,000, or 0.5%, to $105.7 million in the quarter ended July 29, 2007 compared to $106.2 million in the quarter ended July 30, 2006. Sales of optical subsystems and components and network test and monitoring systems represented 91.1% and 8.9%, respectively, of total revenues in the quarter ended July 29, 2007, compared to 90.4% and 9.6%, respectively, in the quarter ended July 30, 2006.

Optical subsystems and components revenues increased $317,000 or 0.3%, to $96.4 million in the quarter ended July 29, 2007 compared to $96.0 million in the quarter ended July 30, 2006. While total optical subsystem revenue was relatively flat between the years, we experienced large fluctuations in our broad product categories. Sales of products for short distance LAN/SAN applications decreased $13.2 million, or 21.1%, to $49.4 million in the quarter ended July 29, 2007 compared to $62.6 million in the quarter ended July 30, 2006. The decline in product sales for LAN/SAN applications was primarily the result of a broad slowdown in unit sales to our SAN customers combined with competitive pricing pressure. Sales of products for longer distance MAN applications increased $13.5 million, or 40.4%, to $47.0 million in the quarter ended July 29, 2007 compared to $33.5 million in the quarter ended July 30, 2006. The increase in sales for MAN products was primarily the result of increased sales of our XFP product for 10Gbps applications.

Network test and monitoring systems revenues decreased $825,000, or 8.1%, to $9.4 million in the quarter ended July 29, 2007 compared to $10.2 million in the quarter ended July 30, 2006.

*Amortization of Acquired Developed Technology.* Amortization of acquired developed technology, a component of cost of revenues, increased $210,000, or 13.8%, in the quarter ended July 29, 2007 to $1.7 million compared to $1.5 million in the quarter ended July 30, 2006. The increase was the result of amortizing purchased technology acquired with the acquisitions of AZNA LLC and Kodeos Communications in the fourth quarter of fiscal 2007.

*Gross Profit.* Gross profit decreased $1.7 million, or 5.0%, to $32.3 million in the quarter ended July 29, 2007 compared to $34.0 million in the quarter ended July 30, 2006. Gross profit as a percentage of total revenue was 30.6% in the quarter ended July 29, 2007 compared to 32.0% in the quarter ended July 30, 2006. We recorded charges of $3.8 million for obsolete and excess inventory in the quarter ended July 29, 2007 and $3.4 million in the quarter ended July 30, 2006. We sold inventory that was written-off in previous periods resulting in a benefit of $1.7 million in the quarter ended July 29, 2007 and $1.1 million in the quarter ended July 30, 2006. As

26

USB FIN 002236

a result, we recognized a net charge of $2.1 million in the quarter ended July 29, 2007 compared to $2.3 million in the quarter ended July 30, 2006. Manufacturing overhead costs included stock-based compensation expenses of $722,000 in the quarter ended July 29, 2007 compared to $1.1 million in the quarter ended July 30, 2006. Excluding the amortization of acquired developed technology, the net impact of excess and obsolete inventory charges and stock-based compensation expenses, gross profit would have been $36.9 million, or 34.9% of revenue, in the quarter ended July 29, 2007 compared to $39.0 million, or 36.7% of revenue in the quarter ended July 30, 2006. The decrease in the adjusted gross profit margin was primarily due to the combined effect of flat revenue, flat manufacturing overhead expenses, and lower average sales prices on maturing products, partially offset by lower material costs.

*Research and Development Expenses.* Research and development expenses increased $3.1 million, or 21.6%, to $17.5 million in the quarter ended July 29, 2007 compared to $14.4 million in the quarter ended July 30, 2006. The increase was primarily due to personnel related charges of $1.7 million and development materials and outside services of $872,000. Approximately $1.1 million of the increase in research and development expenses was due to our acquisitions of AZNA LLC and Kodeos Communications in the prior quarter with the remaining increase resulting primarily from new 10GB and 40GB product development. Research and development expenses include stock-based compensation charges of $955,000 in the quarter ended July 29, 2007 and $1.2 million in the quarter ended July 30, 2006. Research and development expenses as a percent of revenues increased to 16.6% in the quarter ended July 29, 2007 compared to 13.5% in the quarter ended July 30, 2006.

*Sales and Marketing Expenses.* Sales and marketing expenses increased $1.2 million, or 13.8%, to $10.1 million in the quarter ended July 29, 2007 compared to $8.8 million in the quarter ended July 30, 2006. The increase was primarily due to increased personnel related costs, including travel, of $766,000, to develop and support anticipated future sales growth. Commission expense increased $188,000 due to product mix, as certain 10GB products have higher commission rates. Cost of evaluation units increased $187,000 in our Network Test and Monitoring business unit in an effort to stimulate enterprise sales in this segment. Sales and marketing expenses include stock-based compensation charges of $451,000 in the quarter ended July 29, 2007 and $529,000 in the quarter ended July 30, 2006. Sales and marketing expenses as a percent of revenues increased to 9.5% in the quarter ended July 29, 2007 compared to 7.1% in the quarter ended July 30, 2006.

*General and Administrative Expenses.* General and administrative expenses increased $477,000, or 6.3%, to $8.0 million in the quarter ended July 29, 2007 compared to $7.5 million in the quarter ended July 30, 2006. The increase was primarily due to an increase in personnel related costs, of which, approximately $120,000 was related to the acquisition of AZNA and Kodeos. Additionally, in the quarter ended July 29, 2007, we incurred fees associated with our stock option investigation of $1.2 million which were offset by a decrease in legal fees associated with patent infringement litigation. General and administrative expenses include stock-based compensation charges of $631,000 in the quarter ended July 29, 2007 and $607,000 in the quarter ended July 30, 2006. General and administrative expenses as a percent of revenues increased to 7.6% in the quarter ended July 29, 2007 compared to 7.1% in the quarter ended July 30, 2006.

*Amortization of Purchased Intangibles.* Amortization of purchased intangibles increased $191,000, or 63.9%, to $490,000 in the quarter ended July 29, 2007 compared to $299,000 in the quarter ended July 30, 2006. The increase was due to the acquisition of AZNA and Kodeos in the fourth quarter of fiscal 2007.

*Interest Income.* Interest income increased $160,000, or 12.7%, to $1.4 million in the quarter ended July 29, 2007 compared to $1.2 million in the quarter ended July 30, 2006. The increase was due to increased investment balances and interest rates.

*Interest Expense.* Interest expense increased $325,000, or 8.3%, to $4.2 million in the quarter ended July 29, 2007 compared to $3.9 million in the quarter ended July 30, 2006. Of total interest expense included in the quarter ended July 29, 2007, approximately $2.6 million related to our convertible subordinated notes due in 2008 and 2010 and $1.2 million represented a non-cash charge to amortize the beneficial conversion feature of the 2008 notes. The increase in interest expense, between quarters, was primarily due to the interest recorded in the quarter ended July 29, 2007 related to convertible notes in the amount of $17.0 million, bearing interest at 5% per annum, that were issued upon the acquisition of AZNA in the fourth quarter of fiscal 2007.

*Other Income (Expense), Net.* Other expense was $133,000 in the quarter ended July 29, 2007 compared to $370,000 in the quarter ended July 30, 2006. Other expense primarily consists of amortization of subordinated loan costs offset by the gain on the sale of an equity investment in the quarter ended July 29, 2007. Other expense primarily consists of our proportional share of losses associated with a minority investment and amortization of subordinated loan costs, partially offset by a foreign exchange gain in the quarter ended July 30, 2006.

*Provision for Income Taxes.* We recorded income tax provisions of $621,000 and $631,000, respectively, for the quarters ended July 29, 2007 and July 30, 2006. The income tax provision for these periods is primarily the result of establishing a deferred tax liability to reflect tax amortization of goodwill for which no book amortization has occurred. Due to the uncertainty regarding the timing and extent of our future profitability, we have recorded a valuation allowance to offset potential income tax benefits associated

27

Table of Contents

with our operating losses. As a result, we did not record any income tax benefit in the quarters ended July 2007 or 2006. There can be no assurance that deferred tax assets subject to the valuation allowance will ever be realized.

We adopted Financial Accounting Standards Board Interpretation No. 48, "Accounting for Uncertainty in Income Taxes — an interpretation of FASB Statement No. 109" (FIN 48), in the first quarter of 2007. See "Income Taxes" in the Notes to Condensed Consolidated Financial Statements of this Form 10-Q for further discussion.

## Liquidity and Capital Resources

At July 29, 2007, cash, cash equivalents and short-term and long-term available-for-sale investments were $129.3 million compared to $132.5 million at April 30, 2006. Of this amount at July 29, 2007, long-term available-for-sale investments totaled $17.3 million of which $9.1 million was related to debt securities which were readily saleable and $8.2 million related to the conversion of an equity method investment to available-for-sale although there are market restrictions on our ability to sell the security underlying this investment. Restricted securities, used to secure future interest payments on our convertible debt were $625,000 at July 29, 2007 and April 30, 2006. At July 29, 2007, total short and long term debt was $268.3 million, compared to $267.6 million at April 30, 2006.

Net cash provided by operating activities totaled $3.5 million in the quarter ended July 29, 2007, compared to $8.5 million in the quarter ended July 30, 2006. Cash provided by operating activities for the quarter ended July 29, 2007 was primarily a result of operating losses adjusted for depreciation, amortization and non-cash related items in the income statement totaling $5.6 million offset by $2.1 million in additional working capital most of which was related to an increase in accounts receivable and a decrease in accounts payable. The cash provided by operating activities for the quarter ended July 30, 2006 was primarily a result of operating losses adjusted for depreciation, amortization and non-cash related items in the income statement totaling $13.9 million offset by $5.4 million related to lower working capital requirements primarily resulting from an increase in accounts receivable.

Net cash used in investing activities totaled $7.0 million in the quarter ended July 29, 2007 compared to $9.5 million in the quarter ended July 30, 2006. Cash invested in the quarters ended July 2007 and 2006 was primarily related equipment purchases to support production expansion and the purchase of short-term investments.

Net cash used by financing activities totaled $549,000 in the quarter ended July 29, 2007 compared to net cash provided by financing activities of $1.1 million in the quarter ended July 30, 2006. Cash used by financing activities for the quarter ended July 29, 2007 was due to repayments of borrowings. Cash provided by financing activities in quarter ended July 30, 2006 was primarily due to proceeds from the exercise of stock options and sales of stock under the employee stock purchase plan of $1.7 million partially offset by repayments on borrowings of $597,000.

We believe that our existing balances of cash, cash equivalents and short-term investments, together with the cash expected to be generated from our future operations, will be sufficient to meet our cash needs for working capital and capital expenditures for at least the next 12 months. We may however require additional financing to fund our operations in the future. A significant contraction in the capital markets, particularly in the technology sector, may make it difficult for us to raise additional capital if and when it is required, especially if we experience disappointing operating results. If adequate capital is not available to us as required, or is not available on favorable terms, our business, financial condition and results of operations will be adversely affected.

## Contractual Obligations and Commercial Commitments

At July 29, 2007, we had contractual obligations of $345.1 million as shown in the following table (in thousands):

| Contractual Obligations | Total | Payments Due by Period | | | |
| | | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
|---|---|---|---|---|---|
| Short-term debt | $ 1,925 | $ 1,925 | $ — | $ — | $ — |
| Long-term debt | 5,146 | — | 4,206 | 940 | — |
| Convertible debt | 267,200 | 66,950 | 100,250 | 100,000 | — |
| Interest on debt | 18,586 | 9,318 | 8,004 | 1,264 | |
| Lease commitment under sale-leaseback agreement | 44,703 | 3,114 | 6,439 | 6,732 | 28,418 |
| Operating leases | 4,912 | 2,213 | 2,500 | 199 | |
| Purchase obligations | 2,676 | 2,676 | | | |
| Total contractual obligations | $345,148 | $86,196 | $121,399 | $109,135 | $28,418 |

Short-term debt of $1.9 million represents the current portion of a note payable to a financial institution.

Long-term debt consists of the long-term portion of a note payable to a financial institution in the principal amount of $5.1 million.

USB FIN 002238

Convertible debt consists of a series of convertible subordinated notes in the aggregate principal amount of $100.3 million due October 15, 2008, and two series of convertible subordinated notes in the aggregate principal amount of $150.0 million due October 15, 2010. The notes are convertible by the holders of the notes at any time prior to maturity into shares of Finisar common stock at specified conversion prices. The notes are redeemable by us, in whole or in part. Annual interest payments on the convertible subordinated notes are approximately $9.0 million annually.

Interest on debt consists of the scheduled interest payments on our short-term, long-term, and convertible debt.

The lease commitment under sale-leaseback agreement includes the principal amount of $11.9 million related to the sale-leaseback of our corporate office building, which we entered into in the fourth quarter of fiscal 2005.

Operating lease obligations consist primarily of base rents for facilities we occupy at various locations.

Purchase obligations consist of standby repurchase obligations and are related to materials purchased and held by subcontractors on our behalf to fulfill the subcontractors' purchase order obligations at their facilities. Our repurchase obligations of $2.7 million have been expensed and recorded on the balance sheet as non-cancelable purchase obligations as of July 29, 2007.

On November 1, 2007, the Company entered into an amended letter of credit reimbursement agreement with Silicon Valley Bank that will be available to the Company through October 26, 2008. The terms of the new amended agreement are substantially unchanged from the previous agreement, although, the bank has waived the SEC filing requirement covenant until the Company is current with its filing requirements. Under the terms of the amended agreement, Silicon Valley Bank is providing a $15 million letter of credit facility covering existing letters of credit issued by Silicon Valley Bank and any other letters of credit that may be required by us. Outstanding letters of credit secured by this agreement at July 29, 2007 totaled $11.3 million.

## Off-Balance-Sheet Arrangements

At July 29, 2007 and April 30, 2007, we did not have any off-balance sheet arrangements or relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which are typically established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

USB FIN 002239

Table of Contents

## Item 3. *Quantitative and Qualitative Disclosures About Market Risk.*

Our exposure to market risk for changes in interest rates relates primarily to our investment portfolio. The primary objective of our investment activities is to preserve principal while maximizing yields without significantly increasing risk. We place our investments with high credit issuers in short-term securities with maturities ranging from overnight up to 36 months or have characteristics of such short-term investments. The average maturity of the portfolio will not exceed 18 months. The portfolio includes only marketable securities with active secondary or resale markets to ensure portfolio liquidity. We have no investments denominated in foreign country currencies and therefore our investments are not subject to foreign exchange risk.

We invest in equity instruments of privately held companies for business and strategic purposes. These investments are included in other long-term assets and are accounted for under the cost method when our ownership interest is less than 20% and we do not have the ability to exercise significant influence. For entities in which we hold greater than a 20% ownership interest, or where we have the ability to exercise significant influence, we use the equity method. For these non-quoted investments, our policy is to regularly review the assumptions underlying the operating performance and cash flow forecasts in assessing the carrying values. We identify and record impairment losses when events and circumstances indicate that such assets are impaired. If our investment in a privately-held company becomes marketable equity securities upon the company's completion of an initial public offering or its acquisition by another company, our investment would be subject to significant fluctuations in fair market value due to the volatility of the stock market. There has been no material change in our interest rate exposure since April 30, 2007.

## Item 4. *Controls and Procedures.*

### Evaluation of Effectiveness of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this quarterly report.

### Changes in Internal Control Over Financial Reporting

There was no change in our internal control over financial reporting during the first quarter of fiscal 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II — OTHER INFORMATION

### Item 1. *Legal Proceedings*

### Matters Related to Historical Stock Option Grant Practices

On November 30, 2006, we announced that we had undertaken a voluntary review of our historical stock option grant practices subsequent to our initial public offering in November 1999. The review was initiated by senior management, and preliminary results of the review were discussed with the Audit Committee of our Board of Directors. Based on the preliminary results of the review, senior management concluded, and the Audit Committee agreed, that it was likely that the measurement dates for certain stock option grants differed from the recorded grant dates for such awards and that we would likely need to restate our historical financial statements to record non-cash charges for compensation expense relating to some past stock option grants. The Audit Committee thereafter conducted a further investigation and engaged independent legal counsel and financial advisors to assist in that investigation. The Audit Committee concluded that measurement dates for certain option grants differ from the recorded grant dates for such awards. Our management, in conjunction with the Audit Committee, conducted a further review to finalize revised measurement dates and determine the appropriate accounting adjustments to our historical financial statements, which are reflected in this report. The announcement of the investigation, and related delays in filing this quarterly report on Form 10-Q for the quarter ended January 28, 2007 (the "January 10-Q"), our quarterly report on Form 10-Q for the quarters ended October 29, 2006 (the "October 10-Q") and July 29, 2007 (the "July 10-Q") and our annual report on Form 10-K for the fiscal year ended April 30, 2007 (the "2007 10-K"), have resulted in the initiation of regulatory proceedings as well as civil litigation and claims.

### *Nasdaq Determination of Non-compliance*

On December 13, 2006, we received a Staff Determination notice from the Nasdaq Stock Market stating that the Company was not in compliance with Marketplace Rule 4310(c)(14) because we did not timely file the October 10-Q and, therefore, that our

USB FIN 002240

common stock was subject to delisting from the Nasdaq Global Select Market. We received similar Staff Determination Notices with respect to our failure to timely file the January 10-Q, the July 10-Q and the 2007 10-K. In response to the original Staff Determination Notice, we requested a hearing before a Nasdaq Listing Qualifications Panel (the "Panel") to review the Staff Determination and to request additional time to comply with the filing requirements pending completion of the Audit Committee's investigation. The hearing was held on February 15, 2007. The Company thereafter supplemented its previous submission to Nasdaq to include the subsequent periodic reports in its request for additional time to make required filings. On April 4, 2007, the Panel granted us additional time to comply with the filing requirements until June 11, 2007 for the October 10-Q and until July 3, 2007 for the January 10-Q. We appealed the Panel's decision to the Nasdaq Listing and Hearing Review Counsel (the "Listing Council"), seeking additional time to make the filings. On May 18, 2007, the Listing Council agreed to review the Panel's April 4, 2007 decision and stayed that decision pending review of our appeal. On October 5, 2007, the Listing Council granted us an exception until December 4, 2007 to file our delinquent periodic reports and restatement. On November 26, 2007, we filed an appeal with the Nasdaq Board of Directors seeking a review of the Listing Council's decision and a stay of the decision, including the Listing Council's December 4, 2007 deadline. On November 30, 2007, the Nasdaq Board of Directors agreed to review the Listing Council's decision and stayed the decision pending further consideration. We believe that the filing of this report, and the simultaneous filing of the other delinquent reports on Form 10-K and Form 10-Q, will satisfy the conditions of the Listing Council's decision and that our common stock will continue to be listed on the Nasdaq Global Select Market.

### Securities and Exchange Commission Inquiry

In November 2006, we informed the staff of the SEC of the voluntary investigation that had been undertaken by the Audit Committee of our Board of Directors. We were subsequently notified by the SEC that the SEC was conducting an informal inquiry regarding our historical stock option grant practices. We are cooperating with the SEC's review.

### Stock Option Derivative Litigation

Following our announcement on November 30, 2006 that the Audit Committee of the Board of Directors had voluntarily commenced an investigation of our historical stock option grant practices, we were named as a nominal defendant in several shareholder derivative cases. These cases have been consolidated into two proceedings pending in federal and state courts in California. The federal court cases have been consolidated in the United States District Court for the Northern District of California. The state court cases have been consolidated in the Superior Court for the State of California for the County of Santa Clara. Plaintiffs in all cases have alleged that certain of our current or former officers and directors caused us to grant stock options at less than fair market value, contrary to our public statements (including statements in our financial statements), and that, as a result, those officers and directors are liable to the Company. No specific amount of damages has been alleged and, by the nature of the lawsuits no damages will be alleged, against the Company. On May 22, 2007, the state court granted our motion to stay the state court action pending resolution of the consolidated federal court action. On June 12, 2007, the plaintiffs in the federal court case filed an amended complaint to reflect the results of the stock option investigation announced by the Audit Committee in June 2007. On August 28, 2007, we and the individual defendants filed motions to dismiss the complaint. A hearing on the motions has been set for January 11, 2008.

### Trust Indenture Litigation

On January 4, 2007, we received three substantially identical purported notices of default from U.S. Bank Trust National Association, as trustee (the "Trustee") for our 2 1/2% Convertible Senior Subordinated Notes due 2010, our 2 1/2% Convertible Subordinated Notes due 2010 and our 5 1/4% Convertible Subordinated Notes due 2008 (collectively, the "Notes"). The notices asserted that our failure to timely file the October 10-Q with the SEC and to provide a copy to the Trustee constituted a default under each of the three indentures between us and the Trustee governing the respective series of Notes (the "Indentures"). The notices each indicated that, if we did not cure the purported default within 60 days, an "Event of Default" would occur under the respective Indenture. As previously reported, we had delayed filing the October 10-Q pending the completion of the review of our historical stock option grant practices conducted by the Audit Committee of its Board of Directors.

We do not believe that we are in default under the terms of the Indentures. We contend that the plain language of each Indenture requires only that we file with the Trustee reports that have actually been filed with the SEC, and that, since the October 10-Q had not yet been filed with the SEC, we were under no obligation to file it with the Trustee.

In anticipation of the expiration of the 60 day cure period under the notices on March 5, 2007, and the potential assertion by the Trustee or the noteholders that an "Event of Default" had occurred and a potential attempt to accelerate payment on one or more series of the Notes, on March 2, 2007, we filed a lawsuit in the Superior Court for the State of California for the County of Santa Clara against U.S. Bank Trust National Association, solely in its capacity as Trustee under the Indentures, seeking a judicial declaration that we are not in default under the three Indentures, based on our position as described above. The Trustee filed an answer to the complaint generally denying all allegations and also filed a notice of removal of the state case to the United States District Court for the Northern District of California. On October 12, 2007, the action was remanded back to state court in which it was commenced because the Trustee's notice of removal was not timely.

31

Table of Contents

As expected, on March 16, 2007, we received three additional notices from the Trustee asserting that "Events of Default" under the Indentures had occurred and were continuing based on our failure to cure the alleged default within the 60 day cure period.

On April 24, 2007, we received three substantially identical purported notices of default from the Trustee for each of the Indentures, asserting that our failure to timely file the January 10-Q with the SEC and to provide a copy to the Trustee constituted a default under each of the Indentures. The notices each indicated that, if we did not cure the purported default within 60 days, an "Event of Default" would occur under the respective Indenture. We do not believe that we are in default under the terms of the Indentures for the reasons described above.

On June 21, 2007, we filed a second declaratory relief action against the Trustee in the Superior Court of California for the County of Santa Clara. The second action is essentially identical to the first action filed on March 2, 2007 except that it covers the notices asserting "Events of Default" received in April 2007 and any other notices of default that the Trustee may deliver in the future with respect to our delay in filing, and providing copies to the SEC. The Trustee filed an answer to the complaint generally denying all allegations and filed a notice of removal to the United States District Court for the Northern District of California. We have filed a motion to remand to state court, which was heard and taken under submission on November 2, 2007.

On July 9, 2007, we received three substantially identical purported notices of default from the Trustee for each of the Indentures, asserting that our failure to timely file this Form 10 K report with the SEC and to provide a copy to the Trustee constituted a default under each of the Indentures. As before, the notices each indicated that, if we did not cure the purported default within 60 days, an "Event of Default" would occur under the respective Indenture. We do not believe that we are in default under the terms of the Indentures for the reasons described above.

To date, neither the Trustee nor the holders of at least 25% in aggregate principal amount of one or more series of the Notes have declared all unpaid principal, and any accrued interest, on the Notes to be due and payable, although the Trustee stated in its notices that it reserved the right to exercise all available remedies. As of October 31, 2007, there was $250.3 million in aggregate principal amount of Notes outstanding and an aggregate of approximately $558,000 in accrued interest.

## Patent Litigation

### DirecTV Litigation

On April 4, 2005, we filed an action for patent infringement in the United States District Court for the Eastern District of Texas against the DirecTV Group, Inc., DirecTV Holdings, LLC, DirecTV Enterprises, LLC, DirecTV Operations, LLC, DirecTV, Inc., and Hughes Network Systems, Inc. (collectively, "DirecTV"). The lawsuit involves our U.S. Patent No. 5,404,505 (the "'505 patent"), which relates to technology used in information transmission systems to provide access to a large database of information. On June 23, 2006, following a jury trial, the jury returned a verdict that our patent had been willfully infringed and awarded us damages of $78,920,250. In a post-trial hearing held on July 6, 2006, the Court determined that, due to DirecTV's willful infringement, those damages would be enhanced by an additional $25 million. Further, the Court awarded us pre-judgment interest on the jury's verdict in the amount of 6% compounded annually from April 4, 1999, amounting to approximately $13.4 million. Finally, the Court awarded us costs of $147,282 associated with the litigation. The Court declined to award us attorney's fees. The Court denied our motion for injunctive relief, but ordered DirecTV to pay us a compulsory ongoing license fee at the rate of $1.60 per set-top box activated by or on behalf of DirecTV for the period beginning June 16, 2006 through the duration of the patent, which expires in April 2012. The Court entered final judgment in our favor and against DirecTV on July 7, 2006. On September 1, 2006, the Court denied DirecTV's post-trial motions seeking to have the jury verdict set aside or reversed and requesting a new trial on a number of grounds. In another written post-trial motion, DirecTV asked the Court to allow DirecTV to place any amounts owed to us under the compulsory license into an escrow account pending the outcome of any appeal and for those amounts to be refundable in the event that DirecTV prevails on appeal. The Court granted DirecTV's motion, and payments under the compulsory license are being made into an escrow account pending the outcome of the appeal. As of October 12, 2007, DirecTV has deposited approximately $28 million into escrow. These escrowed funds represent DirecTV's compulsory royalty payments for the period from June 17, 2006 through September 30, 2007.

DirecTV has appealed to the United States Court of Appeals for the Federal Circuit. In its appeal, DirecTV raised issues related to claim construction, infringement, invalidity, willful infringement and enhanced damages. We cross-appealed raising issues related to the denial of our motion for permanent injunction, the trial court's refusal to enhance future damages for willfulness and the trial court's determination that some of the asserted patent claims are invalid. The appeals have been consolidated. The parties were ordered to participate in the appellate court's mandatory mediation program, which occurred on February 13, 2007 without resolution. The parties have filed their respective briefs with the appellate court. A neutral third party, New York Intellectual Property Law Association ("NYIPLA") filed an *amicus* brief urging the appellate court to vacate the portion of trial court's judgment denying our motion for a permanent injunction and ordering DirecTV to pay royalties pursuant to a compulsory license. Over DirecTV's objection, the appellate court accepted NYIPLA's *amicus* brief.

32

USB FIN 002242

Table of Contents

On November 19, 2007, the Court of Appeals denied NYIPLA's motion to file a reply brief. Oral arguments have been set for January 7, 2008. Subsequent to the oral arguments, it is anticipated that a decision from the appellate court will issue between March 2008 and November 2008.

### Comcast Litigation

On July 7, 2006, Comcast Cable Communications Corporation, LLC ("Comcast") filed a complaint against us in the United States District Court, Northern District of California, San Francisco Division. Comcast seeks a declaratory judgment that our '505 patent is not infringed and is invalid. The '505 patent is the same patent alleged by us in our lawsuit against DirecTV. Our motion to dismiss the declaratory judgment action was denied on November 9, 2006. As a result, on November 22, 2006, we filed an answer and counterclaim alleging that Comcast infringes the '505 patent and seeking damages to be proven at trial. The court held a claim construction hearing and, on April 6, 2007, issued its claim construction ruling. Discovery is now underway. The parties have been ordered to a mediation and settlement conference on December 13, 2007. A jury trial has been scheduled for March 3, 2008.

### EchoStar Litigation

On July 10, 2006, EchoStar Satellite LLC, EchoStar Technologies Corporation and NagraStar LLC (collectively, "EchoStar") filed an action against us in the United States District Court for the District of Delaware seeking a declaration that EchoStar does not infringe, and has not infringed, any valid claim of our '505 patent. The '505 patent is the same patent that is in dispute in the DirecTV and Comcast lawsuits. On October 24, 2006, we filed a motion to dismiss the action for lack of a justiciable controversy. The Court denied our motion on September 25, 2007. We filed our answer and counterclaim on October 10, 2007. No scheduling order has been entered in the case, and discovery has not yet begun.

### XM/Sirius Litigation

On April 27, 2007, we filed an action for patent infringement in the United States District Court for the Eastern District of Texas, Lufkin Division, against XM Satellite Radio Holdings, Inc., XM Satellite Radio, Inc., and XM Radio, Inc. (collectively, "XM"), and Sirius Satellite Radio, Inc. and Satellite CD Radio, Inc. (collectively, "Sirius"). Judge Clark, the same judge who presided over the DirecTV trial, has been assigned to the case. The lawsuit alleges that XM and Sirius have infringed and continue to infringe our '505 patent and seeks an injunction to prevent further infringement, actual damages to be proven at trial, enhanced damages for willful infringement and attorneys' fees. The defendants filed an answer denying infringement of the '505 patent and asserting invalidity and other defenses. The defendants also moved to stay the case pending the outcome of the Direct TV appeal and the re-examination of the '505 patent described below. The defendants' motion for a stay was denied. Discovery is now underway. The claim construction hearing has been set for February 6, 2008, and the trial has been set for September 15, 2008.

### Requests for Re-Examination of the '505 Patent

Three requests for re-examination of our '505 patent have been filed with the United States Patent and Trademark Office ("PTO"). The '505 patent is the patent that is in dispute in the DirecTV, EchoStar, Comcast and XM/Sirius lawsuits. On December 11, 2006, the PTO entered an order granting the first request and, on March 21, 2007, the PTO entered an order granting the second request. The third request, filed on August 1, 2007, was partially granted on September 28, 2007. We expect that the PTO will take steps to consolidate these requests into one request for re-examination. Alternately, the PTO may consolidate the first two requests and keep the third separate because it is directed to different claims than the first two requests. During the re-examination, some or all of the claims in the '505 patent could be invalidated or revised to narrow their scope, either of which could have a material adverse impact on our position in the DirecTV, EchoStar, Comcast, XM/Sirius lawsuits. Resolution of one or more re-examination requests of the '505 Patent is likely to take more than 15 months.

## Securities Class Action

A securities class action lawsuit was filed on November 30, 2001 in the United States District Court for the Southern District of New York, purportedly on behalf of all persons who purchased our common stock from November 17, 1999 through December 6, 2000. The complaint named as defendants Finisar, Jerry S. Rawls, our President and Chief Executive Officer, Frank H. Levinson, our former Chairman of the Board and Chief Technical Officer, Stephen K. Workman, our Senior Vice President and Chief Financial Officer, and an investment banking firm that served as an underwriter for our initial public offering in November 1999 and a secondary offering in April 2000. The complaint, as subsequently amended, alleges violations of Sections 11 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(b) of the Securities Exchange Act of 1934, on the grounds that the prospectuses incorporated in the registration statements for the offerings failed to disclose, among other things, that (i) the underwriter had solicited and received excessive and undisclosed commissions from certain investors in exchange for which the underwriter allocated to those investors

33

USB FIN 002243

Table of Contents

material portions of the shares of our stock sold in the offerings and (ii) the underwriter had entered into agreements with customers whereby the underwriter agreed to allocate shares of our stock sold in the offerings to those customers in exchange for which the customers agreed to purchase additional shares of our stock in the aftermarket at pre-determined prices. No specific damages are claimed. Similar allegations have been made in lawsuits relating to more than 300 other initial public offerings conducted in 1999 and 2000, which were consolidated for pretrial purposes. In October 2002, all claims against the individual defendants were dismissed without prejudice. On February 19, 2003, the Court denied defendants' motion to dismiss the complaint. In July 2004, we and the individual defendants accepted a settlement proposal made to all of the issuer defendants. Under the terms of the settlement, the plaintiffs would dismiss and release all claims against participating defendants in exchange for a contingent payment guaranty by the insurance companies collectively responsible for insuring the issuers in all related cases, and the assignment or surrender to the plaintiffs of certain claims the issuer defendants may have against the underwriters. Under the guaranty, the insurers would be required to pay the amount, if any, by which $1 billion exceeds the aggregate amount ultimately collected by the plaintiffs from the underwriter defendants in all the cases. If the plaintiffs fail to recover $1 billion and payment is required under the guaranty, we would be responsible to pay its pro rata portion of the shortfall, up to the amount of the self-insured retention under our insurance policy, which may be up to $2 million. The timing and amount of payments that we could be required to make under the proposed settlement would depend on several factors, principally the timing and amount of any payment that the insurers may be required to make pursuant to the $1 billion guaranty. The Court gave preliminary approval to the settlement in February 2005 and held a hearing in April 2006 to consider final approval of the settlement. Before the Court issued a final decision on the settlement, on December 5, 2006, the United States Court of Appeals for the Second Circuit vacated the class certification of plaintiffs' claims against the underwriters in six cases designated as focus or test cases. Thereafter, on December 14, 2006, the Court ordered a stay of all proceedings in all of the lawsuits pending the outcome of the plaintiffs' petition to the Second Circuit Court of Appeals for a rehearing en banc and resolution of the class certification issue. On April 6, 2007, the Second Circuit Court of Appeals denied the plaintiffs' petition for a rehearing, but clarified that the plaintiffs may seek to certify a more limited class. Subsequently, and consistent with these developments, the Court entered an order, at the request of the plaintiffs and issuers, to deny approval of the settlement, and the plaintiffs filed an amended complaint in an attempt to comply with the decision of the Second Circuit Court of Appeals. The plaintiffs and issuers have stated that they are prepared to discuss how the settlement might be amended or renegotiated to comply with the Second Circuit decision. If an amended or modified settlement is not reached, and thereafter approved by the Court, we intend to defend the lawsuit vigorously. Because of the inherent uncertainty of litigation, however, we cannot predict its outcome. If, as a result of this dispute, we are required to pay significant monetary damages, our business would be substantially harmed.

## Item 1A. Risk Factors

OUR FUTURE PERFORMANCE IS SUBJECT TO A VARIETY OF RISKS, INCLUDING THOSE DESCRIBED BELOW. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCUR, OUR BUSINESS COULD BE HARMED AND THE TRADING PRICE OF OUR COMMON STOCK COULD DECLINE. YOU SHOULD ALSO REFER TO THE OTHER INFORMATION CONTAINED IN THIS REPORT, INCLUDING OUR CONSOLIDATED FINANCIAL STATEMENTS AND THE RELATED NOTES. THE RISK FACTORS DESCRIBED BELOW DO NOT CONTAIN ANY MATERIAL CHANGES FROM THOSE DISCLOSED IN ITEM 1A OF OUR ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED APRIL 30, 2007.

USB FIN 002244

*We have incurred significant net losses, our future revenues are inherently unpredictable, our operating results are likely to fluctuate from period to period, and if we fail to meet the expectations of securities analysts or investors, our stock price could decline significantly*

We incurred net losses of $45.4 million, $33.0 million and $117.7 million in our fiscal years ended April 30, 2007, 2006 (as restated) and 2005 (as restated), respectively. Our operating results for future periods are subject to numerous uncertainties, and we cannot assure you that we will be able to achieve or sustain profitability on a consistent basis.

Our quarterly and annual operating results have fluctuated substantially in the past and are likely to fluctuate significantly in the future due to a variety of factors, some of which are outside of our control. Accordingly, we believe that period-to-period comparisons of our results of operations are not meaningful and should not be relied upon as indications of future performance. Some of the factors that could cause our quarterly or annual operating results to fluctuate include market acceptance of our products, market demand for the products manufactured by our customers, the introduction of new products and manufacturing processes, manufacturing yields, competitive pressures and customer retention.

We may experience a delay in generating or recognizing revenues for a number of reasons. Orders at the beginning of each quarter typically represent a small percentage of expected revenues for that quarter and are generally cancelable at any time. Accordingly, we depend on obtaining orders during each quarter for shipment in that quarter to achieve our revenue objectives. Failure to ship these products by the end of a quarter may adversely affect our operating results. Furthermore, our customer agreements typically provide that the customer may delay scheduled delivery dates and cancel orders within specified timeframes without significant penalty. Because we base our operating expenses on anticipated revenue trends and a high percentage of our expenses are fixed in the short term, any delay in generating or recognizing forecasted revenues could significantly harm our business. It is likely that in some future quarters our operating results will again decrease from the previous quarter or fall below the expectations of securities analysts and investors. In this event, it is likely that the trading price of our common stock would significantly decline.

*We may have insufficient cash flow to meet our debt service obligations, including payments due on our subordinated convertible notes*

We will be required to generate cash sufficient to conduct our business operations and pay our indebtedness and other liabilities, including all amounts due on our outstanding 2 $1/2$% convertible senior subordinated notes due 2010 totaling $100 million, our 2 $1/2$% convertible subordinated notes due 2010 totaling $50 million, and our 5 $1/4$% convertible subordinated notes due 2008 totaling $100 million. In addition, the $100 million in principal amount of our 2 $1/2$% convertible senior subordinated notes that mature in October 2010 include a net share settlement feature under which we are required to pay the principal portion of the notes in cash upon conversion. We may not be able to cover our anticipated debt service obligations from our cash flow. This may materially hinder our ability to make payments on the notes. Our ability to meet our future debt service obligations will depend upon our future performance, which will be subject to financial, business and other factors affecting our operations, many of which are beyond our control. Accordingly, we cannot assure you that we will be able to make required principal and interest payments on the notes when due.

*If we are unsuccessful in pending litigation, our payment obligations under our outstanding convertible subordinated notes could be accelerated*

The Trustee for all of our outstanding convertible subordinated notes has notified us that, in the opinion of the Trustee, we are in default under the indentures governing the respective series of notes as a result of our failure to timely file periodic reports with the Securities and Exchange Commission (the "SEC"). Although neither the Trustee nor the holders of any of the notes have declared the unpaid principal, and accrued interest, on any of the notes to be due and payable, the Trustee has stated in its notices that it reserves the right to exercise all available remedies, which would include acceleration of the notes. We do not believe that we were in default under the terms of the indentures on the basis that the plain language of each indenture requires only that we file with the Trustee reports that have actually been filed with the SEC and that, since the reports in question have not yet been filed with the SEC, we are under no obligation to file them with the Trustee. In anticipation of the assertion by the Trustee or the noteholders that "Events of Default" had occurred, and a potential attempt to accelerate payment on one or more series of the notes, we instituted litigation seeking a judicial declaration that we are not in default under the indentures. Should we be unsuccessful in this litigation, the Trustee or the noteholders could attempt to accelerate payment on one or more series of the notes. As of October 31, 2007, there was $250.3 million in aggregate principal amount of Notes outstanding and an aggregate of approximately $558,000 in accrued interest.

*We may not be able to obtain additional capital in the future, and failure to do so may harm our business*

We believe that our existing balances of cash, cash equivalents and short-term investments will be sufficient to meet our cash needs for working capital and capital expenditures for at least the next 12 months, unless our payment obligations under our

USB FIN 002245

Table of Contents

outstanding convertible subordinated notes is accelerated. We may, however, require additional financing to fund our operations in the future or to repay the principal of our outstanding convertible subordinated notes. Due to the unpredictable nature of the capital markets, particularly in the technology sector, we cannot assure you that we will be able to raise additional capital if and when it is required, especially if we experience disappointing operating results. If adequate capital is not available to us as required, or is not available on favorable terms, we could be required to significantly reduce or restructure our business operations.

### *Failure to accurately forecast our revenues could result in additional charges for obsolete or excess inventories or non-cancelable purchase commitments*

We base many of our operating decisions, and enter into purchase commitments, on the basis of anticipated revenue trends which are highly unpredictable. Some of our purchase commitments are not cancelable, and in some cases we are required to recognize a charge representing the amount of material or capital equipment purchased or ordered which exceeds our actual requirements. In the past, we have sometimes experienced significant growth followed by a significant decrease in customer demand such as occurred in fiscal 2001, when revenues increased by 181% followed by a decrease of 22% in fiscal 2002. Based on projected revenue trends during these periods, we acquired inventories and entered into purchase commitments in order to meet anticipated increases in demand for our products which did not materialize. As a result, we recorded significant charges for obsolete and excess inventories and non-cancelable purchase commitments which contributed to substantial operating losses in fiscal 2002. Should revenue in future periods again fall substantially below our expectations, or should we fail again to accurately forecast changes in demand mix, we could be required to record additional charges for obsolete or excess inventories or non-cancelable purchase commitments.

### *If we encounter sustained yield problems or other delays in the production or delivery of our internally-manufactured components or in the final assembly and test of our transceiver products, we may lose sales and damage our customer relationships*

Our manufacturing operations are highly vertically integrated. In order to reduce our manufacturing costs, we have acquired a number of companies, and business units of other companies, that manufacture optical components incorporated in our optical subsystem products and have developed our own facilities for the final assembly and testing of our products. For example, we design and manufacture many critical components including all of the short wavelength VCSEL lasers incorporated in transceivers used for LAN/SAN applications at our wafer fabrication facility in Allen, Texas and manufacture a portion of our internal requirements for longer wavelength lasers at our wafer fabrication facility located in Fremont, California. We assemble and test most of our transceiver products at our facility in Ipoh, Malaysia. As a result of this vertical integration, we have become increasingly dependent on our internal production capabilities. The manufacture of critical components, including the fabrication of wafers, and the assembly and testing of our products, involve highly complex processes. For example, minute levels of contaminants in the manufacturing environment, difficulties in the fabrication process or other factors can cause a substantial portion of the components on a wafer to be nonfunctional. These problems may be difficult to detect at an early stage of the manufacturing process and often are time-consuming and expensive to correct. From time to time, we have experienced problems achieving acceptable yields at our wafer fabrication facilities, resulting in delays in the availability of components. Poor manufacturing yields over a prolonged period of time could adversely affect our ability to deliver our subsystem products to our customers and could also affect our sale of components to customers in the merchant market. Our inability to supply enough lasers or other key components to meet our internal needs could harm our relationships with customers and have an adverse effect on our business.

### *We may lose sales if our suppliers or independent contractors fail to meet our needs*

We currently purchase several key components used in the manufacture of our products from single or limited sources, and we rely on a single independent contract manufacturer to supply us with certain key subassemblies, including printed circuit boards. We depend on these sources to meet our production needs. Moreover, we depend on the quality of the components and subassemblies that they supply to us, over which we have limited control. We have encountered shortages and delays in obtaining components in the past and expect to encounter additional shortages and delays in the future. If we cannot supply products due to a lack of components, or are unable to redesign products with other components in a timely manner, our business will be significantly harmed. We generally have no long-term contracts with any of our component suppliers or contract manufacturers. As a result, a supplier or contract manufacturer can discontinue supplying components or subassemblies to us without penalty. If a supplier were to discontinue supplying a key component, our business may be harmed by the resulting product manufacturing and delivery delays. We are also subject to potential delays in the development by our suppliers of key components which may affect our ability to introduce new products. Similarly, disruptions in the services provided by our contract manufacturers or the transition to other suppliers of these services could lead to supply chain problems or delays in the delivery of our products. These problems or delays could damage our relationships with our customers and adversely affect our business.

We use rolling forecasts based on anticipated product orders to determine our component and subassembly requirements. Lead times for materials and components that we order vary significantly and depend on factors such as specific supplier requirements, contract terms and current market demand for particular components. If we overestimate our component requirements, we may have

36

USB FIN 002246

Table of Contents

excess inventory, which would increase our costs. If we underestimate our component requirements, we may have inadequate inventory, which could interrupt our manufacturing and delay delivery of our products to our customers. Any of these occurrences would significantly harm our business.

***We are dependent on widespread market acceptance of two product families, and our revenues will decline if the market does not continue to accept either of these product families***

We currently derive substantially all of our revenue from sales of our optical subsystems and components and network test and monitoring systems. We expect that revenue from these products will continue to account for substantially all of our revenue for the foreseeable future. Accordingly, widespread acceptance of these products is critical to our future success. If the market does not continue to accept either our optical subsystems and components or our network test and monitoring systems, our revenues will decline significantly. Factors that may affect the market acceptance of our products include the continued growth of the markets for LANs, SANs and MANs and, in particular, Gigabit Ethernet and Fibre Channel-based technologies, as well as the performance, price and total cost of ownership of our products and the availability, functionality and price of competing products and technologies.

Many of these factors are beyond our control. In addition, in order to achieve widespread market acceptance, we must differentiate ourselves from our competition through product offerings and brand name recognition. We cannot assure you that we will be successful in making this differentiation or achieving widespread acceptance of our products. Failure of our existing or future products to maintain and achieve widespread levels of market acceptance will significantly impair our revenue growth.

***We depend on large purchases from a few significant customers, and any loss, cancellation, reduction or delay in purchases by these customers could harm our business***

A small number of customers have consistently accounted for a significant portion of our revenues. For example, sales to our top five customers represented 40% of our revenues in fiscal 2007. Our success will depend on our continued ability to develop and manage relationships with significant customers. Although we are attempting to expand our customer base, we expect that significant customer concentration will continue for the foreseeable future.

The markets in which we sell our optical subsystems and components products are dominated by a relatively small number of systems manufacturers, thereby limiting the number of our potential customers. Our dependence on large orders from a relatively small number of customers makes our relationship with each customer critically important to our business. We cannot assure you that we will be able to retain our largest customers, that we will be able to attract additional customers or that our customers will be successful in selling their products that incorporate our products. We have in the past experienced delays and reductions in orders from some of our major customers. In addition, our customers have in the past sought price concessions from us, and we expect that they will continue to do so in the future. Cost reduction measures that we have implemented over the past several years, and additional action we may take to reduce costs, may adversely affect our ability to introduce new and improved products which may, in turn, adversely affect our relationships with some of our key customers. Further, some of our customers may in the future shift their purchases of products from us to our competitors or to joint ventures between these customers and our competitors. The loss of one or more of our largest customers, any reduction or delay in sales to these customers, our inability to successfully develop relationships with additional customers or future price concessions that we may make could significantly harm our business.

***Because we do not have long-term contracts with our customers, our customers may cease purchasing our products at any time if we fail to meet our customers' needs***

Typically, we do not have long-term contracts with our customers. As a result, our agreements with our customers do not provide any assurance of future sales. Accordingly:

- our customers can stop purchasing our products at any time without penalty;

- our customers are free to purchase products from our competitors; and

- our customers are not required to make minimum purchases.

Sales are typically made pursuant to individual purchase orders, often with extremely short lead times. If we are unable to fulfill these orders in a timely manner, it is likely that we will lose sales and customers.

USB FIN 002247

Table of Contents

*Our market is subject to rapid technological change, and to compete effectively we must continually introduce new products that achieve market acceptance*

The markets for our products are characterized by rapid technological change, frequent new product introductions, changes in customer requirements and evolving industry standards with respect to the protocols used in data communications networks. We expect that new technologies will emerge as competition and the need for higher and more cost-effective bandwidth increases. Our future performance will depend on the successful development, introduction and market acceptance of new and enhanced products that address these changes as well as current and potential customer requirements. For example, we expect the SAN market to begin migrating from 4 Gbps to 8 Gbps product solutions in fiscal 2008 and that our ability to achieve sustained revenue growth in the markets for LAN, MAN and telecom applications will depend to a large extent on our ability to successfully develop and introduce new 10 Gbps transceiver and transponder solutions during this same period. The introduction of new and enhanced products may cause our customers to defer or cancel orders for existing products. In addition, a slowdown in demand for existing products ahead of a new product introduction could result in a write-down in the value of inventory on hand related to existing products. We have in the past experienced a slowdown in demand for existing products and delays in new product development and such delays may occur in the future. To the extent customers defer or cancel orders for existing products due to a slowdown in demand or in the expectation of a new product release or if there is any delay in development or introduction of our new products or enhancements of our products, our operating results would suffer. We also may not be able to develop the underlying core technologies necessary to create new products and enhancements, or to license these technologies from third parties. Product development delays may result from numerous factors, including:

- changing product specifications and customer requirements;

- unanticipated engineering complexities;

- expense reduction measures we have implemented, and others we may implement, to conserve our cash and attempt to achieve and sustain profitability;

- difficulties in hiring and retaining necessary technical personnel;

- difficulties in reallocating engineering resources and overcoming resource limitations; and

- changing market or competitive product requirements.

The development of new, technologically advanced products is a complex and uncertain process requiring high levels of innovation and highly skilled engineering and development personnel, as well as the accurate anticipation of technological and market trends. We cannot assure you that we will be able to identify, develop, manufacture, market or support new or enhanced products successfully, if at all, or on a timely basis. Further, we cannot assure you that our new products will gain market acceptance or that we will be able to respond effectively to product announcements by competitors, technological changes or emerging industry standards. Any failure to respond to technological change would significantly harm our business.

*Continued competition in our markets may lead to a reduction in our prices, revenues and market share*

The end markets for optical products have experienced significant industry consolidation during the past few years while the industry that supplies these customers has not. As a result, the markets for optical subsystems and components and network test and monitoring systems for use in LANs, SANs and MANs are highly competitive. Our current competitors include a number of domestic and international companies, many of which have substantially greater financial, technical, marketing and distribution resources and brand name recognition than we have. We may not be able to compete successfully against either current or future competitors. Increased competition could result in significant price erosion, reduced revenue, lower margins or loss of market share, any of which would significantly harm our business. For optical subsystems, we compete primarily with Avago Technologies, JDS Uniphase, Intel, Opnext, Optium, Sumitomo and a number of smaller vendors. For network test and monitoring systems, we compete primarily with Agilent Technologies and LeCroy. Our competitors continue to introduce improved products and we will have to do the same to remain competitive.

*Decreases in average selling prices of our products may reduce gross margins*

The market for optical subsystems is characterized by declining average selling prices resulting from factors such as increased competition, overcapacity, the introduction of new products and increased unit volumes as manufacturers continue to deploy network and storage systems. We have in the past experienced, and in the future may experience, substantial period-to-period fluctuations in operating results due to declining average selling prices. We anticipate that average selling prices will decrease in the future in

38

USB FIN 002248

Table of Contents

response to product introductions by competitors or us, or by other factors, including price pressures from significant customers. Therefore, in order to achieve and sustain profitable operations, we must continue to develop and introduce on a timely basis new products that incorporate features that can be sold at higher average selling prices. Failure to do so could cause our revenues and gross margins to decline, which would result in additional operating losses and significantly harm our business.

We may be unable to reduce the cost of our products sufficiently to enable us to compete with others. Our cost reduction efforts may not allow us to keep pace with competitive pricing pressures and could adversely affect our margins. In order to remain competitive, we must continually reduce the cost of manufacturing our products through design and engineering changes. We may not be successful in redesigning our products or delivering our products to market in a timely manner. We cannot assure you that any redesign will result in sufficient cost reductions to allow us to reduce the price of our products to remain competitive or improve our gross margins.

*Shifts in our product mix may result in declines in gross margins*

Our gross profit margins vary among our product families, and are generally higher on our network test and monitoring systems than on our optical subsystems and components. Our optical products sold for longer distance MAN and telecom applications typically have higher gross margins than our products for shorter distance LAN or SAN applications. Our gross margins are generally lower for newly introduced products and improve as unit volumes increase. Our overall gross margins have fluctuated from period to period as a result of shifts in product mix, the introduction of new products, decreases in average selling prices for older products and our ability to reduce product costs, and these fluctuations are expected to continue in the future.

*Our customers often evaluate our products for long and variable periods, which causes the timing of our revenues and results of operations to be unpredictable*

The period of time between our initial contact with a customer and the receipt of an actual purchase order may span a year or more. During this time, customers may perform, or require us to perform, extensive and lengthy evaluation and testing of our products before purchasing and using them in their equipment. Our customers do not typically share information on the duration or magnitude of these qualification procedures. The length of these qualification processes also may vary substantially by product and customer, and, thus, cause our results of operations to be unpredictable. While our potential customers are qualifying our products and before they place an order with us, we may incur substantial research and development and sales and marketing expenses and expend significant management effort. Even after incurring such costs we ultimately may not sell any products to such potential customers. In addition, these qualification processes often make it difficult to obtain new customers, as customers are reluctant to expend the resources necessary to qualify a new supplier if they have one or more existing qualified sources. Once our products have been qualified, the agreements that we enter into with our customers typically contain no minimum purchase commitments. Failure of our customers to incorporate our products into their systems would significantly harm our business.

*We depend on facilities located outside of the United States to manufacture a substantial portion of our products, which subjects us to additional risks*

In addition to our principal manufacturing facility in Malaysia, we operate smaller facilities in China and Singapore and rely on two contract manufacturers located in Asia for our supply of key subassemblies. Each of these facilities and manufacturers subjects us to additional risks associated with international manufacturing, including:

- unexpected changes in regulatory requirements;

- legal uncertainties regarding liability, tariffs and other trade barriers;

- inadequate protection of intellectual property in some countries;

- greater incidence of shipping delays;

- greater difficulty in overseeing manufacturing operations;

- greater difficulty in hiring talent needed to oversee manufacturing operations;

- potential political and economic instability; and

- the outbreak of infectious diseases such as severe acute respiratory syndrome, or SARS, which could result in travel restrictions or the closure of our facilities or the facilities of our customers and suppliers.

39

USB FIN 002249

Table of Contents

Any of these factors could significantly impair our ability to source our contract manufacturing requirements internationally.

***Our future operating results may be subject to volatility as a result of exposure to foreign exchange risks.***

We are exposed to foreign exchange risks. Foreign currency fluctuations may affect both our revenues and our costs and expenses and significantly affect our operating results. Prices for our products are currently denominated in U.S. dollars for sales to our customers throughout the world. If there is a significant devaluation of the currency in a specific country relative to the dollar, the prices of our products will increase relative to that country's currency, our products may be less competitive in that country and our revenues may be adversely affected.

Although we price our products in U.S. dollars, portions of both our cost of revenues and operating expenses are incurred in foreign currencies, principally the Malaysian ringit and the Chinese yuan. As a result, we bear the risk that the rate of inflation in one or more countries will exceed the rate of the devaluation of that country's currency in relation to the U.S. dollar, which would increase our costs as expressed in U.S. dollars. To date, we have not engaged in currency hedging transactions to decrease the risk of financial exposure from fluctuations in foreign exchange rates.

***Our business and future operating results are subject to a wide range of uncertainties arising out of the continuing threat of terrorist attacks and ongoing military actions in the Middle East***

Like other U.S. companies, our business and operating results are subject to uncertainties arising out of the continuing threat of terrorist attacks on the United States and ongoing military actions in the Middle East, including the economic consequences of the war in Iraq or additional terrorist activities and associated political instability, and the impact of heightened security concerns on domestic and international travel and commerce. In particular, due to these uncertainties we are subject to:

- increased risks related to the operations of our manufacturing facilities in Malaysia;

- greater risks of disruption in the operations of our China and Singapore facilities and our Asian contract manufacturers and more frequent instances of shipping delays; and

- the risk that future tightening of immigration controls may adversely affect the residence status of non-U.S. engineers and other key technical employees in our U.S. facilities or our ability to hire new non-U.S. employees in such facilities.

***Past and future acquisitions could be difficult to integrate, disrupt our business, dilute stockholder value and harm our operating results***

Since October 2000, we have completed the acquisition of ten privately-held companies and certain businesses and assets from six other companies. We continue to review opportunities to acquire other businesses, product lines or technologies that would complement our current products, expand the breadth of our markets or enhance our technical capabilities, or that may otherwise offer growth opportunities, and we from time to time make proposals and offers, and take other steps, to acquire businesses, products and technologies.

Several of our past acquisitions have been material, and acquisitions that we may complete in the future may be material. In 12 of our 16 acquisitions, we issued common stock or notes convertible into common stock as all or a portion of the consideration. The issuance of stock in any future transactions would dilute our stockholders' percentage ownership.

Other risks associated with acquiring the operations of other companies include:

- problems assimilating the purchased operations, technologies or products;

- unanticipated costs associated with the acquisition;

- diversion of management's attention from our core business;

- adverse effects on existing business relationships with suppliers and customers;

- risks associated with entering markets in which we have no or limited prior experience; and

- potential loss of key employees of purchased organizations.

40

USB FIN 002250

Table of Contents

Not all of our past acquisitions have been successful. During fiscal 2003, we sold some of the assets acquired in two prior acquisitions, discontinued a product line and closed one of our acquired facilities. As a result of these activities, we incurred significant restructuring charges and charges for the write-down of assets associated with those acquisitions. We cannot assure you that we will be successful in overcoming problems encountered in connection with future acquisitions, and our inability to do so could significantly harm our business. In addition, to the extent that the economic benefits associated with any of our acquisitions diminish in the future, we may be required to record additional write downs of goodwill, intangible assets or other assets associated with such acquisitions, which would adversely affect our operating results.

***We have made and may continue to make strategic investments which may not be successful, may result in the loss of all or part of our invested capital and may adversely affect our operating results***

Through fiscal 2007, we recorded minority equity investments in early-stage technology companies, totaling $52.4 million. Our investments in these early stage companies were primarily motivated by our desire to gain early access to new technology. We intend to review additional opportunities to make strategic equity investments in pre-public companies where we believe such investments will provide us with opportunities to gain access to important technologies or otherwise enhance important commercial relationships. We have little or no influence over the early-stage companies in which we have made or may make these strategic, minority equity investments. Each of these investments in pre-public companies involves a high degree of risk. We may not be successful in achieving the financial, technological or commercial advantage upon which any given investment is premised, and failure by the early-stage company to achieve its own business objectives or to raise capital needed on acceptable economic terms could result in a loss of all or part of our invested capital. In fiscal 2003, we wrote off $12.0 million in two investments which became impaired. In fiscal 2004, we wrote off $1.6 million in two additional investments, and in fiscal 2005, we wrote off $10.0 million in another investment. During fiscal 2006, we reclassified $4.2 million of an investment associated with the Infineon acquisition to goodwill as the investment was deemed to have no value. We may be required to write off all or a portion of the $11.3 million in such investments remaining on our balance sheet as of April 30, 2007 in future periods.

***We face risks of regulatory actions and inquiries into our historical stock option grant practices and related accounting, which could require significant management time and attention, and that could have a material adverse effect on our business, results of operations and financial condition***

As a result of our investigation into our historical stock option grant practices and the restatement of our prior financial statements, we may be subject to greater risks associated with litigation, regulatory proceedings and government inquiries and enforcement actions, as described in "Item 3. Legal Proceedings." We have voluntarily informed the SEC of the results of this investigation, and have been cooperating with, and continue to cooperate with, inquiries from the SEC. We are unable to predict what consequences, if any, that any inquiry by any regulatory agency may have on us. Any civil or criminal action commenced against us by a regulatory agency could result in administrative orders against us, the imposition of significant penalties and/or fines against us, and/or the imposition of civil or criminal sanctions against certain of our officers, directors and/or employees. Any regulatory action could result in the filing of additional restatements of our prior financial statements or require that we take other actions, and could divert management's attention from other business concerns and harm our business.

***We have been named as a party to derivative action lawsuits, and we may be named in additional litigation, all of which will require significant management time and attention and result in significant legal expenses and may result in an unfavorable outcome which could have a material adverse effect on our business, financial condition, results of operations and cash flows.***

We have been named as a nominal defendant in several purported shareholder derivative lawsuits concerning the granting of stock options. These cases have been consolidated into two proceedings pending in federal and state courts in California. The federal court cases have been consolidated in the United States District Court for the Northern District of California. The state court cases have been consolidated in the Superior Court for the State of California for the County of Santa Clara. Plaintiffs in all cases have alleged that certain current or former officers and directors of the Company caused it to grant stock options at less than fair market value, contrary to our public statements (including statements in our financial statements), and that, as a result, those officers and directors are liable to the Company. No specific amount of damages has been alleged and, by the nature of the lawsuits no damages will be alleged, against the Company. On May 22, 2007, the state court granted our motion to stay the state court action pending resolution of the consolidated federal court action. On June 12, 2007, the plaintiffs in the federal court case filed an amended complaint to reflect the results of the stock option investigation announced by the Audit Committee in June 2007. On August 28, 2007, we and the individual defendants filed motions to dismiss the complaint. A hearing on the motions has been set for December 7, 2007. We cannot predict whether these actions are likely to result in any material recovery by, or expense to, us. We expect to continue to incur legal fees in responding to these lawsuits, including expenses for the reimbursement of legal fees of present and former officers and directors under indemnification obligations. The expense of defending such litigation may be significant. The amount of time to resolve these and any additional lawsuits is unpredictable and these actions may divert management's attention from the day-to-day operations of our business, which could adversely affect our business, results of operations and cash flows.

41

Table of Contents

*We are subject to other pending legal proceedings*

A securities class action lawsuit was filed on November 30, 2001 in the United States District Court for the Southern District of New York, purportedly on behalf of all persons who purchased our common stock from November 17, 1999 through December 6, 2000. The complaint named as defendants Finisar, certain of our current and former officers, and an investment banking firm that served as an underwriter for our initial public offering in November 1999 and a secondary offering in April 2000. The complaint, as subsequently amended, alleges violations of Sections 11 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(b) of the Securities Exchange Act of 1934. No specific damages are claimed. Similar allegations have been made in lawsuits relating to more than 300 other initial public offerings conducted in 1999 and 2000, which were consolidated for pretrial purposes. In October 2002, all claims against the individual defendants were dismissed without prejudice. On February 19, 2003, the Court denied defendants' motion to dismiss the complaint. In July 2004, we and the individual defendants accepted a settlement proposal made to all of the issuer defendants. Under the terms of the settlement, the plaintiffs would dismiss and release all claims against participating defendants in exchange for a contingent payment guaranty by the insurance companies collectively responsible for insuring the issuers in all related cases, and the assignment or surrender to the plaintiffs of certain claims the issuer defendants may have against the underwriters. Under the guaranty, the insurers would be required to pay the amount, if any, by which $1 billion exceeds the aggregate amount ultimately collected by the plaintiffs from the underwriter defendants in all the cases. If the plaintiffs fail to recover $1 billion and payment is required under the guaranty, we would be responsible to pay our pro rata portion of the shortfall, up to the amount of the self-insured retention under our insurance policy, which may be up to $2 million. The timing and amount of payments that we could be required to make under the proposed settlement would depend on several factors, principally the timing and amount of any payment that the insurers may be required to make pursuant to the $1 billion guaranty. While the court was considering final approval of the settlement, the Second Circuit Court of Appeals vacated the class certification of plaintiffs' claims against the underwriters in six cases designated as focus or test cases. All proceedings in all of the lawsuits have been stayed, and the plaintiffs and issuers have stated that they are prepared to discuss how the settlement might be amended or renegotiated to comply with the Second Circuit decision. There is no assurance that the settlement will be amended or renegotiated to comply with the Second Circuit's ruling, and then approved. If the settlement is not amended or renegotiated and subsequently approved by the Court, we intend to defend the lawsuit vigorously. Because of the inherent uncertainty of litigation, however, we cannot predict its outcome. If, as a result of this dispute, we are required to pay significant monetary damages, our business would be substantially harmed.

*Because of competition for technical personnel, we may not be able to recruit or retain necessary personnel*

We believe our future success will depend in large part upon our ability to attract and retain highly skilled managerial, technical, sales and marketing, finance and manufacturing personnel. In particular, we may need to increase the number of technical staff members with experience in high-speed networking applications as we further develop our product lines. Competition for these highly skilled employees in our industry is intense. Our failure to attract and retain these qualified employees could significantly harm our business. The loss of the services of any of our qualified employees, the inability to attract or retain qualified personnel in the future or delays in hiring required personnel could hinder the development and introduction of and negatively impact our ability to sell our products. In addition, employees may leave our company and subsequently compete against us. Moreover, companies in our industry whose employees accept positions with competitors frequently claim that their competitors have engaged in unfair hiring practices. We have been subject to claims of this type and may be subject to such claims in the future as we seek to hire qualified personnel. Some of these claims may result in material litigation. We could incur substantial costs in defending ourselves against these claims, regardless of their merits.

*Our failure to protect our intellectual property may significantly harm our business*

Our success and ability to compete is dependent in part on our proprietary technology. We rely on a combination of patent, copyright, trademark and trade secret laws, as well as confidentiality agreements to establish and protect our proprietary rights. We license certain of our proprietary technology, including our digital diagnostics technology, to customers who include current and potential competitors, and we rely largely on provisions of our licensing agreements to protect our intellectual property rights in this technology. Although a number of patents have been issued to us, we have obtained a number of other patents as a result of our acquisitions, and we have filed applications for additional patents, we cannot assure you that any patents will issue as a result of pending patent applications or that our issued patents will be upheld. Any infringement of our proprietary rights could result in significant litigation costs, and any failure to adequately protect our proprietary rights could result in our competitors offering similar products, potentially resulting in loss of a competitive advantage and decreased revenues. Despite our efforts to protect our proprietary rights, existing patent, copyright, trademark and trade secret laws afford only limited protection. In addition, the laws of some foreign countries do not protect our proprietary rights to the same extent as do the laws of the United States. Attempts may be made to copy or reverse engineer aspects of our products or to obtain and use information that we regard as proprietary. Accordingly, we may not be able to prevent misappropriation of our technology or deter others from developing similar technology. Furthermore, policing the unauthorized use of our products is difficult and expensive. We are currently engaged in pending litigation to enforce certain of our patents, and additional litigation may be necessary in the future to enforce our intellectual property rights or to determine the validity and scope of the proprietary rights of others. In connection with the pending litigation, substantial management time has been, and will

42

USB FIN 002252

**Table of Contents**

continue to be, expended. In addition, we have incurred, and we expect to continue to incur, substantial legal expenses in connection with these pending lawsuits. These costs and this diversion of resources could significantly harm our business.

*Claims that we infringe third-party intellectual property rights could result in significant expenses or restrictions on our ability to sell our products*

The networking industry is characterized by the existence of a large number of patents and frequent litigation based on allegations of patent infringement. We have been involved in the past as a defendant in patent infringement lawsuits. From time to time, other parties may assert patent, copyright, trademark and other intellectual property rights to technologies and in various jurisdictions that are important to our business. Any claims asserting that our products infringe or may infringe proprietary rights of third parties, if determined adversely to us, could significantly harm our business. Any claims, with or without merit, could be time-consuming, result in costly litigation, divert the efforts of our technical and management personnel, cause product shipment delays or require us to enter into royalty or licensing agreements, any of which could significantly harm our business. Royalty or licensing agreements, if required, may not be available on terms acceptable to us, if at all. In addition, our agreements with our customers typically require us to indemnify our customers from any expense or liability resulting from claimed infringement of third party intellectual property rights. In the event a claim against us was successful and we could not obtain a license to the relevant technology on acceptable terms or license a substitute technology or redesign our products to avoid infringement, our business would be significantly harmed.

*Our products may contain defects that may cause us to incur significant costs, divert our attention from product development efforts and result in a loss of customers*

Our products are complex and defects may be found from time to time. Networking products frequently contain undetected software or hardware defects when first introduced or as new versions are released. In addition, our products are often embedded in or deployed in conjunction with our customers' products which incorporate a variety of components produced by third parties. As a result, when problems occur, it may be difficult to identify the source of the problem. These problems may cause us to incur significant damages or warranty and repair costs, divert the attention of our engineering personnel from our product development efforts and cause significant customer relation problems or loss of customers, all of which would harm our business.

*Our business and future operating results may be adversely affected by events outside our control*

Our business and operating results are vulnerable to events outside of our control, such as earthquakes, fire, power loss, telecommunications failures and uncertainties arising out of terrorist attacks in the United States and overseas. Our corporate headquarters and a portion of our manufacturing operations are located in California. California in particular has been vulnerable to natural disasters, such as earthquakes, fires and floods, and other risks which at times have disrupted the local economy and posed physical risks to our property. We are also dependent on communications links with our overseas manufacturing locations and would be significantly harmed if these links were interrupted for any significant length of time. We presently do not have adequate redundant, multiple site capacity if any of these events were to occur, nor can we be certain that the insurance we maintain against these events would be adequate.

*The conversion of our outstanding convertible subordinated notes would result in substantial dilution to our current stockholders*

We currently have outstanding 2 1/2% convertible senior subordinated notes due 2010 in the principal amount of $100 million, 5 1/4% convertible subordinated notes due 2008 in the principal amount of $100.3 million, and 2 1/2% convertible subordinated notes due 2010 in the principal amount of $50 million. The 5 1/4% notes are convertible, at the option of the holder, at any time on or prior to maturity into shares of our common stock at a conversion price of $5.52 per share. The $50 million in principal amount of our 2 1/2% notes are convertible, at the option of the holder, at any time on or prior to maturity into shares of our common stock at a conversion price of $3.705 per share. The $100 million in principal amount of our 2 1/2% senior notes are convertible upon our stock price reaching $4.92 for a period of time, in which case the notes are convertible at a conversion rate of 304.9055 shares of common stock per $1,000 principal amount of notes, with the underlying principal payable in cash. An aggregate of approximately 42,000,000 shares of common stock would be issued upon the conversion all outstanding convertible subordinated notes at these exchange rates, which would significantly dilute the voting power and ownership percentage of our existing stockholders. We have previously entered into privately negotiated transactions with certain holders of our convertible subordinated notes for the repurchase of notes in exchange for a greater number of shares of our common stock than would have been issued had the principal amount of the notes been converted at the original conversion rate specified in the notes, thus resulting in more dilution. Although we do not currently have any plans to enter into similar transactions in the future, if we were to do so there would be additional dilution to the voting power and percentage ownership of our existing stockholders.

43

USB FIN 002253

Table of Contents

***Delaware law, our charter documents and our stockholder rights plan contain provisions that could discourage or prevent a potential takeover, even if such a transaction would be beneficial to our stockholders***

Some provisions of our certificate of incorporation and bylaws, as well as provisions of Delaware law, may discourage, delay or prevent a merger or acquisition that a stockholder may consider favorable. These include provisions:

- authorizing the board of directors to issue additional preferred stock;

- prohibiting cumulative voting in the election of directors;

- limiting the persons who may call special meetings of stockholders;

- prohibiting stockholder actions by written consent;

- creating a classified board of directors pursuant to which our directors are elected for staggered three-year terms;

- permitting the board of directors to increase the size of the board and to fill vacancies;

- requiring a super-majority vote of our stockholders to amend our bylaws and certain provisions of our certificate of incorporation; and

- establishing advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted on by stockholders at stockholder meetings.

We are subject to the provisions of Section 203 of the Delaware General Corporation Law which limit the right of a corporation to engage in a business combination with a holder of 15% or more of the corporation's outstanding voting securities, or certain affiliated persons.

In addition, in September 2002, our board of directors adopted a stockholder rights plan under which our stockholders received one share purchase right for each share of our common stock held by them. Subject to certain exceptions, the rights become exercisable when a person or group (other than certain exempt persons) acquires, or announces its intention to commence a tender or exchange offer upon completion of which such person or group would acquire, 20% or more of our common stock without prior board approval. Should such an event occur, then, unless the rights are redeemed or have expired, our stockholders, other than the acquirer, will be entitled to purchase shares of our common stock at a 50% discount from its then-Current Market Price (as defined) or, in the case of certain business combinations, purchase the common stock of the acquirer at a 50% discount.

Although we believe that these charter and bylaw provisions, provisions of Delaware law and our stockholder rights plan provide an opportunity for the board to assure that our stockholders realize full value for their investment, they could have the effect of delaying or preventing a change of control, even under circumstances that some stockholders may consider beneficial.

***Our stock price has been and is likely to continue to be volatile***

The trading price of our common stock has been and is likely to continue to be subject to large fluctuations. Our stock price may increase or decrease in response to a number of events and factors, including:

- trends in our industry and the markets in which we operate;

- changes in the market price of the products we sell;

- changes in financial estimates and recommendations by securities analysts;

- acquisitions and financings;

- quarterly variations in our operating results;

- the operating and stock price performance of other companies that investors in our common stock may deem comparable; and

44

USB FIN 002254

**Table of Contents**

- purchases or sales of blocks of our common stock.

Part of this volatility is attributable to the current state of the stock market, in which wide price swings are common. This volatility may adversely affect the prices of our common stock regardless of our operating performance.

USB FIN 002255

Table of Contents

**Item 6.** *Exhibits*

The following exhibits are filed herewith:

31.1  Certification of Principal Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

31.2  Certification of Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

32.1  Certification of Chief Executive Officer Pursuant to 18 U.S.C.Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

32.2  Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

46

USB FIN 002256