# Exhibit B

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2008 WL 373162 (N.D.Tex.), Fed. Sec. L. Rep. P 94,577
(Cite as: Slip Copy)

CAffiliated Computer Services, Inc. v. Wilmington Trust Co.
N.D.Tex.,2008.

United States District Court,N.D. Texas,Dallas Division.
AFFILIATED COMPUTER SERVICES, INC., Plaintiff-counterdefendant,
v.
WILMINGTON TRUST COMPANY, solely in its capacity as Indenture Trustee on behalf of all Holders of Affiliated Computer Services Inc .'s 5.20% Senior Notes Due 2015 and all Holders of Affiliated Computer Services Inc.'s 4.70% Senior Notes Due 2010, Defendant-counterplaintiff.
**Civil Action No. 3:06-CV-1770-D.**

Feb. 12, 2008.

Charles W. Schwartz, Skadden Arps Slate Meagher & Flom, Houston, TX, Michelle L. Davis, Skadden Arps Slate Meagher & Flom LLP, Midlothian, TX, for Plaintiff.
John B. Orenstein, Dorsey & Whitney, Steven M. Pincus, Anthony Ostlund & Baer, Minneapolis, MN, for Defendant.

*MEMORANDUM OPINION AND ORDER*

SIDNEY A. FITZWATER, Chief Judge.
*1 This lawsuit requires the court to interpret a provision of an indenture agreement that obligates the issuer of notes to timely file certain reports with the indenture trustee. The court must decide whether the provision requires the issuer to timely file the reports with the Securities and Exchange Commission ("SEC") or merely obligates the issuer to timely file with the indenture trustee the reports that it files with the SEC, even if the SEC filings are themselves untimely. For the reasons that follow, the court agrees with the plaintiff issuer's interpretation: the provision merely requires the issuer to timely file with the indenture trustee the reports that the issuer has filed with the SEC.

I

Plaintiff-counterdefendant Affiliated Computer Services, Inc. ("ACS") sues defendant-counterplaintiff Wilmington Trust Company ("Wilmington") in Wilmington's capacity as indenture trustee ("Trustee") of two series of senior notes issued by ACS. ACS asks the court to declare that ACS is not in default under an indenture agreement ("Indenture") entered into between ACS and the Bank of New York Trust Company ("Bank of New York"). Wilmington is Bank of New York's successor as Trustee. Wilmington counterclaims for a declaratory judgment that ACS breached the Indenture by failing to timely file a Form 10-K with the SEC and by failing to furnish a Form 10-K to Wilmington as Trustee, and that ACS breached its covenant of good faith and fair dealing. Wilmington also counterclaims alleging that ACS violated § 314(a) of the Trust Indenture Act of 1939 ("TIA").

The parties essentially agree on the relevant facts. In 2005 ACS conducted a public offering of two series of senior notes ("the Notes") under the Indenture: (1) $250 million in 4.70% notes, due 2010 (the "4.70% notes"), and (2) $250 million in 5.20% notes, due 2015 (the "5.20% notes"). The Notes added two supplement agreements to the Indenture.

ACS was later investigated for backdating stock options. In response to an inquiry from the SEC and a subpoena from the Department of Justice, ACS announced in May 2006 through an SEC Form 8-K that it was initiating an internal investigation of its stock option practices. In September 2006 ACS announced through an SEC Form 12b-25 that, due to the ongoing internal investigation, it would not be timely filing its Form 10-K with the SEC for the fiscal year ending June 30, 2006. The Form 10-K was due the day before ACS made this announcement.

In response, Cede Company ("Cede"), the registered holder of record of the 5.20% notes, notified ACS and Bank of New York, the Trustee, that ACS was in default under the Indenture due to its failure to timely file the Form 10-K with the SEC. The notice of default cited § 4.03 of the Indenture as the basis for ACS's affirmative contractual duty to make timely filings with the SEC according to §§ 13 and 15(d) of the Securities Exchange Act of 1934 ("Exchange

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                           Page 2
Slip Copy, 2008 WL 373162 (N.D.Tex.), Fed. Sec. L. Rep. P 94,577
**(Cite as: Slip Copy)**

Act"). Section 4.03(a) of the Indenture provides:
*2 The Company shall file with the Trustee, within 15 days after it files the same with the SEC, copies of the annual reports and the information, documents and other reports (or copies of those portions of any of the foregoing as the SEC may by rules and regulations prescribe) that the Company is required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act. The Company shall also comply with the provisions of the TIA 314(a).

D.App. 33. The notice of default also cited § 6.01 of the Indenture, which makes the failure to comply with certain Indenture covenants or agreements an "Event of Default." *Id.* at 36 (Indenture § 6.01(3)). Section 6.01 also provides, however:A Default under clause (3) of this Section 6.01 is not an Event of Default until the Trustee notifies the Company, or the Holders of at least 25% in principal amount of the then outstanding Securities of the series affected by that Default, or, if outstanding Securities of other series are affected by that Default, then at least 25% in principal amount of the then outstanding Securities so affected, notify the Company and the Trustee, of the Default, and the Company fails to cure the Default within the period of days specified in the applicable indenture supplement after receipt of the notice. The notice must specify the Default, demand that it be remedied and state that the notice is a "Notice of Default."

*Id.* at 37-38.The parties agree that although the Indenture contemplates a cure period to be spelled out in the indenture supplements, the two indenture supplements are silent on a cure period for this type of breach. Once the cure period elapses, and the breach of the Indenture under § 6.03(3) ripens into an "Event of Default," the Indenture permits the Trustee or the holders of notes who have a right to give notice of default under § 6.01 to accelerate the Notes upon proper notice. Indenture § 6.02. Cede's notice satisfied the Indenture's notice of default provision.

ACS, in turn, filed suit against Bank of New York as Indenture Trustee seeking a declaratory judgment that ACS is not in default under the Indenture. Bank of New York, in a notice similar to Cede's, also notified ACS that it was in default on the 5.20% notes. Then Cede, and later Bank of New York,

invoked § 6.02 of the Indenture and demanded from ACS acceleration of the 5.20% notes.

Thereafter, the holders of 25% of the 4.70% notes sent ACS and Bank of New York notices of default alleging the same ground of default as had been asserted regarding the 5.20% notes. These notices complied with the Indenture's requirements for notices of default. Cede followed by delivering to ACS letters demanding acceleration of the 4.70% notes in conjunction with the earlier notices of default.

After completing a lengthy internal investigation, in January 2007 ACS finally filed its Form 10-K with the SEC for the fiscal year ending June 30, 2006. ACS also filed its belated Form 10-Q with the SEC for the first quarter of the following fiscal year ending September 30, 2006. On January 25, 2007 ACS delivered both SEC filings to the Trustee.

*3 Wilmington moves for summary judgment dismissing ASC's declaratory judgment action and establishing its right to recover on its counterclaims. ACS moves for summary judgment on its request for declaratory relief and for dismissal of Wilmington's counterclaims.[FN1]

> FN1. In its summary judgment response, Wilmington moves to strike the declarations of William Jacobs. In its reply, ACS moves to strike the declarations of Robert Lamb. Because in deciding these motions the court has not relied on the testimony in these declarations, the court denies the motions to strike as moot.

II

The Indenture's choice-of-law provision specifies that New York law controls this contract dispute. Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."*Reiss v. Fin. Performance Corp.,* 97 N.Y.2d 195, 198, 738 N.Y.S.2d 658, 764 N.E.2d 958 (2001) (quoting *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990))."[I]f a contract is unambiguous on its face, its proper construction is a question of law."*Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 373162 (N.D.Tex.), Fed. Sec. L. Rep. P 94,577
**(Cite as: Slip Copy)**

Cir.1990) (applying New York law)."Whether or not a writing is ambiguous is a question of law to be resolved by the courts."*Giancontieri,* 77 N.Y.2d at 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (citing *Van Wagner Adver. Corp. v. S & M Enters.,* 67 N.Y.2d 186, 191, 501 N.Y.S.2d 628, 492 N.E.2d 756 (1986))."Ambiguity is determined by looking within the four corners of the document, not to outside sources. And in deciding whether an agreement is ambiguous courts should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed."*Kass v. Kass,* 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998) (citations and quotations omitted). Extrinsic evidence therefore cannot be used to create an ambiguity in a contract. *Giancontieri,* 77 N.Y.2d at 163, 565 N.Y.S.2d 440, 566 N.E.2d 639. "Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law and the case is ripe for summary judgment."*Am. Express Bank Ltd. v. Uniroyal, Inc.,* 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (App.Div.1990).

Because the only matter in dispute between the parties is the construction of the Indenture, if the contract is unambiguous on its face, the court can grant summary judgment.

### III

### A

Section 4.03(a) of the Indenture unambiguously requires ACS to file with the Trustee copies of its SEC reports within 15 days of filing them with the SEC. The question is whether § 4.03(a) itself imposed on ACS the obligation to file such reports with the SEC.

The court finds persuasive the analysis of *Cyberonics, Inc. v. Wells Fargo Bank Nat'l Ass'n,* 2007 WL 1729977 (S.D.Tex. June 13, 2007).*Cyberonics* involved a declaratory judgment action focusing on an almost-identical indenture provision as is contained in § 4.03(a) of the Indenture. The provision read:
  *Reports.*The Company shall deliver to the Trustee within 15 days after it files them with the SEC copies of the annual reports and of the information, documents and other reports (or copies of such portions of any foregoing as the SEC may by rules

and regulations prescribe) which the Company is required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act .... The Company shall also comply with the other provisions of Section 314(a) of the TIA.

**\*4***Id.* at \*1.[FN2] Just as Wilmington argues that § 4.03 of the Indenture creates an independent covenant to make timely filings with the SEC, the indenture trustee in *Cyberonics* argued that the "Reports" covenant affirmatively obligated the issuing company, Cyberonics, Inc. ("Cyberonics"), to file with the SEC the reports required by §§ 13 and 15(d) of the Exchange Act. *Id.* at \*4. Because Cyberonics filed its Form 10-K report with the SEC late, the indenture trustee maintained that Cyberonics was in default under the "Reports" covenant. *Id.* at \*3-\*4.The court disagreed, holding that the "Reports" covenant unambiguously required only that Cyberonics deliver copies of the annual reports and other documents to the indenture trustee within 15 days after filing them with the SEC. *Id.* at \*4. Therefore, unless Cyberonics filed documents with the SEC, it was not obligated to deliver any SEC-related documents to the indenture trustee. Although the provision referred to "reports and of the information ... which the Company is required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act," the court noted that the phrase "which the Company is required" merely identified the types of reports that Cyberonics was required to deliver to the indenture trustee, and did not independently obligate Cyberonics to make any SEC filings. *Id.* The court concluded that had the parties intended to impose a filing, rather than a delivery, obligation, they could easily have done so. *Id.*

> FN2. The only differences between the "Reports" provision in *Cyberonics* and § 4.03(a) of the Indenture are the use of "deliver to" instead of "file with," "them" instead of "the same," and "which" instead of "that."

The court finds further support for the reasoning of *Cyberonics* from the Indenture's treatment of covenants generally. Section 4.03 is found in Article IV of the Indenture, which focuses on the covenants of ACS, the issuing company. Article IV clearly designates its other covenants by beginning an independent clause with language such as, "[t]he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Page 4
Slip Copy, 2008 WL 373162 (N.D.Tex.), Fed. Sec. L. Rep. P 94,577
**(Cite as: Slip Copy)**

Company shall" (used nine times), "[t]he Company will" (used five times), and "[t]he Company covenants" (used two times). Consistent with this approach, § 4.03(a) begins, "[t]he Company shall file with the Trustee[.]" Considering Article IV's other covenant language, there is no reasonable basis to conclude that the parties intended § 4.03's modifying phrase-"that the Company is required to file with the SEC"-to affirmatively obligate ACS to timely file with the SEC those reports and documents that it is already statutorily obligated to file under § 13 or § 15(d) of the Exchange Act. If the parties had intended that the Indenture obligates ACS to timely file reports with the SEC, it would have done so with the same clear language employed by the balance of Article IV's covenants.

Instead, properly interpreted, § 4.03(a) simply obligates ACS to file with the Trustee copies of the reports that ACS in fact files with the SEC, and to do so within 15 days of filing.

B

Wilmington contends that even if § 4. 03(a)'s language does not obligate ACS to make timely SEC filings, § 314(a) of the TIA does. Because the Notes are registered, the Indenture is "qualified" within the meaning of 15 U.S.C. § 77ccc(9). Accordingly, § 314 of the TIA must form a part of the Indenture. *See*15 U.S.C. § 77rrr(c). Moreover, the parties agree that § 4.03 explicitly incorporates § 314(a) of the TIA. Section 314(a) provides, in pertinent part:

> **\*5** Each person who, as set forth in the registration statement or application, is or is to be an obligor upon the indenture securities covered thereby shall-

> (1) file with the indenture trustee copies of the annual reports and of the information, documents, and other reports (or copies of such portions of any of the foregoing as the [SEC] may by rules and regulations prescribe) which such obligor is required to file with the [SEC][.]

15 U.S.C. § 77nnn(a).

As in § 4.03 of the Indenture, the phrase "is required to file with the [SEC]" modifies the types of reports and documents that are included in the universe of those that ACS must file with the Trustee. Thus § 314 of the TIA obligates ACS to file with Wilmington copies of the reports and documents that ACS files with the SEC, but § 314 does not require that ACS file anything with the SEC. In *Cyberonics* the court concluded that § 314(a) of the TIA "is actually less stringent than the ["Reports" covenant] because it does not specify the time by which Cyberonics must provide [the indenture trustee] with copies of information filed with the SEC."*Cyberonics, 2007 WL 1729977, at \*4.*

Wilmington argues that SEC Rule 19a-1 reflects the agency's interpretation of § 314(a)(1) to require that "eligible indenture obligors" such as ACS file timely reports with the SEC:

> An "eligible indenture obligor" that files with the indenture trustee those Exchange Act reports filed with the Commission ... has met its duty under Section 314(a)(1) of the Act (15 U.S.C. 77nn[n] (a)(1)) to "file with the indenture trustee all reports required to be filed with the Commission pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934."

17 C.F.R. § 260.19a-1(c). Under Rule 19a-1, ACS satisfies its obligations under § 314(a)(1) by filing with the Trustee "those Exchange Act reports *filed* with the Commission."*Id.* (emphasis added). This SEC rule is completely consistent with the court's construction of § 314(a): the indenture obligor need only file with the Trustee the reports and documents that it has in fact filed with the SEC. SEC Rule 19a-1 does not affirmatively require the indenture obligor to file original documents and reports with the SEC.

Wilmington also contends that the policies of the TIA support its interpretation of § 314(a). Section 302 of the TIA enumerates some practices that adversely affect the public.

> [I]t is hereby declared that the national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public, are adversely affected-...

> (4) when the obligor is not obligated to furnish to the trustee under the indenture and to such investors adequate current information as to its financial condition, and as to the performance of its obligations with respect to the securities outstanding under such indenture[.]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                      Page 5
Slip Copy, 2008 WL 373162 (N.D.Tex.), Fed. Sec. L. Rep. P 94,577
(Cite as: Slip Copy)

*6 15 U.S.C. § 77bbb(a). The Indenture's requirement that ACS deliver to the Trustee a copy of all of ACS's required SEC filings within 15 days of filing them with the SEC meets this policy concern. It ensures that the note holders through the Trustee possess the same financial information concerning the issuing company that the rest of the investment public has. Moreover, Wilmington cannot argue that it was without any current financial information on ACS from September 13, 2006, the day ACS's Form 10-K was due, until January 25, 2006, the day Wilmington received ACS's 10-K and 10-Q reports. During this four-month period, ACS did apprise the Trustee and investors of the company's financial situation and developments in its internal investigation through SEC Form 8-Ks and other public announcements.FN3 Thus Wilmington's contention that its note holders were deprived of material financial information necessary to make informed judgments has little merit. Although Wilmington would have been better protected had the Indenture affirmatively obligated ACS to timely file its Exchange Act reports directly with the SEC, the court will not rewrite the clear language of § 4.03(a) of the Indenture and § 314(a)(1) of the TIA on this basis. The court notes that, while urging the court to adopt a policy-based interpretation of the Indenture, when it suits Wilmington's purposes concerning other issues in dispute, it maintains that "Public bondholders must have assurance that indentures will be enforced *according to their terms.*"D. Reply 20 (emphasis added).

> FN3. ACS filed a Form 8-K on November 1, 2006 that included its preliminary financial information for the first quarter of the new fiscal year ending September 30, 2006, a notice that it would not timely file a Form 10-Q for that quarter on account of its ongoing internal investigation, as well as updates on the progress of the internal investigation. Later that month, in a Form 12b-25, ACS stated that it would not timely file a Form 10-Q for the first quarter ending September 30, 2006 and that it expected to complete its internal investigation before the end of the year. A few weeks later in a press release, ACS announced the completion of its internal investigation and estimated that the company's backdating practices would

cost it approximately $51 million, plus tax-related expenses. ACS's Form 10-K for the fiscal year ending June 30, 2006 confirmed the accuracy of the press release's estimates.

C

Wilmington's attempt to distinguish *Cyberonics* on the basis that the indenture in that case was not a qualified indenture is misplaced. Although the indenture in *Cyberonics* was not qualified and thus did not statutorily incorporate § 314 of the TIA, the *Cyberonics* court assumed that the indenture agreement incorporated § 314(a).*Cyberonics, 2007 WL 1729977, at *4.* But even if *Cyberonics* could be distinguished on the basis of the applicability of § 314(a) of the TIA, based on the above discussion, the court holds that § 314(a) does not provide an independent obligation for the indenture obligor to timely file reports with the SEC according to §§ 13 and 15(d) of the Exchange Act.

Wilmington argues that reducing § 4.03(a) to a delivery obligation ensuring simultaneous access of information between shareholders and bondholders renders this provision surplusage in an age of electronic filing of SEC reports. Because all public SEC filings are accessible to the public via the Internet on the EDGAR system, Wilmington urges that it would make little sense to have a specific provision in the Indenture solely dealing with the delivery of these SEC filings to the Trustee.

The court acknowledges that the value of a pure delivery obligation in the post-EDGAR world is considerably less than before it. But when the TIA was enacted in 1939, a delivery requirement would have been important, because quick access to SEC filings was not possible through other means. Thus Wilmington's argument does not apply to the court's interpretation of § 314(a) of the TIA. Moreover, because § 4.03(a) of the Indenture largely mirrors the language of § 314(a), there is no reason to believe that the parties intended it to require anything more than what § 314(a) requires, except for the addition of a 15-day delivery limit. While the parties negotiated the Indenture in 2005, the fact that § 4.03(a) largely restates § 314(a)(1) helps explain why the parties might have included a pure delivery requirement in an era of publicly-available Internet filings. But even with electronic access, a delivery

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                          Page 6
Slip Copy, 2008 WL 373162 (N.D.Tex.), Fed. Sec. L. Rep. P 94,577
**(Cite as: Slip Copy)**

requirement is not meaningless. With a delivery requirement the Trustee knows when the Indenture obligor has filed something with the SEC and is spared the time and expense of printing the documents and reports. Nevertheless, the court's construction of § 4.03(a) does not depend on speculation as to why the parties might have written § 4.03(a) as they did, but rather on § 4.03(a)'s clear language and the context of the Indenture as whole [FN4].

> FN4. As the *Cyberonics* court noted:
> [The indenture trustee] contends that because it can already obtain documents and reports filed with the SEC from the EDGAR system, [the "Reports" covenant] is meaningless if read as only requiring copies of documents already filed with the SEC and not as an obligation to actually file with the SEC. Again, [the indenture trustee's] argument overlooks the plain language of the provision. It also overlooks another crucial fact that had the parties intended to require filing of the documents, [the "Reports" covenant] could easily have been written to do just that. If, as [the indenture trustee] contends, the objective of the ["Reports" covenant] was to insure filings consistent with SEC requirements and guidelines, the parties could have simply declared so. Instead, the parties agreed that Cyberonics would deliver to [the indenture trustee] copies of reports after it had filed them with the SEC. The agreement should be enforced as it is clearly and unambiguously written, and not read as [the indenture trustee] now asserts that it should be.

> *Cyberonics,* 2007 WL 1729977, at *4 (citations omitted).

### D

**\*7** Another possible ground for ACS's purported contractual duty to timely file reports with the SEC is that § 4.03(a) of the Indenture incorporates §§ 13 and 15(d) of the Exchange Act. Section 4.03 does refer to ACS's statutory obligation to file reports under §§ 13 and 15(d) of the Exchange Act, but this reference unambiguously fails to incorporate these provisions of the Exchange Act as part of the Indenture. By contrast, § 4.03(a)'s reference to § 314(a) of the TIA clearly manifests the parties' intent to incorporate this

statutory provision as part of the Indenture. D.App. 33 (Indenture § 4.03(a) ("The Company shall also comply with the provisions of TIA 314(a).")). Moreover, § 1.03 of the Indenture specifically deals with incorporation of the TIA. "Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture." D.App. 15 (Indenture § 1.03). Because there is no comparable provision in the Indenture for references to the Exchange Act, the Indenture's reference to §§ 13 and 15(a) of the Exchange Act in § 4.03(a) unambiguously fails to make these provisions part of the Indenture.

### E

Wilmington maintains that ACS's construction of the Indenture cannot be correct, because ACS would then be able to escape its duty to provide financial information to the Trustee by not filing anything with the SEC at all. ACS is statutorily obligated, however, to file continuing reports with the SEC under the Exchange Act. Although ACS's failure to file with the SEC may not subject it to penalties under the Indenture, a late filing exposes ACS to other potential sanctions that are surely adequate to prevent ACS from attempting to take advantage of the note holders. Accordingly, the court's interpretation of § 4.03(a) does little to encourage ACS or other indenture obligors to attempt to skirt their statutory and contractual filing obligations.

### F

Wilmington insists that the court follow *Bank of New York v. Bearingpoint, Inc.,* 824 N.Y.S.2d 752 (N.Y.Sup.Ct.2006) (unpublished table decision). In *Bank of New York* a New York County trial court interpreted an Indenture provision substantially similar to § 4.03 as requiring the indenture obligor to timely file periodic reports with the SEC. *Bank of N.Y.,* 2006 WL 2670143, at *7. But *Bank of New York* is an unpublished decision of a trial court that is not binding on this court.
> In order to determine state law, federal courts look to final decisions of the highest court of the state. When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 7
Slip Copy, 2008 WL 373162 (N.D.Tex.), Fed. Sec. L. Rep. P 94,577
**(Cite as: Slip Copy)**


*Transcon. Gas Pipeline Corp. v. Transp. Ins. Co.,
953 F.2d 985, 988 (5th Cir.1992)* (citing *Comm'r of
Internal Revenue v. Estate of Bosch, 387 U.S. 456,
464-65, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967)*); *see
also O'Neill v. City of Auburn, 23 F.3d 685, 689-90
(2d Cir.1994)* ("Our task is to predict how the state's
highest court would rule on this issue"). The court
finds *Bank of New York* unpersuasive. First, the court
held that the indenture provision equivalent to §
4.03(a) incorporated the Exchange Act, thus making
§ 13 of the Exchange Act a part of the indenture
contract. *Bank of N.Y., 2006 WL 2670143, at \*3*. The
court also held that § 314(a)(1) of the TIA and the
indenture provision largely restating § 314(a)(1)
obligated the indenture issuer to timely file with the
SEC. *Id.*For the reasons set forth above, the court
respectfully disagrees with both of these conclusions.


\* \* \*


**\*8** Under § 4.03(a) of the Indenture, ACS was not
obligated to file timely reports with the SEC
according to §§ 13 and 15(d) of the Exchange Act.
Because ACS filed its belated Forms 10-K and 10-Q
with Wilmington within 15 days after filing them
with the SEC, ACS is entitled to judgment declaring
that it is not in breach of § 4.03(a) of the
Indenture.[FN5]The court therefore grants ACS's May 7,
2007 summary judgment motion, denies
Wilmington's March 27, 2007 motion, and today files
a judgment in ACS's favor.

> [FN5.] Because ACS is not in default under §
> 4.03(a) of the Indenture, the court need not
> address the parties' arguments as to the cure
> period and the acceleration of the Notes.


**SO ORDERED.**


N.D.Tex.,2008.
Affiliated Computer Services, Inc. v. Wilmington
Trust Co.
Slip Copy, 2008 WL 373162 (N.D.Tex.), Fed. Sec. L.
Rep. P 94,577


END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.