**EXHIBIT C**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---

| | |
|---|---|
| FINISAR CORPORATION, a Delaware corporation, ) ) ) ) Plaintiff, ) ) vs. ) ) U.S. BANK TRUST NATIONAL ASSOCIATION, a ) national banking association, not in its ) individual capacity, but solely in its ) capacity as Indenture Trustee on behalf ) of all Holders of Finisar Corporation's 5 ) 1/4% Convertible Subordinated Notes due ) 2008, 2 1/2% Convertible Senior ) Subordinated Notes due 2010, and 2 1/2% ) Convertible Subordinated Notes due 2010, ) and DOES 1 through 10, inclusive, ) ) ) Defendants. ) ) ) | Case No.<br><br>5:07-CV-04052<br>-JF (PVT) |

---

30(B)(6) DEPOSITION OF DIANA JACOBS
March 26, 2008
Seattle, Washington

Reported by:
Connie Recob, CCR, RMR, CRR, CLR
CCR No. 2631
Job No. Los Angeles 927362/Seattle 79041

1               EXAMINATION (Continuing)
2   BY MR. BRENNAN:
3 Q. Let me just take a detour for a moment, because we've been
4   talking about information and providing information.  Are you
5   aware that at the time that Finisar commenced this
6   litigation, that it offered to U.S. Bank to provide it as
7   well as to holders copies of its most current unaudited and
8   preliminary financial statements subject to an appropriate
9   confidentiality and nondisclosure agreement?
10 A. I am aware.
11 Q. And are you aware that that offer was made to U.S. Bank on
12   March 2nd, 2007?
13 A. I couldn't say the date exactly.  What I understand is that
14   the confidentiality agreement never came to fruition.
15              MR. BRENNAN:  I'll have our reporter mark
16   as our next exhibit in order a correspondence from Finisar
17   Corporation, Steve Workman to Thomas Tabor, vice president of
18   U.S. Bank Trust National Association, dated March 2nd, 2007.
19   And it comprises U.S. Bank's production number USB FIN 000249
20   and 000250.
21              (Exhibit No. 5 marked
22              for identification.)
23 Q. (BY MR. BRENNAN) Ms. Jacobs, do you recognize what's been
24   marked for identification as Deposition Exhibit 5?
25 A. I would have to read it.  I don't think I've read this.

1  Q.  Sure. Take a minute.

2  A.  Okay.

3  Q.  Have you previously seen the original or a copy of Exhibit 5?

4  A.  I believe I have.

5  Q.  And who provided that to you?

6  A.  Mr. Tabor, I think.

7  Q.  And when did he provide a copy of Exhibit 5 to you?

8  A.  I believe it was in the files that he sent to me.

9  Q.  Okay. If you'd look down about halfway through the first
10     paragraph, it says, "Nonetheless, in its continuing efforts
11     to do all that it reasonably can to keep the trustee and
12     holders informed of its financial condition, particularly
13     during this period when, as Finisar has previously explained,
14     it is undertaking a review of its historical stock option
15     grant practices, Finisar is further willing to provide to the
16     trustee and to holders copies of its most current unaudited
17     and preliminary financial statements subject to an
18     appropriate confidentiality and nondisclosure agreement.
19     Finisar is continuing to cooperate with the SEC to allow it
20     to make additional public disclosures of its financial
21     condition, but in the meantime the reference statement should
22     provide the trustee with substantial financial information
23     that typically would be contained in Forms 10-Q for Finisar's
24     second and third fiscal quarters."
25          Did U.S. Bank respond to Finisar's offer made on March

1     2nd, 2007, to provide then-current unaudited and preliminary
2     financial statements subject to a confidentiality and
3     nondisclosure agreement?
4  A. What I understand is that my counsel, Faegre, was in
5     negotiations with probably your firm to -- for the
6     confidentiality and nondisclosure agreement, and that you
7     could not -- parties could not come to terms. There was
8     never a confidentiality agreement finalized.
9  Q. When did Faegre or any other counsel acting on behalf of U.S.
10    Bank respond to this offer made on March 2nd, 2007?
11 A. I can't say exactly when they responded to this offer. What
12    I recall that related to this offer was the terms were
13    discussed between the parties and that they couldn't come to
14    agreement.
15 Q. Still in Exhibit 5. If you look at the second paragraph on
16    Page 1 that carries over to Page 2, it says, quote, In
17    addition to the foregoing, a transcript of Finisar's fiscal
18    second quarter 2007 financial results Web cast conducted on
19    November 30, 2006, is presently available on Finisar's Web
20    site at www.Finisar.com under the tabs Company and then
21    Investor Relations.
22         Have you ever reviewed that referenced transcript?
23 A. No.
24 Q. To your knowledge, did anyone at U.S. Bank follow up on the
25    offered information by Finisar and review the transcript of

1      Finisar's fiscal second quarter 2007 financial results?
2  A.   To my knowledge, no.
3  Q.   And why not?
4                   MR. WAHL:  You're asking her why she
5      didn't or why no one did?
6                   MR. BRENNAN:  Well, since she's the
7      designee for U.S. Bank, I'll ask her both capacities.
8                   MR. WAHL:  Object to the form.
9           Answer if you can.
10                  THE WITNESS:  Regarding the second one, I
11     can't speak to anybody else at U.S. Bank.  But the -- I guess
12     we were -- thought that what we were looking for were the
13     complete and audited 10-Qs, and that anything that wasn't as
14     robust was not -- you know, wouldn't comply with the
15     indenture.
16 Q.   (BY MR. BRENNAN) So if there was financial information that
17     would be made available to the holders and U.S. Bank that
18     would provide a significant portion of the information but
19     otherwise would be set forth in a 10-Q, U.S. Bank nonetheless
20     had no interest in that information?
21                  MR. WAHL:  Object to the form.
22                  THE WITNESS:  Yeah, I wouldn't say no
23     interest.  I would just sort of repeat what I said before.
24 Q.   (BY MR. BRENNAN) Okay.  Turning back to the paragraph we were
25     looking at on Page 1 of Exhibit 5, it continues,

1   "Furthermore, Finisar's fiscal third quarter 2007 financial
2   results Web cast is scheduled for this coming March 5, 2007,
3   at 2 o'clock p.m., PT" -- or Pacific time.  "The referenced
4   Finisar Web site can provide you further details regarding
5   accessing this coming Monday's Web cast."
6           Did you listen or participate in that Web cast?
7 A.  No.
8 Q.  To your knowledge, did Mr. Tabor do so?
9 A.  Not to my knowledge.
10 Q. To your knowledge, did anyone at U.S. Bank listen in on or
11     participate in the referenced Web cast?
12 A. Not to my knowledge.
13 Q. Why not?
14 A. I would give the same answer that I gave to your question
15    about the transcript.
16 Q. And the last paragraph of Exhibit 5 on the second page, it
17    says, quote, Please let us know as soon as possible whether
18    the proposed arrangement regarding Finisar's provision of
19    unaudited preliminary financial statements is acceptable and
20    agreeable to the trustee.  If so, Finisar will promptly
21    provide you a proposed NDA for your review and approval, end
22    quote.
23           Do you know whether Mr. Tabor got back to Finisar
24    regarding that proposed arrangement?
25 A. I don't know whether Mr. Tabor did.

1  Q.  Did you?

2  A.  What I know is that counsel -- again, as I understood it from
3      that point, it went to reviewing the NDA between -- among
4      counsel and that that's where it proceeded from there and
5      didn't go any further.

6  Q.  When was counsel involved in reviewing an NDA?

7  A.  I couldn't tell you the exact dates, but just my
8      recollection, that there was discussion back and forth about
9      the terms of the NDA.

10 Q.  Were there discussions regarding an NDA in March of 2007?

11 A.  I don't remember the dates.

12 Q.  April of 2007?

13 A.  I really don't remember the dates.  I'm sorry.

14 Q.  And not to be boorish here, but just so I can try to pin it
15     down:  What about April of 2007?  I asked that.  Let me move
16     to May -- I'm sorry -- May of 2007.

17 A.  I think there are documents, aren't there, that indicate when
18     the negotiations took place?

19 Q.  There are.  And my suggestion would be it was many months
20     after this letter was sent.  And I'm just trying to figure
21     out if you have any different recollection.

22 A.  No, I don't have a different recollection.  I didn't know how
23     much time had passed.  So if you say many months, then that
24     sounds okay.

25 Q.  Well, let's next look at an item of correspondence that is

1     dated March 5th, 2007. And it's from Steve Workman of
2     Finisar Corporation and it is addressed to Mr. Tabor, dated
3     March 5th, 2007, and it bears U.S. Bank's production number
4     USB FIN 000779 and 780.
5                            (Exhibit No. 6 marked
6                             for identification.)
7  Q. (BY MR. BRENNAN) Do you recognize what's been marked as
8     Deposition Exhibit 6?
9  A. Yes.
10 Q. Have you previously seen the original or a copy of Exhibit 6?
11 A. I believe I have.
12 Q. Who provided it to you?
13 A. Mr. Tabor.
14 Q. And when did he provide a copy of Exhibit 6 to you?
15 A. I believe it was with his files that he sent to me.
16 Q. And you'll notice that in the second paragraph of Exhibit 6,
17    it says, "In addition, in my letter to you this past Friday
18    March 2, 2007, I proposed that in Finisar's continuing
19    efforts to do all that it reasonably can to keep the trustees
20    and holders of the notes informed of its financial condition,
21    particularly during this period when, as Finisar previously
22    explained, it is undertaking review of its historical stock
23    option grant practices, Finisar would provide to the trustee
24    and to holders copies of its most current unaudited and
25    preliminary financial statements, subject to an appropriate

1    confidentiality and nondisclosure agreement NDA.

2        In furtherance of that proposal, enclosed is a form NDA

3    that we offer for U.S. Bank's review and, as we hope,

4    approval.  We further ask that in light of the foregoing and

5    the information that I furnished you in my letter this past

6    Friday, U.S. Bank withdraw its notices of default dated

7    January 4, 2007."

8        Now, do you recall whether accompanied with

9    Mr. Workman's letter to Mr. Tabor, which comprises Exhibit 6,

10   whether a draft form of NDA was also provided to U.S. Bank?

11 A. I'm trying to remember.  I can't say with certainty that it

12   was.  I assume it was since he says it was.

13 Q. Well, hopefully, Mr. Workman is a man of his word.  I've

14   experienced him to be such.

15       Let's take a look at Exhibit 7.

16                (Exhibit No. 7 marked

17                for identification.)

18 Q. (BY MR. BRENNAN) Exhibit 7 appears to be dated March 5, 2007,

19   on Finisar letterhead.  I would note for the record that

20   Exhibit 7 comprises production control numbers USB FIN

21   000776, 777, and 778, although I do believe that there is a

22   page missing from this.  And I have gone through the

23   production and just couldn't find what I think is the missing

24   page.  That's just for purposes of disclosure.

25             MR. WAHL:  I'll represent to you that we

1   processed them. If they were hard copies, they were sent to
2   a vendor for scanning. If they were produced to us
3   electronically, we reviewed them and produced them.
4       So I believe that's what there is. I assume you have
5   another page in your official files.
6           MR. BRENNAN: Yeah. I'm not making an
7   accusation; I'm just observing that there's a missing page.
8           MR. WAHL: I understand.
9 Q. (BY MR. BRENNAN) Ms. Jacobs, do you recognize what's been
10  marked as Exhibit 7?
11 A. I don't recognize this. I mean, I know what it is.
12 Q. What do you think it is?
13 A. I just don't remember -- I think it's the terms of the
14  confidentiality agreement.
15 Q. Okay. Now, did Mr. Tabor respond to Mr. Workman's March 5th
16  correspondence marked as Exhibit 6 in the March 5th NDA that
17  he sent along with it; that is, Mr. Workman sent along?
18 A. I don't know if Mr. Tabor responded.
19 Q. Did you respond to the March 5th letter and the accompanying
20  nondisclosure agreement?
21 A. To Mr. Workman?
22 Q. Yes.
23 A. No.
24 Q. Did you respond to anyone acting on behalf of Finisar with
25  respect to the March 5th, 2007, correspondence and the

1    accompanying nondisclosure agreement?

2 A. No.  What I would have done if I had this was I would have

3    forwarded it on to counsel to review.

4 Q. To your knowledge, did counsel -- and by that I assume the

5    Faegre & Benson firm.

6 A. Yes.

7 Q. Did anyone at Faegre & Benson respond to Mr. Workman or to

8    Finisar's legal counsel regarding the March 5th, 2007,

9    further offer to provide information and the enclosed NDA?

10 A. I think I can only state that I know that, as I said before,

11    there were discussions back and forth about the NDA.  So

12    that's all I can say.  I don't know if -- I don't think

13    Faegre would respond directly to Finisar.  I don't think they

14    had conversations with their legal counsel.  I think that's

15    all I can really say.

16 Q. Have you ever seen any communications from Faegre & Benson to

17    me or my law firm, for example, regarding the March 5th NDA?

18 A. What I recollect are communications back and forth regarding

19    negotiating the NDA.  I'm not sure if it was the March 5th

20    NDA.

21 Q. I had asked you earlier about annual reports in your Section

22    7.14 of the indenture.  Did you see in the production any

23    report that might have been provided at any time prior to

24    2007?

25 A. I thought that there was -- that the report that was

1  that.

2 Q. (BY MR. BRENNAN) Has U.S. Bank at any time ever sought to
3     take any action with respect to pursuing any remedy against
4     Finisar for alleged defaults under the indentures and the
5     notes?

6 A. Have we sought any remedy?

7 Q. Yes.

8 A. The only remedy under the indenture is acceleration.

9 Q. Okay. So has U.S. Bank at any time ever sought acceleration?

10 A. No.

11 Q. Why not?

12              MR. WAHL: Same objection.

13              THE WITNESS: I think that's back to the
14    same question.

15 Q. (BY MR. BRENNAN) You're not able to answer the question?

16 A. Right, correct.

17 Q. Do you understand that under the indentures that neither U.S.
18    Bank nor any of the holders could at this date notice an
19    acceleration in any event?

20              MR. WAHL: Object to the form.

21              THE WITNESS: Are you asking me if I
22    believe acceleration is not an option anymore?

23 Q. (BY MR. BRENNAN) In other words, yes.

24 A. No.

25 Q. You don't believe that?

1  A.  U.S. Bank hasn't been harmed. We're a fiduciary for the
2      bondholder, so we're concerned about the holder's interests.
3  Q.  How have the holders been harmed?
4  A.  Well, specifically I'd have to ask them. But they've gone a
5      year without any meaningful financial information, so it's --
6      imagine they could be harmed.
7  Q.  Have any of the holders indicated to U.S. Bank that they've
8      been harmed?
9                     MR. WAHL: Object to the extent it calls
10     for the conclusion of attorney/client privileged information.
11         Answer if you're able without compromising the
12     privilege.
13                    THE WITNESS: Yeah, I guess it's -- I'll
14     have to say I can't answer that.
15  Q.  (BY MR. BRENNAN) So you're not able to provide me any
16     information in terms of how the holders may have been harmed
17     as a result of Finisar's not making certain SEC filings until
18     December 4, 2007?
19  A.  Yeah. I can just say they have been not happy that they have
20     been without financial information.
21  Q.  Have any of them told you that?
22  A.  They have expressed that, yeah.
23  Q.  What have they said?
24                    MR. WAHL: Let me make the same
25     objection. Past answering that on a "yes" or "no," if you

1       its internal investigation regarding its historical stock
2       option grant practices and thus did not make certain SEC
3       periodic filings, you are aware that Finisar did make other
4       SEC filings, right?
5   A.  Yes.
6   Q.  Such as Form 8-Ks and Form 12-B25 reports?
7   A.  Yes.
8   Q.  You got copies of those at U.S. Bank, right?
9   A.  Yes.
10  Q.  And did any of the holders request copies of any of those
11      documents?
12  A.  No.
13
14
15
16
17                          **REDACTED**
                        -Pursuant to Protective Order-
18
19
20
21
22  (
23  A.  I don't believe so.
24  Q.  To your knowledge, has any holder at any time ever made a
25      request of U.S. Bank that U.S. Bank provide to it copies of

```
 1     any SEC filings that Finisar has made with the SEC?
 2  A. Provide copies to it?
 3  Q. Yes.
 4  A. I don't believe so.
 5  Q. Has U.S. Bank ever transmitted to any holders any SEC filings
 6     that Finisar has made?
 7  A. I don't believe so.
 8  Q. So then, to your observation, none of the holders would be
 9     looking to U.S. Bank as a source of SEC filings that Finisar
10     had made, right?
11             MR. WAHL:  Object to the form of the
12     question.
13             THE WITNESS:  I don't know.  They may
14     look to us as a source.
15  Q. (BY MR. BRENNAN) Well, have any of the holders made a request
16     of SEC filings that Finisar has made from U.S. Bank?
17             MR. WAHL:  Object to the form.
18             THE WITNESS:  No.
19  Q. (BY MR. BRENNAN) And U.S. Bank has never provided to any
20     holders any copies of Finisar SEC filings, right?
21  A. Right.
22  Q. So what in your mind would be the basis for any suggestion
23     that any holder would be looking to U.S. Bank as a source for
24     Finisar SEC filings?
25             MR. WAHL:  Object to the form.
```

1            THE WITNESS: Well, I don't want to
2    unequivocally rule out that they might ever ask us for it
3    just because the three holders have not.
4  Q. (BY MR. BRENNAN) Are you aware of any holder having ever
5    asked for SEC filings made for Finisar?
6  A. No.
7  Q. And you're not aware of U.S. Bank ever providing to any
8    holder any Finisar SEC filings, right?
9  A. I'm not aware of that.
10 Q. To your knowledge, how have the holders obtained information
11   regarding the status of Finisar?
12           MR. WAHL: Object to the form.
13       Answer if you're able.
14           THE WITNESS: I would be speculating.
15 Q. (BY MR. BRENNAN) You don't know?
16 A. I don't know.
17 Q. In any of the notices or annual reports that have been
18   provided by U.S. Bank to holders with U.S. Bank with respect
19   to the indentures that are the subject of this litigation,
20   has U.S. Bank ever provided any financial information
21   regarding the Finisar Corporation?
22 A. No.
23 Q. If Finisar had made filings with the SEC that U.S. Bank
24   contends would have been timely and it provided copies of
25   such reports within 15 days of their having been filed with

1     the SEC, what would U.S. Bank have done with those reports?
2                    MR. WAHL:  Object to the form.
3                    THE WITNESS:  We would have filed them.
4  Q.  (BY MR. BRENNAN) Filed them where?
5  A.  In our file.
6  Q.  And that's where they would have sat, right?
7  A.  Right.
8  Q.  U.S. Bank would not have undertaken to have forwarded any of
9      those financial reports to any holder, right?
10 A.  Right.
11 Q.  U.S. Bank has never provided any analysis regarding the
12     financial condition to any holder, has it; that is, the
13     financial condition of Finisar?
14 A.  No.
15 Q.  Has U.S. Bank ever undertaken to analyze the financial
16     condition of Finisar?
17 A.  No.
18 Q.  Have you ever undertaken any review of the financial
19     condition of Finisar?
20 A.  No.
21 Q.  Do you know what the financial condition is of Finisar?
22                   MR. WAHL:  Object to the form.
23                   THE WITNESS:  No.
24 Q.  (BY MR. BRENNAN) Have you ever reviewed the NASDAQ stock
25     trading price of Finisar?

1     pay U.S. Bank's claim fees in exchange for dismissal or
2     discontinuation of litigation?
3  A. I don't recollect that, but --
4  Q. But for the claim fees by U.S. Bank, what purpose did
5     continuing with the litigation serve in terms of U.S. Bank's
6     interests?
7              MR. WAHL:  Object to the form.
8              THE WITNESS:  It's really as a fiduciary
9     for our holders, we need a ruling from the judge so that we
10    can assess -- you know, our holders can assess what their
11    next steps would be.
12 Q. (BY MR. BRENNAN) Have the holders been informed that there
13    are three Federal District Courts that have ruled on this
14    issue?
15 A. Yes.
16 Q. And have any of the holders indicated they need more guidance
17    than those three Federal Court decisions?
18             MR. WAHL:  Let me instruct you not to
19    answer in such a way that would compromise the
20    attorney/client privilege, but answer if you can.
21             THE WITNESS:  No.
22 Q. (BY MR. BRENNAN) I'm sorry?
23 A. No.
24 Q. Is there something that U.S. Bank feels it needs more than
25    the three District Court opinions that have been issued?

```
 1    STATE OF WASHINGTON )      I, Connie Recob,
                          ) ss   CCR 2631 a
 2    County of Snohomish )      duly authorized Notary
                                 Public in and for the
 3                               State of Washington
                                 residing at Everett,
 4                               do hereby certify:

 5

 6
              That the foregoing deposition of DIANA JACOBS was
 7    taken before me and completed on March 26, 2008, and
      thereafter was transcribed under my direction; that the
 8    deposition is a full, true and complete transcript of the
      testimony of said witness, including all questions, answers,
 9    objections, motions and exceptions;

10            That the witness, before examination, was by me
      duly sworn to testify the truth, the whole truth, and nothing
11    but the truth, and that the witness reserved the right of
      signature;
12
              That I am not a relative, employee, attorney or
13    counsel of any party to this action or relative or employee
      of any such attorney or counsel and that I am not financially
14    interested in the said action or the outcome thereof;

15            That I am herewith securely sealing the said
      deposition and promptly delivering the same to Attorney
16    STERLING A. BRENNAN.

17            IN WITNESS WHEREOF, I have hereunto set my hand and
      affixed my official seal this 10th day of April, 2008.
18

19

20
                    Connie Recob
21                  Notary Public in and for the State
                    of Washington, residing at Everett.
22

23

24

25
```