# Exhibit A

Calendar No. 266

| 76TH CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 248 |

# TRUST INDENTURE ACT OF 1939

APRIL 4 (legislative day, APRIL 3), 1939.—Ordered to be printed

Mr. BARKLEY, from the Committee on Banking and Currency, submitted the following

# REPORT

[To accompany S. 2065]

The Committee on Banking and Currency, to whom was referred the bill (S. 2065) to provide for the regulation of the sale of certain securities in interstate and foreign commerce and through the mails, and the regulation of the trust indentures under which the same are issued, and for other purposes, having considered the same, report favorably thereon without amendment, and recommend that the bill do pass.

The bill (S. 2065) is a substitute for the bill (S. 477), introduced on January 10, 1939, upon which hearings were held on February 7, 8, and 9, 1939, before the Securities and Exchange Subcommittee of the Committee on Banking and Currency. Similar proposed legislation was before the Seventy-fifth Congress, and after extensive hearings before such subcommittee in June 1937, was favorably reported by the Committee on Banking and Currency on April 19, 1938.

There follows a general statement of the reasons for the proposed legislation and an analysis of the bill as reported.

## I. GENERAL STATEMENT

### A. INTRODUCTORY

The primary purposes of S. 2065 are threefold:

1. To provide full and fair disclosure, not only at the time of original issue of bonds, notes, debentures, and similar securities, but throughout the life of such securities.

2. To provide machinery whereby such continuing disclosure may be made to the security holders, and whereby they may get together for the protection of their own interests.

2               TRUST INDENTURE ACT OF 1939

3. To assure that the security holders will have the services of a disinterested indenture trustee, and that such trustee will conform to the high standards of conduct now observed by the more conscientious trust institutions.

These objectives are to be accomplished by establishing statutory standards to which trust indentures must conform.

The bill has the same constitutional basis as the Securities Act of 1933, as amended (hereinafter called the Securities Act), namely, the public offering of securities by the use of the mails or of means and instruments of transportation or communication in interstate commerce. In general, the bill applies only to trust indentures which are now required to be submitted to the Securities and Exchange Commission as part of a Securities Act registration statement covering the bonds to be issued thereunder. (Notes, debentures, evidences of indebtedness, and similar securities present identical problems, but for convenience of reference the term "bond" alone will be used in this report.) All trust indentures so filed must now be examined by the Commission in order to determine whether their terms have been fairly disclosed in the registration statement and prospectus. The bill would merely require the Commission to determine also, in the course of such examination, whether the terms of such indentures conform to the standards prescribed by the bill.

These standards in no wise affect the strictly "business" features of indentures. The Commission will have no jurisdiction over such matters as the wisdom of the issue or the amount of security to be given therefor, or the offering price, maturity date, interest rate, or sinking-fund provisions. Its only function will be to see that the provisions which relate to the protection and enforcement of the rights of the investors conform to the prescribed standards. To the fullest extent deemed practicable, these standards take the form of specific statutory requirements rather than general legislative standards to be administered by the Commission. Twenty-six of the thirty pages of the bill which relate to the provisions of the indenture can be copied from the bill into the indenture itself, or incorporated therein by reference. As to the remaining four pages, it has been found necessary to provide a means of adapting the requirements to issuers and indentures of divers types.

The Commission's work will be completed when the form of indenture has been qualified under the bill, except for the rule-making power conferred upon it by section 314 with respect to periodic reports and summaries thereof, which is discussed in paragraph 2, on page 5 of this report. The Commission will have no powers with respect to the enforcement of the provisions of the indenture. After the indenture has been executed it will be enforceable only by the parties, like any other contract.

Provision for small issuers is made in section 304 (a) (8) of the bill, which exempts securities not issued under indentures, and those issued under indentures which are limited to $1,000,000 in amount, subject only to the limitation that the exemption may not be applied in any one year to more than $1,000,000 of any such securities to which the qualification requirements would otherwise apply.

The bill reported by the committee has the approval of the Securities and Exchange Commission. Every draft of the bill was scrutinized by the Special Committee on Mortgage Trusteeships, which was

appointed by the American Bankers Association and is composed of the trust officers of 14 trust institutions in various parts of the country. The committee is advised that a majority of that committee believes that the bill is workable, and does not oppose its adoption. That is also the official position of the American Bankers Association. In addition, the reported bill has the approval of a Special Committee of the National Association of Mutual Savings Banks, which is interested from the investor standpoint.

## B. SCOPE OF THE PROBLEM

1. *Widespread use of trust indenture device.*—Although the trust indenture was originally devised to meet technical legal requirements in connection with the enforcement of mortgages securing obligations held by several holders, its use has become a practical necessity where bonds are to be nationally distributed among investors in a number of States, whose individual holdings are likely to be small. Even if the average bondholder had the necessary initiative and knowledge, it would require a disproportionate expenditure of time and money for him to attempt to make an individual check upon the performance of the obligations assumed by the obligor, or to enforce his rights by individual action. Duplication of effort and expense is avoided through the issuance of the bonds under a trust indenture which vests in the indenture trustee powers with respect to enforcement of the issuer's obligations and the bondholders' rights. The increasing complexity of corporate financial transactions has led to the extension of the trust indenture device to unsecured bonds as well as mortgage bonds, and has made it inevitable that many important provisions affecting the rights of the bondholders appear only in the indenture and are incorporated in the bonds themselves solely by general reference to the indenture. The bond itself is still merely one sheet of paper. But the indenture is an elaborate legal document from 50 to 200 pages long which, although the bondholder rarely sees it and could not understand it, legally constitutes part of his contract.

2. *Nature and manner of preparation of trust indenture.*—In form the trust indenture is a contract between the borrower, the indenture trustee, and the holders of the bonds issued under the indenture. The real parties in interest, however, are the borrower and the investing public. The investment banker who underwrites the offering is not a real party in interest. Although the underwriter may temporarily become the owner of the bonds, it is only with the intention of distributing them to the public.

Where securities are nationally distributed, the investing public cannot participate in the drafting of the indenture or the determination of its terms, because the indenture must be executed before the bonds are issued and before the identity of the ultimate purchasers—the real lenders—can be ascertained. Even if they had the necessary knowledge, they are not in a position to look after their own interests. Statistics show that the trustee has little voice in the drafting. The trust indenture is ordinarily prepared by the attorneys for the borrower or its investment bankers, or both, before the securities are publicly offered.

3. *National importance of the problem.*—To the extent that the types of trust indenture now in common use are inadequate, it is clear that such inadequacy presents a national problem which cannot be dealt

with effectively by the States, for it is conservatively estimated that more than 40 billions of securities which have been nationally distributed are now outstanding under trust indentures, and in the 2 years and 8 months ended December 31, 1938, over 4¼ billions of additional securities which would have been affected by this bill were registered under the Securities Act. Although the Commission's actual registration records show that New York and Chicago institutions were awarded trusteeships under 80.2 percent in dollar amount of all such issues of more than $1,000,000, and that the inclusion of institutions located in 7 other financial centers brings this percentage up to 95.0 percent, the securities themselves were nationally distributed to the investing public by use of the mails or in interstate commerce.

### C. DEFICIENCIES IN TRUST INDENTURES

The hearings before the Securities and Exchange subcommittee of this committee and the reports [1] of the Securities and Exchange Commission made to the Congress pursuant to section 211 of the Securities Exchange Act of 1934 furnish ample evidence of the necessity for improvement in the types of trust indenture now in common use. The enumeration of defects, contained in section 302 of the bill, is based upon the records of the public hearings conducted by the Commission under such section, and upon the Commission's reports of its study, pursuant to such section, of more than 400 trust indentures of issuers of all types, most of them made after 1920. It is also based upon the Commission's examination of approximately 600 indentures filed with it since June 30, 1933, as part of registration statements under the Securities Act covering securities to be issued thereunder. Such examination is necessary in order to ascertain that full disclosure of the terms of the indenture has been made in the prospectus.

The record of the hearings on this bill discloses the prevalence of the following deficiencies in the approximately 1,000 indentures examined by the Commission.

1. *Failure to provide adequate check on issuer's performance.*—Many of these indentures failed to require the issuer to provide the trustee with adequate evidence of the performance of its obligations under the indenture, including its obligations with respect to recording the indenture, or with respect to the application of the proceeds of the issue to the purposes specified in the indenture. Many of them failed to require the issuer to provide the trustee with adequate evidence of the actual performance of the conditions precedent, prescribed by the indenture, to the issuance of additional securities, to the release or substitution of property subject to the lien of the indenture, or to other action by the trustee under the indenture. Many of these indentures contained provisions which make certificates of officers of the issuing company itself conclusive evidence of the performance of such obligations or conditions, even in cases where ordinary prudence would require insistence upon a supporting certificate by some independent person. The Commission's reports of its studies pursuant to section 211 of the Securities Exchange Act contains case histories demonstrating that the consequences of such deficiencies may be disastrous to investors.

[1] Particular reference is made to the Report on the Study and Investigation of the Work, Activities, Personnel, and Functions of Protective and Reorganization Committees, pt. VI, Trustees Under Indentures (June 18, 1936).

To the extent that trust indentures provide adequate machinery for making an effective check on such matters, a competent, vigilant trust institution can render a valuable service to the bondholders by keeping a watchful eye on the actual performance by the issuer of the more important obligations and conditions established by the indenture, without materially increasing the burden on the issuer or the indenture trustee itself. The more conscientious trust institutions do in practice assume that responsibility and make a sincere effort to discharge it, within the limitations imposed by inadequacies in the indentures themselves. But even if the indenture provisions were adequate in this regard, some trust institutions, adhering to the traditional mechanical view of their functions, and, lulled into passivity by exculpatory clauses (discussed in paragraph 4 below) which relieve the trustee of any real responsibility, may fail to discover that the required evidence has not been furnished, or that the evidence furnished indicates a violation of the indenture.

These deficiencies will be corrected by section 315 (a) of the bill, which relates to the duties of the trustee in the period before default, and section 315 (d) (2), which provides a measure of control over the kind of certificate or opinion on which the trustee will be entitled to rely. Section 315 (a) does not mean that, in the period before default, the trustee will have to "interfere with the management" of the issuer's business, in order to avoid the risk of liability for noncompliance with some vague standard of conduct. As section 315 (d) (1) indicates, the indenture provisions relating to the duties of the trustee, in the period before default, will be perfectly specific and clear. The only requirement is that the indenture provisions themselves be drafted in the light of the "prudent man" standard, e. g. as to the kind of evidence which the issuer must furnish to the trustee with respect to the performance of important obligations and conditions imposed upon the issuer by the indenture.

2. *Failure to provide for adequate disclosure to the bondholder.*—With a few recent exceptions, none of the indentures studied, including those filed under the Securities Act, required the transmission to the bondholders of periodic reports, such as stockholders customarily receive, so that the bondholders might be kept currently advised of the condition of their investment; none of them required the trustee to notify the bondholders of even the most serious defaults; and none of them established machinery for the transmission of such reports or notices to the bondholders, through a provision for the maintenance by the trustee of bondholders' lists. A substantial proportion of these indentures even failed to require the issuer to file an annual report with the indenture trustee. Where such provisions are lacking, the bondholder's first warning of disaster may well be the return of an interest coupon unpaid, or a circular announcing the formation of a committee for the protection of his interests.

These deficiencies will be corrected by sections 312, 314, and 315 (b) of the bill. Section 314, in language similar to that of section 15 (d) of the Securities Exchange Act, writes into the indenture a requirement that the issuer file with the indenture trustee, as well as with the Commission, periodic reports similar to those which registrants under the Securities Act must now undertake to file with the Commission. The issuer will be able to avoid additional expense by consolidating these two reports into one, pursuant to rules which the Commission

is authorized to make by section 307 (b). Section 314 (a) (2) also requires the transmission of summaries of these periodic reports to the bondholders. Here, also, the issuer may avoid additional expense by furnishing the same type of summary report to its stockholders.

Under section 315 (b) the trustee will be required to notify the bondholders of important defaults. Section 312 (to be discussed below) writes into the indenture, in the language of the statute, machinery for the transmission of such reports and notices to the bondholders.

3. *Obstacles to concerted action by bondholders.*—Most of the indentures examined contained the so-called "ostrich clause," under which the trustee may conclusively assume that there is no default, even if it has actual knowledge thereof, until it receives notice from the holders of 10 percent or more of the bonds. If a bondholder desires to communicate with his fellow bondholders (who may number hundreds or even thousands scattered throughout several States), in order to assemble the required percentage, or the even larger percentage which is generally required in order to force the trustee to take action, the first essential is a list of the names and addresses of the bondholders. Generally the issuing company itself will have the only available list, derived from the "ownership certificates" which it is now required to procure, under the Federal income-tax regulations, in connection with payments of interest. The bondholder must either resort to publication, or wait until the issuer yields its list of bondholders to some favored protective committee. Nearly 80 percent of the 943 protective committees which reported to the Commission in the course of its study obtained their lists from the underwriters or from the company itself, and as a result many of such committees were largely composed of persons connected with the underwriters or the issuer itself. Case histories set forth in the Commission's reports of its studies demonstrate the consequences to the bondholders.

Section 312 of the bill meets the problem of restoring to the bondholders control of their own destinies by providing that the indenture shall include a requirement that the issuing company furnish to the trustee at stated intervals or at the request of the trustee, information in its possession or control as to the names and addresses of the bondholders. It also contains provisions under which the trustee must either give the bondholders access to such lists, or, without disclosing the list itself, mail out, on the request and at the expense of any bondholder, communications supplied by him relating to the rights of the bondholders.

4. *Trustee's freedom from responsibility.*—Almost all of the indentures examined contained provisions which, despite the occurrence of specified defaults, absolved the trustee from any duty to act unless it received a demand for action from the holders of 25 percent or more of the bonds, and indemnity against expense and liability, notwithstanding the general provision which gives the trustee a prior lien for such expense or liability upon the mortgaged property or proceeds of suit. Many of the indentures contained a further provision under which the trustee retained the power to elect the remedy to be pursued, unless the holders of a majority of the bonds joined in a request requiring the trustee to take a particular type of action. In addition, practically all of the indentures examined expressly exempted the trustee from liability except for negligence. In some of them, the exemption excepted only wilful misconduct.

Since trust indentures rarely contain provisions requiring notice to the bondholders even of serious defaults, and since the obligor itself commonly controls the bondholders' lists, provisions of the sort referred to above constitute a serious obstacle to efforts by bondholders to procure prompt and effective action for the protection and enforcement of their rights through representatives of their own selection.

In the critical period which follows the occurrence of a default and precedes the organization of the bondholders in their own interests, a conscientious trustee will take such action as ordinary prudence dictates for the protection and enforcement of the bondholders' rights. Such a trustee may take steps to impound the rents and profits of the mortgaged property for the benefit of the bondholders, either through entry into possession itself or through procuring the appointment of a receiver. It may also institute proceedings to enjoin violations of the bondholders' rights or to recover assets improperly diverted or withheld. Where receivership or foreclosure proceedings or proceedings for reorganization under chapter X of the Bankruptcy Act are instituted, the indenture trustee can keep a watchful eye on all steps taken in those proceedings which may adversely affect the interests of the bondholders, and, as the representative of all of the bondholders, may take appropriate action to insure fair treatment for minority bondholders. If, however, the indenture trustee accepts the traditional view that it is merely a mechanical, clerical agency, as in fact it is under the terms of the typical modern trust indenture, the trustee can safely fail to exercise its powers even where action is imperative. Case histories are cited in the Commission's reports of its study.

The purpose of section 315 (c) is to raise all indenture trustees to the standard of conduct observed by the more conscientious trust institutions by requiring them, in the event of default, to act as a prudent man would act under the circumstances if he were a fiduciary. Section 315 (d) prohibits the inclusion in the indenture of clauses exempting the trustee from liability for its own negligence. At the same time, reasonable safeguards are provided by that section protecting the trustee where it acts at the direction of the holders of a majority of the bonds, or in reliance upon certificates or opinions which conform to the requirements of the indenture, or where it makes an error of judgment after reasonable investigation of the facts. A further safeguard is provided by section 315 (e), which discourages the bringing of groundless suits against the trustee by permitting the court to require the filing of an undertaking for costs, and to assess reasonable costs, including attorney's fees, against the plaintiff. A similar provision recently enacted in New York has effectively protected trustees against baseless actions for accountings.

5. *Failure to prohibit materially conflicting interests.*—Few of the indentures examined contained any restrictions upon the possession or acquisition by the trustee of interests materially conflicting with those of the bondholders. Some of the indentures specifically permitted them. It is difficult in many cases quantitatively to estimate the effect of too close affiliations with the obligor or with underwriters of its outstanding securities, the ownership of substantial amounts of other securities of the obligor, or the occupancy of a creditor position with respect to the obligor. It is clear, however, that the existence of such relationships does have a tendency to dilute the loyalty of the indenture trustee.

Section 310 (b) of the bill requires that there be written into the indenture, in the language of the statute, a provision which in effect prohibits certain specified materially conflicting interests. And, where the trustee is also a creditor of the obligor, section 311 prevents the trustee from improving its own creditor position at the expense of the bondholders, within 4 months prior to a principal or interest default under the indenture, or after such a default.

### E. NECESSITY FOR LEGISLATION

While the Securities Act requires a registrant to disclose what provisions the indenture contains, it does not require a disclosure of the reasons why the inclusion of certain provisions in the indenture, or the omission of other provisions therefrom, is prejudicial to the investor. For the average investor, the most elaborate explanation would not suffice to make him realize why the deficiencies referred to above operate to his disadvantage. In other words, the disclosure requirements of the Securities Act do not provide an adequate corrective. This conclusion is supported by the fact that the Commission's examination of the approximately 600 trust indentures filed with it under the Securities Act has disclosed substantially the same deficiencies as those found to exist in the 400 defaulted trust indentures examined in the course of its study pursuant to section 211 of the Securities Exchange Act.

Long ago the States found it necessary to establish legislative controls over the form of insurance policies for the protection of the purchasers of those policies. Investors in securities issued under indentures are in no better position to protect themselves than insurance policyholders formerly were. The bill will give them comparable protection. The bill will also reinforce the efforts now being made by progressive corporate trust officers, through their professional associations, to improve trust-indenture practice through formulating standards to which their members endeavor to adhere. Those efforts are now severely handicapped by the fact that if one institution refuses to accept a particular form of trust indenture the obligor can shop around until it finds an institution which will accept it.

### F. OPERATION OF THE BILL

1. *General.*—The provisions of section 318 of the bill are designed to make disclosure more effective, as respects indenture provisions relative to definition of default, releases and substitutions, and the issuance of additional securities under the indenture. That section requires that the prospectus contain an analysis of the effect of such "business" provisions, and provides an exemption from the civil and criminal liability provisions of the Securities Act with respect to any such analysis.

With respect to the non-business features of the indentures at which the bill is directed, however, it is considered both necessary and practicable to operate directly upon the provisions themselves. The bill proceeds on the theory that the proper remedy is to correct these deficiencies in the trust indenture, and that the appropriate time to correct those deficiencies is before the bonds are offered in interstate commerce or through the mails. If this is done, it is believed that the enforcement of the provisions of the indenture may appropriately be left to the bondholders themselves, without continuing supervision by a governmental agency.

2. *Outline of procedure.*—In its essentials, the bill requires that all bonds, the public offering of which is subject to the bill, be issued under a "qualified" indenture. An application for qualification must be filed with the Commission, and becomes effective 20 days after such filing, unless the Commission institutes refusal order proceedings within that time.

The procedure for the qualification of the indenture has been carefully geared to the registration procedure of the Securities Act in other respects as well, but it has been necessary to depart from the Securities Act procedure in a few respects. For example, once an application for qualification has become effective, the Commission has no power, under the bill, to issue a "stop order," analogous to that provided for in section 8 (d) of the Securities Act, barring further offerings of bonds to be issued under the indenture. Under the Securities Act the problem is merely one of disclosure of the material facts and any deficiencies can readily be corrected. Under the bill, the question is whether the indenture conforms to the statutory standards, and it would be difficult to correct inadequacies discovered after the indenture had been executed and some of the securities sold.

Since the Commission will not have the "second line of defense" provided by the stop-order machinery, it is considered unwise to impose a mandatory requirement that refusal order proceedings be instituted within a shorter period than the 20 days provided in section 306 (c) of the bill, although in many cases the Commission will undoubtedly be able to complete its examination and give the issuer an opportunity to correct any defects in the indenture within a considerably shorter time.

3. *Integration with Securities Act and other acts.*—With the single exception of securities issued in connection with voluntary or judicial reorganizations, the bill will apply only to trust indentures which are now required to be filed with the Securities and Exchange Commission as part of a Securities Act registration statement. The only information which would ordinarily be required under the bill, in addition to that already required under the Securities Act, would be information relating to the trustee's freedom from those conflicting interests which are, in effect, prohibited by section 310 (b). Section 307 (b) authorizes the Commission to provide for the consolidation of applications, reports and proceedings under this bill with those required under the Securities Act or other Acts, with the result that issuers in most cases will be able to file a single statement complying with the requirements of both acts.

The 26 pages of nondiscretionary provisions will, of course, not involve any procedure additional to that already necessary under the Securities Act. So far as the trustee's freedom from conflicting interests is concerned, the data necessary for a determination should be contained in the application for qualification itself, and hearings would be necessary only in doubtful cases. With respect to the only three indenture provisions not covered by specific statutory prescription (i. e., those relating to the duties of the trustee before default, the kind of default of which notice must be given, and the type of certificate or opinion upon which the trustee will be entitled to rely, it should be noted that it will undoubtedly be possible to cover large portions of the field by general rules and regulations in the 6 months' period before the bill becomes effective, and from time to time thereafter as administrative experience is accumulated.

In doubtful cases, the issuer can avoid the possibility of delay by filing its application for qualification of the indenture before it files its registration statement under the Securities Act. Such an application will contain those portions of the indenture which are affected by the bill, together with the relevant portions of the Securities Act registration statement, and information as to possible conflicting interests of the trustee. The indenture provisions affected by the bill are more or less standard, and can easily be determined in advance. As to any missing information or documents, the Commission will have the power, under section 306 (a), to consent, in proper cases, to the filing thereof by amendment, as under the Securities Act, and thus prevent delaying the effectiveness of the application. Where the application for qualification is filed before the registration statement, duplication of information and documents can be avoided by incorporating them by reference in the registration statement, pursuant to rules which the Commission is authorized to make under section 307 (a).

The requirements of this bill are therefore not expected to add materially to the cost of flotation of indenture securities, or to encourage the alleged trend to so-called "private placements" of such securities.

In this connection, it is interesting to note that the item of registration expense did not prevent the registration of a total of over 9 billions of securities of all types during the 2 years ended June 30, 1937. Any "drying-up" of public financing must therefore be due to other causes, among which may well be lack of investor confidence, and it is believed that this bill will tend materially to restore such confidence. As shown by the summary set forth below, expense of registration represents a comparatively small proportion of the total expense of publicly distributing indenture securities. In fact, for issues of $1,000,000 or more, underwriters' commission and discount was from four to nine times as important a factor in total cost as was registration expense. The detailed figures contained in this summary are taken from an official release from the Securities Exchange Commission, dated August 3, 1938, and are based on the registrants' own estimates.

*Summary of expenses of flotation of indenture securities registered under the Securities Act during calendar year 1937*

| Size of issue (thousands) | Under $1,000,000 | | | | $1,000,000 or more | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Under $250 | $250 to $499 | $500 to $749 | $750 to $999 | $1,000 to $4,999 | $5,000 to $9,999 | $10,000 to $24,999 | $25,000 or more | |
| Number of issues | 5 | 7 | 5 | 2 | 15 | 3 | 13 | 8 | 58 |
| | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* |
| (1) Underwriters' commission and discount | 5.9 | 6.4 | 5.6 | 2.6 | 3.3 | 3.6 | 2.1 | 1.8 | 2.1 |
| (2) Other expenses unrelated to registration[1] | 1.463 | 1.067 | 1.678 | .609 | .697 | .497 | .515 | .300 | .393 |
| (3) Expenses due to registration | 1.841 | 1.824 | 2.481 | .804 | .850 | .667 | .436 | .204 | .330 |
| Total | 9.204 | 9.291 | 9.759 | 4.013 | 4.847 | 4.764 | 3.051 | 2.304 | 2.823 |

[1] This summary assumes that one-third of the following expenses (detailed in the attached break-down) are not attributable to the necessity of registration: Printing and engraving, legal fees and expenses, accounting fees and expenses, engineering fees and expenses, other and miscellaneous expenses.

A detailed break-down of these figures follows:

| Size of issue (thousands) | Under $1,000,000 | | | | $1,000,000 or more | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Under $250 | $250 to $499 | $500 to $749 | $750 to $999 | $1,000 to $4,999 | $5,000 to $9,999 | $10,000 to $24,999 | $25,000 or more | |
| Number of issues | 5 | 7 | 5 | 2 | 15 | 3 | 13 | 8 | 58 |
| (1) Underwriters' commission and discount[1] | *Percent* 5.9 | *Percent* 6.4 | *Percent* 5.6 | *Percent* 2.6 | *Percent* 3.3 | *Percent* 3.6 | *Percent* 2.1 | *Percent* 1.8 | *Percent* 2.1 |
| Other expenses unrelated to registration: | | | | | | | | | |
|   Listing fees | -------- | -------- | -------- | -------- | 0.007 | -------- | 0.020 | 0.014 | 0.015 |
|   Revenue stamps | 0.049 | 0.011 | 0.214 | 0.053 | .100 | 0.110 | .149 | .123 | .128 |
|   State qualification fees | .081 | .042 | .031 | .012 | .089 | .011 | .005 | .009 | .013 |
|   Trustee fees | .421 | .110 | .198 | .148 | .081 | .065 | .128 | .057 | .078 |
| (2)   Total | .551 | .163 | .443 | .213 | .277 | .186 | .302 | .203 | .234 |
| Expenses partially[1] due to registration: | | | | | | | | | |
|   Registration fees | 0.016 | 0.016 | 0.010 | 0.011 | 0.011 | 0.044 | 0.011 | 0.010 | 0.011 |
|   Printing and engraving | .226 | .111 | .512 | .169 | .304 | .187 | .201 | .080 | .129 |
|   Legal fees and expenses | 1.606 | 1.200 | 1.676 | .486 | .617 | .426 | .223 | .067 | .160 |
|   Accounting fees and expenses | .503 | .368 | .468 | .210 | .180 | .105 | .076 | .026 | .053 |
|   Engineering fees and expenses | .054 | -------- | .245 | -------- | .024 | -------- | .030 | .008 | .016 |
|   Other and miscellaneous expenses | .348 | 1.033 | .805 | .324 | .134 | .216 | .108 | .110 | .120 |
| (3)   Total[2] | 2.753 | 2.728 | 3.716 | 1.200 | 1.270 | .978 | .649 | .301 | .489 |
| Total, lines (1), (2), and (3) | 9.204 | 9.291 | 9.759 | 4.013 | 4.847 | 4.764 | 3.051 | 2.304 | 2.823 |

[1] Figures cover 58 issues for which comparable data were available, out of a total of 135 issues registered, excluding 2 debenture issues registered by investment companies. Percent figures represent percent of gross offering price.

[2] From ⅛ to ½ of these expenses are probably not attributable to the necessity of registration.

## II. ANALYSIS OF THE BILL BY SECTIONS

### SECTION 301. SHORT TITLE

The bill adds a new title to the act approved May 27, 1933, of which the Securities Act of 1933 constitutes title I. The new title, title III, is given the short title of the Trust Indenture Act of 1939.

### SECTION 302. NECESSITY FOR REGULATION

Subsection (a) contains an enumeration of the conditions which necessitate Federal regulation, in the interests of investors and in the national public interest, of public offerings of notes, bonds, debentures, and evidences of indebtedness, through the use of means and instruments of transportation and communication in interstate commerce and of the mails.

(1) This paragraph emphasizes the necessity of having a trustee to represent the interests of bondholders. Reference is made to the obvious impracticability of individual action by bondholders, and to the fact that concerted action is impeded by reason of the unavailability to them of bondholders' lists.

(2) This paragraph refers to the necessity that the trustee have adequate rights and powers and adequate duties and responsibilities

with respect to the protection and enforcement of the rights of the bondholders. It also refers to the general and reasonable assumption by investors that the trustee is under an affirmative duty to take action for the protection and enforcement of their rights, an assumption which is incorrect under the forms of trust indenture in common use.

(3) This paragraph mentions the necessity that the trustee have resources commensurate with its responsibilities, and that it not have any conflicting relationship to, connection with, or interest in the obligor or any underwriter of its securities.

(4) This paragraph has reference to the fact that trust indentures generally fail to require the obligor to furnish to the trustee and to the bondholders adequate current information with respect to its financial condition and the performance of its obligations under the indenture, and fail to provide machinery for the transmission of such information to the bondholders.

(5) This paragraph refers to indenture provisions which are misleading or deceptive, and to the necessity of full and fair disclosure of the effect of indenture provisions with respect to the definition of what shall constitute a default under the indenture, or the release and substitution of property subject to the lien thereof, or the issuance of additional securities.

(6) This paragraph answers the natural question why bondholders have not taken steps to protect themselves by insisting upon the inclusion of adequate protective provisions in indentures. The explanation is that trust indentures are commonly prepared by the obligor or underwriter, and the fact that the securities are publicly offered (the very fact which brings them within the scope of this bill), would make bondholder participation in the drafting process impracticable, even if they understood the problem.

Subsection (b) states that abuses of the foregoing character have been so widespread that, unless regulated, the public offering of such securities, in interstate commerce or through the mails, is injurious to the capital markets, to investors, and to the general public. This subsection also declares the general policy of the bill to be to meet these problems and eliminate these evils.

### SECTION 303. DEFINITIONS

An application for the "qualification" of the indenture under which securities are to be issued will, with few exceptions, be accompanied by registration of the securities themselves under the Securities Act, and so far as possible the procedure under that act is to be followed. Accordingly, paragraph (1) of this section provides that any term defined in section 2 of the Securities Act, as heretofore amended, and not otherwise defined in this section, shall have the meaning assigned to such term in such section 2. Thus the Securities Act definitions of "security" and "issuer" among others, are carried over into the bill.

In addition, section 303 of the bill contains definitions of 17 terms used throughout the bill, such as sale, prospectus, underwriter, director, executive officer, indenture, and voting security.

"Sale" (2) is defined in the same terms as in section 2 (3) of the Securities Act, with the exception mentioned in the latter part of the paragraph. The reason for this exception can best be illustrated by an example. If, as is not an uncommon practice in the case of

real-estate mortgages, the mortgagor executes an ordinary bond and mortgage to a trust company, receiving in exchange "certificates of participation" in such mortgage which he then sells to the public, this transaction is held, under the Securities Act, to involve a public offering not only of the certificates, but of the underlying bond. But for the exception made in this paragraph, it would be necessary that the underlying bond, as well as the certificate of participation, be issued under a qualified trust indenture. The exception does not apply if the eventual distribution of the underlying bond or bonds to the purchasers of the certificates is contemplated, as where the certificates are by their terms convertible into such bonds. In such cases the sale of a certificate of interest or participation is deemed an immediate sale of the underlying bond or bonds even though the conversion privilege is not exercisable until some future date.

"Prospectus" (3) is defined in the same terms as the Securities Act, section 2 (10) of which defines "prospectus" broadly as including any written or radio communication offering a security for sale. By virtue of this definition, communications of this character must conform to the requirements of section 318 with respect to analyses of the effect of indenture provisions relating to the definition of "default," to releases and substitutions, and to the issuance of additional securities under the indenture. In the case of unregistered securities, this paragraph provides two exceptions (comparable to those provided in section 2 (10) of the Securities Act), the effect of which is to exempt from such requirements (1) communications accompanied by a written statement which contains such analyses, and communications sent subsequently to the sending of such a written statement, and (2) the ordinary type of broker and dealer advertising if it states from whom such a written statement may be obtained.

"Underwriter" (4) is defined in exactly the same terms as in section 2 (11) of the Securities Act except that the last sentence of the Securities Act definition is omitted. Under that sentence, a person who undertakes the distribution of a block of outstanding securities for a person in a control relationship with the issuer, or who purchases from such a controlling or controlled person with a view to distribution, is held to be an underwriter just as though he were distributing for or had purchased from the issuer itself, and registration by the issuer is required. The considerations which justify requiring registration by the issuer in this situation do not, however, extend to requiring qualification of the indenture before such a distribution may be made. The elimination of the sentence in question will not give rise to any danger of evasion of the provisions of this bill, since the term "underwriter" as defined in this bill would clearly be broad enough to cover any person, whether or not in a control relation with the issuer, who as part of a scheme for public distribution purchased from the issuer securities issued under an indenture which was not qualified under this bill. For the purposes of the last clause of this paragraph, a "spread" of which a person is given the benefit is to be considered as in the nature of a "commission" to such person, as under the Securities Act definition.

"Director" (5) is defined in substantially the same terms as in section 3 (a) (7) of the Securities Exchange Act of 1934.

"Indenture" (7) means any mortgage, deed of trust, trust or any other indenture or similar instrument or agreement, whether or not

secured, under which securities are outstanding or are to be issued. The term includes any supplement or amendment to any of the foregoing.

"Indenture to be qualified" (9) means the indenture in respect of which a particular application is filed, and the next four terms are defined with reference to that indenture. Through this device the language of sections 310 to 317, inclusive, has been considerably simplified.

"Indenture trustee" (10) means each trustee under the indenture to be qualified and each successor trustee.

"Indenture security" (11) means any security issued or issuable under the indenture to be qualified.

"Obligor" (12) means every person who is liable upon a security issued or issuable under the indenture to be qualified. In the case of certificates of interest or participation, the term includes persons liable upon the security or securities in which such certificate evidences an interest or participation. This provision is of particular importance in connection with the prohibitions against conflicting interests, for in the case of such certificates it is the indenture trustee's interest in or connection with the obligor upon the underlying security which really matters. The last clause of the paragraph is intended to make clear that the trustee under equipment trust certificates or certificates of interest or participation is not itself to be regarded as an obligor, merely by reason of the fact that it agrees to pay over to the certificate holders moneys received from the lessee of the equipment or from the obligor on the underlying security or securities.

"Voting security" (16) is defined in substantially the same terms as in section 2 (a) (17) of the Public Utility Holding Company Act of 1935. The test is the right to vote in the direction or management of the affairs of the "person" in question. The definition makes clear that the expression "percentage of the voting securities" has reference to the voting power, and not to the number of shares.

"Securities Act of 1933" (17) is to be deemed to refer to such act, as heretofore or hereafter amended. Where, in various portions of the bill, the intention is to incorporate provisions of the Securities Act as they now stand, regardless of future amendments, specific reference is made to the Securities Act of 1933 "as heretofore amended." The purpose is to prevent the inadvertent dislocation of the provisions of this bill by reason of future amendments of the Securities Act. A similar provision is made with respect to the "Securities Exchange Act of 1934" and the "Public Utility Holding Company Act of 1935."

### SECTION 304. EXEMPTED SECURITIES AND TRANSACTIONS

Subsection (a) exempts certain securities from the provisions of sections 305, 306, 323, 324, and 325 of the bill.

(1) This is the provision which limits the applicability of the bill to notes, bonds, debentures or evidences of indebtedness, or certificates of interest or participation in, temporary certificates for, or guaranties of any of the foregoing. The specific mention of these types of security, and the failure to mention other types specifically mentioned in the definition of the term "security" contained in section 2 (1) of the Securities Act and incorporated by reference in this bill (such as interim certificates and certificates of deposit), makes clear that such other types of security are exempted from the pro-

visions of this bill. On principle, certificates of interest or participation of the character referred to in the discussion of section 303 (2) of the bill, should be subject to the provisions of the bill. Practical considerations also demand their inclusion, for adoption of the certificate of interest device would provide too easy a method of avoiding the requirements of the bill.

(2) This paragraph in effect limits the type of "certificate of interest or participation" to which the bill applies to the general type of certificate referred to in the discussion of section 303 (2). It would exempt, for example, fixed-trust certificates evidencing an interest in a group of assorted bonds.

(3) Under this paragraph, the qualification requirements of the bill are to become effective 6 months after its enactment. A similar device was used in section 3 (a) (1) of the Securities Act.

(4) The effect of this paragraph is to exempt from the provisions of this bill all securities exempted from registration under the Securities Act with the two exceptions noted below. The category thus exempted includes governments and municipals, securities of National or State banks, short-term commercial paper, securities of eleemosynary institutions and building and loan associations, rails, receivers' certificates, and insurance policies.

The two exceptions are securities issued in exchange for other securities of the same issuer, and securities issued under a plan approved by a court, which are exempted from the Securities Act by sections 3 (a) (9) and 3 (a) (10) thereof. It may be reasonable to suppose, for the purposes of exemption from the disclosure requirements of the Securities Act, that one who already holds securities of a company which are to be exchanged for new securities is reasonably familiar with its affairs, but there is no reason why the indenture under which the new securities are issued should not conform to the higher standards prescribed by this bill. With respect to the failure to carry over the section 3 (a) (10) exemption, it should be noted that while courts may pass on the fairness of the reorganization plan under which securities are issued, they do not commonly examine the trust indenture.

The distinction thus taken indicates why, in this paragraph, reference is made to the Securities Act of 1933, as heretofore amended. It is quite possible that future amendments of the Securities Act will exempt from the operation of that act securities which, for similar reasons, are not entitled on principle to an exemption from this bill.

Although securities "issued by" National or State banks are exempted from this bill, it would not be possible for an issuer to evade compliance with this bill by making a bond and mortgage to such a bank, and then causing the bank to "issue" certificates of interest or participation in such bond and mortgage. Similar questions have arisen under the Securities Act, and under such circumstances the company itself, rather than the bank which performs purely ministerial functions, has been regarded by the Commission as the "issuer" of the certificates of participation. Such administrative interpretations of the Securities Act would, of course, be controlling in the interpretation of this paragraph.

(5) The first clause of this paragraph exempts securities issued under a mortgage indenture as to which a contract of insurance under the National Housing Act is in effect. Under that act, the Federal Housing Administration has control over the form of such mortgage

indentures, and the application of this bill to such securities would result in an unnecessary duplication of regulatory machinery. The second clause of this paragraph gives such securities the same status, with respect to the Securities Act, as securities which are guaranteed by the United States. Under the 1938 amendments of the National Housing Act, the trustee under a mortgage indenture which is guaranteed by the Federal Housing Administration has, in the event of a monetary default, the option of assigning the mortgage to the Federal Housing Administrator in exchange for debentures, guaranteed by the United States, for 98 percent in principal amount of the bonds outstanding under the indenture, together with a certificate of claim entitling him, among other things, to receive the other 2 percent out of any surplus remaining upon the foreclosure of the indenture.

(6) This paragraph exempts obligations of foreign governments and subdivisions. Substantially different considerations apply to such issues.

(7) This paragraph exempts any guaranty of any security exempted from the provisions of this bill by subsection (a). If it is not necessary to comply with the indenture requirements with respect to the security itself, there would be little point in making such requirements applicable to a guarantee of such security.

(8) This paragraph exempts any securities issued otherwise than under an indenture, or issued under an indenture which limits the aggregate principal amount of securities outstanding thereunder to $1,000,000 or less, but in the case of securities of the same issuer to which section 305 would otherwise have been applicable, the maximum aggregate principal amount of such securities to which this exemption may be applied in any period of 12 consecutive months is limited to $1,000,000.

Subsection (b) in effect restricts the applicability of the bill to public offerings by issuers or underwriters, as under the Securities Act itself, transactions by dealers being covered only to the limited extent deemed reasonably necessary to prevent evasions. As has already been noted the term "underwriter" is more narrowly defined under this bill than under the Securities Act. The last sentence of this subsection is necessary in order to prevent persons who would be "underwriters" under the broader Securities Act definition from losing the exemption provided by this subsection. Here again the reference is to the Securities Act of 1933, as heretofore amended.

Subsection (c): This subsection permits the issuer to apply for the exemption of offerings of additional securities issued under trust indentures which were executed prior to the effective date of the qualification requirements. On such application, the Commission is required to grant an exemption with respect to any provisions of the bill as to which the Commission finds, after hearing, that compliance with such provisions, through the execution of a supplemental indenture or otherwise, would require the consent of the holders of securities outstanding under the indenture, or would impose an undue burden on the issuer, having due regard to the public interest and the interests of investors. It will be noticed that compliance with many of the provisions of the bill could not conceivably be regarded as necessitating the consent of the holders of outstanding securities, and the necessary basis of Federal jurisdiction existing, there is no reason why the issuer should not be made to comply to that extent

with the required standards, particularly in view of the safeguard provided in paragraph (2) of this subsection.

Subsection (d): Under this subsection the Commission is authorized, on application by the issuer and after opportunity for hearing thereon, to exempt from any one or more of the provisions of the bill securities issued by a "person" organized and existing under the laws of a foreign government or political subdivision, to the extent that the Commission finds that compliance with such provisions is not necessary in the public interest or for the protection of investors.

### SECTION 305. PROHIBITIONS RELATING TO INTERSTATE COMMERCE AND THE MAILS

Subsection (a) in effect requires that all securities, the public offering of which is subject to the bill, be issued under an indenture as to which "qualification" is effective.  It prohibits, in language substantially similar to that of section 5 of the Securities Act, the use of means or instruments of transportation or communication in interstate commerce or of the mails to sell any such securities or to deliver the same after sale unless they have been or are to be issued under a qualified indenture.

Subsection (b) applies only to securities which are not registered under the Securities Act, but which have been or are to be issued under a "qualified" indenture.  The application of this subsection is thus limited to securities issued in exchange for other securities of the same issuer, and securities issued under a plan approved by a court, which are exempted from the registration and prospectus requirements of the Securities Act by sections 3 (a) (9) and 3 (a) (10) thereof.  Subject to the exemptions allowed by section 304, this subsection, which is modeled on section 5 (b) of the Securities Act, makes it unlawful for any person to make use of the mails or any means or instruments of interstate or foreign commerce to transmit any prospectus relating to the sale of any such security issued under an indenture unless such prospectus includes or is accompanied by analyses of the effect of any indenture provisions relating to the definition of "default", to releases and substitutions and to the issuance of additional securities under the indenture, meeting the requirements of section 318.  It also makes it unlawful for any person to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or delivery after sale, unless accompanied or preceded by such analyses.

### SECTION 306. APPLICATIONS FOR QUALIFICATION AND THE TAKING EFFECT THEREOF

This section establishes machinery for the qualification of an indenture which is not unlike the registration machinery of sections 6, 7, and 8 of the Securities Act.

Subsection (a) requires that an application for qualification be filed by the issuer, as under section 6 (a) of the Securities Act.  The application must contain such of the information and documents which would be required to be filed in order to register the security under the Securities Act, and such additional information, as the Commission may by rules and regulations prescribe.  It must also contain an

analysis of the effect of any indenture provisions with respect to the definition of what shall constitute a default thereunder, the release and substitution of property subject to the lien thereof, and the issuance of additional securities thereunder.  The last sentence of the subsection provides that the information and documents so filed shall be available to the public under such regulations as the Commission may prescribe, subject to the restrictions upon disclosure contained in section 321.  Except for the latter qualification this provision is substantially the same as that in section 6 (d) of the Securities Act.

Subsection (b): The provisions of this subsection with respect to the filing of applications and of amendments thereto are substantially similar to those of section 6 (c) of the Securities Act, except that the Commission is given some discretion as to the medium in which the filing fee is to be paid, where a filing fee is payable.  If a registration statement under the Securities Act covering securities issued or to be issued under the indenture has been filed prior to or simultaneously with the application, no filing fee is payable under this bill.  In all other cases, a filing fee of $100 is payable, but if a registration statement under the Securities Act is subsequently filed the amount so paid is to be credited against the filing fee payable under the Securities Act, and any excess is to be returned to the applicant.  As under section 8 (a) of the Securities Act, the filing of an amendment to an application prior to its effective date has the effect of postponing the effective date, unless the amendment is filed with the consent of the Commission or pursuant to an order of the Commission.  Amendments after the effective date may be made on such terms and conditions as the Commission may prescribe.

Subsection (c): An application for qualification becomes effective 20 days after the filing thereof (the same period as prescribed by section 8 (a) of the Securities Act), unless the Commission issues an order to show cause why the application should become effective.  If a show cause order is issued, an opportunity for hearing thereon must be given within 10 days, and the application becomes effective within such reasonable period of time thereafter as the Commission prescribes by rules and regulations, unless the Commission issues an order pursuant to section 308 refusing to permit the application to become effective.  The last sentence of this subsection specifically confers upon the applicant the right to withdraw its application at any time prior to the effective date thereof.

### SECTION 307. INTEGRATION OF PROCEDURE WITH SECURITIES ACT AND OTHER ACTS

Under the provisions of this section it will be possible to avoid duplication of effort and expense where the indenture security in question is also subject to the Securities Act or one of the other acts administered by the Commission.

Subsection (a) empowers the Commission to provide for "incorporation by reference" of information and documents on file with the Commission under any of such acts, so that if required information or documents have already been filed under one of such acts, they need not be filed again.  By and large, an application for qualification of an indenture would not have to contain any information or

documents not already required to be included in a registration statement under the Securities Act, except as respects the trustee's freedom from conflicting interests.

Subsection (b) empowers the Commission to provide for the consolidation of applications, reports, and proceedings under this title with registration statements, applications, reports, and proceedings under the Securities Act or other acts administered by the Commission. Thus, under this subsection, if the issuer elected to file at the same time its application for qualification of the indenture and its registration statement under the Securities Act, the Commission could authorize the filing of a single document complying with both acts.

Subsection (c) postpones the effective date of registration under the Securities Act until qualification has become effective as to the indenture under which the security is issued.

### SECTION 308. REFUSAL ORDERS

Subsection (a) requires the Commission to refuse to permit an application to become effective if it finds that—

(1) The application does not conform to the requirements of the bill;

(2) The application contains any material misstatements, misleading statements, or omissions;

(3) Any person designated as trustee is not eligible under section 310 (a) or has any conflicting interest as defined in section 310 (b);

(4) The indenture does not conform to the requirements of sections 310 to 317, inclusive;

(5) The indenture or any security to be issued thereunder contains any provision which limits, qualifies, or conflicts with a provision required to be contained therein, or any provision which is misleading or deceptive or the elimination of which is necessary to prevent the circumvention or evasion of the bill.

Provision is made for the rescission of a refusal order when the Commission deems that the objections on which it was based have been met.

Subsection (b) empowers the Commission to make an investigation to determine whether a refusal order should issue, subject, however, in the case of prospective trustees, to the limitations imposed by section 321 (c).

### SECTION 309. EFFECT OF QUALIFICATION OF INDENTURE

Subsection (a) makes clear that an indenture as to which qualification has become effective is not affected by the subsequent adoption, amendment or rescission of rules, regulations or orders, except as otherwise expressly provided in the bill.

Subsection (b) contains a provision making clear that, after an indenture has been qualified, the trustee shall not be subject to any liability because of any failure of such indenture to comply with any provision of the bill or any rule, regulation, or order thereunder.

Subsection (c) makes clear that the Commission has no powers with respect to the enforcement of the provisions of an indenture; its responsibility ceases when the form of indenture has been "qualified."

SECTION 310. ELIGIBILITY AND DISQUALIFICATION OF TRUSTEE

(a) *Persons eligible for appointment as trustee.*—Paragraph (1) requires that at least one trustee under the indenture be an institution, with corporate trust powers, which is subject to governmental supervision or examination.

Under paragraph (2), the indenture must require that such institutional trustee have at all times a combined capital and surplus of a specified minimum amount, not less than $100,000. If the indenture so provides, however, the combined capital and surplus set forth in the most recent annual report of condition published pursuant to law or to the requirements of the supervising or examining authority will be conclusive evidence as to the amount thereof.

Paragraph (3) will permit the making of provision for individual co-trustees, as is necessary under some State laws.

Paragraph (4) requires that in the case of certificates of interest or participation, the trustee have the legal power to exercise the rights of a holder of the underlying securities.

(b) *Disqualification of trustee.*—This subsection requires that if any trustee has or acquires any conflicting interest as defined therein, it shall, within 90 days after ascertainment thereof, either eliminate such conflicting interest or resign. If the trustee fails to comply with this requirement, it must notify the bondholders of that fact within 10 days after the expiration of the 90-day period. If the trustee fails to comply with this requirement after written request, removal proceedings may be instituted by any security holder who has been a bona fide holder of indenture securities for at least 6 months. The subsection then proceeds to state what shall be deemed to be a conflicting interest. If there are two or more trustees, each trustee is to be considered separately for the purposes of this subsection.

(1) Trusteeship under more than one indenture made by the same obligor is to be deemed a conflicting interest with the exceptions mentioned in this paragraph. Cases in which one indenture is a collateral trust indenture secured exclusively by bonds issued under the other indenture are excepted. A similar exception is provided where the obligor is a real estate company having no substantial unmortgaged assets and where both indentures are secured by wholly separate and distinct parcels of real estate. No real conflict of interest exists in such cases. Cases in which both indentures are wholly unsecured are also excepted, in the absence of a finding by the Commission that a material conflict of interest is likely. In addition, the Commission is authorized to make further exceptions where the issuer establishes to its satisfaction that trusteeship under both indentures is not likely to involve a material conflict of interest.

(2) A trustee is to be deemed to have a conflicting interest if it or any of its directors or executive officers is an obligor or underwriter. The latter term is defined in the last paragraph of subsection (b).

(3) This paragraph deals with cases in which the trustee controls or is controlled by or is under common control with an obligor or underwriter.

(4) This paragraph prohibits the trustee itself or any of its directors or executive officers from being an officer, director, partner, employee, appointee, or representative of an obligor, or of an underwriter who is currently engaged in the business of underwriting. This paragraph, however, permits, in common parlance, one director or executive

officer "each way" between the trustee and the obligor, but no person may at the same time be an executive officer of both. The second common director is permitted only if the number of directors of the trustee is more than nine, and his pecuniary interest in the obligor does not exceed 1 percent of the voting or other securities of the obligor. Clause (C) permits the trustee to be designated to act as such, or in certain specified ministerial capacities, by an obligor or underwriter.

(5) This paragraph imposes restrictions on the beneficial ownership, by the obligor, its underwriters and their respective officials, of voting securities of the trustee. Neither the obligor nor any of its officials may be the beneficial owner of more than 5 percent of such securities. The limitation upon their collective ownership is 10 percent, however. The exclusion from these calculations of holdings by a director or executive officer of an obligor who is also a director or executive officer of the trustee by virtue of clause (A) of paragraph (4), is limited to holdings not in excess of 2½ percent.

A 5-percent limit is placed upon the ownership of such securities, individually or collectively, by each underwriter and its officials.

(6), (7), and (8): These paragraphs deal with the matter of the beneficial ownership by the trustee of securities of an obligor or under-writer, and securities of persons who own substantial percentages of the voting securities of an obligor, or who stand in a control relation-ship with an obligor. The restrictions also apply to securities held as collateral security for an obligation as to which an uncured default in principal has continued for more than 30 days. Paragraph (6) gives recognition to the fact that if a trustee is permitted by para-graph (1) of this subsection to act as trustee under more than one indenture, there is no reason why the ownership by the trustee of securities issued under any of such indentures should be deemed to constitute a conflicting interest.

(9) Ownership in a representative capacity—i. e., as executor, trustee, or in a similar capacity—is given separate and more liberal treatment in this paragraph, on the theory that such ownership does not involve as direct a conflict as beneficial ownership. If, on May 15 in any year, the trustee's holdings of such securities in a representative capacity exceed the prescribed 25-percent limit, the trustee is to be deemed to have a conflicting interest. But any such securities (in an amount not exceeding the 25-percent limit) which were acquired through becoming executor, administrator, or testamentary trustee of an estate which included them may be excluded from this calculation for a 2-year period. The trustee is required to make a check of its holdings of such securities in any of the specified representative capaci-ties promptly after May 15 in each year. A similar check must be made when a principal or interest default under the indenture has con-tinued for 30 days, and all such securities held by the trustee in any of the specified representative capacities, with sole or joint control over such securities, are thereafter to be considered as though beneficially owned by the trustee.

The next to the last paragraph of the subsection excludes from the operation of paragraphs (6), (7), (8), and (9) securities other than "cor-porate securities," securities held as collateral under the indenture to be qualified, or for an obligation not in default as to principal for 30 days, and securities held in a ministerial capacity.

The final paragraph of subsection (b) defines the term "underwriter" as meaning, for the purposes of that subsection, any person who, within 4 years prior to the time of determination, was an underwriter of any securities of an obligor outstanding at such time.

(c) *Applicability of section.*—This subsection provides that the provisions of subsections (a) and (b) of this section shall govern, with respect to the eligibility and qualifications of the trustee or prospective trustee under an indenture in respect of which an application for qualification has been filed, to the exclusion of the provisions of the Public Utility Holding Company Act of 1935. The section is intended to prevent the Commission from imposing more stringent requirements with respect to such matters, by virtue of the powers conferred on it by the Holding Company Act.

### SECTION 311. PREFERENTIAL COLLECTION OF CLAIMS AGAINST OBLIGOR

(a) This subsection is designed to eliminate competition between a trustee, who is also a creditor of the obligor, and the bondholders he represents, during and after the 4 months' period preceding a "default" as defined in the last paragraph of the subsection. The trustee is permitted to become a creditor of the obligor, but if it improves its position as such creditor, after the beginning of such 4 months' period, the proceeds of such preferential collection must be apportioned between the trustee and the bondholders in such manner that the trustee receives no greater percentage of its claim (after deducting nonpreferential collections) than the bondholders receive on the unsecured portion of their claim, after deducting receipts from other sources. In the case of bankruptcy, receivership, or reorganization proceedings, administration of these provisions is vested in the court.

The following items, as to which the element of competition is not present, are excluded from the apportionment requirement: (i) Payments by persons, other than the obligor, who are liable upon the claim in question; (ii) the proceeds of the bona fide sale of the claim by the trustee to a third person; (iii) distributions received in bankruptcy or receivership, or in reorganization proceedings pursuant to the Bankruptcy Act or applicable State law; (iv) realizations upon property held as security for the trustee's claim prior to the beginning of the 4 months' period; (v) realizations upon property received as security for a claim created within the 4 months' period—i. e., a so-called "rescue loan"—if the property was so received simultaneously with the creation of the claim, and if the trustee establishes that it had no reasonable cause to believe that the "rescue" would be unsuccessful; that is, no reasonable cause to believe that a default would occur within 4 months.

The next to the last paragraph of the subsection is intended to prevent a trustee from evading the apportionment requirements in the event of resignation or removal.

Under the definitions of the terms "default" and "indenture security holder" contained in the final paragraph of the subsection, if the trustee is acting as trustee under two or more qualified indentures, all of which are in default, the accounting requirements come into operation 4 months prior to the earliest default, and the holders of securities outstanding under all of such indentures are entitled to the benefits thereof.

(b) This subsection permits the exclusion, from the apportionment requirements of section 311 (a), of certain classes of credits, the ownership or acquisition of which does not involve an acute conflict of interest.  Included in this category are (i) credits evidenced by securities issued under an indenture, or by securities having a maturity of 1 year or more at the time of acquisition by the trustee; (ii) advances authorized by a receivership or bankruptcy court, or by the indenture, for the purpose of preserving the mortgaged property, if appropriate notice of such advances is given to the security holders; (iii) certain disbursements of a minor nature; (iv) temporary credits arising from the sale of goods or securities sold in what is substantially a cash transaction, as for example, cases where payment is made by check which may take several days to clear; (v) creditor relationships arising from the ownership of securities of "Edge Act" corporations, which are comparatively few in number and are engaged almost exclusively in the financing of foreign trade; and (vi) credits arising from certain transactions in "self-liquidating paper," such as credits arising from the discount of drafts with bills of lading attached, which are ordinarily liquidated out of the proceeds of the goods, and credits arising out of similar transactions.  By section 319 (a), the Commission is given the power to prescribe, by rules and regulations, the definitions of "cash transaction" and "self-liquidating paper" which are to be included in the indenture.

### SECTION 312. BONDHOLDERS' LISTS

Subsection (a) requires the obligor to file with the trustee, at intervals of not more than 6 months and at such other times as the trustee may request, all information in its possession or control, or in the possession or control of any of its paying agents, as to the names and addresses of the bondholders.  For example, under the requirements of the income-tax title of the Revenue Act of 1936, "ownership certificates" setting forth the names and addresses of the bondholders are required to be filed with paying agents in connection with interest payments.  This subsection would require that information so obtained be turned over to the trustee.  The trustee is under a specific duty to preserve all information as to names and addresses of bondholders furnished to it by the obligor or its paying agents, and any such information received by the trustee itself in the capacity of paying agent.

Under subsection (b), the trustee must, within three business days after application by any bondholder who desires to communicate with other bondholders with respect to their rights, either afford to him access to such information, or advise him as to the approximate number of bondholders and the approximate cost of mailing to them a specified form of proxy or other communication.  In the latter event, the trustee must, on request of such applicant, mail to all bondholders whose names have been so furnished to it or received by it, copies of the form of proxy or other communication specified in the request with reasonable promptness after tender thereof and payment or provision for the payment of the reasonable expenses of such mailing.

Subsection (c) is intended to exempt from the non-disclosure provisions of the Revenue Act the disclosure of information as to the names and addresses of the bondholders in accordance with the provisions of the indenture.

### SUBSECTION 313. REPORTS BY INDENTURE TRUSTEE

Under subsection (a), the indenture must require the trustee to transmit to the indenture security holders at least annually a brief report with respect to the following matters:

(1) Its eligibility and its qualifications under section 310;

(2) The character and amount of any unpaid advances aggregating more than one-half of 1 percent of the principal amount of bonds outstanding, if the trustee claims or may claim a lien or charge for such advances prior to that of the indenture securities;

(3) The character and amount of all indebtedness owing to it by the obligor, with a brief description of any collateral therefor;

(4) The property and funds physically in the possession of the indenture trustee, as such;

(5) Releases or releases and substitutions, not previously reported;

(6) Additional issues not previously reported;

(7) The material steps, not previously reported, taken in the performance of its duties under the indenture.

Under subsection (b), the indenture must require the trustee to transmit, within 90 days after the event, brief interim reports with respect to—

(1) Releases or releases and substitutions of property not certified to have a fair value of less than 10 percent of the principal amount of indenture securities outstanding, and

(2) The character and amount of any unpaid advances, described in paragraph (2) of subsection (a), which were made since the date of the last annual report, if and when the amount thereof, not previously reported, aggregates 10 percent of the principal amount of indenture securities outstanding.

Under subsection (c), interim reports must be transmitted to all registered holders of indenture securities, and also to holders who within 2 years have filed their names and addresses with the trustee for that purpose. Annual reports must be transmitted, as well, to holders whose names and addresses have been furnished to or received by the trustee pursuant to section 312.

Under subsection (d) copies of all reports must be filed with each stock exchange upon which the indenture securities are listed, and also with the Commission.

### SECTION 314. REPORTS BY OBLIGOR

This section in effect requires the obligor to include in the indenture itself an undertaking comparable to that now required to be incorporated in Securities Act registration statements, by virtue of section 15 (d) of the Securities Exchange Act of 1934. Under the latter section the obligor must undertake to keep the registration statement current by filing with the Commission supplementary and periodic information, documents, and reports similar to those required, pursuant to section 13 of the Exchange Act, in respect of securities listed and registered on a national securities exchange. Under section 314, the commitment extends, of course, to information with respect to the performance of the obligations of the obligor under the indenture. Section 314 applies to all indentures to be qualified under the bill, and requires that copies be filed with the trustee as well as with the

Commission, and that summaries be transmitted to the indenture security holders.

The Commission's rules and regulations under section 314 may be adopted either before or after the indenture is qualified.

#### SECTION 315. DUTIES AND RESPONSIBILITY OF THE TRUSTEE

(a) *Duties prior to default.*—This subsection in effect requires that the indenture impose upon the trustee certain specific duties and obligations, prior to default, to be worked out against the background of what a prudent man would do under similar circumstances. Specific mention is made of certain of the more important matters, such as recording; the application of the proceeds of the securities to the purposes specified in the indenture; compliance with conditions precedent to the release and substitution of the mortgaged property; and the performance by the obligor of its obligations under the indenture. The last sentence of the subsection is designed to insure that the obligor will be required to provide the trustee with such opinions, certificates, and other documents as are necessary to enable the trustee to perform its duties in these respects, or to facilitate such performance.

(b) *Notice of defaults.*—The indenture must contain adequate provisions with respect to the giving to bondholders of notice of defaults under the indenture. But the indenture may provide that, except in the case of defaults as to which the Commission deems it necessary or appropriate that prompt notice be given, the trustee shall be protected in withholding notice so long as it determines that course to be in the interests of the bondholders. Such determination must be made in good faith, by the board of directors, or executive committee, or a trust committee composed of directors or responsible officers of the trustee.

(c) *Duties of the trustee in case of default.*—In case of default, the indenture must impose upon the trustee the duty of acting as a prudent man would act under the circumstances if he were a fiduciary. The standard provided for is substantially the same as that which is applicable in the field of personal trusts. Under this provision a trustee will no longer be able to demand indemnity from the bondholders as a condition precedent to performing its obligations under the indenture. But there is nothing in the bill to prevent the inclusion of the customary provision giving the trustee a prior lien, upon the mortgaged or pledged property or the proceeds of suit, for its compensation and expenses in connection with enforcement.

(d) *Responsibility of the trustee.*—This subsection prohibits the inclusion in the indenture of provisions relieving the trustee from liability for its own negligent action or failure to act, or for its own willful misconduct. Included in this prohibition, of course, are provisions relieving the trustee from liability for the negligence of its employees, except to the extent that such provisions are permitted by paragraph (2) of the subsection. The prohibition of exculpatory clauses is subject, however, to four important qualifications:

Paragraph (1) makes clear that, prior to default, the trustee is to be liable for the performance of only such duties as are specifically set out in the indenture.

Paragraph (2) permits the inclusion of provisions authorizing the trustee to rely upon opinions or certificates of attorneys, accountants

or other experts who may, if the indenture so provides, be officers of the obligor. But the Commission will have the right to insist that such provisions shall, as to particular matters, be subject to such requirements as to the independence and qualifications of such attorneys, accountants, and other experts, the exercise by the trustee of reasonable care in their selection, and the nature and scope of the examination or investigation upon which such opinions or certificates are based, as the Commission deems necessary or appropriate in the public interest or for the protection of investors, having due regard to the nature of such matter, the amount involved and the amount of indenture securities issued and issuable under the indenture.

Paragraph (3) makes special provision with respect to losses arising from errors of judgment. If the trustee was not negligent in ascertaining the pertinent facts, it may be protected for losses arising from any error of judgment based upon such facts, if such judgment was made in good faith by responsible officers of the trustee.

Paragraph (4) permits the inclusion of provisions protecting the trustee in respect of any action taken in good faith in accordance with the direction of the holders of not less than a majority in principal amount of the outstanding bonds relating to the method and place of conducting proceedings for any remedy under the indenture.

(e) *Undertaking for costs.*—This subsection authorizes the inclusion in the indenture of provisions requiring the filing of an undertaking for costs, and the assessment of reasonable costs (including reasonable attorneys' fees), in the discretion of the court, in any suit for the enforcement of rights or remedies under the indenture or against the trustee, as such. Precedent for this provision is to be found in section 18 (a) of the Securities Exchange Act of 1934. In the assessment of such costs due regard is to be had to the merits and good faith of the suit or defense. The provisions of the subsection do not apply to suits by bondholders to collect principal or interest, or to suits instituted by bondholders holding in the aggregate more than 10 percent in principal amount of the outstanding bonds. Suits by the trustee are also excluded.

### SECTION 316. DIRECTIONS AND WAIVERS BY BONDHOLDERS; PROHIBITION OF IMPAIRMENT OF HOLDER'S RIGHT TO PAYMENT

Subsection (a) specifically permits the inclusion in the indenture of provisions authorizing the holders of a majority of the outstanding bonds to direct the method and place of conducting all proceedings at law or in equity for any remedy under the indenture, or to consent to the postponement of any interest payment for a period not exceeding 1 year or to the waiver of any past default and its consequences. Provision is made with respect to the exclusion of bonds owned by the obligor or persons standing in a control relation to it, in determining whether the required percentage of bonds has concurred in any such direction or consent.

Under subsection (b), the indenture must provide that, except as to an interest postponement so consented to, the right of any indenture security holder to receive his principal and interest when due and to bring suit therefor may not be impaired without his consent. Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this prohibition. Until comparatively recently, a prohibition of this sort was perfectly standard in note and bond indentures.

In many States it is necessary in order to preserve the negotiability of the notes or bonds; in others it is necessary if the notes or bonds are to be legal investments for insurance companies, savings banks, and the like. This prohibition does not prevent the majority from binding dissenters by other changes in the indenture or by a waiver of other defaults, and the majority may of course consent to alterations of its own rights.

### SECTION 317. SPECIAL POWERS OF TRUSTEES; DUTIES OF PAYING AGENTS

Subsection (a) requires that the indenture confer upon the indenture trustee two powers which are essential where an issue of indenture securities is publicly held. The first of these is the power, as trustee, to recover judgment against the obligor for the whole amount due and unpaid, in the event of a principal default, or an interest default which has continued for such period as the indenture provides. The second is the power to file proofs of claim, in judicial proceedings, on behalf of all indenture security holders.

Under subsection (b), funds deposited with paying agents for the payment of principal and interest must be held in trust, and the paying agent must be required to give the indenture trustee notice of any default in the making of such payments.

### SECTION 318. DISCLOSURE OF EFFECT OF CERTAIN INDENTURE PROVISIONS

This section is concerned with the disclosure to prospective purchasers of indenture securities of the effect of indenture provisions with respect to the definition of default, releases or releases and substitutions, and additional issues. By virtue of this section, it will no longer be necessary for such purchasers to rely solely on a literal transcription in the prospectus of the long and frequently very complicated indenture provisions relating to such matters.

Subsection (a) requires that the "written statement" provided for in section 305 (b) with respect to indenture securities not registered under the Securities Act shall contain the analysis set forth in the application for qualification.

Subsection (b) imposes a similar requirement with respect to any Securities Act prospectus relating to an indenture security qualified under this title.

In either case the Commission may supplement such analysis, or substitute its own analysis for that prepared by the issuer of the indenture securities. In view of this safeguard, subsection (c) exempts, from the civil and criminal liability provisions of the Securities Act, statements in or omissions from any such written statement.

### SECTION 319. RULES, REGULATIONS, AND ORDERS

This section covers the rule-making power of the Commission.

Subsection (c) includes the now standard provisions exempting any person from liability for action taken in good faith in conformity with rules, regulations, or orders of the Commission notwithstanding the subsequent amendment, rescission, or invalidation thereof.

### SECTION 320. HEARINGS BY THE COMMISSION

Hearings may be public and may be held before the Commission or designated members or officers thereof.

### SECTION 321. SPECIAL POWERS OF THE COMMISSION

Subsection (a) empowers the Commission to subpena witnesses and require the production of documents, in substantially the same language as section 19 (b) of the Securities Act. This subsection also incorporates by reference the provisions of sections 20, 22 (b), and 22 (c) of the Securities Act with respect to investigations and hearings, the enforcement of this title, and offenses and violations thereunder.

Subsection (b) is in large part merely confirmatory of existing law. It authorizes the Treasury Department, the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Reserve banks, and the Federal Deposit Insurance Corporation to make information available to the Commission, and to make examinations for the use of the Commission, under such conditions as they may prescribe. Reports made available by the supervisory authorities, communications between trustees or prospective trustees and the supervisory authorities, etc., may be disclosed by the Commission only to the Attorney General of the United States.

Subsection (c). The Commission's powers of investigation of a prospective trustee are limited to determining whether such trustee is qualified to act as such under the provisions of subsection (b) of section 310, or is eligible to act as such under paragraphs (1) and (2) of subsection (a) of section 310. If the indenture contains the provision authorized by the last sentence of such paragraph (2), the Commission's powers with respect to the determination of the combined capital and surplus of a prospective trustee are confined to requiring that there be furnished a copy of its most recent report of condition published pursuant to law or to the requirements of the appropriate supervisory authority.

### SECTION 322. COURT REVIEW OF ORDERS; JURISDICTION OF OFFENSES AND SUITS

This section incorporates by reference the provisions of section 9 and section 22 (a) of the Securities Act.

### SECTION 323. LIABILITY FOR MISLEADING STATEMENTS

Subsection (a) imposes the civil liability of the Securities Exchange Act of 1934 in connection with false or misleading statements in any application, report, or document filed under this title. If, as authorized in this section, the court in its discretion requires an undertaking for costs or assesses costs, due regard is to be had to the merits or good faith of the suit or defense.

Subsection (b) is substantially similar to section 28 (a) of the Securities Exchange Act and provides that the rights and remedies provided by this title shall be cumulative.

### MISCELLANEOUS PROVISIONS

Sections 324 to 328, inclusive, substantially follow the Securities Act of 1933. These sections deal with the following matters:

Section 324: Covers unlawful representations.

Section 325: Sets forth the criminal penalties for violation of this title.

Section 326: Covers the effect of this title on existing law.

Section 327: Makes invalid contracts to waive compliance with provisions of this title.

Section 328: Contains the separability provision of this title.

O