# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| LANDRY'S RESTAURANTS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| POST ADVISORY GROUP, LLC AND LORD ABBETT BOND-DEBENTURE FUND, INC., | § | CIVIL NO. 3:07-CV-00406 |
| | § | |
| Defendants, | § | |
| | § | |
| -and- | § | |
| | § | |
| U.S. BANK NATIONAL ASSOCIATION, solely in its capacity as successor trustee under the Indenture dated as of December 28, 2004 under which Landry's Restaurants, Inc.'s 7.50% Senior Notes due December 15, 2014 were issued, | § | |
| | § | |
| Nominal Defendant. | § | |

**U.S. BANK NATIONAL ASSOCIATION'S**
**OPPOSITION TO PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**


Page

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. The Indenture Requires Landry's to Provide Timely Reports on its Financial Status to the Trustee and to Timely File its Financials with the Commission ........ 3

II. Unable to File its 10-K on Time, Landry's Instead Filed with the Commission a "Notification of Late Filing" and Informed Investors that Some of its Prior Financials Could not Be Relied Upon ........ 5

III. The Trustee Sends a Notice of Default to Landry's ........ 6

IV. The Trustee Sends a Notice of Acceleration ........ 9

V. Landry's Obtains an Ex Parte TRO, and Then Obtains New Financing ........ 11

VI. Landry's Finally Files its Form 10-K ........ 12

ARGUMENT ........ 14

I. Landry's Bears of the Burden of Satisfying Each Element Required for Obtaining a Preliminary Injunction ........ 14

II. Landry's Cannot Establish a Substantial Likelihood of Success on the Merits ........ 14

A. The Indenture Requires Landry's to Provide the Financial Information Regardless of Whether It is Filed With the Commission ........ 15

B. The Late Filing Notice Does Not Operate to Prevent the Existence of a "Default" Under the Indenture ........ 16

1. Form 12b-25 Does Not Provide for an Automatic Extension, Especially Where, as Here, Landry's Admits it has Failed to Comply with the Rule's Requirements ........ 17

2. A "Default" Occurred on March 16, 2007, Under the Terms of the Indenture ........ 20

3. An "Event of Default" Existed as of July 24, 2007, and Acceleration Was Proper ........ 22

C. Landry's Explicitly Waived any Right to an Extension in the Indenture ........ 22

D. The Trustee Was Duly Authorized to Send the Acceleration Notice ........ 23

E. Conclusion ........ 28

III. Landry's Cannot Establish a Substantial Threat of Irreparable Injury if the Injunction is not Granted ........ 29

**TABLE OF CONTENTS**
(continued)

**Page**

IV. Landry's Cannot Establish That its Claimed Injury Outweighs the Injury to the Noteholders and the Trustee ........ 30

V. Granting an Injunction will Disserve the Public Interest ........ 31

CONCLUSION AND PRAYER FOR RELIEF ........ 32

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*In re Apex Oil Co.*,
91 B.R. 865 (Bankr. E.D. Mo. 1988) ........ 29

*Bank of New York v. BearingPoint, Inc.*,
824 N.Y.S.2d 752, 2006 WL. 2670143 (N.Y. Supr. Ct. 2006) ........ 15, 16, 27, 32

*Boyd v. Roland*,
789 F.2d 347 (5th Cir. 1986) ........ 14

*In re Color Tile Inc.*, 92 Fed. Appx. 846 (3d Cir. 2004) ........ 25

*Cyberonics v. Wells Fargo Bank N.A.*,
No. H-07-121, 2007 WL. 1729977 (S.D. Tex. June 13, 2007) ........ 15

*Friedman v. Airlift International, Inc.*,
355 N.Y.S.2d 613 [1st Dept. 1974] ........ 27

*Guy Carpenter & Co., Investment v. Provenzale*,
334 F.3d 459 (5th Cir. 2003) ........ 14

*Lucas v. Lucas*,
946 F.2d 1318 (8th Cir. 1991) ........ 25

*Medlin v. Palmer*,
874 F.2d 1085 (5th Cir. 1989) ........ 14

*Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*,
485 F. Supp. 2d 387 (S.D.N.Y. 2007) ........ 25

*S.E.C. v. Spiegel, Inc.*, No. Civ. A. 03 C 1685,
2003 WL. 22176223 (N.D. Ill. Sept. 15, 2003) ........ 19

*In re Snowden*,
352 B.R. 848 (Bankr. N.D. Ill. 2006) ........ 29

*Stahl v. Comras*,
1993 WL 526302 (S.D.N.Y. 1993) ........ 30

*Sugar Busters LLC v. Brennan*,
177 F.3d 258 (5th Cir. 1999) ........ 14

## TABLE OF AUTHORITIES
(continued)

Page

## FEDERAL STATUTES AND REGULATIONS

17 C.F.R. § 240.12b-25 ........ *passim*

15 U.S.C. § 77bbb ........ 32

15 U.S.C. § 77ppp ........ 10, 26

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| LANDRY'S RESTAURANTS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| POST ADVISORY GROUP, LLC AND LORD | § | |
| ABBETT BOND-DEBENTURE FUND, INC., | § | CIVIL NO. 3:07-CV-00406 |
| | § | |
| Defendants, | § | |
| | § | |
| -and- | § | |
| | § | |
| U.S. BANK NATIONAL ASSOCIATION, solely | § | |
| in its capacity as successor trustee under the | § | |
| Indenture dated as of December 28, 2004 under | § | |
| which Landry's Restaurants, Inc.'s 7.50% Senior | § | |
| Notes due December 15, 2014 were issued, | § | |
| | § | |
| Nominal Defendant. | § | |

**U.S. BANK NATIONAL ASSOCIATION'S**
**OPPOSITION TO PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65, nominal defendant U.S. Bank National Association, not in its individual capacity but solely as indenture trustee (the "Trustee" or "U.S. Bank"), files this opposition to the request of Landry's Restaurants, Inc. for a preliminary injunction.

## INTRODUCTION

This Court should deny the requested injunction because no injunctive relief of any kind is warranted here. Landry's does not dispute that it was in default under the Indenture by not filing its Form 10-K timely, but argues that it was somehow entitled to an extension based on a broken promise to the Securities and Exchange Commission (the "Commission") that it would

file those financials within 15 days. In fact, it was not entitled to nor granted an extension, and ultimately it filed the 10-K more than 115 days after the due date. Amazingly, Landry's argues that it should avoid the consequences of what—even under its own theory—is more than 100 days of default because the Notice of Default was sent before Landry's purported 15-day extension expired. Landry's argument is refuted by the facts, unsupported by the law, and, significantly, is contradicted by Landry's own repeated representations to the public, which it knew would be relied on by investors and the Trustee, in the weeks and months before it filed this suit and changed its tune. There is simply no way that Landry's will be able to establish a likelihood of success on the merits in this case.

Nor can Landry's establish the other essential elements of a preliminary injunction. There is no irreparable harm in this case if the Notice of Acceleration is allowed to remain in place. While Landry's initially claimed it may not be able to obtain financing to pay off the Notes, in fact it has now obtained that financing. Moreover, Landry's has stated it will use that financing to pay off the Notes, no matter the results of this litigation. Therefore, the fact that Landry's had to obtain financing cannot be the basis for a finding of irreparable harm. Moreover, as a result of this business decision by Landry's, it cannot claim that it will suffer more harm than Noteholders or the Trustee as a consequence of a preliminary injunction. Finally, an injunction under these circumstances would disserve the public interest.

For all of these reasons, the Trustee believes the request for a preliminary injunction must be denied.

## BACKGROUND

### I. The Indenture Requires Landry's to Provide Timely Reports on its Financial Status to the Trustee and to Timely File its Financials with the Commission

On or about December 28, 2004, Landry's Restaurants, Inc. entered into an Indenture with certain identified Subsidiary Guarantors and Wachovia Bank, National Association, as Trustee (the "Indenture"). *See* Ex. 1.[1] Nominal Defendant U.S. Bank National Association is the successor to Wachovia Bank, National Association as the trustee under the Indenture. *See* Deposition of Diana Jacobs ("Jacobs Dep.") at 12:18-20. The Indenture is the governing document of a complex financing arrangement pursuant to which Landry's issued "up to $400,000,000 aggregate principal amount of the Company's 7.5% Senior Notes due 2014." Ex. 1. Although the Indenture is between Landry's and the Trustee, it is also expressly "for the benefit of the Holders." *Id.*

As one might expect in connection with $400 million worth of Notes, those who are putting up the money insist on a number of actions by Landry's to ensure that their investment is not wasted. Among the most basic requirements, not surprisingly, is that Landry's keep the Noteholders informed of the financial condition of the Company, by providing information to the Trustee on a regular basis. Thus, § 4.02 of the Indenture requires Landry's to furnish the Trustee[2] with "all quarterly and annual financial information that would be required to be

[1] To facilitate the Court's consideration of this opposition brief in conjunction with the evidence and arguments to be presented at the preliminary injunction hearing on August 16, 2007, the Trustee will file one binder of combined exhibits at the hearing, as well as one binder of deposition testimony. All exhibit references herein are to the Hearing Exhibits, and all deposition cites are to the Deposition Binder.

[2] Under the Indenture, the Trustee is responsible only for the performance of such duties as are specifically set forth in the Indenture, which, prior to the occurrence of a default, are ministerial in nature. Following the occurrence and during the existence of a default, the Trustee is charged with exercising the rights and powers vested in it under the Indenture in the same manner as a prudent person would under the circumstances in the conduct of his or her own affairs. In

contained in a filing with the [Securities and Exchange] Commission on Forms 10-Q and 10-K." Ex. 1 § 4.02(a)(1). The Indenture also makes clear when Landry's must provide this information to the Trustee. Landry's must furnish this information "***within the time periods specified in the [Securities and Exchange] Commission's rules and regulations***." *Id.* (emphasis added). Furthermore, the Indenture states that the obligation to timely provide this information is an independent contractual obligation of the parties, and not simply an obligation to give to the Trustee the publicly-available material filed with the Commission. According to the Indenture, Landry's must provide this information to the Trustee within the applicable time periods "***whether or not required by the [Securities and Exchange] Commission***." *Id.* (emphasis added). In other words, even if Landry's does not file the information with the Commission, it still must provide the information to the Trustee within the time periods specified by the Commission's rules and regulations.

Failure to provide the required information to the Trustee by the Indenture's deadline is a "Default" under the Indenture, which ripens into an "Event of Default" if: (1) the Trustee gives Landry's written notice of its failure; and (2) Landry's does not provide the information within thirty days after such written notice. Ex. 1 § 6.01(4). When an Event of Default occurs and is continuing, the Trustee "may declare the unpaid principal of, premium, if any, and accrued and unpaid interest on, all the Notes then outstanding to be due and payable immediately, by a notice in writing to the Company . . . specifying the respective Event of Default and upon any such declaration such principal, premium, if any, and accrued and unpaid interest shall become immediately due and payable." Ex. 1 § 6.02(a).

---

addition, pursuant to the Indenture, holders of a majority in aggregate principal amount of outstanding Notes have certain rights, including the right to direct the Trustee in the exercise of any remedy, trust or power conferred on the Trustee, including, without limitation, the power to accelerate the Notes following an Event of Default.

**II. Unable to File its 10-K on Time, Landry's Instead Filed with the Commission a "Notification of Late Filing" and Informed Investors that Some of its Prior Financials Could not Be Relied Upon**

Landry's Annual Report on Form 10-K, reporting on its results for the year ended December 31, 2006, (the "Form 10-K") was due to be filed with the Commission on or before March 16, 2007. *See* Dkt. No. 1, Plaintiff Landry's Restaurants, Inc.'s Verified Original Complaint and Application for Temporary Restraining Order ("Compl.") ¶ 22. Landry's did not file its 10-K with the Commission on that date, however. Nor did it provide the 10-K or "the annual financial information that would be required to be contained" in a 10-K to the Trustee on that date. Ex. 1 § 4.02. When March 16, 2007 arrived, Landry's instead filed with the Commission a "Notification of Late Filing," also known as a Form 12b-25 (hereinafter "Late Filing Notice"). *See* Ex. 7, Form 12b-25 (Mar. 16, 2007).

In its Late Filing Notice, Landry's explained that it was not filing its 10-K because it had been investigating its stock option program and had found some problems. *Id.* ("The review did find administrative errors and that the granting process for certain stock options grants had not been complete resulting in incorrect measurement dates."). Moreover, Landry's ominously noted that, "[i]n addition," in the course of its review it had uncovered "certain accounting errors which needed to be fixed." *Id.*

In a press release dated the same day as the Late Filing Notice, Landry's provided additional bad news. According to Landry's, its options investigation revealed "certain stock option awards for which the Company had historically used an incorrect measurement date to determine the amount of compensation expense to be recognized or failed to record compensation expense in accordance with generally accepted accounting principles." *See* Ex. 6, Form 8-K (Mar. 16, 2007). Due to these "errors," Landry's announced that it "expects to restate its historical financial statements and has determined that the financial statements for the years

2001 and prior ***should no longer be relied upon***." *Id.* (emphasis added). Moreover, Landry's stated that it had reported its conduct to federal regulators, and "the Company expects to hear from the Securities and Exchange Commission that it will initiate an informal inquiry concerning the foregoing." *Id.*

**III. The Trustee Sends a Notice of Default to Landry's**

In the wake of these troubling revelations, and in light of Landry's failure to provide its Form 10-K or equivalent information to the Trustee by the Commission's prescribed deadline, on March 20, 2007,[3] the Trustee notified Landry's in writing that a Default had occurred under the terms of the Indenture (the "Notice of Default").[4] Ex. 8, Letter from G. Thomas to R. Liem (Mar. 16, 2007). Citing § 4.02(a)(1) of the Indenture and its requirement that Landry's provide its financial information to the Trustee "whether or not required by the Commission," the Trustee noted that "[a]s of this date, the Company has not filed a copy of the Form 10-K with the Commission or with the Trustee." *Id.* The Trustee explained that pursuant to the Indenture, Landry's had thirty days to cure the default, and that if the default was not cured within thirty days, the default would become an Event of Default. *Id.* As the Trustee put it, "[i]f the 10-K report for the Fiscal Year Ending 12/31/06 is not filed within 30 days of the date of this notice, an event of default will have occurred." *Id.*

---

[3] In certain subsequent communications, the Trustee referred to this letter as dated March 19, 2007. This was merely a scrivener's error, and no party has claimed or could claim to have been misled by this minor discrepancy.

[4] Although the Indenture calls for notices to be sent to the attention of Steven Schienthal, Landry's General Counsel, the Notice of Default was addressed to Landry's CFO, Rick Liem. *See* Ex. 8. This change in individual addressee was done at Landry's request. *See* Ex. 34, Email from S. Finklea to G. Thomas (Mar. 20, 2007); *see also* Ex. 1 § 13.02 (authorizing parties to designate alternative addresses). Moreover, Mr. Schienthal admitted in his deposition that he received the Notice of Default by email from Mr. Liem. *See* Schienthal Dep. at 58:17-59:6; *see also* Liem Dep. at 27:25-29:1.

After the Notice of Default was issued, Landry's counsel sent one letter to the Trustee dated March 23, 2007, complaining about whether Landry's was actually in default of its obligation under the Indenture because it had filed the Late Filing Notice. *See* Ex. 9, Letter from A. Berner to US Bank (Mar. 23, 2007). Landry's counsel contended that, "if the Form 10-K is actually filed within fifteen calendar days following the prescribed due date, then the Form 10-K 'shall be deemed to be filed on the prescribed due date'." *Id.* Landry's counsel asserted therefore that Landry's had until March 30, 2007, to file its 10-K and demanded that the Trustee retract the Notice of Default.[5] *See id.* On March 27, 2007, two business days later, the Trustee informed Landry's through its counsel that it would not retract the Notice of Default and invited Landry's to contact the Trustee's in-house counsel if Landry's so desired. *See* Ex. 6-T, Email from G. Thomas to M. Debois (Mar. 27, 2007); *see also* Thomas Dep. at 25:24-26:25. Notably, neither Landry's nor its counsel accepted this invitation to ask questions about the merits of the default, and the Trustee never heard from Landry's on this issue again until this litigation. *E.g.*, Jacobs Dep. at 91:2-8.

Far from continuing to maintain that the Notice of Default was premature, Landry's, in a call with the Trustee on or about March 29, 2007—just days after the Trustee had communicated to Landry's counsel that it would not retract the Notice of Default—asked for an explanation of the process by which the Notes could be accelerated and indicated that Landry's intended to seek a waiver of its default from a majority of the Noteholders. *See* Liem Dep. at 22:8-24:6, 43:24-44:6. Thereafter, on March 30, 2007, Landry's issued a press release and filed a Form 8-K with

[5] Despite this claim to the Trustee, on that same day Landry's informed Wachovia Bank, National Association, in connection with a credit agreement to which Landry's was a party, that Landry's "would be unable to comply on a timely basis with its covenant to deliver its audited financial statements, and related certificates and schedules, as of and for the year ended December 31, 2006 within 90 days after the end of such fiscal year." *See* Ex. 10, Form 8-K (Mar. 30, 2007).

the Commission, informing the public that it was, in fact, in default under the Indenture. Landry's stated that the Trustee had sent it a Notice of Default because Landry's had "not fil[ed] its Form 10-K on a timely basis." *See* Ex. 10, Form 8-K (Mar. 30, 2007). Landry's acknowledged this failure was a "violation" of the Indenture, which could result in acceleration of the Note, informing the public that "[t]he Company must cure the violation by approximately April 20, 2007 or the Notes could be accelerated and become immediately due and payable." *Id.* The Form 8-K, moreover, corroborated the conversation Landry's had the day before with the Trustee and laid out to the investing public the possible consequences Landry's faced, stating:

> If the Company fails to cure this ***event of noncompliance*** within 30 days after written notice by the Trustee, the Trustee or the holders of not less than 25% in aggregate principal amount of the outstanding Notes ***may accelerate*** the unpaid principal of, and accrued and unpaid interest on, all the Notes then outstanding. Nevertheless, the Trustee has indicated to the Company that the foregoing action will not occur unless it is directed to do so by the requisite number of holders. Moreover, the Company may seek to obtain a waiver of such violation. Notwithstanding the foregoing, the Company has not received any indication from any Holders of the Notes of their intention to accelerate this indebtedness. Moreover, if the Notes were to be accelerated, the Company believes that it would be able to refinance this indebtedness on terms no less favorable to the Company in all material respects.

*Id.* (emphasis added).

Neither the March 30 Form 8-K nor the related press release made reference to the March 23 letter or otherwise suggested that Landry's believed the Notice of Default might be defective. Significantly, Landry's internal documents reveal that a prior draft of the Form 8-K included a statement that Landry's had communicated its belief to the Trustee that the Notice of Default was improper due to the Late Filing Notice, but this statement was conspicuously absent from the Form 8-K and press release Landry's actually filed. *See* Ex. 22, Draft of Landry's Restaurants, Inc., Form 8-K (for filing on Mar. 20, 2007). The reference to April 20 in the press release as the approximate date as of which the Notes could be accelerated obviously was

calculated as the date that was just after the 30 day period following the March 20 letter, thereby acknowledging the validity and effectiveness of the March 20 letter. In summary, the statements regarding the Default and potential for acceleration in the March 30 Form 8-K and press release were clear, unequivocal statements of fact, and were relied upon as such by the investing public and by the Trustee.

**IV. The Trustee Sends a Notice of Acceleration**

When Landry's failed to cure the Default within 30 days from the Notice of Default, it became an Event of Default under the Indenture. The Trustee sent Noteholders a notice of the Event of Default on or about April 23, 2007 (the "Notice of Event of Default"), indicating that, at that time, it did not intend to accelerate the Notes without direction from a majority of holders. *See* Jacobs Dep. at 35:20-25, 37:20-39:5. Following the Notice of Event of Default, several months went by with no provision of a Form 10-K or the related financial information to the Trustee. The dearth of information was exacerbated because, by that point, Landry's Form 10-Q for the first quarter of 2007 was also months late. On June 14, 2007, Landry's issued a press release in which it once again referenced the Trustee's Notice of Default and the right of the Trustee or holders of 25% in aggregate principal amount of the Notes to accelerate the Notes as a remedy for Landry's failure to file its Form 10-K on a timely basis: "As a result of not filing its Form 10-K on a timely basis, the Company has been notified by U.S. Bank, as the Trustee under the Indenture covering the Company's $400.0 million, 7 ½% senior unsecured notes (the "Notes"), that the failure to deliver the Form 10-K is a violation of its covenant under the Indenture and the Notes could be accelerated and become immediately due and payable." *See* Ex. 23, Form 8-K (June 14, 2007).

In addition, Rick Liem, Landry's CFO, had several phone conversations with Diana Jacobs that focused on the risk of acceleration. *See* Liem Dep. at 25:11-27:16; Jacobs Dep. at

90:18-25, 94:24-95:15. At no time during these conversations did Mr. Liem raise the issue of the possible invalidity of the March 20 Notice of Default; to the contrary, his expressions of concern about acceleration were consistent with Landry's public statements acknowledging the validity of the Notice of Default. *See* Liem Dep. at 23:17-19 ("I wouldn't be surprised if I didn't tell them that we disagreed with the timing of their notice."); *id.* at 27:11-16 (answering "no" to the question "[I]n either one of those conversations, Mr. Liem, . . . do you have any specific recollection of having had a discussion with Ms. Jacobs about the propriety or lack thereof of the notice of default?").

In mid-July, a group of Noteholders comprising a majority of the principal amount of the Notes directed the Trustee to accelerate the Notes. *See* Ex. 1 § 6.05; 15 U.S.C. § 77ppp; Jacobs Dep. at 108:13-24. The Trustee was presented with twenty signed letters of direction representing over $200 million of the senior note holders, which constituted a majority of the holders. *Id.* These directions asked the Trustee to accelerate and each of the direction letters represented, among other things, the amount of the notes that were represented and the commitment to indemnify the Trustee pursuant to the terms of the Indenture. *Id.*; *see also* Ex. 31-J, Letters from Noteholders to D. Jacobs, Corporate Trust Services (July 23-24, 2007). Thus, on July 24, 2007, 126 days after the Trustee sent the Notice of Default to Landry's, and 130 days after Landry's was required to file its 10-K, the Trustee sent Landry's a Notice of Acceleration that informed Landry's that the default had ripened into an Event of Default and that "[t]he Indenture Trustee, acting upon a direction of a majority of Note Holders given pursuant to Section 6.05 of the Indenture, hereby declares the unpaid principal of, premium, if any, and accrued and unpaid interest on, all the Notes outstanding to be due and payable

immediately, all pursuant to Section 6.02 of the Indenture." Ex. 11, Letter from D. Jacobs to Landry's Restaurants, Inc. (Mar. 30, 2007).

Thus, what Landry's, on two different occasions, had informed the public could happen had come to pass. Acknowledging this fact in a Form 8-K filed the next day, Landry's publicly admitted that the Acceleration Notice was effective. As Landry's put it: "[t]he sum total of the Notes are $400 million, which ***are now due and payable***." *See* Ex. 12, Form 8-K (July 24, 2007) (emphasis added). Landry's also stated in the 8-K that "the Company believes that it will be able to refinance this indebtedness." *See id.*; *see also* Ex. 10, Form 8-K (Mar. 30, 2007).

**V. Landry's Obtains an Ex Parte TRO, and Then Obtains New Financing**

After the Trustee sent the Acceleration Notice and before Landry's filed suit in this Court, Landry's and the Trustee communicated on more than one occasion. *See* Jacobs Dep. at 90:4-25; Liem Dep. at 22:8-22; *id.* at 25:11-19. Consistent with its public position that the acceleration had occurred, at no time in those communications with the Trustee did Landry's suggest to the Trustee that either the Acceleration Notice or Notice of Default was defective in any way. In fact, the only topic Landry's seemed interested in discussing was the identity of the beneficial holders who had provided direction to the Trustee to accelerate. *See, e.g.*, Schienthal Dep. at 108:23-111:5; Ex. 35, Email from R. Liem to D. Jacobs (July 25, 2007).

On August 1, 2007, Landry's filed suit in this Court, raising, for the very first time since March 23, 2007, the issue of the validity of the March 20 Notice of Default, and contradicting three separate public filings and statements made during the interim. That same day, Landry's obtained the TRO at issue here on an *ex parte* basis, claiming that the Notice of Default was improper and that it would suffer "irreparable harm" if the Notes were accelerated while the case was proceeding to trial.

On August 3, 2007, in an effort to comply with the *ex parte* TRO while simultaneously preserving its rights and the rights of the Noteholders, the Trustee sent Landry's a letter conditionally withdrawing the Acceleration Notice. *See* Ex. 36, Letter from T. Pillar to Landry's Restaurants, Inc. (Aug. 3, 2007). The Trustee explained that the Acceleration Notice "is subject to immediate and retroactive reinstatement in the event that the *ex parte* temporary restraining order is modified or dissolved, and in such event the Company shall not derive any benefit from the delivery of this limited and conditional withdrawal." *Id.*

Barely a week after Landry's represented to the Court that it faced irreparable harm if the Notes were accelerated, Landry's announced that it had arranged for a bank loan to repay the Noteholders in full. *See* Exhibit 14, Form 8-K (Aug. 9, 2007). Landry's told the investing public that "it had obtained committed financing in the event the Company is required to replace its outstanding 7.50% Senior Unsecured Notes." *Id.* The next day, during a conference call with lenders, Landry's CEO Tilman Fertitta went one step further. Mr. Fertitta stated that not only ***could*** Landry's redeem the Notes if ***required*** to do so, but that Landry's in fact intended to redeem the Notes, no matter whether it wins or loses this suit. *See* Ex. 29, Transcript of Landry's Restaurants, Inc. Lender Call at 13 (Aug. 10, 2007).

## VI. Landry's Finally Files its Form 10-K

On Friday, August 10, 2007, Landry's issued its 10-K for the year ended December 31, 2007. Landry's also separately provided a copy to the Trustee. In that document, for the first time, Landry's revealed a number of troubling facts about its operations and financial condition. First, Landry's disclosed that a Special Committee of its Board of Directors, while investigating Landry's stock option granting process, had discovered "a pervasive lack of formality; inattention to legal and plan requirements; failure to adopt and implement consistent practices; and inordinate delays." Ex. 17, Form 10-K at ii (Aug. 20, 2007). The result of these failings was

that "certain options were granted in the money" and the Company "recorded an aggregate non-cash, after tax charge of $10.9 million for the period from 1993 to 2005." *Id.* Second, Landry's analyzed its control environment and concluded that, "as of December 31, 2006, our disclosure controls and procedures . . . were not effective to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Securities Exchange Act of 1934." Moreover, both the Company and its auditors "identified material weaknesses in our internal control over financial reporting," leading the CFO and the CEO to conclude that "as of the end of the period covered by this report, our internal control over financial reporting was not effective."[6] Third, Landry's outside auditors, Grant Thornton, expressed their dissatisfaction with Landry's control environment. According to their letter:

> A material weakness was identified with respect to deficiencies related to the documentation, authorization, accounting and related processes for stock option grants and adjustments in the financial reporting close process. Absent control improvements including oversight, a material misstatement could occur in the annual or interim financial statements.

*Id.* at 77. Grant Thornton's conclusion was blunt: "in our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, ***Landry's Restaurants, Inc. and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2006.***" *Id.* at 78 (emphasis added). Grant Thornton itself described its conclusions as "an adverse opinion on the effectiveness of internal control over financial reporting." *Id.* at 79.

---

[6] Amazingly, at his deposition, Mr. Fertitta, Landry's CEO, testified that he did not actually believe that Landry's controls and procedures were not effective, or that there were "material weaknesses." *See* Fertitta Dep. at 164:15-165:1, 167:9-12, 168:9-170:2. He disagreed with the statement in the 10-K that he had concluded to the contrary, *see* Ex. 17, Form 10-K, at 35, calling into question the accuracy of Landry's 10-K, even now that it has been filed. Mr. Fertitta signed the 10-K and certified its accuracy. *See id.* at 110; Ex. 4.

## ARGUMENT

### I. Landry's Bears of the Burden of Satisfying Each Element Required for Obtaining a Preliminary Injunction

A preliminary injunction is an extraordinary equitable remedy that may be granted only if plaintiff establishes the following four elements:

- a substantial likelihood of success on the merits;
- a substantial threat that the plaintiff will suffer irreparable injury if the injunction is denied;
- the threatened injury outweighs any damage that the injunction might cause defendants;
- the injunction will not disserve the public interest.

*Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999); *see also Guy Carpenter & Co., Inv. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003); *Medlin v. Palmer*, 874 F.2d 1085, 1091 (5th Cir. 1989); *Boyd v. Roland*, 789 F.2d 347, 349 (5th Cir. 1986). The failure to establish any of the four required elements must result in denial of the preliminary injunction. *Medlin*, 874 F.2d at 1091. A court should grant this extraordinary remedy "only if movant has ***clearly carried*** the burden as to all four elements." *Provenzale*, 334 F.3d at 464 (emphasis added).

Landry's cannot meet this high burden.

### II. Landry's Cannot Establish a Substantial Likelihood of Success on the Merits

The Trustee's actions were well within the bargained-for rights that Landry's and the Trustee (on behalf of the Noteholders) agreed to at the outset of this contractual relationship and fully consistent with the functions assigned to the Trustee to perform. Landry's failure to comply with its obligation under the Indenture to provide the Trustee with timely financial information left the Noteholders wholly in the dark about their investment, even as Landry's informed the public that its previously filed financial statements should not be relied on, either.

The Trustee acted consistently under the Indenture by notifying Landry's promptly of its default in failing to provide this information in order to attempt to procure the missing financials from Landry's as soon as possible and ensure that, if the omission was not corrected, the full remedies provided for in the Indenture—including the right to accelerate—would be available. The right to accelerate was designed for just such situations as this one.

### A. The Indenture Requires Landry's to Provide the Financial Information Regardless of Whether It is Filed With the Commission

Section 4.02(a) of the Indenture, requiring the filing of timely financial statements with the Commission and the provision of this financial information to the Trustee, serves the critically important function of allowing Noteholders access to the financial information necessary for them to make informed decisions regarding their investments. Recognizing the importance of these provisions and the fact that they are drafted by sophisticated corporate entities represented by counsel, courts strictly enforce them pursuant to their terms. For example, in *Bank of New York v. BearingPoint, Inc.*, 824 N.Y.S.2d 752, 2006 WL 2670143 (N.Y. Supr. Ct. 2006), the court held that an issuer that failed to provide the trustee with information required in Commission filings was in default under its indenture. *See id.* at *7-9.[7] The court pointed out that "only by guarding against incomplete information, can investors make informed decisions about their investment and guard against the risks attendant to incomplete information." *Id.* at *7. In *Cyberonics v. Wells Fargo Bank N.A.*, No. H-07-121, 2007 WL 1729977 (S.D. Tex. June 13, 2007), the district court held that a provision that merely required Cyberonics to provide the trustee with annual reports "within 15 days after it files them with the SEC" was simply a "delivery" requirement and did not require the issuer to deliver reports unless

[7] The Indenture provides that it is governed by New York law. *See* Ex. 1 § 13.09.

they were actually filed with the Commission. *Id.* at *4. Because Cyberonics did not file a Form 10-K, it had no obligation to deliver a Form 10-K to the trustee and was not in default. *Id.*

Here, the language of the Indenture is even more explicit than in either *BearingPoint* or *Cyberonics*. The Indenture expressly requires Landry's to provide the information "whether or not required by the Commission." Ex. 1 § 4.02(a). Section 4.02(a), therefore, is not simply a housekeeping requirement to deliver copies of Form 10-K's and 10-Q's to the Trustee after they are filed with the Commission (as in *Cyberonics*). It is, instead, a substantive requirement to provide the Trustee with the financial information that "would be required to be contained in a [Form 10-Q or 10-K] . . . within the time periods specified in the Commission's rules and regulations." The parties thus made clear that Landry's was obligated to provide the Trustee with this information regardless of whether it was actually filed with the Commission or whether it was even required to be filed with the Commission. The *BearingPoint* court put the point well:

> BearingPoint's tortured parsing of this provision to read the section as making SEC filings optional under the terms of the Indenture, vitiates the clear purpose of the Indenture to provide information to the investors so that they may protect their investment. This proposed construction would defy the clear intentions of the parties and does not comport with the straightforward and unambiguous intent of the provision.

*BearingPoint*, 2006 WL 2670143, at *7.

**B. The Late Filing Notice Does Not Operate to Prevent the Existence of a "Default" Under the Indenture**

Landry's does not dispute, of course, that a failure to provide financial information to the Trustee in the time frame prescribed by the Indenture constitutes a default. But, Landry's asserts, its Late Filing Notice—the Form 12b-25 filed in lieu of a Form 10-K on March 16, 2007—effectively granted Landry's a 15-day extension. Thus, the argument goes, Landry's Form 10-K was not due until March 30, and the Notice of Default sent on March 20 was premature, thereby rendering the Acceleration Notice defective as well.

This argument is flawed on many levels. First, Rule 12b-25 does not provide for an extension of the filing deadline, particularly when the party invoking the rule fails to comply with its necessary elements. Instead, as the name of Form 12b-25 succinctly states, it is simply a "Notification of Late Filing." Second, regardless of the impact of Form 12b-25 on the deadline for filing the 10-K with the Commission, the terms of the Indenture make clear that a "Default" had occurred. And third, even if the Notice of Default had been premature, Landry's had more than 30 days after even it concedes it was in default to cure, but did not do so; that is all the Indenture requires for acceleration.

**1. Form 12b-25 Does Not Provide for an Automatic Extension, Especially Where, as Here, Landry's Admits it has Failed to Comply with the Rule's Requirements**

According to Landry's, its Late Filing Notice effectively granted it a 15-day extension for filing its Form 10-K. As Landry's General Counsel bluntly explained in his deposition:

> You file a 12b-25 and the commission allows you to have an additional 15 days in which to file your 10-K. That in any language is an extension of the deadline for filing a Form 10-K. That's how I interpret it. That's how I believe the SEC interprets it. I believe that's how all the federal courts interpret it. So the word "extension" is not used, but it 100 percent is an absolute extension to file the Firm 10-K.

Schienthal Dep. at 66:23-67:6.

Contrary to Mr. Schienthal's testimony, the mere fact that Landry's filed a Late Filing Notice did not delay the onset of its Default under the Indenture. Rule 12b-25 provides in relevant part as follows:

> a. If all or any required portion of an annual or transition report on Form 10-K . . . required to be filed pursuant to section 13 or 15(d) of the Act and rules thereunder . . . is not filed within the time period prescribed for such report, the registrant, no later than one business day after the due date for such report, ***shall file a Form 12b-25*** with the Commission which shall contain disclosure of its inability to file the report timely and the reasons therefor in reasonable detail.

b. ***With respect to any report*** or portion of any report described in paragraph (a) of this section which is ***not timely filed*** because the registrant is unable to do so without unreasonable effort or expense, ***such report shall be deemed to be filed on the prescribed due date for such report if***:

1. The registrant files the Form 12b-25 in compliance with paragraph (a) of this section and, when applicable, furnishes the exhibit required by paragraph (c) of this section;

2. The registrant represents in the Form 12b-25 that:

   i. The reason(s) causing the inability to file timely could not be eliminated by the registrant without unreasonable effort or expense; and

   ii. The subject annual report . . . on Form 10-K . . . ***will be filed no later than the fifteenth calendar day following the prescribed due date*** . . .; and

3. The report/portion thereof is ***actually filed within the period specified by paragraph (b)(2)(ii)*** of this section.

Ex. 21, 17 C.F.R. § 240.12b-25 (emphasis added).

Thus, contrary to Plaintiff's erroneous statements in this lawsuit, Rule 12b-25 does ***not*** change the due dates or effect some kind of automatic extension or grace period. Rule 12b-25(a) states that if a report is not timely filed, the registrant "shall file a Form 12b-25." *Id.* § 240.12b-25(a). The requirement to file a Form 12b-25 is thus mandatory for late filers, and there is nothing in the rule which supports Landry's baseless argument that there is an "automatic 15-day extension on filers." *See* Compl. ¶ 5.[8]

Rule 12b-25(b) then provides the requirements for a Form 10-K to be ***deemed*** to have met the original deadline. It does not set a new deadline. By its own terms, this subparagraph applies to a report that is "not timely filed." *Id.* Nonetheless, a report that is "not timely filed" can be "deemed" to have been filed earlier if (i) the issuer files a Form 12b-25 in compliance

[8] Moreover, contrary to Landry's inaccurate statement during the TRO hearing, the Commission did not give Landry's "permission" to file its Form 10-K late. *See* Ex. 13, Transcript of Ex Parte Injunction Hearing Before the Honorable Samuel B. Kent at 3 (Aug. 1, 2007).

with paragraph (a); (ii) the issuer represents in the Form 12b-25 that the Form 10-K "will be filed no later than the fifteenth calendar day following the prescribed due date"; and (iii) the Form 10-K "***is actually filed***" within 15 days. *See* Ex. 21, 17 C.F.R. § 240.12b-25(b) (emphasis added). ***Unless and until all of these conditions are met, the Form 10-K is still considered "late" under the Commission's rules.***[9]

If the issuer fails to meet any of the conditions in paragraphs (b)(1), (2), and (3), including the requirement that the Form 10-K actually be filed within 15 days, the report is never "deemed" to have been filed on an earlier date. It remains "not timely filed." *S.E.C. v. Spiegel, Inc.*, No. Civ. A. 03 C 1685, 2003 WL 22176223, at *29 n. 15 (N.D. Ill. Sept. 15, 2003) ("However, Spiegel's failure to actually file its Form 10-K on April 15, 2003 resulted, pursuant to Rule 12b-25(b)(3), in its failure to file being deemed to have occurred on March 29, 2002, the original date for filing the Form 10-K."). Once again, there is no "automatic extension" of the filing date, only a process by which the Commission will have its records reflect timely filing if and only if the Form 10-K is actually filed within 15 days after the Form 12b-25 is filed. That did not happen, and the Commission's records reflect a failure to file on March 16, not 15 days later.[10]

The history of Rule 12b-25 further confirms that it is not intended to provide an "extension" to late filers. For the first 30 years of its existence, Rule 12b-25 was entitled "Extension of Time for Furnishing Information" and provided for a formalized extension

---

[9] Paragraph (d) of the rule reinforces this point by forbidding issuers from filing a registration statement predicated on a timely filed Form 10-K or 10-Q until the subject report is "actually filed" within 15 days. *Id.* § 240.12b-25(d).

[10] Moreover, given the days and months that passed before Landry's actually filed its 10-K, it is hard to credit Landry's representation to the SEC that it would file its Form 10-K within fifteen days. Landry's should not be able to make an incorrect statement to the Commission and then claim the benefit of a nonexistent "extension" predicated on that incorrect statement.

process. In 1980, however, the Commission amended the rule to "eliminate the present extension application procedure and, in lieu thereof, institute a system requiring notification of a registrant's inability to file timely all or any portion of an annual report on Form 10-K. . . ." *See* "Timely Reporting – Final Amendment of Rule and Form," 1980 SEC LEXIS 1738, at *1 (Apr. 2, 1980). The amendments also provided the process for deeming reports timely filed, which Landry's attempts to rely on here. The Commission concluded that the prior rule's provision of extensions conferred only "limited benefits," which were "outweighed by the detriment to informed markets resulting from the lack of disclosure regarding the timeliness of filings. . . ." *Id.* at *4-5. In distinguishing its new procedure from the prior practice of extensions, the Commission stated plainly that "an automatic extension procedure ***has not*** been incorporated into the amendment." *Id.* at *7 (emphasis added). *But see* Schienthal Dep. at 67:2-3 (characterizing 12b-25 as providing for an "extension" and stating "[t]hat's how I believe the SEC interprets it"). Landry's, in other words, asks this Court to interpret Rule 12b-25 to mean exactly what the Commission rejected when it adopted the rule in its present form. Landry's simply cannot lay claim to any perceived benefits of the Rule's deeming process when it openly admits that it failed to comply with the express requirements of the rule itself.

**2. A "Default" Occurred on March 16, 2007, Under the Terms of the Indenture**

Of course, Landry's missed its purportedly "extended" deadline by more than 100 days. *See* Ex. 17, Form 10-K (Aug. 10, 2007). So Landry's cannot rely on its form 10-K having been "deemed" filed on the due date pursuant to Rule 12b-25(b). Nonetheless, Landry's claims that the mere fact that it submitted a Late Filing Notice means that no default could occur until after March 30, apparently because Landry's could have filed their 10-K within 15 days and provided

it to the Trustee, thus getting the benefit of the "deeming" mechanism. Thus, the Notice of Default submitted on March 20 was invalid. Again, Landry's is wrong.

The Indenture defines "Default" to mean "any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default." Ex. 1 § 1.01, at p. 4. An "Event of Default," in turn, is defined to include the "failure by the Company . . . for 30 days after written notice by the Trustee . . . to comply with any of the other agreements in this Indenture," including the provision of financial information found in § 4.02. *Id.* § 6.01(4). The failure to provide the Form 10-K when due on March 16 plainly meets the definition of "Default" under the Indenture. It is an "event" that "with the passage of time . . . would be, an Event of Default." Indeed, Landry's theory of the case all but concedes this fact. Not providing its financials to the Trustee constitutes a "Default" because, if enough time passes, it will, by definition, become an "Event of Default." The claim that, had Landry's filed it's 10-K within 15 days, it would no longer have been in default, even if true, does not change the fact that a "Default" existed as of March 16. Indeed, the deeming provision of Rule 12b-25 is perfectly consistent with the allowance under the Indenture of a 30-day cure period. Under both provisions, the fact that Landry's could cure its "Default" within a certain time period and thus prevent it from becoming an "Event of Default," does not mean that there was no "Default" in the first place.

Thus, at the time the Trustee issued the Notice of Default, Landry's was clearly in "Default" under the Indenture, as it had failed to file its Form 10-K within the time specified in the Commission's rules and regulations. Moreover, Landry's conceded this point in its public filings with the Commission, in which Landry's admitted the existence of a default. *See* Ex. 10, Form 8-K (Mar. 30, 2007); Ex. 23, Form 8-K (June 14, 2007); Ex. 12, Form 8-K (July 24, 2007). Landry's should not be able to make an incorrect statement to the Commission that it intended to

file within 15 days and then claim the benefit of a nonexistent "extension" predicated on that incorrect statement, especially in light of its subsequent consistent course of conduct evidenced by its public filings. These public filings constitute both admissions of the validity of the Notice of Default and the Acceleration Notice and estop Landry's from arguing now, at this late date, that either of those notices were invalid. Accordingly, Landry's argument that it was not in default when the Notice of Default was sent due to the Late Filing Notice submitted to the Commission has no merit.

### 3. An "Event of Default" Existed as of July 24, 2007, and Acceleration Was Proper

Relatedly, the Indenture makes clear that Landry's argument that the Notice of Default was "premature" is a red herring. The right to accelerate is contingent on an "Event of Default" having occurred, and the timing of the Notice of Default makes no difference in that calculus. As explained above, an "Event of Default" occurs when Landry's has "fail[ed] . . . to comply" with an obligation such as the provision of financial information for a period of "30 days after written notice by the Trustee. . . ." *See* Ex. 1 § 6.01(4). In this case, Landry's does not dispute that it failed to comply with the requirement that it provide its Form 10-K to the Trustee; it merely contends that this failure did not begin until March 30, rather than March 16. Nor does Landry's dispute that it got written notice that it had not provided required financial information. Nor does Landry's dispute that 30 days had passed from the date when even it conceded it had begun to fail to comply before the Notes were accelerated. That is all that the Indenture requires.

## C. Landry's Explicitly Waived any Right to an Extension in the Indenture

The prior discussion demonstrates that Rule 12b-25 does not constitute an automatic extension and Landry's was clearly in "Default" under the agreement as of March 16, 2007. But even if Landry's characterization of the Late Filing Notice as an "automatic extension" had any

support, that would not aid Landry's case here. That is because, pursuant to § 4.06 of the Indenture, Landry's expressly agreed that it would "not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, ***extension*** or usury law, wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture." Ex. 1 § 4.06. In unmistakable language, Landry's "expressly waive[d] all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted." *Id.*

Even if the Late Filing Notice could be construed as providing Landry's with an "extension," this provision of the Indenture absolutely forbids Landry's from taking advantage of such extension. Indeed, Landry's General Counsel admitted that § 4.06 forbids any such extensions. *See* Schienthal Dep. at 69:24-71:17.

**D. The Trustee Was Duly Authorized to Send the Acceleration Notice**

Because Landry's was in default under the Indenture and it had matured into an Event of Default, as shown above, acceleration was a proper remedy. Landry's acknowledged this fact in its press releases noting that acceleration could occur. *See* Ex. 10, Form 8-K (Mar. 30, 2007); Ex. 12, Form 8-K (July 24, 2007). The Indenture provision that authorizes this remedy states, in relevant part, as follows:

> If an Event of Default . . . under Section 6.01 occurs and is continuing, then and in every such case the Trustee or the Holders of not less than 25% in aggregate principal amount of the outstanding Notes may declare the unpaid principal of, premium, if any, and accrued and unpaid interest on, all the Notes then outstanding to be due and payable immediately, by a notice in writing to the Company . . . and upon any such declaration such principal, premium, if any, and accrued and unpaid interest shall become immediately due and payable.

Ex. 1 § 6.02. Under this provision, therefore, it is plain that the Trustee can accelerate the debt when there is an Event of Default. Landry's does not appear to dispute this point.

Based upon questions raised by Landry's in the course of various depositions in this case, it appears that Landry's does, however, dispute the technical propriety of the Trustee's Acceleration Notice, in which the Trustee indicated that it was accelerating the Notes "acting upon a direction of a majority of Note Holders given pursuant to Section 6.05 of the Indenture." *See* Ex. 11, Letter from D. Jacobs to Landry's Restaurants, Inc. (July 24, 2007). Section 6.05 provides that:

> The Holders of a majority in aggregate principal amount of the Notes then outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee under this Indenture. . . .

Ex. 1 § 6.05. Based on Landry's line of questioning, it appears that it will argue that the beneficial holders who directed the Trustee to send the Acceleration Notice are not the "Holders" as that term is defined in the Indenture and used in § 6.05. Thus, while Landry's concedes that the Trustee could have sent out the Acceleration Notice on its own, consistent with the Indenture, it seems that Landry's will argue that the Trustee actually purported to send the Acceleration Notice at the direction of the Noteholders, who, Landry's contends, were not the authorized parties to give direction to the Trustee under the Indenture.

"Holder" is defined in the Indenture as "a Person in whose name a Note is registered on the Registrar's books," *see* Ex. 1 § 1.01, at p. 7, and it is undisputed in this case that the only entity who fits that description is Cede & Co., the registered holder of the Notes as nominee for the Depositary Trust Company ("DTC"). DTC does not actually have an economic interest in the Notes, however. As one court has explained:

> Defendant DTC is a clearing agency . . . which provides central securities depository services for the nation's securities industry. DTC acts as a depository for trillions of dollars worth of physical securities certificates, which are maintained in a central location; and it operates an automated, centralized system for book-entry transfers of securities among its participants, ***the beneficial owners of securities deposited at DTC***. It describes itself as a "utility" for the securities industry that facilitates prompt and accurate settlement of securities transactions, and aims to increase the efficiency of such transactions by reducing the need for actual physical transfer of individual stock certificates.

*Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*, 485 F. Supp. 2d 387, 389 (S.D.N.Y. 2007) (emphasis added) (footnote omitted); *see also In re Color Tile Inc.*, 92 Fed. Appx. 846, 847-48 (3d Cir. 2004) (stating that DTC was "formed pursuant to Congressional mandate for the purpose of owning shares ***for the beneficial interest of customers***") (emphasis added).

DTC is thus a mere agent for the real owners of the notes—an intermediary whose sole interest is to facilitate efficient trading of the notes. "The fact that a holding agent such as the Depository Trust Company possesses the certificate does not diminish the fact that the shareholder owns the security." *Lucas v. Lucas*, 946 F.2d 1318, 1323 (8th Cir. 1991) (citation omitted).

Properly understood, then, it would make no sense to interpret the Indenture to provide that DTC, but not the underlying beneficial holders of the notes, could direct the Trustee to send the Acceleration Notice. *See* Ex. 1 § 1.04 (terms have the meaning assigned to them "[u]nless the context otherwise requires"). This is especially the case where the Indenture itself does not require the Trustee to deal solely with Cede & Co., as "Holder" of the Notes. *See* Ex. 1 § 2.14 ("The Company, any Subsidiary Guarantor, the Trustee, any Paying Agent and any authenticating agent ***may*** treat the Person in whose name any Note is registered as the owner of such Note for the purpose of receiving payment of principal of, premium, if any, or interest on such Note and for all other purposes.") (emphasis added).

Moreover, Landry's strained interpretation of § 6.05 must be rejected because it contradicts the Trust Indenture Act. Section 316 of the Act is entitled "Directions and waivers by bondholders" and provides that all qualified indentures "shall automatically be deemed (unless it is expressly provided therein that any such provision is excluded) to contain provisions authorizing the holders of not less than a majority in principal amount of the indenture securities . . . (A) to direct the time, method, and place of conducting any proceeding for any remedy available to such trustee . . . ." 15 U.S.C. § 77ppp(a)(1). This provision is in no way limited to the nominal "registered" holder of the notes, and it would be more than a little anomalous to suggest that Congress intended, when it passed the Trust Indenture Act in 1939, to authorize a clearing house entity that has no economic interest in the underlying value of the notes to direct the Trustee. Because nothing in the Indenture expressly excludes the ability of the bondholders to direct the Trustee, and indeed because Section 318(c), which is specifically incorporated into the Indenture in § 13.01, provides that the terms of the Trust Indenture Act trump the terms of the Indenture whenever they conflict, the interpretation of "Holders" proffered by Landry's is simply not a viable alternative under the Indenture.[11]

Indeed, Landry's itself has admitted on more than one occasion that the underlying beneficial holders were the entities with the economic interest in the transaction and able to direct the Trustee to accelerate the Notes. After all, it was Landry's who instigated a discussion with the Trustee of the Noteholders' ability to accelerate and suggested that they would identify

[11] Other provisions of the Indenture also refer to "Holders" in contexts that suggest the intent is to refer to all the beneficial holders, not DTC. *See, e.g.*, Ex. 1, at p. 1 (stating that the Indenture is "for the benefit of the Holders"); *id.* § 2.07(g)(i), (ii) (prescribing legend for private placement notes); *id.* § 2.07(i)(ii) (referring to "a Holder of a beneficial interest in a Global Note"); *id.* § 2.07(g) (distinguishing between "Holder under the Notes" and "the registered Holders (which shall be the Depository [DTC] or its nominee in the case of the Global Note)"); *id.* § 4.07 (discussing possible adverse effects "to the Holders" based on Landry's failure to pay taxes or other assessments).

who the underlying beneficial Noteholders were and seek a waiver of the default from them. Landry's did, in fact, have discussions with Noteholders and their representatives regarding the acceleration prior to filing the underlying complaint and application for the TRO. Landry's never suggested that it was DTC that they were concerned about.

Moreover, in the Complaint, Landry's accuses defendants Post and Lord Abbett, along with the other members of the Ad Hoc Committee, of breaching the Indenture by taking unilateral action against Landry's without first satisfying the requirements of Section 6.06 of the Indenture, which requires "Holders" to meet certain conditions precedent prior to pursuing remedies. *See* Compl. ¶¶ 29-31; *see also* Schienthal Dep. at 81:3-6 (stating that, around the time of the March 30, 2007 Form 8-K, "it was the trustee that actually controlled what transpired, along with the bondholders vis-à-vis the senior notes"). Thus, Landry's own complaint and its own General Counsel's testimony are inconsistent with this position. *See also* Jacobs Dep. at 72:9-73. Finally, the Court in *BearingPoint* properly rejected the argument that only Cede & Co, and not the beneficial holders, could accelerate on nearly identical facts:

> Neither did defendant ask to confirm the status of the Holders on whose behalf notice was given as registered Holders, which it knew could have been only DTC or its nominee, Cede & Co. On the contrary, defendant sought to confirm the identity and requisite percentage ownership of the beneficial Holders. BearingPoint is, therefore, estopped from now arguing that only Cede & Co. could give notice.

*BearingPoint*, 2006 WL 2670143, at *6 (citing *Friedman v. Airlift Intl., Inc.*, 355 N.Y.S.2d 613 [1st Dept. 1974].[12] The interpretation of "Holders" proffered by Landry's is simply not a viable alternative under the Indenture.[13]

---

[12] Notably, in *BearingPoint*, the noteholders themselves sent out the notices, rather than instructing the Trustee to do it.

[13] Additionally, it is not clear what legally cognizable interest Landry's has in a provision that regulates the relationship between the Trustee and its holders—other than to attempt to

**E. Conclusion**

In sum, Landry's argument boils down to this: (1) although its 10-K was due on March 16, it unilaterally obtained for itself an extension until March 30 by filing a Late Filing Notice with the Commission and representing to the Commission that it would file its 10-K within 15 days; (2) even though it did not keep its promise to the Commission, the mere fact that Landry's made the promise gave Landry's an extension for providing its financial information to the Trustee under the Indenture, notwithstanding its agreement in the Indenture not to rely on extensions to thwart enforcement of the Indenture's terms; (3) its broken promise to the Commission authorized it to break its promise as well to the Noteholders to provide its financial information to the Trustee; and (4) the Notice of Default was ineffective because it was sent prior to the expiration of the extension unilaterally obtained by Landry's by filing the Late Filing Notice, notwithstanding the multiple public filings, communications with the Trustee, and course of conduct in which the validity of the Default was consistently affirmed by Landry's. This cannot be the law, and it finds no support in the terms of the Indenture.

Landry's is therefore not entitled to a preliminary injunction because it cannot demonstrate a likelihood of success on the merits.

---

manufacture a means of avoiding the contractual consequences of its Default. Landry's contractual interest is particularly difficult to decipher in this context, when, as Landry's does not dispute, the Trustee was fully authorized to accelerate the Notes on its own, without obtaining direction from any of the holders (whether defined as Landry's attempts to do, or consistently with the Trust Indenture Act). *See* Ex. 1 § 6.02. As Landry's General Counsel stated, "You have provisions in the document. Some benefit Landry's; some benefit the noteholders. The provisions that benefit Landry's may not necessarily benefit the noteholders. The provisions that benefit the noteholders may not necessarily benefit Landry's." Schienthal Dep. at 17:20-24.

**III. Landry's Cannot Establish a Substantial Threat of Irreparable Injury if the Injunction is not Granted**

Nor can Landry's establish the essential element of irreparable harm to show it is entitled to a preliminary injunction. Any pretext of "irreparable injury" to Landry's was stripped away on August 9, 2007, when Landry's announced that it had obtained "committed financing" and could repay the Notes if required. Ex. 14, Form 8-K (Aug. 9, 2007).

In light of this development, Landry's assertion of irreparable injury in paragraph 54 of its Complaint is invalid and insufficient. *See* Compl. ¶ 54 ("The harm is imminent because the Company may not be able to renegotiate the terms now sought by its creditors. It is irreparable because if Landry's is unable to agree on new terms for its non-indentured credit, it would suffer irreparable injury"). Whatever Landry's claimed fears were when it filed this lawsuit that it would "not be able to renegotiate the terms,"[14] those fears have vanished now, in the wake of Landry's disclosure that it has obtained alternative financing. There is no irreparable injury and no justification for an injunction under these circumstances.

Moreover, Landry's cannot credibly contend that the mere fact of refinancing or the imposition of supposedly less favorable terms pursuant to the refinancing constitutes irreparable injury. *See In re Apex Oil Co.*, 91 B.R. 865, 869 (Bankr. E.D. Mo. 1988) (court refused to impose stay upon noteholders to prevent them from accelerating pursuant to agreement allowing acceleration if debtor declared bankruptcy). "While Chicap and Southcap may be faced with refinancing of the accelerated debt, such refinancing does not, in the Court's opinion, cause extraordinary or irreparable harm . . . ." *Id.* "There is no evidence that such refinancing will substantially hinder the Debtors' reorganization effort." *Id.*; *see also In re Snowden*, 352 B.R.

[14] These fears were dubious from the outset. In Landry's public statement on July 24, 2007, a week before it filed this lawsuit, it stated that "the Company believes that it will be able to refinance this indebtedness." *See* Ex. 12, Form 8-K (July 24, 2007).

848, 857 (Bankr. N.D. Ill. 2006) (ability to refinance, even when not utilized, defeated request for preliminary injunction); *Stahl v. Comras*, 1993 WL 526302, at *1 (S.D.N.Y. 1993) (availability of refinancing and refusal to accept offer to refinance "defeat plaintiffs' claim of irreparable harm in connection with motion for preliminary injunction").

Nor does the supposed "loss of flexibility" resulting from the refinancing constitute irreparable injury. If this were sufficient, any party facing refinancing would be entitled to a preliminary injunction. The "loss of flexibility" is in fact just a euphemism for money damages. Landry's contends if it did not have to refinance, it would have more funds available for other things. The cost to it of refinancing is easily quantifiable and compensable in damages—if Landry's were somehow ever able to establish a basis for its claims.

In fact, Landry's has now made clear in unmistakable terms that the refinancing and its associated costs are not an irreparable harm to be avoided by an injunction. This is because Landry's has publicly stated that it intends to go through with the refinancing ***even if it succeeds in obtaining a preliminary injunction and wins this case on the merits.*** As Landry's CEO told lenders in a conference call last Friday, "we're going to win this case, okay. We will then still offer to take out the bondholders and move on to bank financing." *See* Ex. 29 at 13. Thus did Landry's obligation to redeem the $400 million of accelerated Notes cease to be an irreparable injury and instead become official company policy.

## IV. Landry's Cannot Establish That its Claimed Injury Outweighs the Injury to the Noteholders and the Trustee

Given that Landry's has obtained replacement financing which it intends to use no matter the result in this proceeding to redeem the bonds, it follows that no asserted harm to Landry's from acceleration can outweigh the harm to the Noteholders. This is particularly apparent when

one examines the terms of the TRO itself, which Landry's seeks to transform into a permanent injunction.

Paragraph (a) of the TRO could potentially cause significant harm to the beneficial holders of the Notes, at whose direction the Trustee acted in issuing the Acceleration Notice under the terms of the Indenture. Under Section 6.02 of the Indenture, an acceleration notice is only valid if it is issued while the Event of Default is "continuing." Ex. 1 § 6.02. Having now filed its Form 10-K, Landry's will likely argue that the Event of Default resulting from the failure to file such Form 10-K is no longer continuing, so that even if the Court ultimately finds the Acceleration Notice was proper, it no longer will provide a basis upon which a new notice of acceleration can be issued. If Landry's argument is accepted, the contractual right to acceleration based upon this Event of Default, which the Trustee was contractually obligated to assert when directed to do so by a majority of the Noteholders, may have been extinguished.

Under these circumstances, the harm to the Noteholders far outweighs any asserted harm to Landry's.

## V. Granting an Injunction will Disserve the Public Interest

Having assured the public that it can repay the Noteholders early if required to do so, and indeed having informed the public that it intends to make that payment even if not required to do so, Landry's should not be allowed to take a conflicting position in these proceedings by contending that repayment will cause irreparable harm. The public interest is not served by allowing Landry's to manipulate public sentiment with its announcements in this manner, or by allowing it to make unwarranted assertions aimed at keeping the TRO in place, obtaining a preliminary injunction, and thereby obtaining negotiating leverage.

Moreover, both the Trust Indenture Act and the Commission's commentary in adopting Rule 12b-25 emphasize the powerful public interest in vindicating the requirement of timely disclosure of financial information. The Trust Indenture Act provides:

> [T]he national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public, are adversely affected . . .
>
> (4) when the obligor is not obligated to furnish to the trustee under the indenture and to such investors adequate current information as to its financial condition. . . .

15 U.S.C. § 77bbb(b); *see also Bearing Point*, 2006 WL 2670143, at *7 (quoting this provision). As the Commission put it in adopting Rule 12b-25, in reasoning equally applicable the context of this case, "[f]ailure by public companies to observe the periodic reporting requirements presents an obstacle to the maintenance of fair and informed trading markets in the securities of publicly-held companies. The pricing mechanism of the market is dependent on timely information and, thus, late reporting may adversely affect the quality of the process." "Timely Reporting – Final Amendment of Rule or Form," 1980 SEC LEXIS 1738, at *9.

Thus, the public interest in this case favors upholding the ability of the Trustee, on behalf of the Noteholders, to rigorously enforcing the requirement that Landry's timely provide its financial information to the Trustee.

## Conclusion and Prayer for Relief

U.S. Bank National Association asks this Court to deny the requested preliminary injunction, and further requests all other relief to which it may be entitled.

Dated: August 16, 2007

FULBRIGHT & JAWORSKI L.L.P.

s/ Gerard G. Pecht

Gerard G. Pecht
State Bar No. 15701800
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

Attorney-in-Charge for Nominal Defendant
U.S. Bank National Association

OF COUNSEL:

Alton C. Todd
The Law Firm of Alton C. Todd
312 S. Friendswood Drive
Friendswood, Texas 77546
Telephone: (281) 992-8633
Facsimile: (281) 648-8633

Layne E. Kruse
State Bar No. 11742550
Reagan M. Brown
State Bar No. 03162200
Edward J. Patterson
State Bar No. 15589500
Fulbright & Jaworski L.L.P.
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

Ira H. Goldman
Julie A. Manning
Shipman & Goodwin, LLP
One Constitution Plaza
Hartford, CT 06103-1919
Telephone: (860) 251-5000
Facsimile: (860) 251-5099

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed with the Court's ECF system and was thus automatically served on all counsel of record who have appeared in this action on the 16th day of August 2007.

s/ Gerard G. Pecht
Gerard G. Pecht